# EXHIBIT 1

FILED
7/15/2021 4:41 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03460

14061454

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

EBONY JONES and MARLA
WALKER, *individually and on behalf
of all others similarly situated*,

        Plaintiffs,

    v.

LEMONADE INC.,

        Defendant.

Case No. ___2021CH03460___

## CLASS ACTION COMPLAINT

Plaintiffs Ebony Jones and Marla Walker, individually and on behalf of all other persons similarly situated (collectively, "Plaintiffs"), by and through their undersigned attorneys, as and for their Class Action Complaint asserting violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq*. ("BIPA") against Lemonade Inc. ("Lemonade" or "Defendant"), allege on personal knowledge, due investigation of their counsel and, where indicated, on information and belief as follows:

## NATURE OF THE ACTION

1.    Every individual has unique biometric identifiers by which he or she can be identified. One such biometric identifier is a person's facial geometry.

2.    The collection, storage, use and dissemination of such sensitive information is highly controversial.

3.    The State of Illinois has been at the forefront of protecting its residents from the surreptitious collection, storage, use, sale, and dissemination of their immutable biometric information.

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

4.     Passed in 2008, the BIPA confers on *all* Illinois residents, among other things, a right to know of the risks and dangers presented by the collection, storage and use of their immutable biometric identifiers[1] and biometric information[2] (referred to collectively at times as "biometrics"), as well as a right to have their biometrics stored using a reasonable standard of care and in a manner that is as protective (if not more so) than the manner in which entities store other confidential information.

5.     As the Illinois General Assembly found: "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions."

6.     Particularly pertinent in this case, businesses worldwide continue to develop ever more advanced facial recognition technology in order to, among other things, gain competitive advantages in the marketplace. This race for data imperils the privacy of individuals everywhere.

7.     Public policy in Illinois provides that, given the risks of such unwanted data collection and disclosure, citizens need the power to make decisions about the fate of their unique biometric identifiers and information. And, in order for such power not to be illusory, Illinois residents need to be informed by companies that seek to collect and use their biometric information.

---

[1] A "biometric identifier" is any personal feature that is unique to an individual, including fingerprints, iris scans, DNA and "face geometry," among others.

[2] "Biometric information" is any information captured, converted, stored or shared based on a person's biometric identifier used to identify an individual.

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

8.     Plaintiffs bring this privacy class action lawsuit against Lemonade, a digital, artificial-intelligence driven insurance company that boasts about its ability to extract thousands of bits of data from videos it requires its customers to upload in order to process their insurance claims.

9.      As set forth herein, Lemonade collected Plaintiffs' and the Class Members' biometric identifiers and biometric information, including their facial geometry via videos it required its customers to upload via its mobile application (the "App").

10.     Despite the fact that BIPA has been the law of the State of Illinois since 2008, and the fact that Lemonade professes to be extremely protective of its customers' personal information, it never adequately informed Plaintiffs or the Class of its biometrics collection practices, never obtained the requisite written consent from Plaintiffs or the Class to collect, store, use and disseminate their biometric information, including facial geometry, and never made public any data retention or destruction policies to Plaintiffs or the Class.

11.     Plaintiffs therefore bring this action for damages and other legal and equitable remedies resulting from the illegal actions of Lemonade in collecting, storing, and using their and other similarly situated individuals' biometrics without obtaining prior, informed written consent or providing the requisite data retention and destruction policies, in direct violation of BIPA.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this lawsuit as the Illinois Constitution gives trial courts subject matter jurisdiction over all justiciable matters.

13.     This Court may assert personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

because Defendant Lemonade—a publicly-traded company incorporated in Delaware with its principal place of business in New York—does business in the State of Illinois.

14.     Moreover, the exercise of personal jurisdiction over Lemonade is appropriate because it collected, stored, and used biometric information and identifiers from Illinois residents who used the Lemonade App and thereby exposed residents of Illinois to ongoing privacy risks.

15.     Furthermore, many of the images Lemonade used for its unlawful collection, storage and use of biometric identifiers and information were created in Illinois, uploaded from Illinois and/or managed via Illinois residents' user accounts, computers, and mobile devices. Because of the scope and magnitude of its conduct, Lemonade knew that its collection, storage, use, disclosure and dissemination of impacted individuals' biometric identifiers and information would injure Illinois residents and citizens.

16.     Lemonade knew or had reason to know that collecting, storing, using, disclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite written releases would deprive Illinois citizens and residents of their statutorily-protected privacy rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via the devices they managed from Illinois and expose Illinois' residents to potential surveillance and other privacy harms as they went about their lives within the State.

17.     Venue is proper in this County pursuant to 735 ILCS 5/2-102(a) because Defendant conducts usual and customary business in Cook County, and many of the acts complained about herein occurred in Cook County.

FILED DATE: 7/15/2021 4:41 PM    2021CH03460

**PARTIES**

18.     Plaintiff Ebony Jones is, and has been at all relevant times, a resident of Elgin, Illinois, and a citizen of the State of Illinois.

19.     Plaintiff Marla Walker is, and has been at all relevant times, a resident of Skokie, Illinois, and a citizen of the State of Illinois.

20.     Defendant Lemonade Inc. is a fully licensed and regulated insurance company which underwrites, prices, and sells various insurance policies. Lemonade is incorporated in the State of Delaware and has its principal place of business in New York, New York. Lemonade is a public company traded under the ticker symbol LMND.

**FACTUAL BACKGROUND**

I.      **Illinois' Biometric Information Privacy Act.**

21.     Recognizing the need to protect its citizens from the risks of unauthorized access to, collection, use and disclosure of their immutable biometric information, Illinois enacted the Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.*, in 2008, to regulate companies that collect and store biometric information, such as facial geometry. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276.

22.     In promulgating BIPA, the Illinois Legislature found that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information" because "[b]iometrics[] are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." *See* 740 ILCS 14/15(c).

23.     The BIPA attempts to address these issues by requiring that entities like Defendant may not, *inter alia*, obtain and/or possess an individual's biometrics unless it informs that person

FILED DATE: 7/15/2021 4:41 PM    2021CH03460

in writing that biometric identifiers or information will be collected or stored. *See* 740 ILCS 14/15(b).

24.    The BIPA further requires that entities collecting biometrics must inform those persons in writing of the specific purpose and length of term for which such biometric identifiers or biometric information are being collected, stored, and used. *See id.*

25.    Moreover, entities collecting biometrics must publish publicly available written retention schedules and guidelines for permanently destroying biometrics collected. *See* 740 ILCS 14/15(a).

26.    Further, the entity must store, transmit and protect an individual's biometric identifiers and biometric information using the same standard of care in the industry and in a manner at least as protective as the means used to protect other confidential and sensitive information. *See* 740 ILCS 14/15(c).

27.    Finally, such entity is expressly prohibited from selling, leasing, trading or otherwise profiting from an individual's biometrics. *See* 740 ILCS 15/15(c).

28.    In direct violation of each of the foregoing provisions of §§15(a) and 15(b) of BIPA, Lemonade collected, stored, and used—without first providing notice, obtaining informed written consent or publishing data retention policies—the biometrics and associated personally identifying information of thousands of Illinois residents who were forced to use Lemonade's App to upload videos in order to have their insurance claims processed.

## II.    Lemonade Collects, Stores and Uses Illinois' Residents' Protected Biometric Information and Identifiers.

29.    Defendant Lemonade is a fast-growing, publicly traded insurance company that prides itself on its pioneering use of artificial intelligence ("AI") and other technologies to intake

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

and to process insurance claims.[3]

30.     Based in and originally launched in New York, Lemonade uses an AI-powered app that offers homeowners, renters, pet and life insurance policies.

31.     Lemonade began writing policies in the State of Illinois in or about April of 2017.

32.      By the end of 2020, Lemonade had in excess of 1,000,000 customers in the United States, and its Chief Operating Officer boasted:

> With every new customer, our system grows smarter, our underwriting process gets better, and our prices become more accurate and fair. **At Lemonade, one million customers translates into billions of data points, which feed our AI at an ever growing speed. Quantity generates quality.**[4]

33.     One of the ways that Lemonade is able to collect so much of its customers' biometric and other information is by using its APP to collect and to maintain vast troves of customer information, including biometric information.

34.     Lemonade is unique in the insurance industry in that its customers (its policy holders) are required, in connection with their claims submission, to upload a video message describing what happened and the facts upon which their claim is based.[5]

35.     Notably, the video is <u>not</u> essential or even necessary to the claim submission, which is completed via a "chat-bot" in the App. Rather, Lemonade requires its customers to provide a video of themselves through the App in order to acquire thousands and thousands of "bits" of data so that Lemonade can then decide whether to honor a given claim and how to price its insurance

---

[3] *See* https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (last visited July 15, 2021).

[4] *See* https://finance.yahoo.com/news/lemonade-ends-2020-over-one-134600018.html (last visited July 15, 2021) (emphasis added).

[5] *See* https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/#:~:text=Lemonade%2C%20(not%20the%20drink),claims%20if%20they%20suspect%20%20fraud (last visited July 15, 2021).

products.

36.     Lest there be any doubt about its intentions, Lemonade itself made them quite clear when it issued a series of tweets containing a proud declaration that its AI analyzes videos of customers when determining if their claims are fraudulent.[6]

37.     Lemonade announced that its customer service chatbots collect as many as 1,600 data points from a single video of a customer answering questions regarding their claim:



38.     Lemonade's twitter thread "implied that [it] was able to detect whether a person was lying in their video and could thus decline insurance claims if its AI believed a person was lying."[7]

39.     Lemonade has boasted that it collects "100X more data than traditional insurance carriers."[8]

40.     Later that week, Lemonade clarified its controversial tweet, explaining that "[t]he

---

[6] https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (last visited July 15, 2021).

[7] https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/.

[8] https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

term, non-verbal cues was a bad choice of words to describe **the facial recognition technology we're using** to flag claims submitted by the same person under different identities. These flagged claims then get reviewed by our human investigators."[9]

41.     Thus, Lemonade confirmed that it uses *facial recognition technology to collect reams of data, including biometric data like face geometry, from its customers, including those in the State of Illinois.*

42.     In a post authored by its Chief Executive Officer and shared on its blog, Lemonade stated:

> It's different for companies built on a digital substrate. Lemonade's chatbots do away with forms altogether, making the process fast and fun, but the data implications are still more profound:
>
> *Lemonade collects about 100x more data-points per customer.*
>
> That's the power of an entirely digital experience.[10]

43.     Indeed, as a recent article detailing Lemonade's questionable uses of AI makes explains, "[t]he in-depth collection of video data and analyzing it against AI tools **make it clear that Lemonade must be storing at least some biometric data** in order to train models to detect patterns of fraud."[11]

44.     Or, put another way, Lemonade is an insurance company that claims it is replacing human brokers and actuaries with bots and AI in order to streamline the insurance claim process. In the process, however, Lemonade collects tremendous amounts of data, including biometric

---

[9]  https://www.lemonade.com/blog/lemonades-claim-automation/ (last visited July 15, 2021) (emphasis added).

[10]  https://www.lemonade.com/blog/precision-underwriting/ (last visited July 15, 2021) (emphasis in original).

[11]  https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/.

information, about its customers without telling them in direct violation of BIPA.[12]

45.    For instance, an article published in *Forbes* detailed a situation where Lemonade

used facial recognition technology to compare various claims submitted by customers in order to

root out fraud:

> In the summer of 2017, a Los Angeles man in his mid-20s put on a
> necklace, blond wig and makeup and made a cellphone video
> describing how his camera and other electronics had been stolen. He
> submitted the video to his renters insurance provider, Lemonade,
> which paid the $677 claim in two days. Three months later, dressed
> in jeans and a T-shirt and using a different name, email address and
> phone number, the same man submitted a video claim for a stolen
> $5,000 camera. But this time, the algorithms that are a crucial part
> of Lemonade's highly automated systems flagged the claim as
> suspicious. Last year, the persistent fraudster, this time wearing a
> pink dress, tried again, only to be foiled once more by Lemonade's
> computers.[13]

46.    Lemonade used its AI, including facial recognition technology, to determine that

the claimants in the above scenario were the same person by collecting, storing, and using the

immutable biometric information and identifiers of its customers.[14]

47.    In its S-1 form filed with the U.S. Securities and Exchange Commission prior to

the company going public—and in forms since—Lemonade states that its proprietary AI

algorithms are at the core of its business and that it could not function without them, but admits

that they could also lead to profit loss should regulators ever crack down:

> ***Our proprietary artificial intelligence algorithms may not operate
> properly or as we expect them to***, which could cause us to write
> policies we should not write, price those policies inappropriately or

---

[12] https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter

[13] https://www.forbes.com/sites/jeffkauflin/2019/05/02/lemonade-fintech-insurance-unicorn/?sh=23c5a7e
e6cde (last visited July 15, 2021).

[14]    https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/
(stating that "[t]he in-depth collection of video data and analyzing it against AI tools make it clear that
Lemonade must be storing at least some biometric data in order to train models to detect patterns of fraud").

FILED DATE: 7/15/2021 4:41 PM    2021CH03460

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

> overpay claims that are made by our customers, the company wrote in the filing. Moreover, our proprietary artificial intelligence algorithms may lead to unintentional bias and discrimination.[15]

48.    In short, Lemonade did not disclose to its customers the extent to which it was collecting and using their sensitive biometric (and other information). Indeed, the "instant, seamless, and delightful" insurance experience that Lemonade aggressively markets was built by the collection of its customers' own data, including their biometric information, which those customers never realized they were providing.

49.    As noted in a recent article entitled *A disturbing, viral Twitter thread reveals how AI-powered insurance can go wrong*, *Lemonade tweeted about what it means to be an AI-first insurance company. It left a sour taste in many customers' mouths*:

> It's rare for a company to be so blatant about how that data can be used in its own best interests and at the customer's expense. But rest assured that Lemonade is not the only company doing it.[16]

50.    According to the analytics site, Crunchbase, there were 47,345 downloads of the App in the last thirty days (as of July 13, 2021), representing a nearly 5% increase from the prior thirty-day period.[17]

**III.    Lemonade's Conduct Violates the BIPA.**

51.    As detailed above, Lemonade designed and implemented an AI tool in the App that automatically performs facial scans, collecting the facial geometry of customers who use the App.

52.    In collecting, using, storing and otherwise obtaining the biometric identifiers and information of Plaintiffs and the Class Members and, upon information and belief, subsequently

---

[15]    https://www.vice.com/en/article/z3x47y/an-insurance-startup-bragged-it-uses-ai-to-detect-fraud-it-did nt-go-well (emphasis added).

[16]    https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

[17]    https://www.crunchbase.com/organization/lemonade/technology (last visited July 13, 2021).

FILED DATE: 7/15/2021 4:41 PM    2021CH03460

disclosing, re-disclosing and otherwise disseminating those biometric identifiers and information to other related corporate entities—all without providing the requisite notice, obtaining the requisite written releases or satisfying any of the other provisions that would excuse it from BIPA's mandates—Lemonade violated BIPA.

53.    In further violation of BIPA, Lemonade failed to use a reasonable standard of care to protect Plaintiffs' and Class Members' biometric identifiers and information from disclosure.

54.    In further violation of BIPA, as a private entity in possession of Plaintiffs' and Class Members' biometric identifiers and information, Lemonade failed to adopt or make available to the public a retention schedule or guidelines for permanently destroying such biometric identifiers and information once the initial purpose for collecting them had or has been satisfied.

55.    Lemonade's violations of BIPA were intentional and reckless or, in the alternative, negligent.

## IV.    Experience of Representative Plaintiff Ebony Jones.

56.    Plaintiff Jones, an Illinois resident, has been a Lemonade customer since at least 2020.

57.    In connection with submitting an insurance claim following a weather incident which caused damage to her home, Plaintiff Jones, as required by Defendant, accessed and used Lemonade's App.

58.    Plaintiff Jones answered numerous questions posed to her by a Lemonade "chatbot." Lemonade had all the requisite information it needed to process Plaintiff Jones' claim, as well as her contact information in order to follow-up with her if it required additional information.

59.    Nonetheless, Lemonade required Plaintiff Jones to upload a "short video describing the incident."

FILED DATE: 7/15/2021 4:41 PM  2021CH03460

60.    Plaintiff Jones uploaded a video of herself describing the incident on July 10, 2020.

61.    Plaintiff Jones did not know that Lemonade would collect, obtain, store and/or use her biometric identifiers or biometric information.

62.    Plaintiff Jones did not give informed written consent to Lemonade to collect, obtain, store and/or use her biometric identifiers or biometric information, nor was Plaintiff Jones presented with or made aware of any publicly available retention schedule regarding her biometric identifiers or biometric information.

63.    Likewise, Lemonade never provided Plaintiff Jones with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage or use of her unique biometric identifiers and/or biometric information.

64.    By collecting, obtaining, storing, and using Plaintiff Jones's unique biometric identifiers and/or biometric information without her consent, written or otherwise, Lemonade invaded Plaintiff Jones's statutorily protected right to privacy in her biometrics.

65.    In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade never informed Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored, and used, nor did Defendant obtain a written release from these individuals.

66.    In direct violation of § 15(a) of BIPA, Lemonade did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

**V.    Experience of Representative Plaintiff Marla Walker.**

67.    Plaintiff Walker, an Illinois resident, has been a Lemonade customer since at least 2018.

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

68.     In connection with submitting an insurance claim in or around September 2018, Plaintiff Walker, as required, accessed, and used Lemonade's App.

69.     In so doing, Plaintiff Walker answered numerous questions posed to her by a Lemonade "chat-bot." Lemonade had all the requisite information it needed to process Plaintiff Walker's claim, as well as her contact information in order to follow up with her if it required additional information.

70.     Nonetheless, Lemonade required Plaintiff Walker to upload a "short video describing the incident."

71.     Plaintiff Walker uploaded a video of herself describing the incident on or about September 15, 2018.

72.     Plaintiff Walker did not know that Lemonade would collect, obtain, store and/or use her biometric identifiers or biometric information.

73.     Plaintiff Walker did not give informed written consent to Lemonade to collect, obtain, store and/or use her biometric identifiers or biometric information, nor was Plaintiff Walker presented with or made aware of any publicly available retention schedule regarding her biometric identifies or biometric information.

74.     Likewise, Lemonade never provided Plaintiff Walker with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage or use of her unique biometric identifiers and/or biometric information.

75.     By collecting, obtaining, storing, and using Plaintiff Walker's unique biometric identifiers and/or biometric information without her consent, written or otherwise, Lemonade invaded Plaintiff Walker's statutorily protected right to privacy in her biometrics.

76.     In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade never informed

FILED DATE: 7/15/2021 4:41 PM    2021CH03460

Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored and used, nor did it obtain a written release from these individuals.

77.     In direct violation of § 15(a) of BIPA, Lemonade did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

## CLASS ALLEGATIONS

78.     **Class Definition:** Plaintiffs bring this action pursuant to 735 ILCS 5/2-801 on behalf of a class of similarly situated individuals, defined as follows:

> All individuals whose biometric identifiers or biometric information were collected, captured, stored, used, transmitted, received or otherwise obtained and/or disseminated by Lemonade within the State of Illinois within the applicable limitations period (the "Class").

79.     Excluded from the Class are (i) any members of the judiciary assigned to preside over this Matter, as well as their immediate family members, (ii) any officer or director of Defendant and any immediate family members of such officer or director; (iii) any entity in which Defendant have a controlling interest and (iv) any employees and agents of Defendant.

80.     **Numerosity:** Pursuant to 735 ILCS 5/2-801(1), the number of persons within the Class is substantial, believed to amount to thousands of persons. It is, therefore, impractical to join each Member of the Class as a named Plaintiff. Further, the size and relatively modest value of the claims of the individual Members of the Class render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, membership in the Class is readily ascertainable and identifiable from Lemonade's records.

81.     **Commonality and Predominance:** Pursuant to 735 ILCS 5/2-801(2), there are

well-defined common questions of fact and law that exist as to all Members of the Class and that predominate over any questions affecting only individual Members of the Class. These common legal and factual questions, which do not vary from Class Member to Class Member, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a) whether Defendant collected or otherwise obtained Plaintiffs' and the Class Members' biometric identifiers and/or biometric information;

(b) whether Defendant properly informed Plaintiffs and the Class Members that they collected, used, and stored their biometric identifiers and/or biometric information;

(c) whether Defendant obtained a written release (as defined in 740 ILCS 1410) to collect, use and store Plaintiffs' and the Class Members' biometric identifiers and/or biometric information;

(d) whether Defendant developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of their last interaction, whichever occurs first;

(e) whether Defendant used Plaintiffs' and the Class Members' biometric identifiers and/or biometric information to identify them;

(f) whether Defendant destroyed Plaintiffs' and the Class Members' biometric identifiers and/or biometric information once that information was no longer needed for the purpose for which it was originally collected and

(g) whether Defendant's violations of BIPA were committed intentionally, recklessly or negligently.

82. **Adequate Representation:** Pursuant to 735 ILCS 5/2-801(3), Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

complex consumer class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent Members of the Class. Plaintiffs have raised viable statutory claims, or the type reasonably expected to be raised by Members of the Class, and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class, additional claims as may be appropriate and/or to amend the Class definition.

83.     **Superiority:** Pursuant to 735 ILCS 5/2-801(4), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class Members is impracticable. Even if every Member of the Classes could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent ,or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each Member of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action.

84.     In short, maintenance of this case as a class action is essential to compliance with BIPA.

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

**COUNT I – FOR DAMAGES AGAINST DEFENDANT**
**VIOLATION OF 740 ILCS 14/15(a) – FAILURE TO INSTITUTE, MAINTAIN AND ADHERE TO**
**PUBLICLY AVAILABLE RETENTION SCHEDULE**

85.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

86.     BIPA mandates that entities in possession of biometric data establish and maintain a satisfactory biometric data retention—and, importantly, deletion—policy.

87.     Specifically, those entities must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (at most three years after the entity's last interaction with the individual); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS 14/15(a).

88.     Defendant did not comply with these BIPA mandates.

89.     Defendant Lemonade is a company registered to do business in Illinois and thus qualifies as a "private entity" under BIPA. *See id*.

90.     Plaintiffs are individuals who had their "biometric identifiers" captured and/or collected by Defendant, as explained in detail herein. *See id*.

91.     Plaintiffs' and the Class Members' biometric identifiers were used to identify them and therefore constitute "biometric information" as defined by BIPA. *See id.*

92.     Defendant failed to provide a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information as specified by BIPA. *See* 740 ILCS 14/15(a).

93.     Defendant lacked retention schedules and guidelines for permanently destroying Plaintiffs' and the Class Members' biometric data. As such, the only reasonable conclusion is that Defendant has not, and will not, destroy Plaintiffs' and the Class Members' biometric data when the initial purpose for collecting or obtaining such data has been satisfied.

94.    On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, capture, storage and use of biometric identifiers and biometric information as described herein; (iii) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1) and (iv) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

**COUNT II – FOR DAMAGES AGAINST DEFENDANT**
**VIOLATION OF 740 ILCS 14/15(b) – FAILURE TO OBTAIN INFORMED WRITTEN CONSENT AND RELEASE BEFORE OBTAINING BIOMETRIC IDENTIFIERS OR INFORMATION**

95.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

96.    BIPA requires entities to obtain informed written consent from Illinois residents before acquiring their biometric data.

97.    Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] first: (i) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (ii) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; **and** (iii) receives a written release executed by the subject of the biometric identifier or biometric information . . . " 740 ILCS 14/15(b) (emphasis added).

98.    Defendant did not comply with these BIPA mandates.

99.    Defendant Lemonade, Inc. is a company registered to do business in Illinois and

*FILED DATE: 7/15/2021 4:41 PM   2021CH03460*

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

thus qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

100.    Plaintiffs and the Class Members are individuals who have had their "biometric identifiers" collected and/or captured by Defendant, as explained herein. *See id.*

101.    Plaintiffs' and the Class Members' biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See id.*

102.    Defendant systematically and automatically collected, captured, used, and stored Plaintiffs' and the Class Members' biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3).

103.    Defendant never informed Plaintiffs, and never informed any Member of the Class in writing that their biometric identifiers and/or biometric information were being collected, captured, stored, and/or used, nor did Defendant inform Plaintiffs and the Class in writing of the specific purpose(s) and length of term for which their biometric identifiers and/or biometric information were being collected, stored, used and disseminated as required by 740 ILCS 14/15(b)(1)-(2).

104.    By collecting, capturing, storing, and/or using Plaintiffs' and the Class Members' biometric identifiers and biometric information as described herein, Defendant violated Plaintiffs' and the Class Members' rights to privacy in their biometric identifiers and/or biometric information as set forth in BIPA. *See* 740 ILCS 14/1, *et seq.*

105.    On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, capture, storage, use and dissemination of biometric identifiers and biometric information as described herein; (iii) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1) and (iv) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Ebony Jones and Marla Walker, on behalf of themselves and the proposed Class, respectfully request that this Court enter an Order:

A.   Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class and appointing their counsel as Class Counsel;

B.   Declaring that Defendant's actions, as set out above, violate BIPA, 740 ILCS 14/1, *et seq*.;

C.   Awarding statutory damages of $5,000.00 for each and every intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, alternatively, statutory damages of $1,000.00 for each and every violation pursuant to 740 ILCS 14/20(1) if the Court finds that Defendant's violations were negligent;

D.   Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an Order requiring Defendant to collect, store and use biometric identifiers and/or biometric information in compliance with BIPA;

E.   Awarding Plaintiffs and the Class their reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3);

F.   Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

G.   Awarding all such other and further relief as equity and justice may require.

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

Dated: July 15, 2021

Respectfully submitted,

*/s/ Gary M. Klinger*

Gary M. Klinger
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Phone: (202) 429-2290
Fax: (202) 429-2294
gklinger@masonllp.com

Gary E. Mason*
David K. Lietz*
**MASON LIETZ & KLINGER LLP**
5101 Wisconsin Avenue NW, Suite 305
Washington, DC 20016
Phone: (202) 429-2290
Fax: (202) 429-2294
gmason@masonllp.com
dlietz@masonllp.com

*Attorneys for Plaintiffs & the Proposed Class*

**Pro Hac Vice* forthcoming

Civil Action Cover Sheet - Case Initiation      **(12/01/20) CCL 0520**

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

EBONY JONES and MARLA WALKER, *individually and on behalf of all others similarly situated,*

v.

LEMONADE INC.,

No. _____

**CIVIL ACTION COVER SHEET - CASE INITIATION**

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ☐ Yes ☒ No

**(FILE STAMP)**

**PERSONAL INJURY/WRONGFUL DEATH**

CASE TYPES:

- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries
  (including Structural Work Act, Road
  Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
  (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

**TAX & MISCELLANEOUS REMEDIES**

CASE TYPES:

- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

**COMMERCIAL LITIGATION**

CASE TYPES:

- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice
  (other than legal or medical)
- ☐ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☒ 074 Statutory Action
  (Please specify below.**)
- ☐ 075 Other Commercial Litigation
  (Please specify below.**)
- ☐ 076 Retaliatory Discharge

**OTHER ACTIONS**

CASE TYPES:

- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

**   Class Action for violations of the Illinois Biometric
    Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.*

Primary Email:   gklinger@masonllp.com

Secondary Email: _____

Tertiary Email: _____

By: _/s/ Gary M. Klinger_ (Atty. No. 6303726)
     (Attorney)            (Pro Se)
     Cook County Code: 64550

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____

## IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILED DATE: 7/15/2021 4:41 PM 2021CH03460

Hearing Date: 11/15/2021 10:00 AM - 10:00 AM
Courtroom Number: 2410
Location: District 1 Court
    Cook County, IL

FILED DATE: 7/15/2021 4:41 PM  2021CH03460

FILED
7/15/2021 4:41 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03460

14061454

| | | |
|---|---|---|
| **2120 - Served** | **2121 - Served** | **2620 - Sec. of State** |
| **2220 - Not Served** | **2221 - Not Served** | **2621 - Alias Sec of State** |
| **2320 - Served By Mail** | **2321 - Served By Mail** | |
| **2420 - Served By Publication** | **2421 - Served By Publication** | |
| **Summons - Alias Summons** | | **(03/15/21) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

EBONY JONES and MARLA WALKER,
individually and on behalf of all others similarly
situated,

                                  Plaintiff(s)

              v.

LEMONADE INC.,

                               Defendant(s)

c/o United Corporate Services, Inc.
901 S. 2nd Street, Suite 201
Springfield, IL 62704

             Address of Defendant(s)

Case No.    **2021CH03460**

Please serve as follows (check one): ○ Certified Mail   ○ Sheriff Service   ● Alias

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court,
within 30 days after service of this summons, not counting the day of service. If you fail to do so, a
judgment by default may be entered against you for the relief asked in the complaint.

### THERE IS A FEE TO FILE YOUR APPEARANCE.

**FILING AN APPEARANCE:** **Your appearance date is NOT a court date.** It is the deadline
for filing your appearance/answer. To file your appearance/answer **YOU DO NOT NEED
TO COME TO THE COURTHOUSE, unless you are unable to eFile your appearance/
answer.** You can download an Appearance form at http://www.illinoiscourts.gov/Forms/
approved/procedures/appearance.asp. After completing and saving your Appearance form, you can
electronically file (e-File) it with the circuit clerk's office.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons**                                                         **(03/15/21) CCG 0001 B**

*(left margin)* FILED DATE: 7/15/2021 4:41 PM 2021CH03460

**E-FILING:** E-filing is now mandatory with limited exemptions. To e-File, you must first create an account with an e-Filing service provider. Visit http://efile.illinoiscourts.gov/ service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-Filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office.  If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

**FEE WAIVER:** If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www.illinoislegalaid.org.  You can also ask your local circuit clerk's office for a fee waiver application.

**COURT DATE:** Your court date will be sent to your e-File email account or the email address you provided to the clerk's office.  You can also call or email the clerk's office to request your next court date.  You will need to provide your case number OR, if unknown, the name of the Plaintiff or Defendant.  For criminal case types, you will also need to provide the Defendant's birthdate.

**REMOTE APPEARANCE:** You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance". Call the Circuit Clerk at (312) 603-5030 or visit their website at www. cookcountyclerkofcourt.org to find out how to do this.

Contact information for each of the Clerk's Office locations is included with this summons.  The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

To the officer:  (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service.  If service cannot be made, this summons shall be returned so endorsed.  This summons may not be served later than thirty (30) days after its date.

Cook County Code: 64550

◉ Atty. No.: 6303726

○ Pro Se 99500

Name: Gary M. Klinger

Atty. for (if applicable):

Plaintiffs Ebony Jones and Marla Walker, *et al.*

Address: 227 W. Monroe Street, Suite 2100

City: Chicago

State: IL    Zip: 60606

Telephone: (202) 429-2290

Primary Email: gklinger@masonllp.com

Witness date     7/15/2021 4:41 PM IRIS Y. MARTINEZ

Iris Y. Martinez, Clerk of the Court

☐ Service by Certified Mail:

☐ Date of Service: _____
(To be inserted by officer on copy left with employer or other person)

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 7/15/2021 4:41 PM   2021CH03460

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date.  Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:**  CivCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:**  CntyCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:**  DRCourtDate@cookcountycourt.com
                OR
            ChildSupCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:**  DVCourtDate@cookcountycourt.com
Gen. Info:    (312) 325-9500

### LAW DIVISION
**Court date EMAIL:**  LawCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:**  ProbCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:**  D2CourtDate@cookcountycourt.com
Gen. Info:    (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:**  D3CourtDate@cookcountycourt.com
Gen. Info:    (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:**  D4CourtDate@cookcountycourt.com
Gen. Info:    (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:**  D5CourtDate@cookcountycourt.com
Gen. Info:    (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:**  D6CourtDate@cookcountycourt.com
Gen. Info:    (708) 232-4551

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
7/22/2021 12:28 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03460

14148053

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

EBONY JONES and MARLA
WALKER, *individually and on behalf
of all others similarly situated*,

                Plaintiffs,

    v.

LEMONADE INC.,

                Defendant.

Case No.: 2021CH03460

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION[1]**

Plaintiffs Ebony Jones and Marla Walker, individually and on behalf of all other persons similarly situated (collectively, "Plaintiffs"), by and through their undersigned attorneys, respectfully move this Court, pursuant to 735 ILCS 5/2-801, *et seq.*, for an Order certifying this litigation as a class action on behalf of the following Class:

> All individuals whose biometric identifiers or biometric information were collected, captured, stored, used, transmitted, received or otherwise obtained and/or disseminated by Lemonade within the State of Illinois within the applicable limitations period (the "Class").

Plaintiffs hereby reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

---

[1] Plaintiffs request that the Court delay its ruling on this Motion until the parties have had an opportunity to complete the discovery process and fully brief this issue. Plaintiffs are filing this Motion in light of the Illinois Supreme Court's opinion in *Ballard RN Ctr., Inc. v. Kohll's Pharm. & Homecare, Inc.*, 2015 IL 118644. In *Ballard RN Ctr.*, the Illinois Supreme Court found that a motion for class certification which "identified [the] defendant, the applicable date or dates, and the general outline of plaintiff's class action allegations" was sufficient to overcome mootness efforts by Defendant to defeat the case in question. *Id.* at *19.

In support of their Motion,[2] Plaintiffs state as follows:

**1.** **Introduction.** This is a class action lawsuit through which Plaintiffs, individually and on behalf of the Class described herein, seek damages from Defendant Lemonade, Inc. ("Defendant") for Defendant's alleged violations of the Illinois Biometric Privacy Act, 740 ILCS 14/1, *et seq.*, in connection with its collection, storage, and usage of its customers' facial geometry.

This case satisfies all of the elements of 735 ILCS 5/2-801, *et seq.* Illinois state law requires numerosity, commonality, adequacy, and appropriateness of representation. As discussed below, each of these requirements is satisfied:

**2.** **Numerosity** – 735 ILCS 5/2-801(1). The numerosity requirement is satisfied where "joinder of all members is impracticable." "Although there is no magic number of class members for numerosity purposes, case law indicates that when a class numbers at least 40, joinder will be considered impracticable." *Hernandez v. Gatto Indus. Platers*, 2009 U.S. Dist. LEXIS 36023, at *6 (N.D. Ill. Apr. 28, 2009).[3] Here, as alleged in the Complaint, the exact number of Class members is known only to Defendant, but in the absence of any discovery to date, that the number is believed to be at least in the thousands. Compl. ¶ 80.

**3**. **Commonality** – 735 ILCS 5/2-801(2). The commonality requirement is satisfied where "common questions [of law or fact] predominate over any questions affecting only individual members." "To satisfy this predominance requirement, a plaintiff must necessarily show

---

[2] Upon presentation of this Motion for Class Certification to the Court, Plaintiffs will request a briefing schedule that will include, among other things, a deadline by which to file their opening memorandum of law in support thereof after sufficient discovery has been allowed. In *Ballard RN Ctr.*, the Illinois Supreme Court stated that "when additional discovery or further development of the factual basis is necessary . . . those matters will be left to the discretion of the trial court." *Id.* at *24.

[3] "Section 2-801 of the Code, which is patterned after Rule 23 of the Federal Rules of Civil Procedure, sets forth the prerequisites needed to maintain a class action. Given the relationship between these two provisions, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois." *Uesco Indus. v. Poolman of Wis., Inc.*, 2013 IL App (1st) 112566, ¶ 45 (internal quotation marks and citations omitted).

FILED DATE: 7/22/2021 12:28 PM    2021CH03460

FILED DATE: 7/22/2021 12:28 PM   2021CH03460

that successful adjudication of the class representative's individual claim will establish a right of recovery in other class members. A favorable judgment for the class should decisively resolve the whole controversy, and all that should remain is for other class members to file proof of their claim. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 33 (internal quotation marks and citations omitted).

As alleged in the Complaint, Defendant engaged in a common course of conduct that was nearly identical for every putative member of the Class. Similar injury is involved for every potential Class member in the form of unlawfully collecting, using, and storing their biometric information.

In this case, the common questions of law or fact include, among others:

(a)  whether Defendant collected or otherwise obtained Plaintiffs' and the Class's biometric identifiers or biometric information;

(b)  whether Defendant properly informed Plaintiffs and the Class that they collected, used, and stored their biometric identifiers or biometric information;

(c)  whether Defendant obtained a written release (as defined in 740 ILCS 1410) to collect, use, and store Plaintiffs' and the Class's biometric identifiers or biometric information;

(d)  whether Defendant developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of their last interaction, whichever occurs first;

(e)  whether Defendant used Plaintiffs' and the Class's biometric identifiers or biometric information to identify them; and

(f)   whether Defendant's violations of BIPA were committed intentionally, recklessly, or negligently.

Compl. ¶ 81.

Based on the nature of Defendant's conduct which Defendant uniformly applied to the Plaintiffs and all members of the alleged Class, commonality is easily established here. "It is proper

FILED DATE: 7/22/2021 12:28 PM   2021CH03460

to allow a class action where a defendant is alleged to have acted wrongfully in the same basic manner towards an entire class." *P.J.'s Concrete Pumping Serv. v. Nextel W. Corp.*, 345 Ill. App. 3d 992, 1003 (2004) (citation omitted).

4.      **Adequacy** – 735 ILCS 5/2-801(3). The adequacy requirement is satisfied where the "representative parties will fairly and adequately protect the interest of the class."

> The purpose of the adequate representation requirement is to ensure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim. The test to determine the adequacy of representation is whether the interests of those who are parties are the same as those who are not joined.

*P.J.'s Concrete Pumping Serv.*, 345 Ill. App. 3d at 1004 (citations omitted).

Here, Plaintiffs have no interests antagonistic to the interests of absent Class members, and Plaintiffs have retained counsel that is qualified, experienced, and generally able to conduct the proposed litigation. Compl. ¶ 82.

5.      **Appropriateness** – 735 ILCS 5/2-801(4). The appropriateness requirement is satisfied where the "class action is an appropriate method for the fair and efficient adjudication of the controversy." Further,

> In deciding whether the fourth requirement for class certification is met, a court considers whether a class action can best secure economies of time, effort, and expense or accomplish the other ends of equity and justice that class actions seek to obtain. Where the first three requirements for class certification have been satisfied, the fourth requirement may be considered fulfilled. Also, class actions are often the last barricade of consumer protection. Consumer class actions provide restitution to the injured and deterrence to the wrongdoer, thus attaining the ends of equity and justice.

*Walczak v. Onyx Acceptance Corp.*, 365 Ill. App. 3d 664, 679 (2006) (citations omitted).

Here, where there are at least thousands of potential consumer Class members, each seeking small recoveries pursuant to claims that cannot be efficiently litigated separately, a class action is clearly the appropriate vehicle to litigate this action in order to secure economies of time, effort and expense for both the Court and the parties. Compl. ¶ 83.

**WHEREFORE**, Plaintiffs respectfully request that this Court, after allowing the parties an opportunity to complete the discovery process and fully brief the issues raised by this Motion, enter an Order: (1) certifying this case as a class action pursuant to 735 ILCS 5/2-801, *et seq.*, (2) appointing Plaintiffs as representatives of the Class; and (3) appointing Plaintiffs' attorneys as Class Counsel.

Dated: July 22, 2021                    Respectfully submitted,

                                        **MASON LIETZ & KLINGER LLP**

                                        By: *Gary M. Klinger*
                                        Gary M. Klinger (IL Bar No. 6303726)
                                        227 W. Monroe Street, Suite 2100
                                        Chicago, IL 60606
                                        Tel: (202) 429-2290
                                        Fax: (202) 429-2294
                                        gklinger@masonllp.com

                                        **MASON LIETZ & KLINGER LLP**
                                        Gary E. Mason*
                                        David K. Lietz*
                                        5101 Wisconsin Avenue NW, Suite 305
                                        Washington, D.C. 20016
                                        Phone: (202) 429-2290
                                        Fax: (202) 429-2294
                                        gmason@masonllp.com
                                        dlietz@masonllp.com

*Pro Hac Vice Forthcoming*              *Attorneys for Plaintiffs and the Proposed Class*

FILED DATE: 7/22/2021 12:28 PM   2021CH03460

FILED DATE: 7/22/2021 12:28 PM   2021CH03460

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 22, 2021, I electronically filed the foregoing document

with the Clerk of this Court using Illinois' online e-filing portal.


By: *Gary M. Klinger*
Gary M. Klinger (IL Bar No. 6303726)
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (202) 429-2290
Fax: (202) 429-2294
gklinger@masonllp.com

FILED
7/27/2021 12:15 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03460

14197322

FILED DATE: 7/27/2021 12:15 PM   2021CH03460

| 2120 - Served | 2121 - Served | 2620 - Sec. of State |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| Summons - Alias Summons | | (03/15/21) CCG 0001 A |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

EBONY JONES and MARLA WALKER,
individually and on behalf of all others similarly
situated,

Plaintiff(s)

v.

Case No. _2021CH03460_

LEMONADE INC.,

Defendant(s)

5 Crosby Street, 3rd Floor
New York, NY 10013

Address of Defendant(s)

Please serve as follows (check one):   ○ Certified Mail   ○ Sheriff Service   ● Alias

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE IS A FEE TO FILE YOUR APPEARANCE.

**FILING AN APPEARANCE:** **Your appearance date is NOT a court date.**  It is the deadline for filing your appearance/answer.  To file your appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE, unless you are unable to eFile your appearance/ answer.** You can download an Appearance form at http://www.illinoiscourts.gov/Forms/ approved/procedures/appearance.asp.  After completing and saving your Appearance form, you can electronically file (e-File) it with the circuit clerk's office.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons**          **(03/15/21) CCG 0001 B**

**E-FILING:** E-filing is now mandatory with limited exemptions. To e-File, you must first create an account with an e-Filing service provider. Visit http://efile.illinoiscourts.gov/ service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-Filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

**FEE WAIVER:** If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www.illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

**COURT DATE:** Your court date will be sent to your e-File email account or the email address you provided to the clerk's office. You can also call or email the clerk's office to request your next court date. You will need to provide your case number OR, if unknown, the name of the Plaintiff or Defendant. For criminal case types, you will also need to provide the Defendant's birthdate.

**REMOTE APPEARANCE:** You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance". Call the Circuit Clerk at (312) 603-5030 or visit their website at www. cookcountyclerkofcourt.org to find out how to do this.

Contact information for each of the Clerk's Office locations is included with this summons. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

Cook County Code: 64550

◉ Atty. No.: _6303726_

○ Pro Se 99500

Name: _Gary M. Klinger_

Atty. for (if applicable):

_Plaintiffs Ebony Jones and Marla Walker, et al._

Address: _227 W. Monroe Street, Suite 2100_

City: _Chicago_

State: _IL_   Zip: _60606_

Telephone: _(202) 429-2290_

Primary Email: _gklinger@masonllp.com_

7/27/2021 12:15 PM IRIS Y. MARTINEZ

Witness date _____

_____
Iris Y. Martinez, Clerk of Court

☐ Service by Certified Mail _____

☐ Date of Service: _____
(To be inserted by officer on copy left with employer or other person)

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 7/27/2021 12:15 PM 2021CH03460

**GET YOUR COURT DATE BY CALLING IN OR BY EMAIL**

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date.  Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:**  CivCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:**  CntyCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:**  DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:**  DVCourtDate@cookcountycourt.com
Gen. Info:   (312) 325-9500

### LAW DIVISION
**Court date EMAIL:**  LawCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:**  ProbCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:**  D2CourtDate@cookcountycourt.com
Gen. Info:   (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:**  D3CourtDate@cookcountycourt.com
Gen. Info:   (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:**  D4CourtDate@cookcountycourt.com
Gen. Info:   (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:**  D5CourtDate@cookcountycourt.com
Gen. Info:   (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:**  D6CourtDate@cookcountycourt.com
Gen. Info:   (708) 232-4551

FILED DATE: 7/27/2021 12:15 PM   2021CH03460

Hearing Date: 8/16/2021 9:30 AM - 9:30 AM
Courtroom Number:
Location:

FILED
8/9/2021 12:00 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03460

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

14350785

EBONY JONES and MARLA WALKER,
individually and on behalf of all others
similarly situated,

     Plaintiffs,

  v.

LEMONADE INC.,

     Defendant.

Case No.: 2021CH03460

**NOTICE OF PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED**
**COMPLAINT AND FOR THE APPOINTMENT OF INTERIM CLASS COUNSEL**

   **PLEASE TAKE NOTICE** that on **Monday**, **August 16, 2021** at **9:30 a.m. CST,** or as

soon thereafter as counsel may be heard, the undersigned shall appear before the Honorable Anna

M. Loftus , or any Judge sitting in her stead in Room 2410 of the Circuit Court of Cook County,

Richard J. Daley Center, 50 W. Washington Street, Chicago, Illinois 60602 **via Zoom (Meeting**

**ID**: 955 3557 3920; **Password:** None required; **Link:** https://circuitcourtofcookcounty.zoom.us/j/

95535573920), and shall then and there present Plaintiffs' Motion for Leave to File First Amended

Complaint and for the Appointment of Interim Class Counsel, a copy of which is attached hereto.

Dated: August 8, 2021      Respectfully submitted,

          */s/ Gary M. Klinger*
          Gary M. Klinger (ARDC # 6303726)
          **MASON LIETZ & KLINGER LLP**
          227 W. Monroe Street, Suite 2100
          Chicago, IL 60606
          Telephone: (202) 429-2290
          Facsimile: (202) 429-2294
          gklinger@masonllp.com

          *Attorney for Plaintiffs Jones and Walker*

Katrina Carroll
**CARLSON LYNCH, LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (312) 750-1591
kcarroll@carlsonlynch.com

Joseph P. Guglielmo*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com

Jonathan M. Jagher*
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6487
Facsimile: (224) 632-4521
jjagher@fklmlaw.com

Frederick J. Klorczyk III*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
fklorczyk@bursor.com

*Pro Hac Vice Forthcoming*                    *Attorneys for Plaintiffs in the Related Actions*

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 8, 2021, I electronically filed the foregoing document with the Clerk of this Court using the Illinois E-Filing System, which should further distribute a true and accurate copy of the foregoing to all counsel of record.

*/s/ Gary M. Klinger*

Gary M. Klinger (ARDC # 6303726)
Cook County Code: 64550

Hearing Date: 8/16/2021 9:30 AM - 9:30 AM
Courtroom Number:
Location:

FILED
8/9/2021 12:00 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03460

14350776

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

EBONY JONES and MARLA WALKER,
individually and on behalf of all others
similarly situated,

                    Plaintiffs,

        v.

LEMONADE INC.,

                    Defendant.

Case No.: 2021CH03460

## MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AND FOR THE APPOINTMENT OF INTERIM CLASS COUNSEL

In this putative class action, Plaintiffs Ebony Jones and Marla Walker allege that Lemonade Inc. violated the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"). There are three additional related putative class actions also pending in the Circuit Court of Cook County, Chancery Division that involve the same claims, issues, and putative classes (the "Related Actions"). Counsel for Plaintiffs Jones and Walker have conferred with counsel for the plaintiffs in the Related Actions, and all counsel have self-organized and agreed to work together to efficiently litigate these actions. To that end, Plaintiffs Jones and Walker move this Court for an order granting them leave to file a First Amended Complaint that will, among other things, add all parties and claims from the Related Actions and include them in a single pleading. In addition, to streamline this litigation for the benefit of all parties and this Court, Plaintiffs Jones and Walker and the plaintiffs in the Related Actions move this Court for the appointment of Interim Class Counsel.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

## BACKGROUND

1.      On July 15, 2021, Plaintiffs Jones and Walker filed this putative class action against Lemonade Inc. For the Court's convenience, a copy of the Complaint is attached hereto as **Exhibit A**. In their Complaint, Plaintiffs Jones and Walker allege that Lemonade violated BIPA by collecting, storing, and using their biometrics, including their facial geometry, without complying with BIPA's requirements governing the collection and use of this highly sensitive personal information. Plaintiffs Jones and Walker allege that Lemonade obtained their biometrics from videos they were required to submit when making insurance claims.

2.      Soon thereafter, the Related Actions were filed here in the Circuit Court of Cook County, Chancery Division—specifically, *Citchens v. Lemonade Inc.*, No. 2021CH03578 (**Exhibit B** attached hereto); *Swerdlow v. Lemonade Ins. Agency, LLC*, No. 2021CH03583 (**Exhibit C** attached hereto); and *Clarke v. Lemonade Inc.*, No. 2021CH03593 (**Exhibit D** attached hereto). Like Plaintiffs Jones and Walker, the Plaintiffs in the Related Actions claim that Lemonade violated BIPA through its unauthorized collection and use of their biometrics as part of their insurance claims. And they seek to represent essentially the same Class of individuals that Plaintiffs Jones and Walker seek to represent in this case.

3.      To streamline the prosecution of these cases, Plaintiffs Jones and Walker seek leave to file a First Amended Complaint to include the Plaintiffs and claims from the Related Actions. Plaintiffs Jones and Walker seek leave to file this First Amended Complaint within 14 days, *i.e.*, by August 23, 2021. At the time that Plaintiffs Jones and Walker file the First Amended Complaint in this action, the Plaintiffs in the Related Actions will file Notices of Voluntary Dismissal in those matters.

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

4.      In addition, to ensure the effective case management of this matter following the filing of the First Amended Complaint, Plaintiffs Jones and Walker and the Plaintiffs in the Related Actions request that the Court appoint Interim Class Counsel.

## ARGUMENT

**A.**    **Amendment Is Proper.**

1.      Under 735 ILCS 5/2-616(a), amendments to pleadings are allowed at any time before final judgment on just and reasonable terms. "Illinois has a liberal policy towards granting a motion to amend a pleading." *Arie Zweig Self Decl. of Tr. v. Bozorgi Ltd. P'ship*, 2016 IL App (1st) 152628-U, ¶ 12.

2.      When deciding a motion for leave to file an amended complaint, courts consider: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Acad. v. S & S Roof Maint., Inc.*, 146 Ill. 2d 263, 273 (1992).

3.      Plaintiffs Jones and Walker timely seek amendment to streamline this action and the Related Actions rather than to cure a defect. Moreover, amendment will not result in delay or otherwise cause prejudice, as Lemonade has yet to appear or file responsive pleadings in this action or the Related Actions. Amendment, in fact, will benefit all Parties and the Court by combining the Parties and claims in these actions into one cohesive, operative complaint.

**B.**    **The Appointment Of Interim Class Counsel Is Appropriate.**

4.      Along with the Motion for Leave to Amend the Complaint, Plaintiffs Jones and Walker, as well as the Plaintiffs in the Related Actions, request that the Court appoint Interim Class Counsel so that this matter can be managed efficiently and effectively.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

5.     Class actions present unique and complex challenges that require a greater level of case management to simultaneously protect the interests of litigants and absent Class Members while also creating efficiencies and avoiding confusion and disorganization. Given the substantial size of the putative Class here, Plaintiffs anticipate that additional individual or class action lawsuits may be filed in this Court in the future. Multiple cases create a risk of inefficiency, disorganization, and confusion among the litigants, their counsel, and the Court. One mechanism the Court has to prevent such an outcome is to appoint competent and credentialed attorneys as leaders in the litigation who are familiar with the law and the facts, who will provide vigorous representation, and who will advocate on behalf of the putative Class.

6.     To promote the just, efficient, and orderly prosecution of this case, Plaintiffs respectfully seek the entry of an Order appointing Gary M. Klinger of Mason Lietz & Klinger LLP, Katrina Carroll of Carlson Lynch, LLP, and Joseph Guglielmo of Scott+Scott Attorneys at Law LLP as Interim Co-Lead Counsel, along with a Plaintiffs' Executive Committee ("EC") consisting of Frederick J. Klorczyk III of Bursor & Fisher, PA and Jonathan Jagher of Freed Kanner London & Millen LLC. The group includes the attorneys who investigated the facts of this case and were the first to file. They also have decades of experience in class action litigation, previously worked as co-counsel in other matters, and have reached an agreement to work collaboratively for the benefit of the Class and this Court.

7.     The Illinois class action statute (735 ILCS 5/2-801, *et seq.*) is patterned after an earlier version of Rule 23 of the Federal Rules of Civil Procedure and courts in Illinois have recognized Rule 23 as persuasive authority on class certification issues. *See Smith v. Ill. Cent. R.R. Co.*, 223 Ill. 2d 441, 447–48 (2006); *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 125 (2005).

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

8.      Leadership is routinely appointed in federal class action cases, since Fed. R. Civ. P. 23(g)(3) provides that "[t]he court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." In order for an applicant to be found adequate to serve, federal courts consider: (i) the work counsel did in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv).

9.      Illinois courts have also found that lawyers representing class members must protect their due process rights and be "qualified, experienced, and generally able to conduct the proposed litigation." *Lee v. Buth-Na-Bodhaige, Inc.*, 2019 IL App (5th) 180033, ¶ 63 (citing *Miner v. Gillette Co.*, 87 Ill. 2d 7, 14 (1981); *Steinberg v. Chicago Med. Sch.*, 69 Ill.2d 320, 339 (1977)).

10.      In determining which counsel is best suited to act as interim class counsel, courts "have frequently appointed more than one firm" when it is in the best interests of the proposed class. *See Walker v. Discover Fin. Servs.*, No. 10-CV-6994, 2011 WL 2160889, at *3 (N.D. Ill. May 26, 2011) (collecting cases). Diversity is also a factor, as courts should appoint an experienced slate of attorneys who will "fairly represent all plaintiffs, keeping in mind the benefits of diversity of experience, skills, and backgrounds." Duke Law School Center for Judicial Studies, Standards and Best Practices for Large and Mass-Tort MDLs at 46 (1st ed. Dec. 19, 2014).[1]

11.      Apart from investigating the facts underlying this case and being the first to file, the firms comprising the proposed slate have a proven history of achieving outstanding results for

---

[1] Available at https://judicialstudies.duke.edu/wp-content/uploads/2018/10/standards_and_best_practices_for_large_and_mass-tort_mdls-Bolch-Judicial.pdf.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

plaintiffs in complex class litigation and, particularly, data privacy litigation. In recent years alone, as demonstrated on the firm resumes attached hereto as **Exhibits E through I**, these successes include groundbreaking trial-level and appellate victories; creating new, plaintiff-friendly precedents; winning contested certifications of large, nationwide classes; and obtaining landmark settlements providing (cumulatively) billions of dollars to their clients.

12.     Proposed Interim Co-Lead Counsel Gary M. Klinger, a partner of Mason Lietz & Klinger LLP (firm resume attached hereto as **Exhibit E**), investigated the claims underlying this litigation and was the first to file. Mr. Klinger has extensive experience serving as leadership in numerous class action cases involving privacy violations like this one. He is presently litigating more than fifty class action cases across the country involving privacy, data breaches, and ransomware. In 2020 alone, Mr. Klinger settled, preliminarily or finally, more than fifteen privacy class actions. Mr. Klinger presently serves as one of two Court-appointed Lead Counsel in the data breach case *In re Canon U.S.A. Data Breach Litig.*, No. 1:20-cv-06239-AMD-SJB (S.D.N.Y. filed Dec. 23, 2020). Mr. Klinger was also recently appointed Co-Lead Counsel in the data breach case of *Quintana v. Herff Jones, LLC*, No. 1:21-cv-01350-TWP (S.D. Ind. filed May 26, 2021), which involves more than one million class members. Mr. Klinger has an exceptional history of positive resolutions for privacy class actions like this one. *See, e.g.*, *Struck v. Woodman's Food Mkt.*, No. 2021-CH-00000053 (Ill. Cir. Ct. Lake Cnty. July 9, 2021) (appointed sole class counsel in $3 million BIPA settlement); *Baksh v. Ivy Rehab Network, Inc.*, No. 7:20-cv-01845-CS (S.D.N.Y. Jan. 27, 2021) (Class Counsel in a privacy class action settlement involving 125,000 individuals with a settlement value of $12.8 million; Final Approval granted); *Mowery v. Saint Francis Healthcare Sys.*, No. 1:20-cv-00013-SRC (E.D. Mo. Dec. 22, 2020) (appointed Class Counsel; settlement value of over $13 million); *Jackson-Battle v. Navicent Health, Inc.*, No. 2020-CV-

FILED DATE: 8/9/2021 12:00 AM  2021CH03460

072287 (Ga. Super. Ct. Bibb Cnty. filed Apr. 29, 2020) (appointed Class Counsel in data breach case involving 360,000 patients; settlement valued at over $72 million); *Chatelain v. C, L & W PLLC*, No. 50742-A (Tex. 42d Dist. Ct. Taylor Cnty. filed Apr. 28, 2020) (appointed Class Counsel; settlement valued at over $7 million).

13.     Mr. Klinger has also successfully litigated privacy class actions through class certification. In *Karpilovsky v. All Web Leads, Inc*., No. 17 C 1307, 2018 WL 3108884, at *1 (N.D. Ill. June 25, 2018), Mr. Klinger certified, over objection, a nationwide privacy class action involving more than one million class members. The *Karpilovsky* case ultimately settled for $6.5 million. Mr. Klinger also serves as court-appointed counsel in the high-profile RICO litigation against Exelon Corporation where the proposed class seeks damages in connection with a bribery scheme involving corrupt public officials. *See Gress v. Commonwealth Edison Co*., No. 20-cv-4405 (N.D. Ill. Dec. 2, 2020), ECF No. 64. In a recent class settlement hearing in the U.S. District Court for the Northern District of California, Judge Richard Seeborg personally commended Mr. Klinger for "quite a substantial recovery for class members." Judge Seeborg further stated he could not recall any class action case where "the amounts going to each class member were as substantial" as that obtained by Mr. Klinger.

14.     Proposed Interim Co-Lead Counsel, Katrina Carroll, the Managing Member of Carlson Lynch, LLP's Chicago Office (firm resume attached hereto as **Exhibit F**), has litigated complex matters and class actions for over twenty years and has devoted her career to representing plaintiffs in complex cases. In total, she has litigated over one hundred class actions and obtained recoveries in excess of $1 billion in all types of cases. She has been recognized as one of the top 25 class action lawyers in the State of Illinois by the National Trial Lawyers Association. She currently serves as court appointed Co-Lead counsel in *In re TikTok, Inc. Consumer Priv. Litig.*,

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

No. 1:20-cv-04699 (N.D. Ill. Sept. 28, 2020), ECF No. 94, a major data privacy litigation against the popular social media app where preliminary approval of a $92 million class action settlement is currently pending. Outside of the courtroom, Ms. Carroll has dedicated significant effort to promoting diversity in the field. She participates in formal legal mentoring programs in the Chicago area and speaks regularly at symposiums and conferences related to various class action topics. Ms. Carroll is an active Board member of the Advisory Board of Loyola University School of Law's Institute for Consumer and Antitrust Studies.

15.     Proposed Interim Co-Lead Counsel, Joseph Guglielmo, is a partner at Scott+Scott (firm resume attached hereto as **Exhibit G**), a nationally recognized class action law firm with over forty attorneys and offices worldwide. For over the past 20 years, Mr. Guglielmo has been appointed to numerous leadership positions in consumer class actions and has achieved significant recoveries for his clients. Mr. Guglielmo served as Co-Lead Counsel on behalf of financial institutions in well-publicized national data breach matters against The Home Depot and Equifax, which resulted in significant recoveries. *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-md-02583 (N.D. Ga. Sept. 22, 2017) ($27.25 million settlement); *In re Equifax, Inc. Customer Data Sec. Breach Litig.*, No. 1:17-md-02800 (N.D. Ga. July 25, 2019) (settlement valued in excess of $32.5 million). Mr. Guglielmo and Scott+Scott also represented defrauded investors in the litigation relating to the Ponzi scheme perpetrated by Bernard Madoff, where Mr. Guglielmo and Scott+Scott were complimented by the court on their "superlative" advocacy and "remarkable grasp and handling of the extraordinarily complex matters" involved. Order 9–10, *N.Y. Univ. v. Ariel Fund Ltd.*, No. 603803/08 (N.Y. Sup. Ct. Feb. 22, 2010). Apart from his courtroom work, Mr. Guglielmo lectures on electronic discovery, has served on the Steering Committee of Working Group 1 of the Sedona Conference®, and

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

presently serves on the board of the Advanced eDiscovery Institute at Georgetown University Law Center.

16. Proposed Executive Committee Member, Jonathan Jagher, of Freed Kanner London & Millen LLC (firm resume attached hereto as **Exhibit H**), has built a practice representing plaintiffs in consumer and antitrust class actions and has recovered close to $1 billion for his clients and represented classes. He has been appointed to leadership structures in the data privacy field, having been appointed to the Plaintiffs' Steering Committee in *In re TikTok, Inc. Consumer Priv. Litig.*, No. 1:20-cv-04699 (N.D. Ill. Sept. 28, 2020), ECF No. 94. He was also appointed to the Executive Committee in *Dalton v. Morgan Stanley Smith Barney, LLC*, No. 1:20-cv-06468-AT (S.D.N.Y. Sept. 17, 2020), ECF No. 16, a data breach case. Mr. Jagher also has significant experience and has served in lead roles in the some of the largest antitrust cases on record including *In re Auto. Parts Antitrust Litig.*, MDL No. 2311 (E.D. Mich. Feb. 6, 2017), ECF No. 217 ("*Auto Parts*"), an ongoing MDL consisting of over 25 different coordinated actions in which settlements to date total over $550 million. He currently serves on the Advisory Board of Loyola University School of Law's Institute for Consumer Antitrust Studies and frequently serves as a guest speaker on a multitude of class action issues on panels throughout the United States.

17. Proposed Executive Committee Member, Frederick J. Klorczyk III, of Bursor & Fisher, PA (firm resume attached hereto as **Exhibit I**), has extensive experience litigating and settling consumer class actions. For instance, Mr. Klorczyk played a key litigation role in *In re Blue Buffalo Co., Ltd., Mktg. & Sales Pras. Litig.*, No.14-md-2562 (E.D. Mo. June 16, 2016), ECF No. 214, which settled for a $32 million cash common fund within two years of filing the complaint. Mr. Klorczyk also has substantial experience litigating and certifying contested claims on behalf of nationwide and multi-state classes. *See, e.g.*, *Martinelli v. Johnson & Johnson*, No.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

2:15-cv-01733-MCE-DB, 2019 WL 1429653 (E.D. Cal. Mar. 29, 2019) (granting class certification of California false advertising claims and multi-state express warranty claims brought by purchasers of a butter substitute); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014) (granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product). Mr. Klorczyk also has extensive experience in resolving class cases. *See, e.g.*, *Isley v. BMW of N. Am., LLC*, No. 2:19-cv-12680 (D.N.J. Aug. 3, 2021); *Jordan v. WP Co.*, No. 3:20-cv-05218 (N.D. Cal. July 8, 2021); *Crandell v. Volkswagen Grp. of Am., Inc.*, No. 2:18-cv-1337 (D.N.J. June 9, 2021); *Moses v. N.Y. Times Co.*, No. 1:20-cv-04568 (S.D.N.Y. May 12, 2021); *Heigl v. Waste Mgmt. of N.Y.C*, No. 1:19-cv-05487 (E.D.N.Y. Aug. 27, 2020); *Russett v. Nw. Mut. Life Ins. Co.*, No. 7:19-cv-07414 (S.D.N.Y. Oct. 6, 2020); *Gregorio v. Premier Nutrition Corp.*, No. 1:17-cv-05987 (S.D.N.Y. Jan. 17, 2019) (approving $9 million settlement regarding alleged false advertising by Premier Nutrition); *Ruppel v. Consumers Union of U.S., Inc.*, No. 16-cv-02444 (S.D.N.Y. Dec. 4, 2018) ($16.375 million common fund).

18.    These attorneys and their law firms offer an array of experienced class action lawyers and staff, with offices in Chicago and across the country. The proposed organizational structure will facilitate the orderly and efficient prosecution of this case.

19.    Therefore, counsel respectfully request that the Court appoint Gary M. Klinger of Mason Lietz & Klinger LLP, Katrina Carroll of Carlson Lynch, LLP, and Joseph Guglielmo of Scott+Scott Attorneys at Law LLP as Interim Co-Lead Counsel, along with a Plaintiffs' Executive Committee consisting of Frederick J. Klorczyk III of Bursor & Fisher, PA and Jonathan Jagher of Freed Kanner London & Millen LLC to prosecute this case.

For these reasons, Plaintiffs Jones and Walker respectfully request an Order granting them leave to file a First Amended Complaint within 14 days, *i.e.*, by August 23, 2021, that will, among

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

other things, add the parties and claims from the Related Actions. In addition, Plaintiffs Jones and Walker and the plaintiffs in the Related Actions move this Court for the appointment of Interim Class Counsel.

Dated: August 8, 2021                    Respectfully submitted,

                                         /s/ Gary M. Klinger
                                         Gary M. Klinger (ARDC # 6303726)
                                         Cook County Code: 64550
                                         **MASON LIETZ & KLINGER LLP**
                                         227 W. Monroe Street, Suite 2100
                                         Chicago, IL 60606
                                         Telephone: (202) 429-2290
                                         Facsimile: (202) 429-2294
                                         gklinger@masonllp.com

                                         *Attorney for Plaintiffs Jones and Walker*

                                         Katrina Carroll
                                         **CARLSON LYNCH, LLP**
                                         111 W. Washington Street, Suite 1240
                                         Chicago, IL 60602
                                         Telephone: (312) 750-1265
                                         Facsimile: (312) 750-1591
                                         kcarroll@carlsonlynch.com

                                         Joseph P. Guglielmo*
                                         **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                         230 Park Avenue, 17th Floor
                                         New York, NY 10169
                                         Telephone: (212) 223-6444
                                         Facsimile: (212) 223-6334
                                         jguglielmo@scott-scott.com

                                         Jonathan M. Jagher*
                                         **FREED KANNER LONDON & MILLEN LLC**
                                         923 Fayette Street
                                         Conshohocken, PA 19428
                                         Telephone: (610) 234-6487
                                         Facsimile: (224) 632-4521
                                         jjagher@fklmlaw.com

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

Frederick J. Klorczyk III*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
fklorczyk@bursor.com

*Pro Hac Vice Forthcoming*                    *Attorneys for Plaintiffs in the Related Actions*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 8, 2021, I electronically filed the foregoing document with the Clerk of this Court using the Illinois E-Filing System, which should further distribute a true and accurate copy of the foregoing to all counsel of record.

*/s/ Gary M. Klinger*
Gary M. Klinger (ARDC # 6303726)
Cook County Code: 64550

12

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# Exhibit A

Hearing Date: 11/15/2021 10:00 AM - 10:00 AM
Courtroom Number: 2410
Location: District 1 Court
    Cook County, IL

FILED DATE: 8/9/2021 1:00 PM   2021CH03460

FILED
7/15/2021 4:41 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03460

14061454

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

EBONY JONES and MARLA
WALKER, *individually and on behalf
of all others similarly situated*,

    Plaintiffs,

v.

LEMONADE INC.,

    Defendant.

Case No. ___2021CH03460___

## CLASS ACTION COMPLAINT

Plaintiffs Ebony Jones and Marla Walker, individually and on behalf of all other persons similarly situated (collectively, "Plaintiffs"), by and through their undersigned attorneys, as and for their Class Action Complaint asserting violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq*. ("BIPA") against Lemonade Inc. ("Lemonade" or "Defendant"), allege on personal knowledge, due investigation of their counsel and, where indicated, on information and belief as follows:

## NATURE OF THE ACTION

1.     Every individual has unique biometric identifiers by which he or she can be identified. One such biometric identifier is a person's facial geometry.

2.     The collection, storage, use and dissemination of such sensitive information is highly controversial.

3.     The State of Illinois has been at the forefront of protecting its residents from the surreptitious collection, storage, use, sale, and dissemination of their immutable biometric information.

FILED DATE: 8/9/2021 12:00 PM 2021CH03460

4.      Passed in 2008, the BIPA confers on *all* Illinois residents, among other things, a right to know of the risks and dangers presented by the collection, storage and use of their immutable biometric identifiers[1] and biometric information[2] (referred to collectively at times as "biometrics"), as well as a right to have their biometrics stored using a reasonable standard of care and in a manner that is as protective (if not more so) than the manner in which entities store other confidential information.

5.      As the Illinois General Assembly found: "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions."

6.      Particularly pertinent in this case, businesses worldwide continue to develop ever more advanced facial recognition technology in order to, among other things, gain competitive advantages in the marketplace. This race for data imperils the privacy of individuals everywhere.

7.      Public policy in Illinois provides that, given the risks of such unwanted data collection and disclosure, citizens need the power to make decisions about the fate of their unique biometric identifiers and information. And, in order for such power not to be illusory, Illinois residents need to be informed by companies that seek to collect and use their biometric information.

---

[1] A "biometric identifier" is any personal feature that is unique to an individual, including fingerprints, iris scans, DNA and "face geometry," among others.

[2] "Biometric information" is any information captured, converted, stored or shared based on a person's biometric identifier used to identify an individual.

FILED DATE: 8/5/2021 2:00 PM   2021CH03460

8.      Plaintiffs bring this privacy class action lawsuit against Lemonade, a digital, artificial-intelligence driven insurance company that boasts about its ability to extract thousands of bits of data from videos it requires its customers to upload in order to process their insurance claims.

9.      As set forth herein, Lemonade collected Plaintiffs' and the Class Members' biometric identifiers and biometric information, including their facial geometry via videos it required its customers to upload via its mobile application (the "App").

10.     Despite the fact that BIPA has been the law of the State of Illinois since 2008, and the fact that Lemonade professes to be extremely protective of its customers' personal information, it never adequately informed Plaintiffs or the Class of its biometrics collection practices, never obtained the requisite written consent from Plaintiffs or the Class to collect, store, use and disseminate their biometric information, including facial geometry, and never made public any data retention or destruction policies to Plaintiffs or the Class.

11.     Plaintiffs therefore bring this action for damages and other legal and equitable remedies resulting from the illegal actions of Lemonade in collecting, storing, and using their and other similarly situated individuals' biometrics without obtaining prior, informed written consent or providing the requisite data retention and destruction policies, in direct violation of BIPA.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this lawsuit as the Illinois Constitution gives trial courts subject matter jurisdiction over all justiciable matters.

13.     This Court may assert personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States

because Defendant Lemonade—a publicly-traded company incorporated in Delaware with its principal place of business in New York—does business in the State of Illinois.

14.     Moreover, the exercise of personal jurisdiction over Lemonade is appropriate because it collected, stored, and used biometric information and identifiers from Illinois residents who used the Lemonade App and thereby exposed residents of Illinois to ongoing privacy risks.

15.     Furthermore, many of the images Lemonade used for its unlawful collection, storage and use of biometric identifiers and information were created in Illinois, uploaded from Illinois and/or managed via Illinois residents' user accounts, computers, and mobile devices. Because of the scope and magnitude of its conduct, Lemonade knew that its collection, storage, use, disclosure and dissemination of impacted individuals' biometric identifiers and information would injure Illinois residents and citizens.

16.     Lemonade knew or had reason to know that collecting, storing, using, disclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite written releases would deprive Illinois citizens and residents of their statutorily-protected privacy rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via the devices they managed from Illinois and expose Illinois' residents to potential surveillance and other privacy harms as they went about their lives within the State.

17.     Venue is proper in this County pursuant to 735 ILCS 5/2-102(a) because Defendant conducts usual and customary business in Cook County, and many of the acts complained about herein occurred in Cook County.

FILED DATE: 8/5/2021 12:00 PM   2021CH03460

## PARTIES

18.     Plaintiff Ebony Jones is, and has been at all relevant times, a resident of Elgin, Illinois, and a citizen of the State of Illinois.

19.     Plaintiff Marla Walker is, and has been at all relevant times, a resident of Skokie, Illinois, and a citizen of the State of Illinois.

20.     Defendant Lemonade Inc. is a fully licensed and regulated insurance company which underwrites, prices, and sells various insurance policies. Lemonade is incorporated in the State of Delaware and has its principal place of business in New York, New York. Lemonade is a public company traded under the ticker symbol LMND.

## FACTUAL BACKGROUND

### I.     Illinois' Biometric Information Privacy Act.

21.     Recognizing the need to protect its citizens from the risks of unauthorized access to, collection, use and disclosure of their immutable biometric information, Illinois enacted the Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.*, in 2008, to regulate companies that collect and store biometric information, such as facial geometry. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276.

22.     In promulgating BIPA, the Illinois Legislature found that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information" because "[b]iometrics[] are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." *See* 740 ILCS 14/15(c).

23.     The BIPA attempts to address these issues by requiring that entities like Defendant may not, *inter alia*, obtain and/or possess an individual's biometrics unless it informs that person

in writing that biometric identifiers or information will be collected or stored. *See* 740 ILCS 14/15(b).

24.     The BIPA further requires that entities collecting biometrics must inform those persons in writing of the specific purpose and length of term for which such biometric identifiers or biometric information are being collected, stored, and used. *See id.*

25.     Moreover, entities collecting biometrics must publish publicly available written retention schedules and guidelines for permanently destroying biometrics collected. *See* 740 ILCS 14/15(a).

26.     Further, the entity must store, transmit and protect an individual's biometric identifiers and biometric information using the same standard of care in the industry and in a manner at least as protective as the means used to protect other confidential and sensitive information. *See* 740 ILCS 14/15(c).

27.     Finally, such entity is expressly prohibited from selling, leasing, trading or otherwise profiting from an individual's biometrics. *See* 740 ILCS 15/15(c).

28.     In direct violation of each of the foregoing provisions of §§15(a) and 15(b) of BIPA, Lemonade collected, stored, and used—without first providing notice, obtaining informed written consent or publishing data retention policies—the biometrics and associated personally identifying information of thousands of Illinois residents who were forced to use Lemonade's App to upload videos in order to have their insurance claims processed.

## II.     Lemonade Collects, Stores and Uses Illinois' Residents' Protected Biometric Information and Identifiers.

29.     Defendant Lemonade is a fast-growing, publicly traded insurance company that prides itself on its pioneering use of artificial intelligence ("AI") and other technologies to intake

FILED DATE: 8/9/2021 12:00 PM   2021CH03460

and to process insurance claims.[3]

30.     Based in and originally launched in New York, Lemonade uses an AI-powered app that offers homeowners, renters, pet and life insurance policies.

31.     Lemonade began writing policies in the State of Illinois in or about April of 2017.

32.      By the end of 2020, Lemonade had in excess of 1,000,000 customers in the United States, and its Chief Operating Officer boasted:

> With every new customer, our system grows smarter, our underwriting process gets better, and our prices become more accurate and fair. **At Lemonade, one million customers translates into billions of data points, which feed our AI at an ever growing speed. Quantity generates quality.**[4]

33.     One of the ways that Lemonade is able to collect so much of its customers' biometric and other information is by using its APP to collect and to maintain vast troves of customer information, including biometric information.

34.     Lemonade is unique in the insurance industry in that its customers (its policy holders) are required, in connection with their claims submission, to upload a video message describing what happened and the facts upon which their claim is based.[5]

35.     Notably, the video is <u>not</u> essential or even necessary to the claim submission, which is completed via a "chat-bot" in the App. Rather, Lemonade requires its customers to provide a video of themselves through the App in order to acquire thousands and thousands of "bits" of data so that Lemonade can then decide whether to honor a given claim and how to price its insurance

---

[3] *See* https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (last visited July 15, 2021).

[4] *See* https://finance.yahoo.com/news/lemonade-ends-2020-over-one-134600018.html (last visited July 15, 2021) (emphasis added).

[5] *See* https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/#:~: text=Lemonade%2C%20(not%20the%20drink),claims%20if%20they%20suspect%20fraud (last visited July 15, 2021).

FILED DATE: 8/5/2021 1:00 PM   2021CH03460

FILED DATE: 8/5/2021 12:00 PM  2021CH03460

products.

36.     Lest there be any doubt about its intentions, Lemonade itself made them quite clear when it issued a series of tweets containing a proud declaration that its AI analyzes videos of customers when determining if their claims are fraudulent.[6]

37.     Lemonade announced that its customer service chatbots collect as many as 1,600 data points from a single video of a customer answering questions regarding their claim:



38.     Lemonade's twitter thread "implied that [it] was able to detect whether a person was lying in their video and could thus decline insurance claims if its AI believed a person was lying."[7]

39.     Lemonade has boasted that it collects "100X more data than traditional insurance carriers."[8]

40.     Later that week, Lemonade clarified its controversial tweet, explaining that "[t]he

---

[6] https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (last visited July 15, 2021).

[7] https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/.

[8] https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

term, non-verbal cues was a bad choice of words to describe **the facial recognition technology we're using** to flag claims submitted by the same person under different identities. These flagged claims then get reviewed by our human investigators."[9]

41.    Thus, Lemonade confirmed that it uses *facial recognition technology to collect reams of data, including biometric data like face geometry, from its customers, including those in the State of Illinois.*

42.    In a post authored by its Chief Executive Officer and shared on its blog, Lemonade stated:

> It's different for companies built on a digital substrate. Lemonade's chatbots do away with forms altogether, making the process fast and fun, but the data implications are still more profound:
>
> *Lemonade collects about 100x more data-points per customer.*
>
> That's the power of an entirely digital experience.[10]

43.    Indeed, as a recent article detailing Lemonade's questionable uses of AI makes explains, "[t]he in-depth collection of video data and analyzing it against AI tools **make it clear that Lemonade must be storing at least some biometric data** in order to train models to detect patterns of fraud."[11]

44.    Or, put another way, Lemonade is an insurance company that claims it is replacing human brokers and actuaries with bots and AI in order to streamline the insurance claim process. In the process, however, Lemonade collects tremendous amounts of data, including biometric

---

[9] https://www.lemonade.com/blog/lemonades-claim-automation/ (last visited July 15, 2021) (emphasis added).

[10] https://www.lemonade.com/blog/precision-underwriting/ (last visited July 15, 2021) (emphasis in original).

[11] https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/.

FILED DATE: 8/5/2021 12:00 PM    2021CH03460

FILED DATE: 8/5/2021 12:00 PM   2021CH03460

information, about its customers without telling them in direct violation of BIPA.[12]

45.     For instance, an article published in *Forbes* detailed a situation where Lemonade

used facial recognition technology to compare various claims submitted by customers in order to

root out fraud:

> In the summer of 2017, a Los Angeles man in his mid-20s put on a
> necklace, blond wig and makeup and made a cellphone video
> describing how his camera and other electronics had been stolen. He
> submitted the video to his renters insurance provider, Lemonade,
> which paid the $677 claim in two days. Three months later, dressed
> in jeans and a T-shirt and using a different name, email address and
> phone number, the same man submitted a video claim for a stolen
> $5,000 camera. But this time, the algorithms that are a crucial part
> of Lemonade's highly automated systems flagged the claim as
> suspicious. Last year, the persistent fraudster, this time wearing a
> pink dress, tried again, only to be foiled once more by Lemonade's
> computers.[13]

46.     Lemonade used its AI, including facial recognition technology, to determine that

the claimants in the above scenario were the same person by collecting, storing, and using the

immutable biometric information and identifiers of its customers.[14]

47.     In its S-1 form filed with the U.S. Securities and Exchange Commission prior to

the company going public—and in forms since—Lemonade states that its proprietary AI

algorithms are at the core of its business and that it could not function without them, but admits

that they could also lead to profit loss should regulators ever crack down:

> ***Our proprietary artificial intelligence algorithms may not operate
> properly or as we expect them to,*** which could cause us to write
> policies we should not write, price those policies inappropriately or

---

[12] https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter

[13] https://www.forbes.com/sites/jeffkauflin/2019/05/02/lemonade-fintech-insurance-unicorn/?sh=23c5a7e
e6cde (last visited July 15, 2021).

[14]     https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/
(stating that "[t]he in-depth collection of video data and analyzing it against AI tools make it clear that
Lemonade must be storing at least some biometric data in order to train models to detect patterns of fraud").

FILED DATE: 8/5/2021 12:00 PM   2021CH03460

overpay claims that are made by our customers, the company wrote in the filing. Moreover, our proprietary artificial intelligence algorithms may lead to unintentional bias and discrimination.[15]

48.    In short, Lemonade did not disclose to its customers the extent to which it was collecting and using their sensitive biometric (and other information). Indeed, the "instant, seamless, and delightful" insurance experience that Lemonade aggressively markets was built by the collection of its customers' own data, including their biometric information, which those customers never realized they were providing.

49.    As noted in a recent article entitled *A disturbing, viral Twitter thread reveals how AI-powered insurance can go wrong, Lemonade tweeted about what it means to be an AI-first insurance company. It left a sour taste in many customers' mouths*:

> It's rare for a company to be so blatant about how that data can be used in its own best interests and at the customer's expense. But rest assured that Lemonade is not the only company doing it.[16]

50.    According to the analytics site, Crunchbase, there were 47,345 downloads of the App in the last thirty days (as of July 13, 2021), representing a nearly 5% increase from the prior thirty-day period.[17]

**III.    Lemonade's Conduct Violates the BIPA.**

51.    As detailed above, Lemonade designed and implemented an AI tool in the App that automatically performs facial scans, collecting the facial geometry of customers who use the App.

52.    In collecting, using, storing and otherwise obtaining the biometric identifiers and information of Plaintiffs and the Class Members and, upon information and belief, subsequently

---

[15]    https://www.vice.com/en/article/z3x47y/an-insurance-startup-bragged-it-uses-ai-to-detect-fraud-it-did nt-go-well (emphasis added).

[16]    https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

[17]    https://www.crunchbase.com/organization/lemonade/technology (last visited July 13, 2021).

FILED DATE: 8/5/2021 1:00 PM    2021CH03460

disclosing, re-disclosing and otherwise disseminating those biometric identifiers and information to other related corporate entities—all without providing the requisite notice, obtaining the requisite written releases or satisfying any of the other provisions that would excuse it from BIPA's mandates—Lemonade violated BIPA.

53.     In further violation of BIPA, Lemonade failed to use a reasonable standard of care to protect Plaintiffs' and Class Members' biometric identifiers and information from disclosure.

54.     In further violation of BIPA, as a private entity in possession of Plaintiffs' and Class Members' biometric identifiers and information, Lemonade failed to adopt or make available to the public a retention schedule or guidelines for permanently destroying such biometric identifiers and information once the initial purpose for collecting them had or has been satisfied.

55.     Lemonade's violations of BIPA were intentional and reckless or, in the alternative, negligent.

## IV.     Experience of Representative Plaintiff Ebony Jones.

56.     Plaintiff Jones, an Illinois resident, has been a Lemonade customer since at least 2020.

57.     In connection with submitting an insurance claim following a weather incident which caused damage to her home, Plaintiff Jones, as required by Defendant, accessed and used Lemonade's App.

58.     Plaintiff Jones answered numerous questions posed to her by a Lemonade "chat-bot." Lemonade had all the requisite information it needed to process Plaintiff Jones' claim, as well as her contact information in order to follow-up with her if it required additional information.

59.     Nonetheless, Lemonade required Plaintiff Jones to upload a "short video describing the incident."

FILED DATE: 8/9/2021 12:00 PM    2021CH03460

60.     Plaintiff Jones uploaded a video of herself describing the incident on July 10, 2020.

61.     Plaintiff Jones did not know that Lemonade would collect, obtain, store and/or use her biometric identifiers or biometric information.

62.     Plaintiff Jones did not give informed written consent to Lemonade to collect, obtain, store and/or use her biometric identifiers or biometric information, nor was Plaintiff Jones presented with or made aware of any publicly available retention schedule regarding her biometric identifiers or biometric information.

63.     Likewise, Lemonade never provided Plaintiff Jones with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage or use of her unique biometric identifiers and/or biometric information.

64.     By collecting, obtaining, storing, and using Plaintiff Jones's unique biometric identifiers and/or biometric information without her consent, written or otherwise, Lemonade invaded Plaintiff Jones's statutorily protected right to privacy in her biometrics.

65.     In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade never informed Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored, and used, nor did Defendant obtain a written release from these individuals.

66.     In direct violation of § 15(a) of BIPA, Lemonade did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

**V.     Experience of Representative Plaintiff Marla Walker.**

67.     Plaintiff Walker, an Illinois resident, has been a Lemonade customer since at least 2018.

FILED DATE: 8/9/2021 12:00 PM    2021CH03460

68. In connection with submitting an insurance claim in or around September 2018, Plaintiff Walker, as required, accessed, and used Lemonade's App.

69. In so doing, Plaintiff Walker answered numerous questions posed to her by a Lemonade "chat-bot." Lemonade had all the requisite information it needed to process Plaintiff Walker's claim, as well as her contact information in order to follow up with her if it required additional information.

70. Nonetheless, Lemonade required Plaintiff Walker to upload a "short video describing the incident."

71. Plaintiff Walker uploaded a video of herself describing the incident on or about September 15, 2018.

72. Plaintiff Walker did not know that Lemonade would collect, obtain, store and/or use her biometric identifiers or biometric information.

73. Plaintiff Walker did not give informed written consent to Lemonade to collect, obtain, store and/or use her biometric identifiers or biometric information, nor was Plaintiff Walker presented with or made aware of any publicly available retention schedule regarding her biometric identifies or biometric information.

74. Likewise, Lemonade never provided Plaintiff Walker with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage or use of her unique biometric identifiers and/or biometric information.

75. By collecting, obtaining, storing, and using Plaintiff Walker's unique biometric identifiers and/or biometric information without her consent, written or otherwise, Lemonade invaded Plaintiff Walker's statutorily protected right to privacy in her biometrics.

76. In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade never informed

- 14 -

FILED DATE: 8/9/2021 1:00 PM    2021CH03460

Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored and used, nor did it obtain a written release from these individuals.

77.    In direct violation of § 15(a) of BIPA, Lemonade did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

## CLASS ALLEGATIONS

78.    **Class Definition:** Plaintiffs bring this action pursuant to 735 ILCS 5/2-801 on behalf of a class of similarly situated individuals, defined as follows:

> All individuals whose biometric identifiers or biometric information were collected, captured, stored, used, transmitted, received or otherwise obtained and/or disseminated by Lemonade within the State of Illinois within the applicable limitations period (the "Class").

79.    Excluded from the Class are (i) any members of the judiciary assigned to preside over this Matter, as well as their immediate family members, (ii) any officer or director of Defendant and any immediate family members of such officer or director; (iii) any entity in which Defendant have a controlling interest and (iv) any employees and agents of Defendant.

80.    **Numerosity:** Pursuant to 735 ILCS 5/2-801(1), the number of persons within the Class is substantial, believed to amount to thousands of persons. It is, therefore, impractical to join each Member of the Class as a named Plaintiff. Further, the size and relatively modest value of the claims of the individual Members of the Class render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, membership in the Class is readily ascertainable and identifiable from Lemonade's records.

81.    **Commonality and Predominance:** Pursuant to 735 ILCS 5/2-801(2), there are

FILED DATE: 8/9/2021 2:00 PM   2021CH03460

well-defined common questions of fact and law that exist as to all Members of the Class and that predominate over any questions affecting only individual Members of the Class. These common legal and factual questions, which do not vary from Class Member to Class Member, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

    (a)    whether Defendant collected or otherwise obtained Plaintiffs' and the Class Members' biometric identifiers and/or biometric information;

    (b)    whether Defendant properly informed Plaintiffs and the Class Members that they collected, used, and stored their biometric identifiers and/or biometric information;

    (c)    whether Defendant obtained a written release (as defined in 740 ILCS 1410) to collect, use and store Plaintiffs' and the Class Members' biometric identifiers and/or biometric information;

    (d)    whether Defendant developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of their last interaction, whichever occurs first;

    (e)    whether Defendant used Plaintiffs' and the Class Members' biometric identifiers and/or biometric information to identify them;

    (f)    whether Defendant destroyed Plaintiffs' and the Class Members' biometric identifiers and/or biometric information once that information was no longer needed for the purpose for which it was originally collected and

    (g)    whether Defendant's violations of BIPA were committed intentionally, recklessly or negligently.

82.    **Adequate Representation:** Pursuant to 735 ILCS 5/2-801(3), Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in

FILED DATE: 8/5/2021 1:00 PM    2021CH03460

complex consumer class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent Members of the Class. Plaintiffs have raised viable statutory claims, or the type reasonably expected to be raised by Members of the Class, and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class, additional claims as may be appropriate and/or to amend the Class definition.

83.    **Superiority:** Pursuant to 735 ILCS 5/2-801(4), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class Members is impracticable. Even if every Member of the Classes could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent ,or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each Member of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action.

84.    In short, maintenance of this case as a class action is essential to compliance with BIPA.

FILED DATE: 8/5/2021 2:00 PM   2021CH03460

**COUNT I – FOR DAMAGES AGAINST DEFENDANT**
**VIOLATION OF 740 ILCS 14/15(a) – FAILURE TO INSTITUTE, MAINTAIN AND ADHERE TO**
<u>**PUBLICLY AVAILABLE RETENTION SCHEDULE**</u>

85.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

86.     BIPA mandates that entities in possession of biometric data establish and maintain a satisfactory biometric data retention—and, importantly, deletion—policy.

87.     Specifically, those entities must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (at most three years after the entity's last interaction with the individual); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS 14/15(a).

88.     Defendant did not comply with these BIPA mandates.

89.     Defendant Lemonade is a company registered to do business in Illinois and thus qualifies as a "private entity" under BIPA. *See id.*

90.     Plaintiffs are individuals who had their "biometric identifiers" captured and/or collected by Defendant, as explained in detail herein. *See id.*

91.     Plaintiffs' and the Class Members' biometric identifiers were used to identify them and therefore constitute "biometric information" as defined by BIPA. *See id.*

92.     Defendant failed to provide a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information as specified by BIPA. *See* 740 ILCS 14/15(a).

93.     Defendant lacked retention schedules and guidelines for permanently destroying Plaintiffs' and the Class Members' biometric data. As such, the only reasonable conclusion is that Defendant has not, and will not, destroy Plaintiffs' and the Class Members' biometric data when the initial purpose for collecting or obtaining such data has been satisfied.

94.     On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, capture, storage and use of biometric identifiers and biometric information as described herein; (iii) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1) and (iv) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

**COUNT II – FOR DAMAGES AGAINST DEFENDANT**
**VIOLATION OF 740 ILCS 14/15(b) – FAILURE TO OBTAIN INFORMED WRITTEN CONSENT AND**
**RELEASE BEFORE OBTAINING BIOMETRIC IDENTIFIERS OR INFORMATION**

95.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

96.     BIPA requires entities to obtain informed written consent from Illinois residents before acquiring their biometric data.

97.     Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] first: (i) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (ii) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; **and** (iii) receives a written release executed by the subject of the biometric identifier or biometric information . . . " 740 ILCS 14/15(b) (emphasis added).

98.     Defendant did not comply with these BIPA mandates.

99.     Defendant Lemonade, Inc. is a company registered to do business in Illinois and

FILED DATE: 8/5/2021 12:00 PM 2021CH03460

FILED DATE: 8/5/2021 2:00 PM    2021CH03460

thus qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

100.    Plaintiffs and the Class Members are individuals who have had their "biometric identifiers" collected and/or captured by Defendant, as explained herein. *See id*.

101.    Plaintiffs' and the Class Members' biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See id.*

102.    Defendant systematically and automatically collected, captured, used, and stored Plaintiffs' and the Class Members' biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3).

103.    Defendant never informed Plaintiffs, and never informed any Member of the Class in writing that their biometric identifiers and/or biometric information were being collected, captured, stored, and/or used, nor did Defendant inform Plaintiffs and the Class in writing of the specific purpose(s) and length of term for which their biometric identifiers and/or biometric information were being collected, stored, used and disseminated as required by 740 ILCS 14/15(b)(1)-(2).

104.    By collecting, capturing, storing, and/or using Plaintiffs' and the Class Members' biometric identifiers and biometric information as described herein, Defendant violated Plaintiffs' and the Class Members' rights to privacy in their biometric identifiers and/or biometric information as set forth in BIPA. *See* 740 ILCS 14/1, *et seq*.

105.    On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, capture, storage, use and dissemination of biometric identifiers and biometric information as described herein; (iii) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740

FILED DATE: 8/9/2021 12:00 PM 2021CH03460

ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1) and (iv) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Ebony Jones and Marla Walker, on behalf of themselves and the proposed Class, respectfully request that this Court enter an Order:

A. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class and appointing their counsel as Class Counsel;

B. Declaring that Defendant's actions, as set out above, violate BIPA, 740 ILCS 14/1, *et seq*.;

C. Awarding statutory damages of $5,000.00 for each and every intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, alternatively, statutory damages of $1,000.00 for each and every violation pursuant to 740 ILCS 14/20(1) if the Court finds that Defendant's violations were negligent;

D. Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an Order requiring Defendant to collect, store and use biometric identifiers and/or biometric information in compliance with BIPA;

E. Awarding Plaintiffs and the Class their reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3);

F. Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

G. Awarding all such other and further relief as equity and justice may require.

FILED DATE: 8/9/2021 11:00 PM    2021CH03460

Dated: July 15, 2021

Respectfully submitted,

*/s/ Gary M. Klinger*
Gary M. Klinger
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Phone: (202) 429-2290
Fax: (202) 429-2294
gklinger@masonllp.com

Gary E. Mason*
David K. Lietz*
**MASON LIETZ & KLINGER LLP**
5101 Wisconsin Avenue NW, Suite 305
Washington, DC 20016
Phone: (202) 429-2290
Fax: (202) 429-2294
gmason@masonllp.com
dlietz@masonllp.com

*Attorneys for Plaintiffs & the Proposed Class*

**Pro Hac Vice* forthcoming

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# Exhibit B

FILED
7/21/2021 11:02 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03578

14139254

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

MILTON CITCHENS, individually and on
behalf of all others similarly situated,

               Plaintiff,

v.

LEMONADE INC.,

               Defendant.

Case no. 2021CH03578

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

Plaintiff Milton Citchens ("Plaintiff"), individually and on behalf of a Class of all other persons similarly situated defined below, by and through his attorneys, brings this Class Action Complaint ("Complaint") pursuant to 735 ILCS 5/2-801 against Lemonade Inc. ("Lemonade" or "Defendant"). Plaintiff alleges the following based upon personal knowledge as to himself and his own actions, and, as to all other matters, alleges, upon information and belief and investigation of his counsel, as follows:

### NATURE OF THE ACTION

1.    This action seeks damages and injunctive relief arising out of Defendant's violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, et seq. ("BIPA"). BIPA prohibits, among other things, private entities from collecting, capturing, obtaining, disclosing, redisclosing, disseminating or profiting from the biometric identifiers or information of an individual without providing written notice and without obtaining a written release from the impacted individual or his or her authorized representative. BIPA also requires private entities in possession of biometric identifiers to adopt retention and destruction policies and to take measures to prevent the release of that information.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

FILED DATE: 7/21/2021 11:02 PM   2021CH03578

1

FILED DATE: 7/29/2021 12:08 PM    2021CH03468

2.      Lemonade is an insurance company based in New York offering homeowners and renters insurance in the United States.  The company uses artificial intelligence and behavioral economics, to replace brokers and bureaucracy with bots and machine learning. According to Lemonade's securities filing, customers seeking renters or homeowners insurance can have a two-minute chat with its bot, AI Maya, while claims can be filed by chatting with another bot, AI Jim, who pays claims in as little as ***three seconds.*** [1]

3.      Lemonade states that its mission is to harness technology and social impact to be the world's most loved insurance company.  It further represents that its data architecture melds artificial intelligence with the human kind and learns from the prodigious data it generates to become ever better at delighting customers and quantifying risk.[2]  Lemonade touts its fast processing of claims through the use of artificial intelligence.

4.      Lemonade recently admitted that it collects and analyzes users' information, including video information which the Company claims to utilize in connection with its claims handling process.  In now-deleted tweets and blog posts,  the Company represented, among other things, that its AI analyzes the videos that users submit when they file insurance claims for signs of fraud, picking up "non-verbal cues that traditional insurers can't, since they don't use a digital claims process."

---

[1] Chen, I-Chun (June 25, 2020). *"Lemonade, insurer that uses bots to replace brokers, plans $286M IPO". American City Business Journals*. https://www.bizjournals.com/newyork/news/2020/06/25/lemonade-insurer-that-uses-bots-plans-ipo.html

[2] *Id.*

2

FILED DATE: 7/29/2021 12:08 PM   2021CH03468

**Lemonade** ✔ @Lemonade_Inc · May 24

Lemonade is built on a digital substrate - we use bots and machine learning to make insurance instant, seamless, and delightful.

This puts us at a data advantage—in fact, we collect about 100X more data than traditional insurance carriers. Here's why that matters 👇 (1/7)



💬 135        �only 434        ♡ 290        ⬆️

**Lemonade** ✔ @Lemonade_Inc · May 24

A typical homeowners policy form has 20–40 fields (name, address, bday...), so traditional insurers collect 20-40 data points per user.

AI Maya asks just 13 Q's but collects over 1,600 data points, producing nuanced profiles of our users and remarkably predictive insights. (2/7)

💬 15        ↻ 45        ♡ 32        ⬆️

**Lemonade** ✔ @Lemonade_Inc · May 24

This data helps us understand the level of risk each customer brings, which improves our underwriting, customer acquisition, and fraud detection. (3/7)

💬 4        ↻ 20        ♡ 32        ⬆️

@Lemonade_Inc

Replying to @Lemonade_Inc

For example, when a user files a claim, they record a video on their phone and explain what happened.

Our AI carefully analyzes these videos for signs of fraud. It can pick up non-verbal cues that traditional insurers can't, since they don't use a digital claims process. (4/7)

12:38 PM · May 24, 2021 · Twitter Web App

3

FILED DATE: 7/29/2021 12:08 PM    2021CH03468



5.      In response to the tweets and blog posts, Lemonade issued the following statement on its website:

> ***We have never, and will never, let AI auto-reject claims.*** Here's why: We do not believe that it is possible, nor is it ethical (or legal), to deduce anything about a person's character, quality, or fraudulent intentions based on facial features, accents, emotions, skin-tone, or any other personal attribute.[3]

6.      Notably, Lemonade did not deny its collection and use of biometric information for its artificial intelligence, in fact it is something that it prides its company on.  Lemonade merely states that artificial intelligence is not involved in the auto-rejection of claims.

7.      Plaintiff alleges that Defendant's collection, storage, use and dissemination of its users' sensitive information is a violation of BIPA.

8.      The State of Illinois General Assembly noted in passing BIPA that: "[b]iometrics are unlike other unique  identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no

---

[3] https://www.lemonade.com/blog/lemonades-claim-automation/

4

recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions."

9.     Plaintiff brings this action against Lemonade for their collection and use of Plaintiff's and Class' biometric identifiers and biometric information in violation of BIPA, including their facial geometry via videos it required its customers to upload via its mobile application (the "App").

10.     Plaintiff seeks damages and injunctive relief resulting from Defendant's actions in collecting and using biometric information and Lemonade's failure to obtain prior, informed written consent in direct violation of BIPA.

## PARTIES

11.     Plaintiff Milton Citchens is a citizen and resident of Illinois. Plaintiff has renters insurance through Lemonade, and submitted a video that included his face to Defendant in support of his claim for losses under his renters insurance policy.

12.     Defendant Lemonade Inc. is Delaware corporation with its principle executive offices located at 5 Crosby Street, 3rd Floor New York, New York 10013.  Lemonade is a fully licensed and regulated insurance company which underwrites, prices, and sells various insurance policies.  Lemonade is incorporated in the State of Delaware and has its principal place of business in New York, New York.  Lemonade is a public company traded under the ticker symbol LMND.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this lawsuit as the Illinois Constitution gives trial courts subject matter jurisdiction over all justiciable matters.

FILED DATE: 7/29/2021 12:08 PM   2021CH03466

14.     This Court may assert personal jurisdiction over Defendant pursuant to 735 ILCS
5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States
because Defendant Lemonade—a publicly-traded company incorporated in Delaware with its
principal executive offices located in New York—does substantial business in the State of Illinois.

15.     Moreover, the exercise of personal jurisdiction over Lemonade is appropriate
because it collected, stored, and used biometric information and identifiers from Illinois residents
who used the Lemonade App in violation of BPIA.

16.     Furthermore, many of the biometric markers and images Lemonade collected, used
and stored were created in Illinois, uploaded from Illinois and/or managed via Illinois citizens'
user accounts, computers, and mobile devices.

17.     This Court has personal jurisdiction over Defendant because Lemonade used and
disseminated data derived directly from Illinois-based users and exposed residents of Illinois to
ongoing privacy risks within Illinois based on the collection, capture, obtainment, disclosure,
redisclosure and dissemination of their biometric identifiers and information. Furthermore, many
of the images Defendant used for their unlawful collection, capture and obtainment of biometric
identifiers and information were created in Illinois, uploaded from Illinois, and/or managed via
Illinois-based user accounts, computers, and mobile devices.  Because of the scope and magnitude
of Defendant's conduct, Defendant knew that their collection, capture, obtainment, disclosure,
redisclosure and dissemination of impacted individuals' biometric identifiers and information
would injure Illinois residents and citizens. Defendant knew or had reason to know that collecting,
capturing, obtaining, disclosing, redisclosing and disseminating Illinois citizens' and residents'
biometric identifiers and information without providing the requisite notice or obtaining the
requisite releases would deprive Illinois citizens and residents of their statutorily-protected privacy

FILED DATE: 7/29/2021 12:08 PM   2021CH03468

FILED DATE: 7/29/2021 12:08 PM   2021CH03468

rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via their Illinois-managed devices and exposed residents in Illinois to potential surveillance and other privacy harms as they went about their lives within the state.

18.     Because of the scope and magnitude of its conduct, Lemonade knew that its collection, storage, use, disclosure and dissemination of impacted individuals' biometric identifiers and information would injure Illinois residents and citizens.

19.     Lemonade knew or had reason to know that collecting, storing, using, disclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite consent would deprive Illinois citizens and residents of their statutorily-protected privacy rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via the devices they managed from Illinois and expose Illinois' residents to potential surveillance and other privacy harms as they went about their lives within the State.

20.     Venue is proper in this County pursuant to 735 ILCS 5/2-102(a) because Defendant conducts business in Cook County, and many of the acts complained about herein occurred in Cook County.

### FACTUAL BACKGROUND

I.     **Illinois' Biometric Information Privacy Act**

21.     BIPA seeks to safeguard individuals' biometric identifiers and information.

22.     Biometric identifiers include a scan of an individual's face geometry or voiceprint. 740 ILCS § 14/10.

23.     Biometric information is "any information . . . based on an individual's biometric identifier used to identify an individual." 740 ILCS § 14/10.

FILED DATE: 7/29/2021 12:08 PM    2021CH03468

24.     In the early 2000s, major national corporations started using Chicago and other locations in Illinois to test "new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." 740 ILCS § 14/5(c). Given its relative infancy, an overwhelming portion of the public became weary of this then-growing yet unregulated technology. *See* 740 ILCS § 14/5.

25.     In late 2007, a biometrics company called Pay by Touch, which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions, filed for bankruptcy. That bankruptcy was alarming to the Illinois Legislature because suddenly there was a serious risk that millions of fingerprint records – which, like other unique biometric identifiers, can be linked to people's sensitive financial and personal data – could now be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who used the company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

26.     Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted BIPA in 2008. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS § 14/5.

27.     Additionally, to ensure compliance, BIPA provides that, for each violation, the prevailing party may recover $1,000 or actual damages, whichever is greater, for negligent violations and $5,000, or actual damages, whichever is greater, for intentional or reckless violations. 740 ILCS § 14/20.

FILED DATE: 7/29/2021 12:08 PM    2021CH03468

28.    BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first:

a.    Informs the subject in writing that a biometric identifier or biometric information is being collected, stored and used;

b.    Informs the subject in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

c.    Receives a written release executed by the subject of the biometric identifier or biometric information.

*See* 740 ILCS § 14/15(b).

29.    Biometric identifiers include retina and iris scans, fingerprints and handprints, and – most importantly here – facial geometry and voiceprints. *See* 740 ILCS § 14/10. Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *Id*.

30.    BIPA establishes standards for how companies must handle Illinois citizens' biometric identifiers and biometric information. *See, e.g.,* 740 ILCS § 14/15(c)-(d). For example, BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for such disclosure. *See* 740 ILCS § 14/15(d)(1).

31.    BIPA also prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifiers or biometric information (740 ILCS § 14/15(c)) and requires companies to develop and comply with a written policy – made available to the public – establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric

FILED DATE: 7/29/2021 12:08 PM   2021CH03466

information when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS § 14/15(a).

32.     The Illinois legislature enacted BIPA due to the increasing use of biometric data in financial and security settings, the general public's hesitation to use biometric information, and – most significantly – the unknown ramifications of biometric technology. Biometrics are biologically unique to the individual and, once compromised, an individual is at a heightened risk for identity theft and left without any recourse.

33.     BIPA provides individuals with a private right of action, protecting their right to privacy regarding their biometrics as well as protecting their rights to know the precise nature for which their biometrics are used and how they are being stored and ultimately destroyed. Unlike other statutes that only create a right of action if there is a qualifying data breach, BIPA strictly regulates the manner in which entities may collect, store, use, and disseminate biometrics and creates a private right of action for lack of statutory compliance.

34.     Plaintiff, like the Illinois legislature, recognizes how imperative it is to keep biometric information secure. Biometric information, unlike other personal identifiers such as a social security number, cannot be changed or replaced if hacked or stolen.

35.     In direct violation of each of the foregoing provisions of §§15(a) and 15(b) of BIPA, Lemonade collected, stored, and used—without first providing notice, obtaining informed written consent or publishing data retention policies—the biometrics and associated personally identifying information of Plaintiff and the Class who are Illinois residents who used Lemonade's App to apply for insurance and upload videos in order to have their insurance claims processed.

**II.     Lemonade Collects, Stores and Uses Illinois' Residents' Protected Biometric Information and Identifiers**

FILED DATE: 7/29/2021 12:08 PM   2021CH03468

36. Defendant Lemonade is a fast-growing, publicly traded insurance company that prides itself on its pioneering use of artificial intelligence ("AI") and other technologies to intake and to process insurance claims.[4]

37. Based in and originally launched in New York, Lemonade uses an AI-powered app that offers homeowners, renters, pet and life insurance policies.

38. Lemonade began writing policies in the State of Illinois in or about April of 2017.

39. Lemonade represented in its annual letter to shareholders that at the end of 2020, Lemonade had in excess of 1,000,000 customers in the United States.[5] Lemonade's Chief Operating Officer boasted:

> With every new customer, our system grows smarter, our underwriting process gets better, and our prices become more accurate and fair. **At Lemonade, one million customers translates into billions of data points, which feed our AI at an ever growing speed. Quantity generates quality.[6]**

40. One of the ways that Lemonade is able to collect so much of its customers' biometric and other information is by using its APP to collect and to maintain vast troves of customer information, including biometric information.

41. Lemonade is unique in the insurance industry in that its customers (its policy holders) are required, in connection with their claims submission, to upload a video message describing what happened and the facts upon which their claim is based.[7]

---

[4] *See* https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (last visited July 21, 2021).

[5] https://s24.q4cdn.com/139015699/files/doc_downloads/2021/Q4-2020-LMND-Shareholder-Letter_vF.pdf (last visited July 21, 2021)

[6] *See* https://finance.yahoo.com/news/lemonade-ends-2020-over-one-134600018.html (last visited July 21 2021) (emphasis added).

[7] *See* https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/#:~:text=Lemonade%2C%20(not%20the%20drink),claims%20if%20they%20suspect%20fraud (last visited July 15, 2021).

FILED DATE: 7/29/2021 12:00 PM    2021CH03460

42.     Notably, the video is not essential or even necessary to the claim submission, which is completed via a "chat-bot" in the App.  Rather, Lemonade requires its customers to provide a video of themselves through the App in order to acquire thousands and thousands of "bits" of data so that Lemonade can then decide whether to honor a given claim and how to price its insurance products.

43.     Lemonade admitted in a series of tweets and blogs that its AI analyzes videos of customers when determining if their claims are fraudulent.[8]

44.     Lemonade announced that its customer service chatbots collect as many as 1,600 data points from a single video of a customer answering questions regarding their claim:



---

[8]          https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (last visited July 15, 2021).

45. Lemonade's twitter thread "implied that [it] was able to detect whether a person was lying in their video and could thus decline insurance claims if its AI believed a person was lying."[9]

46. Lemonade has boasted that it collects "100X more data than traditional insurance carriers."[10]

47. Lemonade later attempted to clarify its tweet and blog postings, explaining that "[t]he term, non-verbal cues was a bad choice of words to describe **the facial recognition technology we're using** to flag claims submitted by the same person under different identities. These flagged claims then get reviewed by our human investigators."[11]

48. Regardless of its clarification, Lemonade did not deny that it collects and uses *facial recognition technology to collect reams of data, including biometric data like face geometry, from its customers, including those in the State of Illinois.*

49. In a post authored by its Chief Executive Officer and shared on its blog, Lemonade stated:

> It's different for companies built on a digital substrate. Lemonade's chatbots do away with forms altogether, making the process fast and fun, but the data implications are still more profound:
>
> ***Lemonade collects about 100x more data-points per customer.***
>
> That's the power of an entirely digital experience.[12]

---

[9]    https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/.

[10]    https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

[11]    https://www.lemonade.com/blog/lemonades-claim-automation/ (last visited July 15, 2021) (emphasis added).

[12]    https://www.lemonade.com/blog/precision-underwriting/ (last visited July 15, 2021) (emphasis in original).

13

FILED DATE: 7/29/2021 12:08 PM   2021CH03468

FILED DATE: 7/29/2021 12:08 PM 2021CH03466

50.     Indeed, as a recent article detailing Lemonade's questionable uses of AI explains, "[t]he in-depth collection of video data and analyzing it against AI tools make it clear that Lemonade must be storing at least some biometric data in order to train models to detect patterns of fraud."[13]

51.     Or, put another way, Lemonade is an insurance company that claims it is replacing human brokers and actuaries with bots and AI in order to streamline the insurance claim process. In the process, however, Lemonade collects tremendous amounts of data, including biometric information, about its customers without telling them in direct violation of BIPA.[14]

52.     For instance, an article published in *Forbes* detailed a situation where Lemonade used facial recognition technology to compare various claims submitted by customers in order to root out fraud:

> In the summer of 2017, a Los Angeles man in his mid-20s put on a necklace, blond wig and makeup and made a cellphone video describing how his camera and other electronics had been stolen. He submitted the video to his renters insurance provider, Lemonade, which paid the $677 claim in two days. Three months later, dressed in jeans and a T-shirt and using a different name, email address and phone number, the same man submitted a video claim for a stolen $5,000 camera. But this time, the algorithms that are a crucial part of Lemonade's highly automated systems flagged the claim as suspicious. Last year, the persistent fraudster, this time wearing a pink dress, tried again, only to be foiled once more by Lemonade's computers.[15]

---

[13]     https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/.

[14]     https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

[15]     https://www.forbes.com/sites/jeffkauflin/2019/05/02/lemonade-fintech-insurance-unicorn/?sh=23c5a7ee6cde (last visited July 15, 2021).

53.    Lemonade used its AI, including facial recognition technology, to determine that the claimants in the above scenario were the same person by collecting, storing, and using the immutable biometric information and identifiers of its customers.[16]

54.    In its S-1 form filed with the U.S. Securities and Exchange Commission prior to the company going public—and in forms since—Lemonade states that its proprietary AI algorithms are at the core of its business and that it could not function without them, but admits that they could also lead to profit loss should regulators ever crack down:

> ***Our proprietary artificial intelligence algorithms may not operate properly or as we expect them to,*** which could cause us to write policies we should not write, price those policies inappropriately or overpay claims that are made by our customers, the company wrote in the filing. Moreover, our proprietary artificial intelligence algorithms may lead to unintentional bias and discrimination.[17]

55.    Lemonade did not disclose to its customers the extent to which it was collecting and using their sensitive biometric (and other information).  Indeed, the "instant, seamless, and delightful" insurance experience that Lemonade aggressively markets was built by the collection of its customers' own data, including their biometric information, which those customers never realized they were providing.

56.    As noted in a recent article entitled *A disturbing, viral Twitter thread reveals how AI-powered insurance can go wrong, Lemonade tweeted about what it means to be an AI-first insurance company. It left a sour taste in many customers' mouths:*

> It's rare for a company to be so blatant about how that data can be used in its own best interests and at the customer's expense. But rest assured that Lemonade is not the only company doing it.[18]

---

[16]    https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/(stating that "[t]he in-depth collection of video data and analyzing it against AI tools make it clear that Lemonade must be storing at least some biometric data in order to train models to detect patterns of fraud").

[17]    https://www.vice.com/en/article/z3x47y/an-insurance-startup-bragged-it-uses-ai-to-detect-fraud-it-didnt-go-well (emphasis added).

[18]    https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

57.     According to the analytics site, Crunchbase, there were 47,345 downloads of the App in the last thirty days (as of July 13, 2021), representing a nearly 5% increase from the prior thirty-day period.[19]

### III.    Lemonade's Conduct Violates the BIPA.

58.     As detailed above, Lemonade designed and implemented an AI tool in the App that automatically performs facial scans, collecting the facial geometry of customers who use the App.

59.     In collecting, using, storing and otherwise obtaining the biometric identifiers and information of Plaintiff and the Class Members and, upon information and belief, subsequently disclosing, re-disclosing and otherwise disseminating those biometric identifiers and information to other related corporate entities—all without providing the requisite notice, obtaining the requisite written releases or satisfying any of the other provisions that would excuse it from BIPA's mandates—Lemonade violated BIPA.

60.     In further violation of BIPA, Lemonade failed to use a reasonable standard of care to protect Plaintiff's and Class Members' biometric identifiers and information from disclosure.

61.     In further violation of BIPA, as a private entity in possession of Plaintiff's and Class Members' biometric identifiers and information, Lemonade failed to adopt or make available to the public a retention schedule or guidelines for permanently destroying such biometric identifiers and information once the initial purpose for collecting them had or has been satisfied.

62.     Lemonade's violations of BIPA were intentional and reckless or, in the alternative, negligent.

### IV.    Experience of Representative Plaintiff.

---

[19]     https://www.crunchbase.com/organization/lemonade/technology (last visited July 13, 2021).

FILED DATE: 7/29/2021 12:00 PM   2021CH03406

63.     Plaintiff, an Illinois resident, has been a Lemonade customer since at least 2018.  In connection with submitting an insurance claim following a weather incident which caused damage to his apartment, Plaintiff, as required by Defendant, accessed and used Lemonade's App.

64.     Plaintiff answered numerous questions posed to him by a Lemonade "chat-bot." Lemonade had all the requisite information it needed to process Plaintiff's claim, as well as his contact information in order to follow-up with him if it required additional information.

65.     Nonetheless, Lemonade required Plaintiff to upload a "short video describing the incident."

66.     Plaintiff uploaded a video of himself describing the incident on August 11, 2020. Plaintiff did not know that Lemonade would collect, obtain, store and/or use his biometric identifiers or biometric information.  Plaintiff did not give informed written consent to Lemonade to collect, obtain, store and/or use his biometric identifiers or biometric information, nor was Plaintiff presented with or made aware of any publicly available retention schedule regarding his biometric identifiers or biometric information.

67.     Likewise, Lemonade never provided Plaintiff with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage or use of his unique biometric identifiers and/or biometric information.

68.     By collecting, obtaining, storing, and using Plaintiff's unique biometric identifiers and/or biometric information without his consent, written or otherwise, Lemonade invaded Plaintiff's statutorily protected right to privacy in his biometrics.

69.     In direct violation of §§15(b)(2) and 15(b)(3) of BIPA, Lemonade never informed Plaintiff or other Illinois residents who had their biometrics collected of the specific purpose and

17

length of time for which their biometric identifiers or information would be collected, stored, and used, nor did Defendant obtain a written release from these individuals.

70. In direct violation of § 15(a) of BIPA, Lemonade did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

## CLASS ALLEGATIONS

71. **Class Definition:** Plaintiff brings this action pursuant to 735 ILCS 5/2-801 on behalf of a Class, defined as follows:

> All individuals whose biometric identifiers or biometric information were collected, captured, stored, used, transmitted, received or otherwise obtained and/or disseminated by Lemonade within the State of Illinois within the applicable limitations period (the "Class").

72. Excluded from the Class are (i) any members of the judiciary assigned to preside over this Matter, as well as their immediate family members, (ii) any officer or director of Defendant and any immediate family members of such officer or director; (iii) any entity in which Defendant have a controlling interest and (iv) any employees and agents of Defendant.

73. Numerosity: Pursuant to 735 ILCS 5/2-801(1), the number of persons within the Class is substantial, believed to amount to thousands of persons. It is, therefore, impractical to join each Member of the Class as a named Plaintiff. Further, the size and relatively modest value of the claims of the individual Members of the Class render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, membership in the Class is readily ascertainable and identifiable from Lemonade's records.

74.　Commonality and Predominance: Pursuant to 735 ILCS 5/2-801(2), there are well-defined common questions of fact and law that exist as to all Members of the Class and that predominate over any questions affecting only individual Members of the Class.  These common legal and factual questions, which do not vary from Class Member to Class Member, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a)　whether Defendant collected or otherwise obtained Plaintiff's and the Class Members' biometric identifiers and/or biometric information;

(b)　whether Defendant properly informed Plaintiff and the Class Members that they collected, used, and stored their biometric identifiers and/or biometric information;

(c)　whether Defendant obtained a written release (as defined in 740 ILCS 1410) to collect, use and store Plaintiff's and the Class Members' biometric identifiers and/or biometric information;

(d)　whether Defendant developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of their last interaction, whichever occurs first;

(e)　whether Defendant used Plaintiff's and the Class Members' biometric identifiers and/or biometric information to identify them;

(f)　whether Defendant destroyed Plaintiff's and the Class Members' biometric identifiers and/or biometric information once that information was no longer needed for the purpose for which it was originally collected; and

(g)　whether Defendant's violations of BIPA were committed intentionally, recklessly or negligently.

75.　Adequate Representation: Pursuant to 735 ILCS 5/2-801(3), Plaintiff has retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict

FILED DATE: 7/29/2021 12:08 PM 2021CH03668

FILED DATE: 7/29/2021 12:08 PM   2021CH03468

with, the interests of the absent Members of the Class. Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by Members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class, additional claims as may be appropriate and/or to amend the Class definition.

76.     Superiority: Pursuant to 735 ILCS 5/2-801(4), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class Members is impracticable. Even if every Member of the Classes could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent ,or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each Member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

### COUNT I – FOR DAMAGES AGAINST DEFENDANT
### VIOLATION OF 740 ILCS 14/15(a) – FAILURE TO INSTITUTE, MAINTAIN AND ADHERE TO PUBLICLY AVAILABLE RETENTION SCHEDULE

77.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

78.     BIPA mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention – and, importantly, deletion – policy. Specifically, those companies must: (i) make publicly available a written policy establishing a retention

FILED DATE: 7/29/2021 12:08 PM   2021CH03466

schedule and guidelines for permanent deletion of biometric data (at most three years after the company's last interaction with the individual); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS § 14/15(a).

79.   Defendant failed to comply with these BIPA mandates.

80.   Defendant qualifies as a "private entity" under BIPA. *See* 740 ILCS § 14/10.

81.   Plaintiff and the Class are individuals who have had their "biometric identifiers" collected by Defendant (in the form of their facial geometry and/or voiceprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS § 14/10.

82.   Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

83.   Defendant failed to publish a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information as specified by BIPA. *See* 740 ILCS § 14/15(a).

84.   Upon information and belief, Defendant lacks a retention schedule and guidelines for permanently destroying Plaintiff's and the Class's biometric data and have not and will not destroy Plaintiff's or the Class's biometric data when the initial purpose for collecting or obtaining such data has been satisfied or within three years of the individual's last interaction with the app.

85.   On behalf of themselves and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to

FILED DATE: 7/29/2021 12:08 PM   2021CH03468

740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3).

## COUNT II – FOR DAMAGES AGAINST DEFENDANT
## VIOLATION OF 740 ILCS 14/15(b) – FAILURE TO OBTAIN INFORMED WRITTEN CONSENT AND RELEASE BEFORE OBTAINING BIOMETRIC IDENTIFIERS OR INFORMATION

86.     Plaintiff incorporates the foregoing allegations as if fully set forth herein

87.     BIPA requires companies to obtain informed written consent from individuals before acquiring their biometric data. Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] first: (1) informs the subject…in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject…in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information…" 740 ILCS § 14/15(b) (emphasis added).

88.     Defendant failed to comply with these BIPA mandates.

89.     Defendant is a "private entity" under BIPA. *See* 740 ILCS § 14/10.

90.     Plaintiff and the Class are individuals who have had their "biometric identifiers" collected by Defendant (in the form of their facial geometry and/or voiceprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS § 14/10.

91.     Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

92.     Defendant systematically and automatically collected, used, stored and disseminated Plaintiff's and the Class's biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS § 14/15(b)(3).

93.     Defendant did not inform Plaintiff and the Class in writing that their biometric identifiers and/or biometric information were being collected, stored, used and disseminated, nor did Defendant inform Plaintiff and the Class in writing of the specific purpose(s) and length of term for which their biometric identifiers and/or biometric information were being collected, stored, used, and disseminated as required by 740 ILCS § 14/15(b)(1)-(2).

94.     By collecting, storing, and using Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendant violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS § 14/1, *et seq*.

95.     On behalf of themselves and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3).

**COUNT III – FOR DAMAGES AGAINST DEFENDANT VIOLATION OF
740 ILCS 14/15(d): Disclosure of Biometric Identifiers and Information
Before Obtaining Consent**

FILED DATE: 7/29/2021 12:08 PM   2021CH03468

96.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

97.    BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for that disclosure. *See* 740 ILCS § 14/15(d)(1).

98.    Defendant failed to comply with this BIPA mandate.

99.    Defendant qualifies as a "private entity" under BIPA. *See* 740 ILCS § 14/10.

100.    Plaintiff and the Class are individuals who have had their "biometric identifiers" collected by Defendant (in the form of their facial geometry and/or voiceprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS § 14/10.

101.    Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

102.    Defendant systematically and automatically disclosed, redisclosed, or otherwise disseminated Plaintiff's and the Class's biometric identifiers and/or biometric information without first obtaining the consent required by 740 ILCS § 14/15(d)(1).

103.    By disclosing, redisclosing, or otherwise disseminating Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendant violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS § 14/1, *et seq.*

104.    On behalf of themselves and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, use and dissemination of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS §

FILED DATE: 7/29/2021 12:08 PM   2021CH03668

14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully request that this Court enter an Order:

A.      Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as Class representatives and appointing undersigned counsel as Class Counsel;

B.      Declaring that Defendant's actions, as set forth above, violate BIPA;

C.      Awarding statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS § 14/20(1);

D.      Declaring that Defendant's actions, as set forth above, were intentional and/or reckless;

E.      Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including an Order requiring Defendant to collect, store, use and disseminate biometric identifiers and/or biometric information in compliance with BIPA;

F.      Awarding Plaintiff and the Class their reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3);

G.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and,

H.      Awarding all such other and further relief as equity and justice may require.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims so triable.

Date:   July 21, 2021                                   Respectfully Submitted,

                                                        */s/ Katrina Carroll*
                                                        Katrina Carroll

25

**CARLSON LYNCH, LLP**
Kyle A. Shamberg
Nicholas R. Lange
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
kcarroll@carlsonlynch.com
*kshamberg@ carlsonlynch.com*
*nlange@carlsonlynch.com*
Firm ID: 63746

Gary F. Lynch*
Kelly K. Iverson*
Jamisen A. Etzel*
Nicholas A. Colella*
**CARLSON LYNCH, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
glynch@carlsonlynch.com
kiverson@carlsonlynch.com
jetzel@carlsonlynch.com
ncolella@carlsonlynch.com

Joseph P. Guglielmo*
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com

*Attorneys for Plaintiff*

* = pro hac vice forthcoming

26

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# Exhibit C

Case: 1:21-cv-04513 Document #: 2-1 Filed: 08/24/21 Page 103 of 249 PageID #:110

FILED
7/22/2021 11:36 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03583

14146238

FILED DATE: 7/22/2021 12:00 AM   2021CH03583

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

KYLE SWERDLOW, individually and on
behalf of all others similarly situated,

        Plaintiff,

        v.

LEMONADE INSURANCE AGENCY,
LLC,

        Defendant.

Case No.: **2021CH03583**

## CLASS ACTION COMPLAINT

Plaintiff Kyle Swerdlow ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for violations of the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.*, against Defendant Lemonade Insurance Agency, LLC ("Lemonade" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge and the advice and consultation of third-party agents concerning technical matters.

## NATURE OF THE ACTION

1. Plaintiff brings this action for damages and other legal and equitable remedies resulting from the illegal actions of Defendant in collecting, storing, and using Plaintiff's and other similarly situated individuals' biometric identifiers[1] and biometric information[2] (referred to collectively as "biometrics") without obtaining the requisite prior informed written consent or providing the requisite data retention and destruction policies, in direct violation of BIPA.

---

[1] "'Biometric identifier' means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10.

[2] "'Biometric information' means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.*

FILED DATE: 7/29/2021 12:00 AM    2021CH03460

2.      The Illinois Legislature has found that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." *Id.*

3.      In recognition of these concerns over the security of individuals' biometrics, the Illinois Legislature enacted BIPA, which provides, *inter alia*, that a private entity like Defendant may not obtain and/or possess an individual's biometrics unless it: (1) informs that person (or their representative) in writing that a biometric identifier or biometric information is being collected or stored, *id.* 14/15(b)(1); (2) informs that person in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used, *id.* 14/15(b)(2); (3) receives a written release from the person (or their representative) for the collection of his or her biometric identifier or information, *id.* 14/15(b)(3); and (4) publishes publicly available written retention schedules and guidelines for permanently destroying biometric identifiers and biometric information. *Id.* 740 ILCS 14/15(a). Further, the entity must store, transmit, and protect from disclosure all biometric identifiers and biometric information using the same standard of care in the industry and in a manner at least as protective as the means used to protect other confidential and sensitive information. *Id.* 14/15(e). Finally, no private entity may sell, lease, trade or otherwise profit from a person's or customer's biometrics. *Id.* 14/15(c).

4.      In direct violation of each of the foregoing provisions of § 15(a) and § 15(b) of BIPA, Defendant is actively collecting, storing, and using—without providing notice, obtaining

FILED DATE: 7/29/2021 12:00 AM   2021CH03460

informed written consent, or publishing data retention policies—the biometrics of thousands of Illinois residents who have submitted insurance claims to Defendant.

5.       Defendant requires consumers submitting insurance claims to send them a video via their digital application explaining the basis for their claim.[3]



---

[3] *The Secret Behind Lemonade's Claims*. https://www.lemonade.com/claims; *see also* Lemonade, Inc., *Form S-1* (June 25, 2020), https://www.sec.gov/Archives/edgar/data/1691421/000104746920003846/a2241899zs-1a.htm ("We also ask the customer to record a video explaining their claims to enhance the claims review process. After the customer completes a claim report on our mobile app, the customer is asked to enter bank account wire information. If the claim is approved, a payment is issued and deposited directly into the customer's account. Claims are commonly paid and declined through our claims-bot, AI Jim, within seconds.").

FILED DATE: 7/28/2021 12:00 AM 2021CH03460

6.    Insureds are required to keep their face in a designated frame while submitted their claims so that their facial geometry is in frame:





FILED DATE: 7/29/2021 12:00 AM 2021CH03460

7.    Using artificial intelligence (AI), Defendant "carefully analyzes these videos for signs of fraud." It does so by examining "non-verbal cues," which it has clarified does not involve "us[ing] physical or personal features to deny claims (phrenology/physiognomy)."[4]



---

[4] Sara Morrison, *A Disturbing, Viral Twitter Thread Reveals How AI-Powered Insurance Can Go Wrong*, Vox, (May 27, 2021), https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (including a screenshot of Lemonade's tweet to this effect).

FILED DATE: 7/22/2021 12:00 AM    2021CH03460

8.    Defendant then inputs the "predictive data" gathered from consumers to feed its "machine learn[ing]" process.



9.    Using its claims process, Defendant captures, uploads, stores, and disseminates app users' facial geometry and related biometrics without complying with BIPA's requirements.

10.    If Defendant's database of app users' biometrics were to fall into the wrong hands, by data breach or otherwise, these consumers could have their identities or financial and other highly personal information stolen and used for nefarious purposes. BIPA confers on Plaintiff and all other similarly situated Illinois residents a right to know of such risks inherent to the collection and storage of biometrics, and a right to know how long such risks will persist after their use of the mobile application. Yet Defendant never adequately informed any of its app users of its biometrics collection practices, never obtained written consent from any of its app users regarding its biometric practices, and never provided any data retention or destruction policies to any of its app users.

6

FILED DATE: 7/29/2021 12:00 AM   2021CH03460

11.     Plaintiff brings this action to prevent Defendant from further violating the privacy rights of Illinois residents and to recover statutory damages for Defendant's unauthorized collection, storage, and use of these individuals' biometrics in violation of BIPA.

## JURISDICTION AND VENUE

12.     The Court has personal jurisdiction over Defendant because the biometric information that gives rise to this lawsuit were captured from Plaintiff Swerdlow while he was residing and physically present in Cook County, Illinois.

13.     The Chancery Division is the appropriate venue for this action because it is a class action and, additionally, because it seeks declaratory and injunctive relief.

## PARTIES

14.     Plaintiff Swerdlow is, and has been at all relevant times, a resident and citizen of Chicago, Illinois, in Cook County, Illinois.

15.     Defendant Lemonade Insurance Agency, LLC is a New York limited liability company with its headquarters and principal place of business in New York, New York. Defendant is a subsidiary of Lemonade Inc.

16.     Defendant, a "fintech unicorn," is a licensed insurance carrier.[5] Defendant, together with its sister subsidiary Lemonade Life Insurance Agency, offers homeowners, renters, pet, and life insurance. Defendant markets itself as "millennial-friendly," utilizing a web-only platform.[6] It is also the owner of the smartphone application "Lemonade Insurance" which is designed, developed, implemented, hosted, maintained, updated, and otherwise operated from Lemonade

---

[5] Jeff Kauflin & Kristin Stoller, *First, Fire All The Brokers: How Lemonade, A Millennial-Loved Fintech Unicorn, Is Disrupting The Insurance Business*, Forbes (May 2, 2019), https://www.forbes.com/sites/jeffkauflin/2019/05/02/lemonade-fintech-insurance-unicorn/?sh=2 03b6ffd6cde.
[6] *See id*.

FILED DATE: 7/29/2021 12:00 AM   2021CH03460

Insurance Agency's headquarters in New York, New York. This application functions using servers located in New York to scan and store Class members' biometric data without their consent.

## **FACTUAL ALLEGATIONS**

### I.    ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT

17.    In 2008, the Illinois Legislature enacted BIPA due to the "very serious need [for] protections for the citizens of Illinois when it comes to biometric information." Illinois House Transcript, 2008 Reg. Sess. No. 276. BIPA makes it unlawful for a company to, *inter alia*, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers biometric information, unless it first:

> (l) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative."

740 ILCS 14/15(b).

18.    Section 15(a) of BIPA also provides:

> A private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

740 ILCS 14/15(a).

19.     As alleged below, Defendant's practices of collecting, storing, and using individuals' biometric identifiers and associated biometric information without obtaining informed written consent violate all three prongs of § 15(b) of BIPA. Additionally, Defendant's failure to provide a publicly-available written policy regarding its schedule and guidelines for the retention and permanent destruction of individuals' biometrics identifiers and biometric information also violates § 15(a) of BIPA.

## II.     DEFENDANT VIOLATES ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT

20.     Unbeknownst to the average consumer, and in direct violation of § 15(b)(1) of BIPA, Defendant scans and collects, and then indefinitely stores in an electronic database, biometric information and identifiers of its app users when they submit a video recording for their claim through the Lemonade mobile application—without ever informing anyone of this practice in writing.

21.     In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Defendant never informed Illinois residents who submitted a video recording for their claim through the Lemonade mobile application of the specific purpose and length of term for which their biometrics would be collected, stored, and used, nor did Defendant obtain a written release from any of these individuals.

22.     In direct violation of § 15(a) of BIPA, Defendant does not have written, publicly-available policies identifying their retention schedules, or guidelines for permanently destroying any of these biometric identifiers or biometric information.

## III.     PLAINTIFF KYLE SWERDLOW'S EXPERIENCE

23.     In or around June 2020, Plaintiff Swerdlow recorded a video as part of the insurance claims process via Defendant's mobile application.

FILED DATE: 7/29/2021 12:06 AM   2021CH03460

24.     When Plaintiff Swerdlow recorded and submitted this video on Defendant's mobile application, Defendant captured, collected, stored, and transferred biometric scans of Plaintiff Swerdlow's face and other biometric information and identifiers.

25.     Plaintiff Swerdlow never consented, in writing or in any other form, to the collection or storage of his unique biometric identifiers or biometric information.

26.     Further, Defendant never provided Plaintiff Swerdlow with a written release permitting Defendant to collect or store his unique biometric identifiers or biometric information. Plaintiff Swerdlow never signed such a release, nor did he have the opportunity to consider doing so.

27.     Likewise, Defendant never provided Plaintiff Swerdlow with the requisite statutory disclosures or any opportunity to prohibit or prevent the collection, storage, or use of his unique biometric identifiers or biometric information.

28.     Defendant never provided Plaintiff Swerdlow with a written policy establishing a retention schedule and guidelines for permanently destroying his biometric identifiers and biometric information.

29.     By collecting Plaintiff Swerdlow's unique biometrics without his consent, written or otherwise, Defendant invaded Plaintiff Swerdlow's statutorily protected right to privacy in his biometrics.

## CLASS ALLEGATIONS

30.     **Class Definition**: Plaintiff brings this action pursuant to 735 ILCS 5/2-801 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All individuals who had their biometric information and identifiers collected, captured, received, or otherwise obtained and/or stored, by Defendant in Illinois.

FILED DATE: 7/29/2021 12:06 AM   2021CH03460

The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) the legal representatives, successors, and assigns of any such excluded persons.

31.     **Numerosity**: Pursuant to 735 ILCS 5/2-801(1), members of the Class are so numerous that their individual joinder is impracticable. Upon information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Defendant's records.

32.     **Commonality and Predominance**: Pursuant to 735 ILCS 5/2-801(2), common and well-defined questions of fact and law exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a)     whether Defendant collected or otherwise obtained Plaintiff's and the Class's biometric identifiers or biometric information;

(b)     whether Defendant properly informed Plaintiff and the Class that it collected, used, and stored their biometric identifiers or biometric information;

FILED DATE: 7/29/2021 12:00 AM 2021CH03460

(c)     whether Defendant obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Class's biometric identifiers or biometric information;

(d)     whether Defendant developed and made available to the public a written policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of their last interaction, whichever occurs first;

(e)     whether Defendant used Plaintiff's and the Class's biometric identifiers or biometric information to identify them; and

(f)     whether Defendant's violations of BIPA were committed intentionally, recklessly, or negligently.

33.     **Adequate Representation**: Pursuant to 735 ILCS 5/2-801(3), Plaintiff has retained competent counsel experienced in prosecuting complex consumer class action. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff and his counsel can fairly and adequately represent and protect the interests of such a Class because their interests do not conflict with the interests of the Class members Plaintiff seeks to represent. Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class or additional claims as may be appropriate.

34.     **Superiority**: Pursuant to 735 ILCS 5/2-801(4), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is impracticable. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Moreover, even if every member of the Class could afford to pursue individual litigation, the Court system could not. Individual litigation of numerous cases would be unduly burdensome to the courts. Individualized

FILED DATE: 7/29/2021 12:00 AM   2021CH03460

litigation would also present the potential for inconsistent or contradictory judgments, and it would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the Class. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Plaintiff anticipates no difficulty in the management of this action as a class action. Class-wide relief is essential to compel compliance with BIPA.

## COUNT I

**Violation of 740 ILCS 14/1, *et seq.***
**(On Behalf of Plaintiff and the Class)**

35.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

36.     BIPA makes it unlawful for any private entity to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information . . . ." 740 ILCS 14/15(b).

37.     Defendant is a New York limited liability company and thus qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

FILED DATE: 7/29/2021 12:00 AM 2021CH03460

38. Plaintiff and the Class members are individuals who had their biometrics, collected and stored by Defendant. *See* 740 ILCS 14/10.

39. Defendant stored Plaintiff's and the Class members' biometrics in the form of a digitally encrypted code, derived from Plaintiff's and the Class members' facial geometry, that uniquely identifies the individual to whom the facial geometry belongs.

40. Defendant systematically collected, used, and stored Plaintiff's and the Class members' biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3), and thereby uniformly invaded Plaintiff's and each Class member's statutorily protected right to privacy in their biometrics.

41. Defendant failed to properly inform Plaintiff or the Class in writing that their biometric identifiers and/or biometric information were being collected, stored, or otherwise obtained, and of the specific purpose and length of term for which those biometrics were being collected, stored, and used, as required by 740 ILCS 14/15(b)(1)-(2).

42. In addition, Defendant does not provide a written, publicly available retention schedule and guidelines for permanently destroying the biometric identifiers and/or biometric information of Plaintiff or the Class members, as required by BIPA. *See* 740 ILCS 14/15(a). The failure by Defendant to provide such a schedule and guidelines constitutes an independent violation of the statute.

43. Each instance in which Defendant collected, stored, used, or otherwise obtained Plaintiff's and/or the Class's biometric identifiers and/or biometric information as described herein constitutes a separate violation of the statutory right of Plaintiff and each Class member to keep private these biometric identifiers and biometric information, as set forth in BIPA, 740 ILCS 14/1, *et seq.*

14

44. On behalf of himself and the proposed Class members, Plaintiff seeks: (1) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with BIPA's requirements, including BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein, and for the provision of the requisite written disclosure to consumers; (2) statutory damages of $5,000.00 for each and every intentional and reckless violation of BIPA pursuant to 740 ILCS 14/20(2), or, alternatively, statutory damages of $1,000.00 for each and every violation pursuant to 740 ILCS 14/20(1) if Defendant's violations are found to have been committed negligently; and (3) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court enter an Order:

A. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing his counsel as Class Counsel;

B. Declaring that Defendant's actions, as set out above, violate BIPA, 740 ILCS l4/1, *et seq.*;

C. Awarding statutory damages of $5,000.00 for each and every intentional and reckless violation of BIPA pursuant to 740 ILCS 14/20(2), or, alternatively, statutory damages of $1,000.00 for each and every violation pursuant to 740 ILCS 14/20(1) if Defendant's violations are found to have been committed negligently;

FILED DATE: 7/22/2021 12:00 AM   2021CH03460

D.    Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an order requiring Defendant ensures that its collection, storage, and usage of biometric identifiers or biometric information complies with BIPA;

E.    Awarding Plaintiff and the Class reasonable litigation expenses and attorneys' fees;

F.    Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

G.    Awarding such other and further relief as equity and justice may require.

Dated: July 22, 2021                    Respectfully submitted,

                                        **MASON LIETZ & KLINGER LLP**

                                        By: */s/ Gary M. Klinger*
                                        Gary M. Klinger
                                        227 W. Monroe Street, Suite 2100
                                        Chicago, IL 60606
                                        Tel: (202) 429-2290
                                        Fax: (202) 429-2294
                                        E-Mail: gklinger@masonllp.com

                                        **BURSOR & FISHER, P.A.**
                                        Frederick J. Klorczyk III*
                                        888 Seventh Avenue
                                        New York, NY 10019
                                        Tel: (646) 837-7150
                                        Fax: (212) 989-9163
                                        E-Mail: fklorczyk@bursor.com

                                        **BURSOR & FISHER, P.A.**
                                        Brittany S. Scott*
                                        1990 N. California Boulevard, Suite 940
                                        Walnut Creek, CA 94596
                                        Tel: (925) 300-4455
                                        Fax: (925) 407-2700
                                        Email: bscott@bursor.com

*\*Pro Hac Vice Forthcoming*                    *Attorneys for Plaintiff and the proposed Class*

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

Exhibit D

Hearing Date: 11/19/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
    Cook County, IL

FILED DATE: 8/22/2021 3:55 PM 2021CH03593

FILED
7/22/2021 3:55 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03593

14154064

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

ALEXANDER CLARKE, individually and
on behalf of all others similarly situated,

        Plaintiff,

v.

LEMONADE INC.,

        Defendant.

Case no. 2021CH03593

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

Plaintiff Alexander Clarke ("Plaintiff"), individually and on behalf of a Class of all other

persons similarly situated defined below, by and through his attorneys, brings this Class Action

Complaint ("Complaint") pursuant to 735 ILCS 5/2-801 against Lemonade Inc. ("Lemonade" or

"Defendant"). Plaintiff alleges the following based upon personal knowledge as to himself and his

own actions, and, as to all other matters, alleges, upon information and belief and investigation of

his counsel, as follows:

### NATURE OF THE ACTION

1.    This action seeks damages and injunctive relief arising out of Defendant's

violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, et seq. ("BIPA").

BIPA prohibits, among other things, private entities from collecting, capturing, obtaining,

disclosing, redisclosing, disseminating or profiting from the biometric identifiers or information

of an individual without providing written notice and without obtaining a written release from the

impacted individual or his or her authorized representative. BIPA also requires private entities in

1

FILED DATE: 8/22/2021 2:56 PM    2021CH03460

possession of biometric identifiers to adopt retention and destruction policies and to take measures to prevent the release of that information.

2.      Lemonade is an insurance company based in New York offering homeowners and renters insurance in the United States.  The company uses artificial intelligence and behavioral economics, to replace brokers and bureaucracy with bots and machine learning. According to Lemonade's securities filing, customers seeking renters or homeowners insurance can have a two-minute chat with its bot, AI Maya, while claims can be filed by chatting with another bot, AI Jim, who pays claims in as little as ***three seconds.*** [1]

3.      Lemonade states that its mission is to harness technology and social impact to be the world's most loved insurance company.  It further represents that its data architecture melds artificial intelligence with the human kind and learns from the prodigious data it generates to become ever better at delighting customers and quantifying risk.[2]  Lemonade touts its fast processing of claims through the use of artificial intelligence.

4.      Lemonade recently admitted that it collects and analyzes users' information, including video information which the Company claims to utilize in connection with its claims handling process.  In now-deleted tweets and blog posts, the Company represented, among other things, that its AI analyzes the videos that users submit when they file insurance claims for signs of fraud, picking up "non-verbal cues that traditional insurers can't, since they don't use a digital claims process."

---

[1] Chen, I-Chun (June 25, 2020). *"Lemonade, insurer that uses bots to replace brokers, plans $286M IPO". American City Business Journals*. https://www.bizjournals.com/newyork/news/2020/06/25/lemonade-insurer-that-uses-bots-plans-ipo.html

[2] *Id.*

FILED DATE: 8/22/2021 12:56 PM    2021CH03900

**Lemonade** ✓ @Lemonade_Inc · May 24                    ···

Lemonade is built on a digital substrate - we use bots and machine learning to make insurance instant, seamless, and delightful.

This puts us at a data advantage—in fact, we collect about 100X more data than traditional insurance carriers. Here's why that matters 👇 (1/7)



💬 135          ↑↓ 434          ♡ 290          ↑

**Lemonade** ✓ @Lemonade_Inc · May 24                    ···

A typical homeowners policy form has 20–40 fields (name, address, bday...), so traditional insurers collect 20-40 data points per user.

AI Maya asks just 13 Q's but collects over 1,600 data points, producing nuanced profiles of our users and remarkably predictive insights. (2/7)

💬 15          ↑↓ 45          ♡ 32          ↑

**Lemonade** ✓ @Lemonade_Inc · May 24                    ···

This data helps us understand the level of risk each customer brings, which improves our underwriting, customer acquisition, and fraud detection. (3/7)

💬 4          ↑↓ 20          ♡ 32          ↑

@Lemonade_Inc

Replying to @Lemonade_Inc

For example, when a user files a claim, they record a video on their phone and explain what happened.

Our AI carefully analyzes these videos for signs of fraud. It can pick up non-verbal cues that traditional insurers can't, since they don't use a digital claims process. (4/7)

12:38 PM · May 24, 2021 · Twitter Web App

3

FILED DATE: 8/22/2021 2:55 PM  2021CH03860



5.      In response to the tweets and blog posts, Lemonade issued the following statement on its website:

> ***We have never, and will never, let AI auto-reject claims.*** Here's why: We do not believe that it is possible, nor is it ethical (or legal), to deduce anything about a person's character, quality, or fraudulent intentions based on facial features, accents, emotions, skin-tone, or any other personal attribute.[3]

6.      Notably, Lemonade did not deny its collection and use of biometric information for its artificial intelligence, in fact it is something that it prides its company on. Lemonade merely states that artificial intelligence is not involved in the auto-rejection of claims.

7.      Plaintiff alleges that Defendant's collection, storage, use and dissemination of its users' sensitive information is a violation of BIPA.

8.      The State of Illinois General Assembly noted in passing BIPA that: "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no

---

[3] https://www.lemonade.com/blog/lemonades-claim-automation/

recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions."

9.     Plaintiff brings this action against Lemonade for their collection and use of Plaintiff's and Class' biometric identifiers and biometric information in violation of BIPA, including their facial geometry via videos it required its customers to upload via its mobile application (the "App").

10.     Plaintiff seeks damages and injunctive relief resulting from Defendant's actions in collecting and using biometric information and Lemonade's failure to obtain prior, informed written consent in direct violation of BIPA.

## PARTIES

11.     Plaintiff Alexander Clarke is a citizen and resident of Illinois. Plaintiff obtained pet and renters insurance through Lemonade, and submitted a video that included his biometric information to Defendant in support of his claim for losses under his renters insurance policy.

12.     Defendant Lemonade Inc. is Delaware corporation with its principle executive offices located at 5 Crosby Street, 3rd Floor New York, New York 10013.  Lemonade is a fully licensed and regulated insurance company which underwrites, prices, and sells various insurance policies.  Lemonade is incorporated in the State of Delaware and has its principal place of business in New York, New York.  Lemonade is a public company traded under the ticker symbol LMND.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this lawsuit as the Illinois Constitution gives trial courts subject matter jurisdiction over all justiciable matters.

FILED DATE: 8/22/2021 2:56 PM   2021CH03860

FILED DATE: 8/22/2021 12:56 PM    2021CH03660

14.     This Court may assert personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States because Defendant Lemonade—a publicly-traded company incorporated in Delaware with its principal executive offices located in New York—does substantial business in the State of Illinois.

15.     Moreover, the exercise of personal jurisdiction over Lemonade is appropriate because it collected, stored, and used biometric information and identifiers from Illinois residents who used the Lemonade App in violation of BPIA.

16.     Furthermore, many of the biometric markers and images Lemonade collected, used and stored were created in Illinois, uploaded from Illinois and/or managed via Illinois citizens' user accounts, computers, and mobile devices.

17.     This Court has personal jurisdiction over Defendant because Lemonade used and disseminated data derived directly from Illinois-based users and exposed residents of Illinois to ongoing privacy risks within Illinois based on the collection, capture, obtainment, disclosure, redisclosure and dissemination of their biometric identifiers and information. Furthermore, many of the images Defendant used for their unlawful collection, capture and obtainment of biometric identifiers and information were created in Illinois, uploaded from Illinois, and/or managed via Illinois-based user accounts, computers, and mobile devices.  Because of the scope and magnitude of Defendant's conduct, Defendant knew that their collection, capture, obtainment, disclosure, redisclosure and dissemination of impacted individuals' biometric identifiers and information would injure Illinois residents and citizens. Defendant knew or had reason to know that collecting, capturing, obtaining, disclosing, redisclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite releases would deprive Illinois citizens and residents of their statutorily-protected privacy

rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via their Illinois-managed devices and exposed residents in Illinois to potential surveillance and other privacy harms as they went about their lives within the state.

18.    Because of the scope and magnitude of its conduct, Lemonade knew that its collection, storage, use, disclosure and dissemination of impacted individuals' biometric identifiers and information would injure Illinois residents and citizens.

19.    Lemonade knew or had reason to know that collecting, storing, using, disclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite consent would deprive Illinois citizens and residents of their statutorily-protected privacy rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via the devices they managed from Illinois and expose Illinois' residents to potential surveillance and other privacy harms as they went about their lives within the State.

20.    Venue is proper in this County pursuant to 735 ILCS 5/2-102(a) because Defendant conducts business in Cook County, and many of the acts complained about herein occurred in Cook County.

**FACTUAL BACKGROUND**

**I.    Illinois' Biometric Information Privacy Act**

21.    BIPA seeks to safeguard individuals' biometric identifiers and information.

22.    Biometric identifiers include a scan of an individual's face geometry or voiceprint. 740 ILCS § 14/10.

23.    Biometric information is "any information . . . based on an individual's biometric identifier used to identify an individual."  740 ILCS § 14/10.

FILED DATE: 8/22/2021 12:56 PM    2021CH03460

FILED DATE: 8/23/2021 12:56 PM   2021CH03460

24.     In the early 2000s, major national corporations started using Chicago and other locations in Illinois to test "new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." 740 ILCS § 14/5(c). Given its relative infancy, an overwhelming portion of the public became weary of this then-growing yet unregulated technology. *See* 740 ILCS § 14/5.

25.     In late 2007, a biometrics company called Pay by Touch, which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions, filed for bankruptcy. That bankruptcy was alarming to the Illinois Legislature because suddenly there was a serious risk that millions of fingerprint records – which, like other unique biometric identifiers, can be linked to people's sensitive financial and personal data – could now be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who used the company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

26.     Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted BIPA in 2008. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS § 14/5.

27.     Additionally, to ensure compliance, BIPA provides that, for <u>each</u> violation, the prevailing party may recover $1,000 or actual damages, whichever is greater, for negligent violations and $5,000, or actual damages, whichever is greater, for intentional or reckless violations. 740 ILCS § 14/20.

28. BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first:

     a. Informs the subject in writing that a biometric identifier or biometric information is being collected, stored and used;

     b. Informs the subject in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

     c. Receives a written release executed by the subject of the biometric identifier or biometric information.

*See* 740 ILCS § 14/15(b).

29. Biometric identifiers include retina and iris scans, fingerprints and handprints, and – most importantly here – facial geometry and voiceprints. *See* 740 ILCS § 14/10. Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *Id*.

30. BIPA establishes standards for how companies must handle Illinois citizens' biometric identifiers and biometric information. *See, e.g.,* 740 ILCS § 14/15(c)-(d). For example, BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for such disclosure. *See* 740 ILCS § 14/15(d)(1).

31. BIPA also prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifiers or biometric information (740 ILCS § 14/15(c)) and requires companies to develop and comply with a written policy – made available to the public – establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric

FILED DATE: 8/22/2021 2:56 PM 2021CH03960

9

information when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS § 14/15(a).

32.     The Illinois legislature enacted BIPA due to the increasing use of biometric data in financial and security settings, the general public's hesitation to use biometric information, and – most significantly – the unknown ramifications of biometric technology. Biometrics are biologically unique to the individual and, once compromised, an individual is at a heightened risk for identity theft and left without any recourse.

33.     BIPA provides individuals with a private right of action, protecting their right to privacy regarding their biometrics as well as protecting their rights to know the precise nature for which their biometrics are used and how they are being stored and ultimately destroyed. Unlike other statutes that only create a right of action if there is a qualifying data breach, BIPA strictly regulates the manner in which entities may collect, store, use, and disseminate biometrics and creates a private right of action for lack of statutory compliance.

34.     Plaintiff, like the Illinois legislature, recognizes how imperative it is to keep biometric information secure. Biometric information, unlike other personal identifiers such as a social security number, cannot be changed or replaced if hacked or stolen.

35.     In direct violation of each of the foregoing provisions of §§15(a) and 15(b) of BIPA, Lemonade collected, stored, and used—without first providing notice, obtaining informed written consent or publishing data retention policies—the biometrics and associated personally identifying information of Plaintiff and the Class who are Illinois residents who used Lemonade's App to apply for insurance and upload videos in order to have their insurance claims processed.

10

FILED DATE: 8/22/2021 2:56 PM   2021CH03460

II.     **Lemonade Collects, Stores and Uses Illinois' Residents' Protected Biometric Information and Identifiers**

36.     Defendant Lemonade is a fast-growing, publicly traded insurance company that prides itself on its pioneering use of artificial intelligence ("AI") and other technologies to intake and to process insurance claims.[4]

37.     Based in and originally launched in New York, Lemonade uses an AI-powered app that offers homeowners, renters, pet and life insurance policies.

38.     Lemonade began writing policies in the State of Illinois in or about April of 2017.

39.     Lemonade represented in its annual letter to shareholders that at the end of 2020, Lemonade had in excess of 1,000,000 customers in the United States.[5]   Lemonade's Chief Operating Officer boasted:

> With every new customer, our system grows smarter, our underwriting process gets better, and our prices become more accurate and fair.  **At Lemonade, one million customers translates into billions of data points, which feed our AI at an ever growing speed.  Quantity generates quality.**[6]

40.     One of the ways that Lemonade is able to collect so much of its customers' biometric and other information is by using its APP to collect and to maintain vast troves of customer information, including biometric information.

---

[4]     *See* https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (last visited July 21, 2021).

[5]     https://s24.q4cdn.com/139015699/files/doc_downloads/2021/Q4-2020-LMND-Shareholder-Letter_vF.pdf (last visited July 21, 2021)

[6]     *See* https://finance.yahoo.com/news/lemonade-ends-2020-over-one-134600018.html (last visited July 21 2021) (emphasis added).

41.     Lemonade is unique in the insurance industry in that its customers (its policy holders) are required, in connection with their claims submission, to upload a video message describing what happened and the facts upon which their claim is based.[7]

42.     Notably, the video is not essential or even necessary to the claim submission, which is completed via a "chat-bot" in the App.  Rather, Lemonade requires its customers to provide a video of themselves through the App in order to acquire thousands and thousands of "bits" of data so that Lemonade can then decide whether to honor a given claim and how to price its insurance products.

43.     Lemonade admitted in a series of tweets and blogs that its AI analyzes videos of customers when determining if their claims are fraudulent.[8]

44.     Lemonade announced that its customer service chatbots collect as many as 1,600 data points from a single video of a customer answering questions regarding their claim:

---

[7]     *See* https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/#:~:text=Lemonade%2C%20(not%20the%20drink),claims%20if%20they%20suspect%20fraud (last visited July 15, 2021).

[8]     https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (last visited July 15, 2021).

FILED DATE: 8/22/2021 12:56 PM   2021CH03460

FILED DATE: 8/22/2021 2:56 PM   2021CH03460



45.     Lemonade's twitter thread "implied that [it] was able to detect whether a person was lying in their video and could thus decline insurance claims if its AI believed a person was lying."[9]

46.     Lemonade has boasted that it collects "100X more data than traditional insurance carriers."[10]

47.     Lemonade later attempted to clarify its tweet and blog postings, explaining that "[t]he term, non-verbal cues was a bad choice of words to describe **the facial recognition technology we're using** to flag claims submitted by the same person under different identities. These flagged claims then get reviewed by our human investigators."[11]

---

[9]        https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/.

[10]       https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

[11]       https://www.lemonade.com/blog/lemonades-claim-automation/ (last visited July 15, 2021) (emphasis added).

FILED DATE: 8/22/2021 2:56 PM   2021CH03460

48.    Regardless of its clarification, Lemonade did not deny that it collects and uses *facial recognition technology to collect reams of data, including biometric data like face geometry, from its customers, including those in the State of Illinois.*

49.    In a post authored by its Chief Executive Officer and shared on its blog, Lemonade stated:

> It's different for companies built on a digital substrate. Lemonade's chatbots do away with forms altogether, making the process fast and fun, but the data implications are still more profound:
>
> **Lemonade collects about 100x more data-points per customer.**
>
> That's the power of an entirely digital experience.[12]

50.    Indeed, as a recent article detailing Lemonade's questionable uses of AI explains, "[t]he in-depth collection of video data and analyzing it against AI tools make it clear that Lemonade must be storing at least some biometric data in order to train models to detect patterns of fraud."[13]

51.    Or, put another way, Lemonade is an insurance company that claims it is replacing human brokers and actuaries with bots and AI in order to streamline the insurance claim process. In the process, however, Lemonade collects tremendous amounts of data, including biometric information, about its customers without telling them in direct violation of BIPA.[14]

52.    For instance, an article published in *Forbes* detailed a situation where Lemonade used facial recognition technology to compare various claims submitted by customers in order to root out fraud:

---

[12]    https://www.lemonade.com/blog/precision-underwriting/ (last visited July 15, 2021) (emphasis in original).

[13]    https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/.

[14]    https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

FILED DATE: 8/22/2021 2:56 PM   2021CH03460

> In the summer of 2017, a Los Angeles man in his mid-20s put on a necklace, blond wig and makeup and made a cellphone video describing how his camera and other electronics had been stolen. He submitted the video to his renters insurance provider, Lemonade, which paid the $677 claim in two days. Three months later, dressed in jeans and a T-shirt and using a different name, email address and phone number, the same man submitted a video claim for a stolen $5,000 camera. But this time, the algorithms that are a crucial part of Lemonade's highly automated systems flagged the claim as suspicious. Last year, the persistent fraudster, this time wearing a pink dress, tried again, only to be foiled once more by Lemonade's computers.[15]

53.     Lemonade used its AI, including facial recognition technology, to determine that the claimants in the above scenario were the same person by collecting, storing, and using the immutable biometric information and identifiers of its customers.[16]

54.     In its S-1 form filed with the U.S. Securities and Exchange Commission prior to the company going public—and in forms since—Lemonade states that its proprietary AI algorithms are at the core of its business and that it could not function without them, but admits that they could also lead to profit loss should regulators ever crack down:

> ***Our proprietary artificial intelligence algorithms may not operate properly or as we expect them to,*** which could cause us to write policies we should not write, price those policies inappropriately or overpay claims that are made by our customers, the company wrote in the filing. Moreover, our proprietary artificial intelligence algorithms may lead to unintentional bias and discrimination.[17]

55.     Lemonade did not disclose to its customers the extent to which it was collecting and using their sensitive biometric (and other information).  Indeed, the "instant, seamless, and delightful" insurance experience that Lemonade aggressively markets was built by the collection

---

[15]     https://www.forbes.com/sites/jeffkauflin/2019/05/02/lemonade-fintech-insurance-unicorn/?sh=23c5a7ee6cde (last visited July 15, 2021).

[16]     https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/(stating that "[t]he in-depth collection of video data and analyzing it against AI tools make it clear that Lemonade must be storing at least some biometric data in order to train models to detect patterns of fraud").

[17]     https://www.vice.com/en/article/z3x47y/an-insurance-startup-bragged-it-uses-ai-to-detect-fraud-it-didnt-go-well (emphasis added).

FILED DATE: 8/22/2021 2:56 PM    2021CH03460

of its customers' own data, including their biometric information, which those customers never realized they were providing.

56.     As noted in a recent article entitled *A disturbing, viral Twitter thread reveals how AI-powered insurance can go wrong, Lemonade tweeted about what it means to be an AI-first insurance company. It left a sour taste in many customers' mouths:*

> It's rare for a company to be so blatant about how that data can be used in its own best interests and at the customer's expense. But rest assured that Lemonade is not the only company doing it.[18]

57.     According to the analytics site, Crunchbase, there were 47,345 downloads of the App in the last thirty days (as of July 13, 2021), representing a nearly 5% increase from the prior thirty-day period.[19]

## III.    Lemonade's Conduct Violates the BIPA.

58.     As detailed above, Lemonade designed and implemented an AI tool in the App that automatically performs facial scans, collecting the facial geometry of customers who use the App.

59.     In collecting, using, storing and otherwise obtaining the biometric identifiers and information of Plaintiff and the Class Members and, upon information and belief, subsequently disclosing, re-disclosing and otherwise disseminating those biometric identifiers and information to other related corporate entities—all without providing the requisite notice, obtaining the requisite written releases or satisfying any of the other provisions that would excuse it from BIPA's mandates—Lemonade violated BIPA.

60.     In further violation of BIPA, Lemonade failed to use a reasonable standard of care to protect Plaintiff's and Class Members' biometric identifiers and information from disclosure.

---

[18]     https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

[19]     https://www.crunchbase.com/organization/lemonade/technology (last visited July 13, 2021).

FILED DATE: 8/22/2021 2:55 PM   2021CH03560

61.     In further violation of BIPA, as a private entity in possession of Plaintiff's and Class Members' biometric identifiers and information, Lemonade failed to adopt or make available to the public a retention schedule or guidelines for permanently destroying such biometric identifiers and information once the initial purpose for collecting them had or has been satisfied.

62.     Lemonade's violations of BIPA were intentional and reckless or, in the alternative, negligent.

## IV.     Experience of Representative Plaintiff.

63.     Plaintiff, an Illinois resident, has been a Lemonade customer since at least 2018.  In connection with submitting an insurance claim following water damage to his apartment, Plaintiff, as required by Defendant, accessed and used Lemonade's App.

64.     Plaintiff answered numerous questions posed to him by a Lemonade "chat-bot." Lemonade had all the requisite information it needed to process Plaintiff's claim, as well as his contact information in order to follow-up with him if it required additional information.

65.     Nonetheless, Lemonade required Plaintiff to upload a "short video describing the incident."

66.     Plaintiff uploaded a video of himself describing the damage on July 10, 2018. Plaintiff did not know that Lemonade would collect, obtain, store and/or use his biometric identifiers or biometric information.  Plaintiff did not give informed written consent to Lemonade to collect, obtain, store and/or use his biometric identifiers or biometric information, nor was Plaintiff presented with or made aware of any publicly available retention schedule regarding his biometric identifiers or biometric information.

FILED DATE: 8/22/2021 12:55 PM   2021CH03660

67.     Likewise, Lemonade never provided Plaintiff with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage or use of his unique biometric identifiers and/or biometric information.

68.     By collecting, obtaining, storing, and using Plaintiff's unique biometric identifiers and/or biometric information without his consent, written or otherwise, Lemonade invaded Plaintiff's statutorily protected right to privacy in his biometrics.

69.     In direct violation of §§15(b)(2) and 15(b)(3) of BIPA, Lemonade never informed Plaintiff or other Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored, and used, nor did Defendant obtain a written release from these individuals.

70.     In direct violation of § 15(a) of BIPA, Lemonade did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

## CLASS ALLEGATIONS

71.     **Class Definition:** Plaintiff brings this action pursuant to 735 ILCS 5/2-801 on behalf of a Class, defined as follows:

> All individuals whose biometric identifiers or biometric information were collected, captured, stored, used, transmitted, received or otherwise obtained and/or disseminated by Lemonade within the State of Illinois within the applicable limitations period (the "Class").

72.     Excluded from the Class are (i) any members of the judiciary assigned to preside over this Matter, as well as their immediate family members, (ii) any officer or director of Defendant and any immediate family members of such officer or director; (iii) any entity in which Defendant have a controlling interest and (iv) any employees and agents of Defendant.

18

FILED DATE: 8/22/2021 12:56 PM   2021CH03960

73.     Numerosity: Pursuant to 735 ILCS 5/2-801(1), the number of persons within the Class is substantial, believed to amount to thousands of persons. It is, therefore, impractical to join each Member of the Class as a named Plaintiff. Further, the size and relatively modest value of the claims of the individual Members of the Class render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, membership in the Class is readily ascertainable and identifiable from Lemonade's records.

74.     Commonality and Predominance: Pursuant to 735 ILCS 5/2-801(2), there are well-defined common questions of fact and law that exist as to all Members of the Class and that predominate over any questions affecting only individual Members of the Class.  These common legal and factual questions, which do not vary from Class Member to Class Member, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a)     whether Defendant collected or otherwise obtained Plaintiff's and the Class Members' biometric identifiers and/or biometric information;

(b)     whether Defendant properly informed Plaintiff and the Class Members that they collected, used, and stored their biometric identifiers and/or biometric information;

(c)     whether Defendant obtained a written release (as defined in 740 ILCS 1410) to collect, use and store Plaintiff's and the Class Members' biometric identifiers and/or biometric information;

(d)     whether Defendant developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of their last interaction, whichever occurs first;

(e)     whether Defendant used Plaintiff's and the Class Members' biometric identifiers and/or biometric information to identify them;

(f)     whether Defendant destroyed Plaintiff's and the Class Members' biometric identifiers and/or biometric information once that information

19

FILED DATE: 8/22/2021 12:56 PM    2021CH03460

was no longer needed for the purpose for which it was originally collected; and

(g)    whether Defendant's violations of BIPA were committed intentionally, recklessly or negligently.

75.    Adequate Representation: Pursuant to 735 ILCS 5/2-801(3), Plaintiff has retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent Members of the Class. Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by Members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class, additional claims as may be appropriate and/or to amend the Class definition.

76.    Superiority: Pursuant to 735 ILCS 5/2-801(4), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class Members is impracticable. Even if every Member of the Classes could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent ,or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights

FILED DATE: 8/22/2021 12:56 PM   2021CH03560

of each Member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

**COUNT I – FOR DAMAGES AGAINST DEFENDANT**
**VIOLATION OF 740 ILCS 14/15(a) – FAILURE TO INSTITUTE, MAINTAIN AND**
**ADHERE TO PUBLICLY AVAILABLE RETENTION SCHEDULE**

77.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

78.     BIPA mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention – and, importantly, deletion – policy. Specifically, those companies must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (at most three years after the company's last interaction with the individual); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS § 14/15(a).

79.     Defendant failed to comply with these BIPA mandates.

80.     Defendant qualifies as a "private entity" under BIPA. *See* 740 ILCS § 14/10.

81.     Plaintiff and the Class are individuals who have had their "biometric identifiers" collected by Defendant (in the form of their facial geometry and/or voiceprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS § 14/10.

82.     Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

83.     Defendant failed to publish a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information as specified by BIPA. *See* 740 ILCS § 14/15(a).

84.     Upon information and belief, Defendant lacks a retention schedule and guidelines for permanently destroying Plaintiff's and the Class's biometric data and have not and will not

FILED DATE: 8/22/2021 12:56 PM    2021CH03960

destroy Plaintiff's or the Class's biometric data when the initial purpose for collecting or obtaining

such data has been satisfied or within three years of the individual's last interaction with the app.

85.    On behalf of themselves and the Class, Plaintiff seeks: (1) declaratory relief; (2)

injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by

requiring Defendant to comply with BIPA's requirements for the collection, storage, and use of

biometric identifiers and biometric information as described herein; (3) statutory damages of

$5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or,

in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to

740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses

pursuant to 740 ILCS § 14/20(3).

## COUNT II – FOR DAMAGES AGAINST DEFENDANT
### VIOLATION OF 740 ILCS 14/15(b) – FAILURE TO OBTAIN INFORMED WRITTEN CONSENT AND RELEASE BEFORE OBTAINING BIOMETRIC IDENTIFIERS OR INFORMATION

86.    Plaintiff incorporates the foregoing allegations as if fully set forth herein

87.    BIPA requires companies to obtain informed written consent from individuals

before acquiring their biometric data. Specifically, BIPA makes it unlawful for any private entity

to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's

biometric identifiers or biometric information unless [the entity] first: (1) informs the subject…in

writing that a biometric identifier or biometric information is being collected or stored; (2) informs

the subject…in writing of the specific purpose and length of term for which a biometric identifier

or biometric information is being collected, stored, and used; and (3) receives a written release

executed by the subject of the biometric identifier or biometric information…" 740 ILCS §

14/15(b) (emphasis added).

22

FILED DATE: 8/22/2021 12:56 PM    2021CH03600

88.     Defendant failed to comply with these BIPA mandates.

89.     Defendant is a "private entity" under BIPA. *See* 740 ILCS § 14/10.

90.     Plaintiff and the Class are individuals who have had their "biometric identifiers" collected by Defendant (in the form of their facial geometry and/or voiceprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS § 14/10.

91.     Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

92.     Defendant systematically and automatically collected, used, stored and disseminated Plaintiff's and the Class's biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS § 14/15(b)(3).

93.     Defendant did not inform Plaintiff and the Class in writing that their biometric identifiers and/or biometric information were being collected, stored, used and disseminated, nor did Defendant inform Plaintiff and the Class in writing of the specific purpose(s) and length of term for which their biometric identifiers and/or biometric information were being collected, stored, used, and disseminated as required by 740 ILCS § 14/15(b)(1)-(2).

94.     By collecting, storing, and using Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendant violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS § 14/1, *et seq*.

95.     On behalf of themselves and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of

23

FILED DATE: 8/22/2021 12:56 PM   2021CH03660

$5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3).

### COUNT III – FOR DAMAGES AGAINST DEFENDANT VIOLATION OF 740 ILCS 14/15(d): Disclosure of Biometric Identifiers and Information Before Obtaining Consent

96.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

97.     BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for that disclosure. *See* 740 ILCS § 14/15(d)(1).

98.     Defendant failed to comply with this BIPA mandate.

99.     Defendant qualifies as a "private entity" under BIPA. *See* 740 ILCS § 14/10.

100.     Plaintiff and the Class are individuals who have had their "biometric identifiers" collected by Defendant (in the form of their facial geometry and/or voiceprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS § 14/10.

101.     Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

102.     Defendant systematically and automatically disclosed, redisclosed, or otherwise disseminated Plaintiff's and the Class's biometric identifiers and/or biometric information without first obtaining the consent required by 740 ILCS § 14/15(d)(1).

103.     By disclosing, redisclosing, or otherwise disseminating Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendant violated Plaintiff's

24

FILED DATE: 8/22/2021 12:56 PM   2021CH03460

and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS § 14/1, *et seq.*

104.    On behalf of themselves and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, use and dissemination of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully request that this Court enter an Order:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as Class representatives and appointing undersigned counsel as Class Counsel;

B.    Declaring that Defendant's actions, as set forth above, violate BIPA;

C.    Awarding statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS § 14/20(1);

D.    Declaring that Defendant's actions, as set forth above, were intentional and/or reckless;

E.    Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including an Order requiring Defendant to collect, store, use and disseminate biometric identifiers and/or biometric information in compliance with BIPA;

FILED DATE: 8/2/2021 2:56 PM   2021CH03460

F.      Awarding Plaintiff and the Class their reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3);

G.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and,

H.      Awarding all such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

Date:   July 22, 2021                                        Respectfully Submitted,

*/s/ Katrina Carroll*
Katrina Carroll
**CARLSON LYNCH, LLP**
Kyle A. Shamberg
Nicholas R. Lange
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
kcarroll@carlsonlynch.com
kshamberg@ carlsonlynch.com
nlange@carlsonlynch.com


Gary F. Lynch*
Kelly K. Iverson*
Jamisen A. Etzel*
Nicholas A. Colella*
**CARLSON LYNCH, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
glynch@carlsonlynch.com
kiverson@carlsonlynch.com
jetzel@carlsonlynch.com
ncolella@carlsonlynch.com


Joseph P. Guglielmo*
Erin Green Comite*
Joseph A. Pettigrew*
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor

FILED DATE: 8/22/2021 12:56 PM   2021CH03460

New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
ecomite@scott-scott.com
jpettigrew@scott-scott.com

*Attorneys for Plaintiff*

\* = pro hac vice forthcoming

27

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# Exhibit E

FILED DATE: 8/9/2021 12:00 AM   2021CH03460



# FIRM RESUME

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

With offices in Washington, D.C., and Chicago, Illinois, Mason Lietz & Klinger LLP is dedicated to representing plaintiffs in class actions, mass torts and individual actions in courts throughout the United States.

## **ATTORNEY PROFILES**

### Gary E. Mason
### Managing Partner

Gary is a nationally recognized leader of the class action bar. Focusing on consumer class actions and mass torts, Gary has recovered more than $1.5 billion in the 30 years he has represented plaintiffs.

With his broad experience, Gary is nationally known for representing consumers in class actions involving a wide range of defective products, including Chinese drywall, fire retardant plywood, polybutylene pipe, high-temperature plastic venting, hardboard siding, pharmaceutical products, consumer electronics and automobiles.

Gary has served in leadership positions in many consumer class actions in State and Federal Courts nationwide as well as in Multi-District Litigation. Gary writes and speaks frequently on topics related to class action litigation. He was the 2012-2013 Co-Chair of the Class Action Litigation group for the American Association for Justice. He has repeatedly been named as a Washington, DC Superlawyer for Class Actions.

Gary also serves as Executive Director and President of the Board of Directors of The Bethesda Blues and Jazz Foundation.

Gary graduated magna cum laude, Phi Beta Kappa, from Brown University in 1984 and earned his law degree from Duke University Law School. He then clerked for the Honorable Andrew J. Kleinfeld, U.S. District Court Judge, in Anchorage, Alaska. Gary is admitted to practice law in Washington, D.C, New York and Maryland. He is a member of the Bar of the United States Supreme Court and numerous federal Courts of Appeals and District Courts across the country.

### David Lietz
### Partner

David Lietz's practice concentrates in the areas of complex civil litigation, consumer class actions, and mass torts in federal and state courts nationwide. His class action experience includes a wide range of subject matters, including violations of federal consumer protection laws (such as the FDCPA and TCPA), violations of state consumer protection law, defective products, wage abuse, and data privacy. Mass tort experience includes pharmaceutical litigation.

David also has decades of experience as a trial lawyer, representing plaintiffs in complex actions involving wrongful death and critical injury. Through both trials and settlement, he has recovered millions and millions of dollars for the victims of commercial trucking accidents,

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

commercial airplane crashes, bus crashes, manufacturing and power plant explosions and fires, and construction related injuries and deaths.

David's practice includes appellate work, having briefed and argued multiple cases before federal appellate courts, including *Home Depot v. Jackson* at the Fourth Circuit. David then served as part of the winning brief-writing and oral advocacy team for Home Depot v. Jackson at the United States Supreme Court.

David holds an AV rating from the Martindale-Hubbell Law Directory, an honor he has held since 1998. He is listed in the Bar Register of Preeminent Lawyers, Washington D.C. & Baltimore's Top Rated Lawyers, 2012 - 2015 edition, and has a Martindale-Hubbell Client Distinction Award.

Outside of the law, David served for 12 years on the Board of Regents of his alma mater, Luther College, and was appointed Regent Emeritus in 2017. He was a member of the Luther College Presidential Search Committee, and received the Luther College Distinguished Service Award in 2018.

David received his undergraduate degree in Political Science from Luther College in 1988, where he graduated with honors. He received his J.D. from the Georgetown University Law Center in 1991. He is admitted to practice law in the District of Columbia, and is admitted to practice before a number of federal district and appellate courts.

**Gary M. Klinger**
**Partner**

Gary is a natural competitor and relishes the challenge of being a litigator. He is a tenacious and dedicated advocate of his client's interests and welcomes every opportunity to help them prevail in complex, high-stakes litigation.

Gary represents clients in class actions involving wide-ranging theories of liability including consumer fraud, breach of contract, privacy violations, conspiracy, violation of the antitrust laws, and other torts. He has been appointed as class counsel to millions of consumers across the country. Gary has recovered tens of millions of dollars for consumers in class action settlements.

Prior to forming Mason Lietz & Klinger LLP, Gary was an attorney at one of the premier litigation firms in Chicago where he focused on class action litigation. Gary has successfully represented clients from pre-litigation disputes through trials and appeals in federal and state jurisdictions throughout the country.

Gary is a graduate of the University of Illinois where he received both his undergraduate and law degrees. He is licensed to practice in Illinois and numerous federal district courts across the country.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

**Danielle L. Perry**
**Partner**

Danielle's primary focus is in protecting employee and consumer rights through class action lawsuits.

Danielle graduated from the University of California, Berkeley in 2010 with a Bachelor of Arts in Peace and Conflict Studies. During her undergraduate studies, she managed and rowed for the university's Lightweight Crew Team and also spent a year in Budapest, Hungary, where she interned with the Helsinki Committee, an international human rights organization. Danielle went on to attend Loyola Law School, where she was on the Board of the Public Interest Law Foundation and headed efforts to promote alternative dispute resolution, including founding a club structured to inform students of developments in mediation and working at The Center for Conflict Resolution.

During law school, she held an externship as a law clerk for the Honorable Victoria Chaney of the California Court of Appeals, worked with the Labor Division of the Los Angeles Office of the City Attorney, and was a Board Member for the Public Interest Law Foundation.

Prior to joining Mason Lietz & Klinger, Danielle practiced at a plaintiffs' class action firm in Los Angeles, where she worked as an advocate for victims of wage theft–employees who were being deprived of pay and not provided with legally required meal and rest periods. Danielle spent much of her time working on lawsuits brought to recover lost wages and penalties for banking, manufacturing, retail, property management, and trucking industry employees.

Danielle is a member of the American Association for Justice and regularly volunteers as an advising attorney at the Employment Justice Center.

## <u>NOTABLE CLASS ACTION CASES LITIGATED BY MLK ATTORNEYS</u>

### <u>Antitrust</u>

*In re: TFT-LCD (Flat Panel) Antitrust Litigation,* No. 3:07-cv-01827, MDL No. 1827 (N.D. Cal.) (combined settlement totaling nearly $1.1 billion in suit alleging the illegal formation of an international cartel to restrict competition in the LCD panel market) (2012).

### <u>Appliances</u>

*Ersler, et. al v. Toshiba America et. al*, No. 07- 2304 (D.N.J.) (settlement of claims arising from allegedly defective television lamps) (2009).

*Maytag Neptune Washing Machines* (class action settlement for owners of Maytag Neptune washing machines).

MLK Firm Resume
Page 5 of 9

*Stalcup, et al. v. Thomson, Inc.* (Ill. Cir. Ct.) ($100 million class settlement of clams that certain GE, PROSCAN and RCA televisions may have been susceptible to temporary loss of audio when receiving broadcast data packages that were longer than reasonably anticipated or specified) (2004).

*Hurkes Harris Design Associates, Inc., et al. v. Fujitsu Computer Prods. of Am., Inc.* (settlement provides $42.5 million to pay claims of all consumers and other end users who bought certain Fujitsu Desktop 3.5" IDE hard disk drives) (2003).

*Turner v. General Electric Company*, No. 2:05-cv-00186 (M.D. Fla.) (national settlement of claims arising from allegedly defective refrigerators) (2006).

## Automobiles

*In re General Motors Corp. Speedometer Prods. Liability Litig.,* MDL 1896 (W.D. Wash.) (national settlement for repairs and reimbursement of repair costs incurred in connection with defective speedometers) (2007).

*Baugh v. The Goodyear Tire & Rubber Company* (class settlement of claims that Goodyear sold defective tires that are prone to tread separation when operated at highway speeds; Goodyear agreed to provide a combination of both monetary and non-monetary consideration to the Settlement Class in the form of an Enhanced Warranty Program and Rebate Program) (2002).

*Lubitz v. Daimler Chrysler Corp.,* No. L-4883-04 (Bergen Cty. Super. Ct, NJ 2006) (national settlement for repairs and reimbursement of repair costs incurred in connection with defective brake system; creation of $12 million fund; 7th largest judgment or settlement in New Jersey) (2007).

*Berman et al. v. General Motors LLC,* Case No. 2:18-cv-14371 (S.D. Fla.) (Co-Lead Counsel; national settlement for repairs and reimbursement of repair costs incurred in connection with Chevrolet Equinox excessive oil consumption).

## Civil Rights

*In re Black Farmers Discrimination Litigation*, Case No. 1:08-mc-00511 (D.D.C.) ($1.25 billion settlement fund for black farmers who alleged U.S. Department of Agriculture discriminated against them by denying farm loans) (2013).

*Bruce, et. al. v. County of Rensselaer et. al.,* Case No. 02-cv-0847 (N.D.N.Y.) (class settlement of claims that corrections officers and others employed at the Rensselaer County Jail (NY) engaged in the practice of illegally strip searching all individuals charged with only misdemeanors or minor offenses) (2004).

## Commercial

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

MLK Firm Resume
Page 6 of 9

*In re: Outer Banks Power Outage Litigation,* 4:17-cv-141 (E.D.N.C) (Co-Lead Counsel; $10.35 million settlement for residents, businesses, and vacationers on Hatteras and Ocracoke Islands who were impacted by a 9-day power outage) (2018)

## Construction Materials

*Cordes et al v. IPEX, Inc.*, No. 08-cv-02220-CMA-BNB (D. Colo.) (class action arising out of defective brass fittings; court-appointed member of Plaintiffs' Steering Committee) (2011).

*Elliott et al v. KB Home North Carolina Inc. et al* 08-cv-21190 (N.C. Super. Ct. Wake County) (Lead Counsel; class action settlement for those whose homes were constructed without a weather-resistant barrier)(2017)

*In re: Pella Corporation Architect and Designer Series Windows Marketing, Sales Practices and Products Liability Litigation,* MDL No. 2514 (D.S.C.)(class action arising from allegedly defective windows; Court-appointed Co-Lead Counsel).

*In re MI Windows and Doors, Inc., Products Liability Litigation*, MDL No. 2333 (D.S.C) (National class action settlement for homeowners who purchased defective windows; Court-appointed Co-Lead Counsel).

*In re: Atlas Roofing Corporation Chalet Shingle Products Liability Litig.*, MDL No. 2495 (N.D. Ga.) (class action arising from allegedly defective shingles; Court-appointed Co-Lead Counsel).

*Helmer et al. v. Goodyear Tire & Rubber Co.*, No. 12-cv-00685-RBJ (D. Colo. 2012) (class action arising from allegedly defective radiant heating systems; Colorado class certified, 2014 WL 3353264, July 9, 2014)).

*In re: Zurn Pex Plumbing Products Liability Litigation*, No. o:08-md-01958, MDL No. 1958 (D. Minn.) (class action arising from allegedly plumbing systems; member of Executive Committee; settlement) (2012).

*Hobbie, et al. v. RCR Holdings II, LLC, et al.*, No. 10-1113 , MDL No. 2047 (E.D. La.) ($30 million settlement for remediation of 364 unit residential high-rise constructed with Chinese drywall) (2012).

*In re: Chinese Manufactured Drywall Products Liability Litigation,* No. 2:09-md-02047, MDL No. 2047 (E.D. La.) (litigation arising out of defective drywall) (appointed Co-Chair, Insurance Committee) (2012).

*Galanti v. Goodyear Tire & Rubber Co.*, No. 03-209 (D.N.J. 2003) (national settlement and creation of $330 million fund for payment to owners of homes with defective radiant heating systems) (2003).

FILED DATE: 8/9/2021 12:00 AM 2021CH03460

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

*In re Synthetic Stucco Litig.,* Civ. Action No. 5:96-CV-287-BR(2) (E.D.N.C.) (member of Plaintiffs' Steering Committee; settlements with four EIFS Manufacturers for North Carolina homeowners valued at more than $50 million).

*In re Synthetic Stucco (EIFS) Prods. Liability Litig.,* MDL No. 1132 (E.D.N.C.) (represented over 100 individuals homeowners in lawsuits against homebuilders and EIFS manufacturers).

*Posey, et al. v. Dryvit Systems, Inc.,* Case No. 17,715-IV (Tenn. Cir. Ct) (Co-Lead Counsel; national class action settlement provided cash and repairs to more than 7,000 claimants) (2002).

*Sutton, et al. v. The Federal Materials Company, Inc., et al,* No. 07-CI-00007 (Ky. Cir. Ct) (Co-Lead Counsel; $10.1 million class settlement for owners of residential and commercial properties constructed with defective concrete).

*Staton v. IMI South, et al.* (Ky. Cir. Ct.) ((Co-Lead Counsel; class settlement for approximately $30 million for repair and purchase of houses built with defective concrete).

*In re Elk Cross Timbers Decking Marketing, Sales Practices and Products Liability Litigation*, No. 15-cv-0018, MDL No. 2577 (D.N.J.) (Lead Counsel; national settlement to homeowners who purchased defective GAF decking and railings).

*Bridget Smith v. Floor and Decor Outlets of America, Inc*., No. 1:15-cv-4316 (N.D. Ga.) (Co-Lead Counsel; National class action settlement for homeowners who purchased unsafe laminate wood flooring).

*In re Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation* MDL No. 1:15-md-2627 (E.D.Va.) (Formaldehyde case; $36 million national class action settlement for member who purchased a certain type of laminate flooring).

*In re Lumber Liquidators Chinese-Manufactured Laminate Flooring Durability Marketing, Sales Practices Litigation* MDL No. 1:16-md-2743 (E.D.Va.) (Co-Lead Counsel; Durability case; $36 million national class action settlement for member who purchased a certain type of laminate flooring).

*In re Windsor Wood Clad Window Products Liability Litigation* MDL No. 2:16-md-02688 (E.D. Wis.) (National class action settlement for homeowners who purchased defective windows; Court-appointed Lead Counsel).

*In re Allura Fiber Cement Siding Products Liability Litigation* MDL No. 2:19-md-02886 (D.S.C.) (class action arising from allegedly defective cement board siding; Court-appointed Lead Counsel).

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

## Environmental

*Nnadili, et al. v. Chevron U.S.A., Inc*, No. 02-cv-1620 (D.D.C.) ($6.2 million settlement for owners and residents of 200 properties located above underground plume of petroleum from former Chevron gas station) (2008).

*In re Swanson Creek Oil Spill Litigation*, No. 00-1429 (D. Md.) (Lead Counsel; $2.25 million settlement of litigation arising from largest oil spill in history of State of Maryland) (2001).

## Fair Labor Standards Act/Wage and Hour

*Craig v. Rite Aid Corporation*, Civil No. 08-2317 (M.D. Pa.) (FLSA collective action and class action settled for $20.9 million) (2013).

*Stillman v. Staples, Inc.,* Civil No. 07-849 (D.N.J. 2009) (FLSA collective action, plaintiffs' trial verdict for $2.5 million; national settlement approved for $42 million) (2010).

*Lew v. Pizza Hut of Maryland, Inc.*, Civil No. CBB-09-CV-3162 (D. Md.) (FLSA collective action, statewide settlement for managers-in-training and assistant managers, providing recompense of 100% of lost wages) (2011).

## Food  and Drug Misrepresentation

*Smid et al. v. Nutranext, LLC*, No. 20L0190 (St. Clair Ctuy., Ill., 2020) ($6.7 million settlement)

*In re Hill's Pet Nutrition, Inc. Dog Food Prods. Liab. Litg.*, MDL No. 2887, No. 2:19-md-02887 (D. Kan. filed June 6, 2019) (Court-appointed Co-Lead Counsel)

## Financial

*Roberts v. Fleet Bank (R.I.), N.A.*, Civil Action No. 00-6142 (E. D. Pa. 2003) ($4 million dollar settlement on claims that Fleet changed the interest rate on consumers' credit cards which had been advertised as "fixed.").

*Penobscot Indian Nation et al v United States Department of Housing and Urban Development*, N. 07-1282 (PLF) (D.D.C. 2008) (represented charitable organization which successfully challenged regulation barring certain kinds of down-payment assistance; Court held that HUD's promulgation of rule violated the Administrative Procedure Act),

## Insurance

*Young, et al.  v. Nationwide Mut. Ins. Co, et al*., No. 11-5015 (E.D. Ky. 2014) (series of class actions against multiple insurance companies arising from unlawful collection of local taxes on premium payments; class certified and affirmed on appeal, 693 F.3d 532 (6th Cir., 2012); settlements with all defendants for 100% refund of taxes collected).

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*Nichols v. Progressive Direct Insurance Co., et al*., No. 2:06cv146 (E.D. Ky. 2012) (Class Counsel; class action arising from unlawful taxation of insurance premiums; statewide settlement with Safe Auto Insurance Company and creation of $2 million Settlement Fund; statewide settlement with Hartford Insurance Company and tax refunds of $1.75 million )

**Privacy/Data Breach**

*In Re: U.S. Office of Personnel Management Data Security Breach Litigation*, No. 15-1393 (ABJ), MDL No. 2664 (D.D.C.) (court appointed interim Liaison Counsel).

*In re Google Buzz Privacy Litigation,* No. 5:10-cv-00672 (N.D. Cal. 2010) (court-appointed Lead Class Counsel; $8.5 million cy pres settlement).

*In re: Dept. of Veterans Affairs (VA) Data Theft Litig.,* No. 1:2006-cv-00506, MDL 1796 (D.D.C. 2009) (Co-Lead counsel representing veterans whose privacy rights had been compromised by the theft of an external hard drive containing personal information of approximately 26.6 million veterans and their spouses; creation of a $20 million fund for affected veterans and a cy pres award for two non-profit organizations).

*In re: Adobe Systems Inc. Privacy Litigation,* No. 5:13-cv-05226 (N.D. Cal. 2015) (settlement requiring enhanced cyber security measures and audits).

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# Exhibit F

DATE: 8/9/2021 12:00 AM   2021CH03460



# CARLSON
# LYNCH

**Pittsburgh ▪ San Diego ▪ Chicago**
**Los Angeles ▪ Philadelphia**

FIRM RESUME

# CARLSON LYNCH

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

## FIRM SUMMARY

With offices in Pittsburgh, San Diego, Los Angeles, Philadelphia, and Chicago, Carlson Lynch is a national firm specializing in complex class and collective actions, and is involved in several high-profile multidistrict litigation proceedings. The attorneys of Carlson Lynch LLP ("Carlson Lynch") have litigated class-action matters involving financial fraud (including securities fraud, derivative actions, and lending fraud), data breach, privacy, consumer fraud, breach of contract, labor and employment, antitrust, and civil rights, in federal and state courts throughout the country. Litigation prosecuted by Carlson Lynch and its attorneys has resulted in substantial monetary recoveries and injunctive benefits on behalf of class members, described in more detail below. In addition, the Carlson Lynch team has generated seminal legal authority in both trial and appellate courts.

Carlson Lynch represents a wide variety of clients, including individual consumers and employees, small businesses, banks and credit unions, non-profits, issue advocacy groups, and governmental entities. Since 2014, Carlson Lynch has been a national leader in payment card data breach litigation, recovering over $100 million for financial institutions that suffered fraud losses and card reissuance costs in the wake of payment card data compromises at major retailers such as Target, Home Depot, Eddie Bauer, and Wendy's. Carlson Lynch has worked closely with the Independent Community Bankers of America, the Credit Union National Association, and state-level associations and leagues to prosecute these cases. The firm also advocates for and consults with these groups outside of the court system, such as by drafting proposed legislation and hosting educational seminars about data breach litigation and privacy laws.

Carlson Lynch was founded in 2004 by Bruce Carlson and Gary Lynch, who started the firm to merge and build upon their collective experiences litigating complex class action matters. In 2015, the firm expanded to the west coast with the addition of its San Diego office, managed by Todd Carpenter. Continuing its growth, in 2019, the firm added an office in Chicago, managed by Katrina Carroll, and its Los Angeles office, managed by Eddie (Jae) K. Kim. In 2020, the firm opened an office in Philadelphia, managed by Edward Ciolko.

In October 2020, *The Legal Intelligencer* named Carlson Lynch "Litigation Department of the Year" for general litigation in Pennsylvania. Carlson Lynch's attorneys are recipients of numerous additional individual awards, as described in more detail in the individual biographies on the firm's website.

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

# CARLSON LYNCH

## REPRESENTATIVE CASES

### PRIVACY & DATA BREACH LITIGATION

***In re Equifax, Inc. Customer Data Security Breach Litig.***, MDL 2800 (N.D. Ga.). The Equifax data breach compromised the nation's entire credit reporting system. Carlson Lynch was retained by the Independent Community Bankers of America, along with several banks and credit unions, to institute litigation against Equifax on behalf of a class of all financial institutions in the nation for damages resulting from the data breach. The financial institutions, as providers and purchasers of information within the credit reporting system, were severely impacted by the Equifax data breach, in which 147.9 million U.S. consumers – roughly 46% of the U.S. population and nearly 60% of all adults in the U.S. – had their highly sensitive personally identifying information ("PII") and payment card data ("PCD") compromised between May and July 2017 (the "Data Breach"). More than 400 lawsuits filed by consumers and financial institutions were consolidated in the MDL. Gary Lynch was appointed co-lead counsel for financial institution plaintiffs in this multidistrict litigation. After significant dispositive motions practice and initial rounds of discovery, the parties negotiated a settlement of the financial institution class action that provides up to $7.75 million in cash benefits, plus additional injunctive relief. The court granted preliminary approval of the settlement in June 2020 and final approval in October 2020.

***In re Target Corporation Customer Data Breach Litig.***, 0:14-md-02522, MDL 2522 (D. Minn.). This multidistrict litigation arose out of the massive data breach that occurred in late 2013. Judge Magnuson appointed Gary Lynch to the five-member Plaintiffs' Executive Committee that managed the litigation on behalf of all Plaintiffs' tracks (consumer, financial institution, and shareholder). A settlement agreement which provided $10 million to affected individual customers was granted final approval in November 2015. A separate settlement providing approximately $39 million in relief to plaintiff financial institutions was granted final approval in May 2016.

***In re TikTok, Inc., Consumer Privacy Litig.***, No. 20-cv-4699 (MDL No. 2948) (N.D. Ill.). Judge Lee appointed Katrina Carroll as Co-Lead Counsel in this multidistrict litigation alleging that one of the world's biggest social media platforms captured, collected, and transmitted personal data from TikTok users and their devices without their consent and/or knowledge, including private information and biometric information within the meaning of the Illinois Biometric Information Privacy Act.

***First Choice Federal Credit Union v. The Wendy's Company et al***, 2:16-cv-0506, (W.D. Pa.). This class action arose out of a data breach alleged to have begun in October 2015,

## Pittsburgh ▪ San Diego ▪ Chicago ▪ Los Angeles ▪ Philadelphia

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# CARLSON LYNCH

when computer hackers installed malware on the point-of-sale systems of Wendy's franchised restaurants for the purpose of capturing and ex-filtrating customer payment card data (the "Data Breach"). It is estimated that approximately 18 million payment cards were exposed in the Data Breach. The United States District Court for the Western District of Pennsylvania consolidated several proposed class actions and appointed Gary Lynch as Co-Lead Counsel on behalf of the Plaintiff financial institutions. Plaintiffs filed an early motion seeking to apply *Ohio law to Plaintiffs' claims on a nationwide basis, proposing to the Court that the choice of* law issue, which is normally not decided until the class certification or summary judgment stage, could be decided early, under Rule 1's mandate that the rules be interpreted to "secure the just, speedy and inexpensive determination of every action and proceeding." Wendy's opposed the motion. On June 6, 2018, the Court adopted the Magistrate's Report and Recommendation to grant the motion and to apply Ohio law to the negligence and negligence *per se* claims. In November 2018, after three rounds of in-person mediation, Wendy's agreed to pay $50 million into a non-reversionary fund and to adopt and/or maintain certain reasonable safeguards to manage its data security risks. When the settlement received final approval in November 2019, the Honorable Maureen P. Kelly noted Class Counsel's "national reputation," "significant experience in these types of class actions and in data breach litigation," and "high level of skill and efficiency." Judge Kelly further explained:

> This case has gone on for three and a half years…This was a very involved case and everyone brought to the table an incredible wealth of knowledge, was always prepared, really was thorough and professional in everything that was provided to the Court. And as involved as this case was, if every case I had was as well organized and professionally presented as this case has been, my life would be much easier… The briefs I got in this case and any filings were just so well-done and detailed. And my law clerks and I have discussed that a number of times. I want to thank counsel for the way you have conducted yourselves and the way you've all presented this case.

***In re Home Depot Customer Data Breach Litig.***, 1:14-md-02583, MDL 2583 (N.D. Ga.). In this multidistrict litigation, Carlson Lynch represented financial institutions in litigation related to the major data breach at the retailer which continued for almost six months in 2014 and resulted in the compromise of approximately 56 million payment card accounts. Gary Lynch was appointed by Judge Thrash to be one of three lead counsel managing the financial institution track of the litigation. Over forty financial institutions and seventeen credit union associations filed a consolidated complaint in May 2015. Judge Thrash denied the majority of Home Depot's motion to dismiss on May 18, 2016. In September 2017, the Court granted final approval to a comprehensive class settlement that provides over $27 million in relief to the financial institution class.

# CARLSON LYNCH

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

***Veridian Credit Union v. Eddie Bauer LLC***, 2:17-cv-356 (W.D. Wash.). Carlson Lynch served as co-lead counsel on behalf of a class of financial institutions in this class action against Eddie Bauer arising out of payment card data breach of the retailer's point-of-sale systems in 2016, which led to the exposure of up to 1.4 million payment cards. After overcoming a motion to dismiss and engaging in substantial discovery, the parties negotiated a class action settlement, which was approved in 2019. The agreement made up to $2.8 million available in direct cash relief to class members and provided for an addition $7 million worth of injunctive relief and other benefits.

***In Re: Solara Medical Supplies Data Breach Litigation***, 19-cv-02284 (S.D. Cal.). In January 2020, Judge Marilyn Huff appointed Kelly Iverson to the Plaintiffs' Steering Committee in this data breach action that affected both the personally identifiable information as well as protected health information of Plaintiffs' and the classes.

***In re Wawa, Inc. Data Security Litig***, 2:19-cv-6019 (E.D. Pa.). Gary Lynch was appointed co-lead counsel for a putative class of financial institution plaintiffs in consolidated actions brought against Wawa, Inc. arising out of a 2019 payment card data breach involving the convenience store's point-of-sale systems. A consolidated amended complaint was filed in July 2020, and as of February 2021, the defendant's motion to dismiss is fully briefed and awaiting disposition.

***Greater Chautauqua Federal Credit Union et al v. Kmart Corporation et al***, No. 15-cv-02228 (N.D. Ill.). In this consolidated data breach case in which financial institutions were seeking recovery for losses sustained as a result of a 2014 data breach at one of the nation's largest discount retail chains, Judge Lee appointed Gary Lynch to the Plaintiffs' Executive Committee, and Katrina Carroll to serve as Liaison Counsel. A settlement was reached and approved in June 2017.

***In re Marriott International Customer Data Security Breach Litigation,*** MDL No. 2879 (D. MD.). Gary Lynch was appointed to the Plaintiffs' Steering Committee in this multidistrict litigation related to the data breach involving Starwood guest information dating back to at least 2014. The MDL includes more than 100 cases and is in pretrial litigation.

***Dittman et al v. UPMC d/b/a The University of Pittsburgh Medical Center and UPMC McKeesport***, (Allegheny Cty., Pa. No. GD-14-003285). Carlson Lynch is representing several employees of the health care group UPMC in a class action stemming from a breach of UPMC's personnel files. On November 21, 2018, the Supreme Court of Pennsylvania issued a landmark decision, reversing two lower courts, regarding the viability of common law negligence claims in the wake of a data breach. The Court found that UPMC engaged in affirmative conduct by collecting and storing employee data, and that general principles of negligence support holding actors to "a duty to others to exercise the care of a reasonable man

# CARLSON LYNCH

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

to protect [others] against an unreasonable risk of harm to them arising out of the act." As to the economic loss doctrine, the Court agreed with Plaintiffs' interpretation of Pennsylvania legal precedent on the issue, finding that the question of whether the economic loss doctrine applies necessarily turns on the "source of the duty alleged," and, accordingly, a plaintiff may seek pecuniary damages under a negligence theory if the duty sought to be enforced arises independently of any contractual relationship between the parties. After remand to the trial court, additional motions practice, and initiating discovery, the parties reached a settlement and are preparing to submit for preliminary approval.

*In re Anthem, Inc. Customer Data Security Breach Litig.*, No. 5:15-md-02617, MDL 2617 (N.D. Cal.). Carlson Lynch represented customers of a national health insurer which experienced a data breach involving the personal information, including social security numbers, of up to an estimated 80 million customers. The case was consolidated and transferred to the Northern District of California in June 2015. Carlson Lynch participated in discovery related to Highmark, the Pennsylvania-based member of the Blue Cross Blue Shield Association and a co-defendant in the MDL. The parties reached a settlement valued at $117 million, which was approved by the Court.

*In re Community Health Systems, Inc., Customer Data Security Breach Litigation*, 2:15-cv-00222, MDL 2595 (N.D. Ala.). Gary Lynch served as a member of the plaintiffs' steering committee in consolidated multidistrict litigation stemming from a 2014 data breach involving one of the nation's largest hospital chains. The breach affected over 200 hospitals and the sensitive personal information of approximately 4.5 million patients was compromised. The action settled on a class basis for up to $3.1 million.

*In re Arby's Restaurant Group*, 1:17-mi-55555 (N.D. Ga.). In October 2016, computer hackers accessed Arby's inadequately protected point-of-sale system and installed malware that infected nearly 1,000 Arby's restaurant locations. Gary Lynch was appointed by Judge Totenberg as Chair of the Financial Institution Plaintiffs' Executive Committee. The case settled and received final approval in November 2020.

*In re Ashley Madison Customer Data Security Breach Litig.,* MDL No. 2669 (E.D. Mo.). In this well-publicized data breach case Carlson Lynch represented individuals whose highly sensitive account information was leaked from a social media company. The case was consolidated and transferred to the Eastern District of Missouri in December 2015. Judge Ross appointed Gary Lynch and Katrina Carroll (while with her prior firm) to the Executive Committee. A class settlement for $11.2 million was given final approval in November 2017.

*In re Vizio, Inc. Consumer Privacy Litig*., MDL No. 2693 (C.D. Cal.). Carlson Lynch represented individuals who purchased Vizio "Smart TVs," which contained software that

**Pittsburgh ▪ San Diego ▪ Chicago ▪ Los Angeles ▪ Philadelphia**

# CARLSON LYNCH

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

collected information about the users in a manner that allegedly violates numerous consumer protection statutes. The case was consolidated and transferred to the Central District of California in April 2016, and Gary Lynch was appointed to the Plaintiffs' Steering Committee. In March 2017, District Judge Staton granted in part and denied in part a motion to dismiss, leaving the most significant claims intact and granting plaintiffs leave to re-plead the dismissed counts. After plaintiffs filed a second consolidated amended complaint, a second motion to dismiss was denied in July 2017. Vizio's attempt to certify an interlocutory appeal was denied in October 2017. The case was settled and received final approval in 2019, providing for a $17 million common fund.

*Vance v. International Business Machines Corp.*, 1:20-cv-577 (N.D. Ill.). Carlson Lynch appointed Co-Lead Counsel in this class action claiming IBM violated Illinois's Biometric Information Privacy Act when it collected, obtained, disclosed, redisclosed, disseminated, and otherwise profited from Illinois residents' unique facial geometric measurements without providing notice or obtaining consent. In September 2020, Carlson Lynch defeated nearly all of the arguments raised in IBM's motion to dismiss, allowing the case to proceed forward toward class certification.

*In Re: Clearview AI, Inc., Consumer Privacy Litig.*, 1:21-cv-00135 (N.D. Ill.). Carlson Lynch serves as counsel in this multidistrict litigation on behalf of a proposed class of Illinois citizens alleging that Clearview, in violation of the Illinois Biometric Information Privacy Act, scraped over 3 billion facial images from the internet, scanned the facial images' biometrics, and built a searchable database of the scanned images and biometrics, allowing users to instantly identify an unknown individual with only a photograph. Clearview then sold or otherwise gave access to these biometrics to hundreds of law enforcement agencies, private entities, and individuals.

*Storm et al. v. Paytime, Inc.*, No. 1:14-cv-011380-JEJ (M.D. Pa.). Carlson Lynch represented individuals whose sensitive personal and financial information was stolen from the systems of a Pennsylvania payroll processing company. The case was appealed to the Third Circuit and settled on a class basis while the appeal was pending.

*In re SuperValu, Inc. Customer Data Security Breach Litig.*, 0-14-md-02586, MDL 2586 (D. Minn.). In April 2015, Ed Kilpela of Carlson Lynch was appointed as interim co-lead counsel in this consolidated case. The litigation stems from a 2014 data breach that compromised the sensitive personal and financial information of customers of approximately 1,000 grocery stores operating under a variety of brand names in over a dozen states.

*Sullivan v. Wenner Media LLC*, No. 1:16-cv-960 (M.D. Mich.). Carlson Lynch was co-lead counsel for plaintiffs who brought claims against the publisher of *Rolling Stone* magazine. Plaintiffs allege that *Rolling Stone* sold subscriber information to marketing partners without the

# CARLSON LYNCH

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

subscriber's consent, in violation of Michigan state privacy laws. The parties reached a proposed settlement including a $1.1 million settlement fund and alternative forms of relief. The settlement was approved in May 2018.

***Lewert v. PF Chang's China Bistro, Inc.***, No. 1:14-cv-04787 (N.D. Ill.): Katrina Carroll served as Court-appointed Co-Lead counsel representing P.F. Chang's customers who had their personal financial information compromised in a 2014 security breach. This matter was one of the first data breach cases on record. Ms. Carroll oversaw all of the appellate briefing in ultimately obtaining a landmark ruling in the Seventh Circuit on Article III standing, hailed by Law360 as one of the "top privacy cases" of 2016.

***Salam v. Lifewatch, Inc.***, No. 1:13-cv-09305 (N.D. Ill.): In this hard-fought litigation, Carlson Lynch partner Katrina Carroll is currently involved as court-appointed Co-Lead Counsel on behalf of a certified class in this privacy matter brought under the Telephone Consumer Protection Act ("TCPA"). Ms. Carroll has been directly involved in all aspects of litigation, including discovery and motion practice which culminated in a total victory for plaintiffs in contested class certification.

***Bakov v. Consolidated World Travel Inc.***, No. 1:15-cv-02980 (N.D. Ill.): Katrina Carroll serves as court-appointed Co-Lead Counsel in this TCPA litigation for a certified class of consumers.

## FINANCIAL FRAUD, LENDING PRACTICES, AND SECURITIES

***In re: FedLoan Student Loan Servicing Litigation* – MDL No. 2833**, (E.D. Pa.). Carlson Lynch serves as court-appointed co-lead counsel on behalf of student loan borrowers and federal grant recipients in this multidistrict litigation. The claims relate to widespread and systemic failures on the part of a student loan servicer and the U.S. Department of Education to adequately service the programs and advise its participant. A consolidated complaint was filed in November 2019. As of January 2020, a motion to dismiss is fully briefing and currently awaiting resolution by the Court.

***Rescap Bankruptcy***, (S.D.N.Y. Bkr.). On November 27, 2013, the Bankruptcy Court in the Southern District of New York granted final approval of a class settlement on behalf of in excess of 45,000 residential mortgage borrowers. Carlson Lynch is co-lead counsel for the class. The settlement is for an allowed claim amount of $300 million dollars. There is a guaranteed payout of approximately $36 million dollars. The debtor assigned its insurance rights to the class and insurance will potentially cover the difference between the $36 million dollar guaranteed payout and the allowed claim amount of $300 million. Upon signing the

## Pittsburgh ▪ San Diego ▪ Chicago ▪ Los Angeles ▪ Philadelphia

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

**CARLSON LYNCH**

Order granting final confirmation of the bankruptcy plan, the judge stated that this was the most factually and legally complex matter that he had presided over since taking the bench.

***CitiMortgage SCRA Litigation***, (S.D.N.Y.). Carlson Lynch was tri-lead counsel in this class action against CitiMortgage on behalf of Sergeant Jorge Rodriguez in the Southern District of New York. This case alleges that CitiMortgage improperly foreclosed upon Mr. Rodriguez's home (and the homes of similarly situated individuals) while he was serving his country in Iraq, in violation of the Servicemembers Civil Relief Act. The case settled and received final approval in October 2015, securing a total recovery of $38.2 million for members of our military service.

***Pitts v. NovaStar Home Loans, Inc. et al.*** , (S.D. Ga.). Carlson Lynch was co-lead counsel for plaintiffs in this national RESPA class action. The Southern District of Georgia was the MDL court for this litigation. After the Court denied defendant's motion to dismiss, after the Court denied defendants' motion for summary judgment and granted plaintiffs' motion for class certification in a related Maryland state court action – where Carlson Lynch was also co-lead counsel -- and after extensive discovery including the video depositions of several of defendants' top executives, the parties participated in multiple mediation sessions and ultimately arrived at a national cash settlement on behalf of class members for $17.3 million.

***In re Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Secondary Mortgage Loan Litigation***, (W.D. Pa./3d Cir.). Carlson Lynch was co-lead class counsel in this national litigation on behalf of second mortgage borrowers under the Real Estate Settlement Procedures Act. The class was certified by the district court and affirmed by the Third Circuit, 795 F.3d 380 (2015). A class settlement was finalized in early 2017 and obtained a total recovery of $24 million.

***Kahrer v. Ameriquest Mortgage Co.***, (W.D. Pa./MDL N.D. Ill.). Carlson Lynch was counsel for plaintiff in connection with this consolidated group of class actions alleging the existence of a kick-back scheme in violation of RESPA, along with numerous other unfair lending practices. The specific case being handled by Carlson Lynch created new law under RESPA. Specifically, Carlson Lynch filed this action as a test case to challenge what they viewed as a negative trend in the law regarding how federal trial courts were determining whether a consumer has standing to sue under RESPA, as well as the manner in which damages are calculated under RESPA. Every prior federal trial court to consider these issues had sided with defendants. In opposing the Ameriquest motion to dismiss that was filed in this case, Carlson Lynch argued that these other federal trial courts had fundamentally misinterpreted the legislative history of RESPA in their decisions to dismiss the prior cases. In a seminal decision, the United States District Court for the Western District of Pennsylvania departed from the holdings issued by these other federal courts and agreed with the arguments of Carlson Lynch,

**Pittsburgh ▪ San Diego ▪ Chicago ▪ Los Angeles ▪ Philadelphia**

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

denying the motion to dismiss. *See Kahrer v. Ameriquest Mortgage Co.*, 418 F.Supp.2d 748 (W.D. Pa. 2006) (Hay, J.). Multiple federal courts of appeals have adopted the *Kahrer* reasoning, including at least the Sixth and Third Circuits. This case was ultimately settled as part of MDL proceedings against Ameriquest in the Northern District of Illinois, and final approval of the settlement was granted.

*Bannon v. First One Lending, Inc.,* (C.P., Allegheny County, Pennsylvania). Carlson Lynch was co-lead counsel in this class action filed on behalf of Pennsylvania second mortgage loan borrowers alleging that they were charged excessive settlement fees in violation of the Pennsylvania Secondary Mortgage Loan Act. After the court denied defendant's motion to dismiss, the case ultimately settled and plaintiffs and the class were refunded 100% of the alleged overcharges.

*In re Tenet Healthcare Corp. Securities Litigation*, 02-cv-8462 (C.D. Cal.). Prior to joining the firm, Katrina Carroll represented the State of New Jersey's Division of Investment in this securities class action against Tenet Healthcare and its outside auditor, KPMG, related to false and misleading public statements those entities made between 2000 and 2002 about Tenet's financial health. Katrina played a large role in drafting motions *in limine* briefing issues regarding the admissibility of plaintiff's expert witness report. Tenet settled in 2006 for $215 million, and KPMG settled in 2008 for $65 million.

*In re Motorola Securities Litig.*, 03-cv-287 (N.D. Ill.). Katrina Carroll represented the State of New Jersey's Division of Investment in this securities class action against Motorola, stemming from misrepresentations made by the company regarding a $2 billion loan it made to a Turkish entity that was not repaid. The case settled a few days before trial for $190 million.

<u>GOVERNMENT COVID-19 CLOSURE ORDER LITIGATION</u>

*In re Generali Covid-19 Travel Insurance Litig.*, No. 20-md-2968, MDL 2968 (S.D.N.Y). In January 2021, Jamisen Etzel was appointed co-lead counsel in this MDL comprising actions brought on behalf of consumers whose travel plans were cancelled as a result of the Covid-19 pandemic, and whose travel insurance provider either denied coverage or refused to return premiums paid for post-departure risks the insurer was not required to cover. As of February 2021, the MDL is in the initial pleading stage.

Case: 1:21-cv-04515 Document #: 1-1 Filed: 08/24/21 Page 168 of 249 PageID #:175

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

**Business Income Insurance Coverage Litigation**, various. Carlson Lynch represents dozens of business-policyholders who face devastating losses as a result of being forced to close or curtail their business operations as a result of government shut down orders in the wake of the Covid-19 pandemic and who have been denied insurance coverage under their "all risks" property insurance coverage by various insurers. These cases are at various stages, including a case in the Third Circuit where Carlson Lynch and various other plaintiffs' counsel are seeking certification of the coverage issues to the Supreme Court of Pennsylvania, and a multi-district litigation in Western District of Pennsylvania where all claims against Erie Insurance have been centralized.

**University COVID Tuition/Fee Refund Litigation**, various jurisdictions. The COVID pandemic has affected all of our lives, but few more than students. Carlson Lynch has spent significant resources in response to repeated inquiries by concerned and confused college kids and their parents who wondered why they were still made to pay full (and sometimes increasing) tuition and mandatory fees to colleges and universities who were moving to virtual learning and closing campuses. The firm responded by surveying the variety of COVID responses of public and private universities around the country (some attended by our own sons and daughters), consulting with industry experts, evaluating some of the earliest cases, and digging deep into federal and state law across the country. We decided the basic question was one of: what was bargained for, what was provided, and who was in the weakest and most vulnerable position by the total change in circumstances. In a situation with no clear heroes or villains, we came down on the side of students left with few options and parents faced with a depressed economy and new health responsibilities.

Carlson Lynch now represents such students in cases across the country, leading breach of contract/ unjust enrichment actions against private universities such as Cornell, Northwestern, Temple, and the University of Pennsylvania. Further, we have become the premier firm in the nation in bringing similar cases against public university schools and systems. The law here is more complex, often involving novel applications of Constitutional due process and "takings" claims, as well as specialized courts, U.S. Department of Education regulations, and state agency proceedings. The firm leads or helps lead COVID refund cases against the state university systems of Washington, Colorado, Arizona, Illinois, and Georgia, to name a few. And our motion to dismiss victories in cases against Ohio University and Kent State University were among the first in the country to allow these actions to move into discovery and have our basic "breach of contract" theory blessed by Courts. With more than 40 of these cases being actively litigated, these claims and the students and parents so affected have quickly become some of our most important and largest group of clients.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

## CONSUMER PROTECTION/PRODUCTS LIABILITY

***In re Robinhood Outage Litig.***, No. 20-cv-1626 (N.D. Cal.). In July 2020, Jamisen Etzel was appointed to the executive committee overseeing consolidated actions brought by consumers who sustained losses when the trading application Robinhood suffered severe service outages in early 2020 during a period of intense market volatility. A consolidated amended complaint was filed in August 2020, and rulings on Robinhood's initial dispositive motion is expected in early 2021.

***Morrow v. Ann Inc.***, 16-cv-3340 (S.D.N.Y.). Carlson Lynch was co-class counsel in a case alleging deceptive pricing practices by a major national retail chain. After plaintiffs overcame a motions to dismiss, the case settled for $6.1 million worth of class benefits. The settlement was approved in April 2018.

***Luca v. Wyndham Hotel Group, LLC***, 2:16-cv-746 (W.D. Pa.). Carlson Lynch was co-lead counsel in a class action against the Wyndham hotel companies for violations of New Jersey consumer protection statutes. Plaintiffs alleged that Wyndham's websites deceptively masked the resort fees charged at certain hotels and forced patrons to agree to illegal terms and conditions. In 2017, plaintiffs defeated a motion to dismiss filed by two of the primary operating subsidiaries. A class settlement worth up to $7.6 million was reached in 2019 and approved later that year.

***Van v. LLR, Inc.***, 3:18-cv-0197 (D. Ak.); 962 F.3d 1160 (9th Cir. 2020). Carlson Lynch attorneys Jamisen Etzel and Kelly Iverson won a significant consumer rights ruling from the United States Court of Appeals for the Ninth Circuit. The action alleged the defendant's overcharged customers over the course of more than a year; however, after notice of the suit but before it was filed, the defendant refunded the entire class – but only the amount overcharged without interest or other statutory damages. The district judge dismissed the action based on lack of subject matter jurisdiction after finding that the consumers' lost time value of money was "too little" to be a constitutionally recognizable harm. The appeals court reversed and, in a published decision, held that the temporary loss of money is a sufficient "injury-in-fact" under Article III of the Constitution to confer standing on a consumer to file a federal lawsuit.

***Robert Brown, et al. v. Electrolux Home Products, Inc., d/b/a Frigidaire***, No. 15-11455 (11th Cir.). In July 2015, Carlson Lynch attorneys co-authored a brief on behalf of Public Justice, P.C.; the National Association of Consumer Advocates; U.S. PIRG (United States Public Interest Research Group); Consumer Action; and the Consumer Federation of California, appearing as *amici curiae* to the Eleventh Circuit and arguing in support of

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

**CARLSON LYNCH**

affirmance of a district court's certification of a class of purchasers of defective washing machines.

***Kobylanski v. Motorola Mobility, Inc., et al.***, No. 2:13-cv-1181 (W.D. Pa.). Carlson Lynch represented purchasers of MOTOACTV wearable fitness devices who alleged that the devices, although marketed as "sweat-proof" and "rain-resistant," were in fact susceptible to damage from even slight amounts of moisture. A settlement was reached which provided for full refunds for class members who had previously submitted a claim for water damage to Motorola but were denied a repair or replacement, and additional forms of relief for class members who had not previously complained of water damage. The settlement was approved in October 2014.

***Quinn et al. v. Walgreen Co., Wal-Mart Stores, Inc., Supervalu, Inc., and Perrigo Company of South Carolina, Inc.***, No. 7:12-cv-8187 (S.D.N.Y.). Carlson Lynch served as co-lead counsel on behalf of purchasers of glucosamine/chondroitin products manufactured by Perrigo and sold by various retailers. A settlement was reached in 2014 which provided for a total settlement fund of $2.8 million and provided for full or partial refunds to class members who submitted valid claims. Final approval was granted in March 2015.

***In re Nutramax Cosamin Marketing and Sales Practices Litigation* – MDL No. 2498,** (D. Md.). Carlson Lynch represented several plaintiffs in nationwide litigation regarding Nutramax's false and misleading marketing of glucosamine/chondroitin supplements, which multiple studies have determined to be without efficacy for the conditions they purport to treat. After the cases were consolidated for pre-trial proceedings, Carlson Lynch partner Ed Kilpela was appointed to the Executive Committee overseeing the litigation.

***In re Wireless Phone Equipment Replacement Insurance Litigation,*** (C.P. Allegheny County, Pennsylvania). Carlson Lynch was lead counsel in this national litigation alleging consumer fraud in connection with wireless phone equipment replacement insurance. In November 2004, the Court approved a class settlement and entered Findings of Fact and Conclusions of Law which commented on the adequacy of Carlson Lynch as lead counsel as follows:

> "Class counsel have abundant experience as lead counsel in consumer class action litigation. Indeed, class counsel have frequently appeared before this Court. Other courts have routinely recognized class counsels' adequacy . . . . This Court readily agrees with these other courts, and finds that Bruce Carlson and Gary Lynch are more than adequate counsel, and indeed are capable and diligent class action attorneys."

**Pittsburgh ▪ San Diego ▪ Chicago ▪ Los Angeles ▪ Philadelphia**

FILED DATE: 8/9/2021 12:00 AM  2021CH03460

***Mednick v. Precor, Inc.***, No. 14-cv-03624 (N.D. Ill.):   Katrina Carroll served as court-appointed Co-Lead Counsel in this products liability matter concerning the heart rate monitoring feature on Precor fitness machines. Due to Ms. Carroll's efforts, the plaintiffs defeated a contested class certification motion and obtained class certification for a multi-state consumer class. Ms. Carroll was instrumental in negotiating a class settlement providing meaningful relief for class members shortly thereafter, for which the Court recently issued final approval.

***Bishop et al. v. Behr Process Corp. et al.***, No. 1:17-cv-4464 (N.D. Ill.):   Carlson Lynch partner Katrina Carroll currently serves as court-appointed Co-Lead Counsel in this national products liability class action matter relating to defective deck paint. Together with her co-counsel, Ms. Carroll obtained a substantial settlement for the class, which has been finally approved by the Court and is currently being administered.

***In re Rust-Oleum Restore Marketing, Sales Practices and Prods. Liab. Litig.*** No. 1:15-cv-1364 (N.D. Ill.): In this sprawling products liability MDL relating to defective deck resurfacing products, Katrina Carroll was instrumental in negotiating a $9.3 million settlement providing meaningful relief to consumers, which received final approval in March of 2017 by the Honorable Amy J. St. Eve of the United States District Court for the Northern District of Illinois, now a sitting Judge of the Court of Appeals for the Seventh Circuit. Over the course of the litigation, among other things, the court resolved an extremely challenging motion to dismiss substantially in plaintiffs' favor, issuing a sixty-page opinion, oft-cited in warranty and consumer fraud class actions across the country. Ms. Carroll oversaw the plaintiffs' briefing on that motion.

## WAGE AND HOUR & EMPLOYMENT DISCRIMINATION LITIGATION

***Verma v. 3001 Castor Inc.***, (E.D. Pa.). As co-class counsel, Carlson Lynch won a $4.59 million jury verdict in 2018 for misclassified workers at a Philadelphia nightclub. The claims were brought under the FLSA and Pennsylvania Minimum Wage Act. The trial verdict was fully affirmed by the Third Circuit in August 2019.

***Gardner v. Country Club, Inc.*** (D.S.C.). Carlson Lynch served as class counsel for a class of nightclub workers who were misclassified as independent contractors, subjected to deductions from their tip income, and denied wages. Carlson Lynch won two significant dispositive motions, obtaining a ruling that the workers were legally employees, and a legal opinion determining as a matter of first impression under South Carolina wage laws that tip income was protected from employer deductions. The case then settled for a total of $1.5 million, and final approval was granted in 2019.

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

# CARLSON LYNCH

***Herron v. Investment Professionals Inc.*** (W.D. Pa.). Carlson Lynch secured a $450,000 settlement for 12 financial advisors who were misclassified by a financial services company and consequently did not receive overtime compensation. The settlement was approved in February 2018.

***Herzfeld v. 1416 Chancellor Inc.*** (E.D. Pa.). Carlson Lynch is class counsel for a litigation-certified Rule 23 class and FLSA collective of more than 100 nightclub entertainers alleging misclassification and violations of the FLSA and Pennsylvania wage and hour laws. A settlement for a total amount of $415,000 was reached and granted preliminary approval in January 2018. Final approval was granted following a fairness hearing in June 2018.

***Correll v. One Three Five, Inc.*** (W.D. Pa.). Carlson Lynch was class counsel for a class of several hundred nightclub performers who alleged that they were misclassified by the club's owner as independent contractors, resulting in violations of the Fair Labor Standards Act and Pennsylvania state wage laws. A class settlement was granted final approval in 2016 and provided $815,000 in total relief for the class.

***Genesis Healthcare v. Symczyk*** (U.S. Supreme Court). Gary Lynch served as Counsel of Record before the United States Supreme Court in an appeal addressing the application of mootness principles in a putative collective action filed under Section 216(b) of the Fair Labor Standards Act. When defendant served Carlson Lynch' client with a Rule 68 offer of judgment for "make whole" relief, the district court dismissed the case as moot. Gary Lynch successfully argued the appeal in the United States Court of Appeals for the Third Circuit, which held that the FLSA collective action did not become moot upon the plaintiff's receipt of a Rule 68 offer of judgment for full satisfaction of her individual claim. The Supreme Court reversed in a 5-4 opinion, with Justice Kagan writing a strong dissent on behalf of Carlson Lynch's client—a position which was subsequently adopted by the majority of the Court in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). Carlson Lynch's position before the Supreme Court was supported by the United States as Amicus Curiae.

***Gualano v. Abercrombie & Fitch Stores, Inc.***, (W.D. Pa). Carlson Lynch was co-lead counsel in this wage and hour litigation alleging that defendant retail clothier was violating federal and state minimum wage laws. Following the fairness hearing in early 2005, where a multi-state settlement was presented to the Court for approval, the Court entered Findings of Fact and Conclusions of Law addressing lead counsels' adequacy as follows:

> "The Court finds the plaintiffs' counsel, Bruce Carlson and Gary Lynch, are experienced class counsel and that they have met all of the requirements of Rule 23(g)(1)(B) and (C). Consistent with the underlying purpose of Fed. R. Civ. P. 23,

**Pittsburgh ▪ San Diego ▪ Chicago ▪ Los Angeles ▪ Philadelphia**

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

**CARLSON LYNCH**

plaintiffs' counsel have achieved, with utmost efficiency, a quality result for the entire class and are commended for the diligence and effective advocacy they have displayed on behalf of their clients."

***Pasci v. Express, LLC***, (W.D. Pa.). This case was similar to the *Abercrombie* case discussed above and proceeded to a fairness hearing in November 2004, where a multi-state settlement was presented to the Court for approval. Regarding the adequacy of Carlson Lynch, the Court issued Findings and Conclusions stating:

> "With respect to the adequacy of counsel, the Court finds that class counsel have capably and vigorously represented the class. Bruce Carlson and Gary Lynch have substantial experience in class-based litigation involving consumer fraud and employment claims . . . . Class counsel achieved an efficient and excellent result on behalf of the class."

***Ellis v. Edward Jones,*** (N.D. Ohio). Carlson Lynch chaired the Plaintiffs' Leadership Committee in this wage and hour class action alleging that defendant stock brokerage company violated federal and state overtime laws. After Defendant filed an answer and after significant discovery wherein Defendant produced in excess of 500,000 pages of documents and hundreds of videotapes, the parties commenced mediation to pursue a potential global settlement. The first mediation, which occurred in Atlanta in March 2007, was unsuccessful. Ultimately, the parties participated in a second mediation in San Francisco, at which the parties arrived at the basic terms of a proposed settlement pursuant to which class members from multiple states received in excess of $19 million. After a fairness hearing on January 5, 2009, the Court granted final approval of the settlement.

***Byers v. PNC Financial Services Group, Inc.,*** (W.D. Pa.). Carlson Lynch was lead plaintiff's counsel in this wage and hour class action alleging that defendant stock brokerage company violated federal and state overtime laws. A multi-state settlement was approved following a fairness hearing in June 2008.

***Steen v. A.G. Edwards, Inc.,*** (S.D. Cal.). Carlson Lynch was co-class counsel for plaintiff in this wage and hour litigation alleging that defendant stock brokerage company violated federal and state overtime laws. A mediated national class-based settlement has been reached and preliminary approval has been granted. A fairness hearing was held on August 31, 2009 in Los Angeles, after which the Court entered an Order granting final approval of the settlement.

***Meola v. AXA Financial, Inc.,*** (N.D. Cal.). Carlson Lynch was co-class counsel for plaintiff in this wage and hour litigation alleging that defendant financial services company violated

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

# CARLSON LYNCH

federal and state overtime laws. A mediated national class-based settlement was negotiated in this matter, and final approval was granted following a fairness hearing in the fall of 2009.

*In re St. Francis Health System,* (C.P., Allegheny County Pennsylvania). Carlson Lynch was counsel for the class in connection with this wage and hour litigation on behalf of certain former employees of the St. Francis Health System in Pittsburgh. Plaintiff asserted that the class was deprived of severance benefits when St. Francis Health System was acquired by another hospital group in Western Pennsylvania. Prior to the disposition of Plaintiff's class certification motion, the parties engaged in extensive mediation before reaching a class-based settlement.

*Haag v. Janney Montgomery Scott,* (E.D. Pa.). Carlson Lynch was a member of the three firm Executive Committee in this wage and hour class action alleging that defendant stock brokerage company violated federal and state overtime laws. After protracted litigation and two separate mediations, the parties reached a multi-state settlement. A fairness hearing was conducted in Philadelphia on June 30, 2009, where Gary Lynch appeared on behalf of the class. Following the hearing, the Court granted final approval of the settlement.

*Steinberg v. Morgan Stanley & Co.,* (S.D. Cal.). Carlson Lynch was co-class counsel for plaintiff in this wage and hour litigation alleging that defendant stock brokerage company violated federal and state overtime laws. A mediated national class-based settlement was reached, and final approval of the settlement was granted.

*Ramsey v. Ryan Beck, Inc.* (S.D.N.Y.). Carlson Lynch was co-class counsel in this wage and hour class action alleging that defendant stock brokerage company violated federal and state overtime laws. After protracted litigation, the parties reached a multi-state settlement, and final approval was granted in June 2010.

*Kniess v. Heritage Valley Health Systems, Inc.,* (C.P., Allegheny County, Pennsylvania). Carlson Lynch was lead counsel in this wage and hour class action alleging that the defendant hospital system failed to pay overtime compensation to its nurse practitioners and physician's assistants. The parties reached a mediated class settlement whereby class members received the majority of the back pay alleged by Carlson Lynch.

*Leadbitter v. The Washington Hospital, Inc.,* (W.D. Pa.). Carlson Lynch was lead counsel in this wage and hour class action alleging the defendant hospital system failed to pay overtime compensation to its nurse practitioners and physician's assistants. The parties reached a mediated class settlement whereby class members will be eligible to receive the majority of the back pay alleged by Carlson Lynch, and the settlement has received final approval from the Court.

# CARLSON LYNCH

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

***Career Education Corporation Misclassification Litigation,*** (W.D. Pa.). In early 2011, Carlson Lynch filed a putative collective action on behalf of admissions representatives employed by culinary schools operated by Career Education Corporation. Carlson Lynch alleged that these individuals were misclassified and improperly denied overtime benefits. A class settlement was negotiated and final approval of the settlement was granted in December 2011.

***Atrium Centers, LLC Automatic Meal Break Deduction Litigation,*** (N.D. Ohio). Carlson Lynch was lead counsel in this collective action on behalf of hourly health care workers (primarily nurses) alleging improper pay practices in connection with automatic meal break deductions. After the court granted Plaintiffs' motion for conditional certification of a collective action under the FLSA, extensive discovery ensued. Following the close of discovery in the fall of 2012, the Parties engaged in mediation with a former United States Magistrate Judge and reached an agreement to settle the case on a collective basis. The settlement was approved by the court in December 2012, and the settlement proceeds have been distributed.

***Northwestern Memorial Healthcare Automatic Meal Break Deduction Litigation,*** (N.D. Ill.), Carlson Lynch was lead counsel in this collective/class action on behalf of hourly health care workers (primarily nurses) alleging improper pay practices in connection with automatic meal break deductions. After extensive discovery and the denial of Defendant's motion for summary judgment, the Parties reached a mediated class settlement in the fall of 2012. In December 2013, the Court granted final approval of the settlement, and the settlement proceeds have been distributed to the class.

***Crozer-Keystone Health System Overtime Litigation,*** (E.D. Pa.), Carlson Lynch filed a putative collective action against Crozer-Keystone Health System in the Eastern District of Pennsylvania. The Complaint challenged pay practices related to nurse practitioners and/or physicians' assistants. The plaintiffs in these cases allege that they were illegally denied overtime compensation by their employers. After discovery, the Parties filed cross motions for summary judgment. In a widely reported opinion issued on January 4, 2011, the Court granted Plaintiffs' motion for summary judgment, holding that Defendant had misclassified individuals in Plaintiff's job positions. Defendant's motion for reconsideration of the federal court's summary judgment decision was denied in a twenty-one page opinion and order issued on August 15, 2011. Following mediation, the settlement of this case was approved in August 2012.

***Ehrheart v. Verizon Wireless,*** No. 2:07-cv-01165 (W.D. Pa.), 609 F.3d 590 (3d Cir. 2010). Carlson Lynch represented the Plaintiff/Appellant in this matter alleging violation of the Fair and Accurate Credit Transaction Act. A settlement was negotiated and preliminarily approved by the district court pursuant to Rule 23. Subsequent to the settlement, Congress passed the

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

Credit and Debit Card Receipt Clarification Act, which had the effect of eliminating Plaintiff's cause of action. On motion of Verizon, the district court vacated its preliminary approval of the settlement and granted Verizon judgment on the pleadings. On appeal, the United States Court of Appeals for the Third Circuit reversed the district court, and in doing so clarified the role of the district court in evaluating class settlements under Rule 23, holding:

> It is essential that the parties to class action settlements have complete assurance that a settlement agreement is binding once it is reached. The fact that a settlement agreement is governed by Rule 23 does not diminish its enforceability as a contract. Where, as here, the parties have executed an agreement, a party cannot avoid its independent contractual obligations simply because a change in the law confers upon it a benefit that could have altered the settlement calculus.

***White v. United Steel Workers of America***, (W.D. Pa.), Carlson Lynch was co-lead counsel in this age-discrimination class action against the U.S.W.A. After overcoming a motion to dismiss on a legal issue regarding a substantial split of authority, the defendant requested mediation to explore the possibility of settlement. After extensive mediation over a one-month period in June 2004, the case ultimately settled for an amount that defense counsel characterized as the highest ever paid by the U.S.W.A. in connection with civil litigation.

### ANTITRUST

***In Re Railway Industry Employee No-Poach Antitrust Litigation,*** **MDL 2850,** (W.D. Pa.), Carlson Lynch represented a class of employees who alleged the defendants and their co-conspirators entered into unlawful agreements to reduce and eliminate competition among them for employees and to suppress the compensation of those employees. Chief Judge Joy Flowers Conti appointed Carlson Lynch partner Kelly K. Iverson as Liaison Counsel on behalf of the class. The two defendants agreed to class settlements worth a combined $48.95 million, and final approval was granted in August 2020.

***In Re Blue Cross Blue Shield Antitrust Litigation,*** **MDL No. 2406**, (N.D. Ala.). Carlson Lynch represents healthcare subscriber plaintiffs in four states in this nationwide class action challenging the anti-competitive practices of Blue Cross/Blue Shield's nationwide network of local insurers who do not compete with each other based on geographic boundaries. In addition to Carlson Lynch's work on the individual cases, Carlson Lynch attorneys have been significantly involved in the discovery process.

# CARLSON LYNCH

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

## ENVIRONMENTAL LAW

***Steward et al. v. Honeywell Int'l, Inc.***, No. 3:18-cv-01124 (S.D. Ill.)  Carlson Lynch is currently involved in this property damage class action involving nuclear and non-nuclear contamination of large swaths of the City of Metropolis and the County of Massac. Carlson Lynch and co-lead counsel are prosecuting claims for injunctive relief, property damage, and medical monitoring in this extremely complicated environmental contamination case.

## CIVIL RIGHTS

***ADA (Americans with Disabilities Act) Accessibility Litigation***. Carlson Lynch is currently counsel for plaintiffs in a substantial number of putative class actions filed on behalf of individuals with disabilities to enforce the ADA's accessibility requirements. Over the last six years, Carlson Lynch has represented the visually disabled in seeking improved access to ATMs, Point of Sale devices, automated retail kiosks, and websites.

In January 2016, Magistrate Judge Robert C. Mitchell of the United States District Court for the Western District of Pennsylvania recommended certification of a national class of mobility-disabled individuals who were denied full and equal access to Cracker Barrel stores due to the company's inadequate centralized ADA maintenance policies. Judge Mitchell recommended that Carlson Lynch be appointed as counsel for the Class. Cracker Barrel has over 630 stores across the country. The report and recommendation was adopted by District Judge Mark Hornak in July 2016. The case subsequently settled, securing injunctive relief for the nationwide class.

More recently, Carlson Lynch was representing an individual with a mobility disability in *Egan v. Live Nation Worldwide, Inc.*, 2:17-cv-445 (W.D. Pa.). The claims involve wheelchair inaccessibility and ticket unavailability at Pittsburgh-area concert events promoted by Live Nation and ticketed by Ticketmaster. In March 2018, Judge Mark Hornak denied Live Nation's attempt to force arbitration of the potential class action. On appeal, the Third Circuit remanded the arbitration question for trial on disputed factual issues. The case settled before trial.

As a result of its work advocating for individuals with disabilities, Carlson Lynch received the ACHIEVA Award of Excellence for Legal Work in 2018.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# Exhibit G

FILED DATE: 8/9/2021 12:00 AM 2021CH03460

SCOTT
+
SCOTT

# INVESTING IN THE LAW

Firm Overview



FILED DATE: 8/9/2021 12:00 AM 2021CH03460

Scott+Scott specializes in the investigation and prosecution of complex actions across the globe – recovering billions for its clients. The Firm has extensive experience litigating securities fraud, antitrust, and other complex cases and is a pioneer in structured finance monitoring for client portfolios. We represent individual, institutional and multinational clients in the U.S and EU courts, offering a one-stop shop for international recoupment.

FILED DATE: 8/9/2021 12:00 AM 2021CH03460



# THE FIRM

Scott+Scott was founded in 1975 and began its securities litigation practice in 1997. The Firm has since grown into one of the most respected law firm specializing in the investigation and prosecution of complex actions across the United States and in Europe. Today, it is comprised of over 125 team members, including over 100 highly experienced attorneys, a 30+ paraprofessional team comprised of paralegals and legal assistants, a finance manager, institutional investor liaisons, and other office support staff, in addition to an IT support and development group, financial analysts, forensic accountants, investment consultants, and an in-house investigations department.

Scott+Scott is headquartered in Connecticut and has additional offices in New York, London, Amsterdam, Berlin, California, Virginia, Ohio, and Arizona.

Scott+Scott has extensive experience litigating securities fraud, antitrust, and other complex cases on behalf of our institutional and individual clients throughout the United States, serving as lead counsel in numerous securities class actions since the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and as lead and co-lead counsel in antitrust, consumer, and other complex litigation. The Firm also represents many multinational corporations in foreign jurisdiction litigation in the EU courts.

Scott+Scott's attorneys are recognized experts and leaders in securities monitoring, complex litigation, and corporate governance law. They regularly speak at institutional investor educational conferences around the world and before boards of directors and trustees responsible for managing institutional investments. Scott+Scott attorneys educate institutional investors and governmental entities on the importance of fulfilling fiduciary obligations through the adoption of appropriate asset recovery services, as well as through the development and enforcement of corporate governance initiatives.

Scott+Scott has been a pioneer in structured finance monitoring of our clients' portfolios and the Firm's vast experience in structured debt financial litigation has enabled us to provide clients with in-depth monitoring of their structured finance products. Structured-finance

FILED DATE: 8/9/2021 12:00 AM 2021CH03460

products, like asset-backed securities and collateralized debt obligations, attract investors with high returns relative to other fixed-income instruments. However, those returns can come with substantial undisclosed risks due to investors' limited ability to assess what they are actually acquiring. Most investors cannot review the assets that underlie securitizations, nor negotiate around the boiler-plate terms that govern securitizations, and have very little control over the parties that administer securitizations.

Scott+Scott's portfolio monitoring service responds to these unique risks. Importantly, the Firm does not just track the performance of our clients' structured-finance positions. We analyze it in the context of other data that allows us to understand what drives losses, should any occur. Initially, Scott+Scott conducts a review of the overall record of the parties that issue and administer our clients' structured-finance investments, such as sponsors, servicers, and trustees. The conduct of those parties reveals whether a securitization is suffering from hidden flaws, such as defective underlying assets, for which investors should be compensated. In addition, Scott+Scott reviews securitizations' asset-level performance ts and their governing agreements to identify any specific instances of those parties breaching their obligations and harming investors. This comprehensive approach enables Scott+Scott to identify hard-to-spot wrongdoing and hold the appropriate parties responsible, ultimately winning significant recoveries for clients who purchased structured-finance products. The Firm has also evaluated and monitored debt and debentures originating from private placements and non-public companies, including municipal bonds and derivatives for our clients.



# CONSUMER LITIGATION

Scott+Scott's Consumer Practice Group consists of some of the premier advocates in the area of consumer protection and has been at the forefront in litigating and securing some of the most significant consumer protection settlements on behalf of its clients, resulting in hundreds of millions of dollars to class members. The Firm's Consumer Practice Group has attorneys dedicated to three primary areas: Data Breach/Data Privacy Litigation, Healthcare and Pharmaceutical Litigation, and Consumer Protection Litigation.

FILED DATE: 8/9/2021 12:00 AM 2021CH03460

## DATA BREACH/DATA PRIVACY LITIGATION

Scott+Scott has extensive experience litigating data privacy and data breach class actions advancing cutting-edge legal theories. The Firm has achieved some of the largest recoveries in this area and currently serves in a leadership capacity in a number of data privacy and data breach class actions, including:

- *In re Equifax, Inc. Customer Data Security Breach Litigation*, No. 1:17-md-02800 (N.D. Ga.) (claims on behalf of financial institutions injured as a result of the 2017 Equifax data breach that exposed the personal and financial information of approximately 150 million U.S. consumers; preliminary approval of **settlement valued at $32.5 million**);

- *In re Google Assistant Privacy Litigation*, No. 5:19-cv-04286 (N.D. Cal.) (class action on behalf of consumers alleging privacy violations whereby Google Assistant records and discloses their private confidential communications without consent);

- *Lopez v. Apple Inc.*, No. 4:19-cv-04577 (N.D. Cal.) (class action on behalf of consumers and their minor children alleging privacy violations by Apple through its Siri application); and

- *In re: American Medical Collection Agency, Inc. Customer Data Security Breach Litigation*, No. 2:19-md-02904 (D.N.J.) (claims on behalf of consumers involving data breach of personal information).

Recently, in settling a class action against The Wendy's Co. involving a breach of personal and financial information, the court, in approving the $50 million dollar settlement, noted that Scott+Scott and its attorneys demonstrated *"very significant experience in these types of class actions and in data breach litigation"* and that the attorneys *"brought to the table an incredible wealth of knowledge, was always prepared, really was thorough and professional in everything that was provided to the Court." First Choice Federal Credit Union v. The Wendy's Co.*, No. 2:16-cv-00506, Transcript at 32 (W.D. Pa. Nov. 6, 2019).

## REPRESENTATIVE DATA BREACH/DATA PRIVACY CASES

Additional data privacy and data breach settlements achieved by Scott+Scott for its clients include:

- *The Home Depot, Inc., Customer Data Security Breach Litigation*, MDL No. 2583 (N.D. Ga.) (co-lead counsel; **$27.25 million settlement** on behalf of financial institutions involving data breach and theft of the personal and financial information of over 40 million credit and debit card holders);

- *In re Target Corporation Customer Data Security Breach Litigation*, MDL No. 2522 (D. Minn.) (**$59 million settlement** on behalf of financial institutions injured by the theft of sensitive payment card information);

- *Greater Chautauqua Federal Credit Union v. Kmart Corporation*, No. 1:15-cv-02228 (N.D. Ill.) (settlement valued at $13.4 million on behalf of financial institutions injured by the theft of sensitive payment card information); and

- WinSouth Credit Union v. Mapco Express, Inc., No. 3:14-cv-01573 (M.D. Tenn.) (largest per dollar per card recovery involving payment card data breach brought on behalf of a class of financial institutions).

## INSURANCE AND PHARMACEUTICAL LITIGATION

Scott+Scott represents consumers and health and welfare funds throughout the United States who have been overcharged in connection with their insurance and pharmaceutical transactions. The Firm currently serves in a leadership capacity in a number of insurance and pharmaceutical class actions, including:

- *Sohmer v. UnitedHealth Group Inc.*, No. 0:18-cv-03191 (D. Minn.) (co-lead counsel; claims on behalf of plan participants alleging overcharge for prescription drug copayments);

- *Negron v. Cigna Corporation*, No. 3:16-cv-01702 (D. Conn.) (chair of executive committee; claims on behalf of plan participants alleging overcharge for prescription drug copayments);

- *Forth v. Walgreen Co, Inc.*, No. 1:17-cv-02246 (N.D. Ill.) (class action on behalf of consumers and third party union benefit funds alleging unlawful overcharges for medically necessary prescription drugs); and

- *Stafford v. Rite Aid Corporation*, No. 3:17-cv-01340 (S.D. Cal.) (class action on behalf of consumers who were overcharged for prescription drug claims).

## REPRESENTATIVE INSURANCE AND PHARMACEUTICAL CASES

Scott+Scott have significant experience litigating against insurance companies and pharmaceutical manufacturers. The Firm's lawyers have obtained some of the largest settlements in consumer healthcare litigation, including:

- *In re Managed Care Litig.*, MDL No. 1334 (S.D. Fla.) (**settlements** with Aetna, CIGNA, Prudential, Health Net, Humana, and WellPoint providing monetary and injunctive benefits **exceeding $1 billion**); and

- *In re Prudential Ins. Co. SGLI/VGLI Contract Litigation*, MDL No. 2208 (D. Mass.) (**$40 million settlement** was achieved on behalf of a class of military service members and their families who had purchased insurance contracts).

FILED DATE: 8/9/2021 12:00 AM 2021CH03460

## CONSUMER PROTECTION LITIGATION

Scott+Scott has been at the forefront in prosecuting consumer protection actions against organizations engaging in unfair practices. The Firm currently serves in a leadership capacity in a number of consumer protection class actions, including:

- *Aquilina v. Certain Underwriters at Lloyd's London*, No. 1:18-cv-00496 (D. Haw.) (representing Hawaii homeowners who were placed into insurance excluding lava coverage and suffered devastating losses as a result of the 2018 eruption of Kilauea); and

- *Morris v. Apple, Inc.*, No. 5:20-cv-04812 (N.D. Cal.) (class action on behalf of consumers who purchased iTunes gift cards under false pretenses and were not refunded the value of the iTunes gift cards).

**Representative Consumer Protection Cases:**

Over the past decade, Scott+Scott has litigated a number of diverse cases and fought for rights of consumers to be treated fairly and equitably. The Firm has achieved significant settlements that have protected consumers' rights and recovered substantial monetary benefits, including:

- *The Vulcan Society, Inc. v. The City of New York*, No. 1:07-cv-02067 (E.D.N.Y.) (**$100 million settlement and significant injunctive relief** was obtained for a class of black applicants who sought to be New York City firefighters, but were denied or delayed employment due to racial discrimination);

- *In re Providian Financial Corp. Credit Card Terms Litigation*, MDL No. 1301 (E.D. Pa.) (**$105 million settlement** was achieved on behalf of a class of credit card holders who were charged excessive interest and late charges on their credit cards);

- *In re Pre-Filled Propane Tank Marketing & Sales Practices Litigation*, MDL No. 2086 (W.D. Mo.) (**$37 million settlement** obtained on behalf of class of propane purchasers who alleged defendants overcharged the class for under-filled propane tanks);

- *Murr v. Capital One Bank (USA)*, N.A., No. 1:13-cv-01091 (E.D. Va.) (**$7.3 million settlement** pending on behalf of class of consumers who were misled into accepting purportedly 0% interest credit card offers); and

- *Gunther v. Capital One, N.A.*, No. 2:09-cv-02966 (E.D.N.Y.) (**settlement resulting in class members receiving 100% of their damages** in case alleging consumers were improperly charged undeliverable mail fees).



FILED DATE: 8/9/2021 12:00 AM  2021CH03460

# INVESTIGATIONS



Our internal investigations unit is unmatched in its sophistication and ability to identify, connect with, and obtain vital information from witnesses. The Firm's in house investigative department is led by attorney Alex Vargas, who has over a decade of legal and investigative experience. Under Vargas' direction, investigators employ public record databases, in-person interviews, and forensic IT to unravel complex cases, discover critical "evidence" and deliver actionable intelligence. The team works seamlessly with a robust, international network of boots-on-the-ground investigative experts to navigate the privacy and banking laws of different jurisdictions and deliver the facts from anywhere in the world.

**The team's investigations have contributed to recoveries in excess of $3.2 billion** on behalf of aggrieved investors, including, notably, their efforts in identifying, interviewing, and working with key witnesses, as well as obtaining critical evidentiary materials, leading to the largest trial settlement in the securities fraud arena ($2.46 billion in *Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*, No. 02-cv-05893 (N.D. Ill. 2006)).

Prior to joining Scott+Scott, Mr. Vargas served as the Director of Litigation Support at a boutique investigation firm in New York and earlier, was employed by an investigation firm handling securities fraud cases exclusively. Mr. Vargas received both his B.A. and J.D. from the University of San Diego and is licensed to practice law in New York, California, and the District of Columbia.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460



# WORLD-CLASS ATTORNEYS

We pride ourselves on the caliber of legal talent on our team. In addition to some of the best and brightest rising stars, we have attorneys who have served with distinction in the U.S. Department of Justice, been admitted to the U.S. Supreme Court, served in OAGs at the state level, argued before the UK's CAT and High Courts, and received virtually every accolade offered in our profession.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# JOSEPH P. GUGLIELMO

## PRACTICE EMPHASIS

Joseph P. Guglielmo represents institutional and individual clients in antitrust, consumer and securities litigation in federal and state courts throughout the United States.

## EDUCATION

Catholic University of America (J.D., 1995; B.A., cum laude, 1992; Certificate of Public Policy)

## HIGHLIGHTS

Mr. Guglielmo is a partner in the firm's New York office and was recognized for his efforts representing New York University in obtaining a monumental temporary restraining order of over $200 million from a Bernard Madoff feeder fund. Specifically, New York State Supreme Court Justice Richard B. Lowe III stated, "Scott+Scott has demonstrated a remarkable grasp and handling of the extraordinarily complex matters in this case. The extremely professional and thorough means by which NYU's counsel has litigated this matter has not been overlooked by this Court."

Mr. Guglielmo serves in a leadership capacity in a number of complex antitrust and consumer actions, including: *In Equifax, Inc. Customer Data Security Breach Litigation*, No. 1:17-md-2800 (N.D. Ga.), co-lead counsel, claims on behalf of financial institutions involving data breach of personal and financial information of approximately 150 million consumers, *Arkansas Federal Credit Union v. Hudson Bay*, No. 1:19-cv-4492-PKC (S.D.N.Y.), lead counsel, claims on behalf of financial institutions arising out of data breaches; *Forth v. Walgreen Co, Inc.*, No. 1:17-cv-02246 (N.D. Ill.), lead counsel, asserting claims on behalf of class of consumers and third-party payers alleging overcharge for medically necessary, covered prescription drugs; *Sohmer v. UnitedHealth Group Inc.*, No. 18-cv-03191 (JNE/BRT) (D. Minn.); co-lead counsel, claims on behalf of plan participants alleging overcharge for copayments; *Negron v. Cigna Corporation*, No. 3:16-cv-1702 (WWE) (D. Conn.) (chair of executive committee, claims on behalf of plan participants involving overcharge of copayments for prescription drugs); *In re: Disposable Contact Lens Antitrust Litigation*, No. 3:15-md-2626 (M.D. Fla.), co-lead counsel, claims on behalf of a class of contact lens purchasers alleging violations of the antitrust laws; *In re: American Airlines Federal Credit Union v Sonic Corp.*, No., CIV-19-208G (N.D. Ohio.), Plaintiffs' Executive Committee, claims on behalf of financial institutions involving data breach of financial information of approximately five million consumers; and *In re: American Medical Collection Agency, Inc. Customer Data Security Breach Litigation*, No. 19-md-2904 (D.N.J.), Plaintiffs' Steering Committee, claims on behalf of consumers involving data breach of personal information.

Mr. Guglielmo is also actively involved in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-07789-LGS (S.D.N.Y.), which involves claims on behalf of purchasers of foreign exchange instruments alleging violations of federal antitrust laws.

Mr. Guglielmo has achieved significant victories and obtained numerous settlements for his clients. Mr. Guglielmo was co-lead counsel in *In re The Home Depot, Inc., Customer Data Security Breach Litigation*, MDL No. 2583 (N.D. Ga.), where a **$27.25 million settlement** was obtained on behalf of financial institutions involving a data breach and the theft of the personal and financial information of over 40 million credit and debit card holders. Mr. Guglielmo is counsel in *First Choice Federal Credit Union v. The Wendy's Company*, No. 16-cv-00506 (W.D. Pa.), where a **$50 million settlement** was obtained. He is also co-lead counsel in *Veridian Credit Union v. Eddie Bauer LLC*, No. 2:17-CV-00356-JLR (W.D. Wa.), where a settlement valued at approximately **$9.8 million** was recently obtained. Previously, Mr. Guglielmo was also a member of the Plaintiffs' Steering Committee in *In re Target Corporation Customer Data Security Breach Litigation*, MDL No. 2522 (D. Minn.), where a **$59 million settlement** was obtained on behalf of financial institutions involving data breach of personal and financial information of approximately 110 million credit and debit cardholders. Mr. Guglielmo was also lead counsel in *Winsouth Credit Union v. Mapco Express Inc.*, No. 3:14-cv-1573 (M.D. Tenn.), which achieved the largest dollar-per-card recovery on behalf of financial institutions involving data breach of credit and debit card information. Mr. Guglielmo was one of the principals involved in the litigation and settlement of *In re Managed Care Litigation*, MDL No. 1334 (S.D. Fla.), which included **settlements** with Aetna, CIGNA, Prudential, Health Net, Humana, and WellPoint, providing monetary and injunctive benefits **exceeding $1 billion.**

Additional cases in which Mr. Guglielmo played a leading role and obtained substantial recoveries for his clients include: *Love v. Blue Cross and Blue Shield Ass'n*, No. 03-cv-21296 (S.D. Fla.), which resulted in **settlements of approximately $130 million and injunctive benefits valued in excess of $2 billion**; *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1897 (D.N.J.), **settlements in excess of $180 million**; *Valle v. Popular Community Bank*, No. 653936/2012 (N.Y. Supreme Ct.), **$5.2 million settlement** on behalf of consumers, *In re Pre-Filled Propane Tank Marketing and Sales Practices Litigation*, MDL No. 2086 (W.D. Mo.), consumer **settlements in excess of $40 million**; *Bassman v. Union Pacific Corp.*, No. 97-cv-02819 (N.D. Tex.), **$35.5 million securities class action settlement**; *Garcia v. Carrion*, No. CV 11-1801 (D.P.R.), substantial **corporate governance reforms**; *Boilermakers National Annuity Trust Fund v. WaMu Mortgage Pass-Through Certificates*, No. 09-cv-00037 (W.D. Wash.), **$26 million securities class action settlement**, *Murr v. Capital One Bank (USA), N.A.*, No. 13-cv-1091 (E.D. Va.), **$7.3 million settlement** pending on behalf of class of consumers who were misled into accepting purportedly 0% interest offers, and *Howerton v. Cargill, Inc.*, No. 13-cv-00336 (D. Haw.), **$6.1 million settlement** obtained on behalf of class of consumers who purchased Truvia, purported to be deceptively marketed as "all-natural." Mr. Guglielmo was the principle litigator and obtained a significant opinion from the Hawaii Supreme Court in *Hawaii Medical Association v. Hawaii Medical Service Association*, 113 Hawaii 77 (Haw. 2006), reversing the trial court's dismissal and clarifying rights for consumers under the state's unfair competition law.

Mr. Guglielmo lectures on electronic discovery and was a member of the Steering Committee of Working Group 1 of the Sedona Conference®, an organization devoted to providing

FILED DATE: 8/9/2021 12:00 AM 2021CH03460

guidance and information concerning issues such as discovery and production issues, as well as areas focusing on antitrust law, complex litigation, and intellectual property, and a member of the drafting team responsible for the Sedona Principles, Third Edition. Presently, Mr. Guglielmo serves on the **board of the Advanced eDiscovery Institute at Georgetown University Law Center**. He is a frequent speaker on electronic discovery issues. Mr. Guglielmo was also recognized for his achievements in litigation by his selection to **The National Law Journal's "Plaintiffs' Hot List."** In 2020, Mr. Guglielmo was recognized by **Super Lawyers** as a top Antitrust lawyer in the New York metro area, was named by **Who's Who in Legal Litigation: Leading Practitioner-E-Discovery (2020)**, and was named by **Lawdragon as one of the 500 Leading Plaintiff Financial Lawyers**.

Mr. Guglielmo is also a member of the following associations: District of Columbia Bar Association, New York State Bar Association, and American Bar Association.

## CAREY ALEXANDER

### PRACTICE EMPHASIS

Carey Alexander prosecutes complex consumer class actions with a focus on deceptive pricing and data breach litigation.

### EDUCATION

St. John's University School of Law (J.D., magna cum laude, 2012);
Skidmore College (B.A., 2004)

### HIGHLIGHTS

Mr. Alexander is an associate in the firm's New York office and has worked closely with the leadership teams steering numerous class actions, including:

- *In re Equifax, Inc., Customer Data Security Breach Litig.*, No. 1:17-md-2800 (N.D. Ga.) (member of the Plaintiffs' Coordination and Discovery Committee);

- *First Choice Federal Credit Union v. The Wendy's Co.*, No. 2:16-cv-506 (W.D. Pa.) (settlement valued at $50 million); and

- *Morrow v. Ann Inc.*, No. 1:16-cv-3340 (S.D.N.Y.) (settlement valued at $7.1 million).

During law school, Mr. Alexander served as Associate Managing Editor of the *St. John's Law Review*. Mr. Alexander's student note, Dodd–Frank Section 1031 and the Continuing Struggle to Protect Consumers, 85 St. John's L. Rev. 1105 (2012), has been *cited in judicial opinions and several legal journals, including the Harvard Law Review.*

Before joining the bar, Mr. Alexander served as an editor of the widely acclaimed consumer-advocacy blog *The Consumerist*. He also served as a policy advisor to the Bronx Borough President and worked as part of the *National Campaign to Restore Civil Rights.*

## ERIN GREEN COMITE

### PRACTICE EMPHASIS

Erin Green Comite litigates complex class actions throughout the United States, representing the rights of shareholders, employees, consumers, and other individuals harmed by corporate misrepresentation and malfeasance.

### EDUCATION

University of Washington School of Law (J.D., 2002);
Dartmouth College (B.A., magna cum laude, 1994)

### HIGHLIGHTS

Ms. Comite is a partner in the firm's Connecticut office and currently serves in a leadership role in a number of complex class actions including: *First Choice Federal Credit Union v. The Wendy's Company*, No. 16-cv-00506 (W.D. Pa.), co-lead counsel on behalf of financial institutions arising out of data breach; *In re Arby's Restaurant Group, Inc. Litigation*, No. 17-mi-55555 (N.D. Ga.), member of Plaintiffs' Executive Committee on behalf of financial institutions arising out of a data breach, *In re Equifax, Inc. Customer Data Security Breach Litigation*, MDL No. 2800 (N.D. Ga.), chair of law and briefing committee; *Forth v. Walgreen Co, Inc.*, No. 1:17-cv-02246 (N.D. Ill.), co-lead counsel, asserting claims on behalf of class of consumers alleging overcharge for medically necessary, covered prescription drugs; and *Aquilina v. Certain Underwriters at Lloyd's London*, No. 1:18-cv-00496 (D. Haw.), co-lead counsel, alleging that insurers, brokers, and agents improperly steered insureds into surplus lines insurance.

Recently, Ms. Comite has played a significant role in the prosecution of consumer class cases such as: *In re The Home Depot, Inc., Customer Data Security Breach Litigation*, MDL No. 2583 (N.D. Ga.) ($27.25 million settlement) and *In re Target Corporation Customer Data Security Breach Litigation*, MDL No. 2522 (D. Minn.) ($59 million settlement), two of the largest data breaches impacting consumer personal data to date; *Greater Chautauqua Federal Credit Union v. Kmart Corp.*, No. 15-cv-02228 (N.D. Ill.), *Chair of the Plaintiffs' Steering Committee* ($8.1 million settlement); *Morrow v. Ann, Inc.*, No. 1:16-cv-03340 (S.D.N.Y.) ($8.1 million settlement); *Howerton v. Cargill, Inc.*, No. 13-cv-00336 (D. Haw.) ($6.1 settlement); *Murr v. Capital One Bank (USA), N.A.*, No. 13-cv-1091 (E.D. Va.) ($7.3 million settlement); and *In re Nutella Mktg. & Sales Practices Litigation*, No. 11-cv-01086 (D.N.J.) ($2.5 million settlement).

Ms. Comite's appellate victories in consumer class actions include *Nunes v. Saks Inc.*, 2019 WL 2305039 (9th Cir. May 30, 2019); *Chavez v. Nestle USA, Inc.*, 511 F. App'x 606 (9th Cir. 2013) (achieving a reversal of dismissal); and *In re Nutella Mktg. & Sales Practices Litigation*, 589 F. App'x 53 (3d Cir. 2014) (defending settlement from professional objectors).

Since joining Scott+Scott in 2002, she has litigated such cases as *In re Priceline.com Securities Litigation* ($80 million settlement); *Schnall v. Annuity and Life Re (Holdings) Ltd.* ($27 million settlement); and *In re Qwest Communications International, Inc.*

FILED DATE: 8/9/2021 12:00 AM 2021CH03460

(settlement obtaining $25 million for the company and achieving corporate governance reforms aimed at ensuring board independence).

While Ms. Comite is experienced in all aspects of complex pre-trial litigation, she is particularly accomplished in achieving favorable results in discovery disputes. *In Hohider v. United Parcel Service, Inc.*, Ms. Comite spearheaded a nearly year-long investigation into every facet of UPS's preservation methods, requiring intensive, full-time efforts by a team of attorneys and paralegals well beyond that required in the normal course of pre-trial litigation. Ms. Comite assisted in devising the plan of investigation in weekly conference calls with the Special Master, coordinated the review of over 30,000 documents that uncovered a blatant trail of deception and prepared dozens of briefs to describe the spoliation and its ramifications on the case to the Special Master. In reaction to UPS's flagrant discovery abuses brought to light through the investigation, the Court conditioned the parties' settlement of the three individual ADA cases on UPS adopting and implementing preservation practices that passed the approval of the Special Master.

Prior to entering law school, Ms. Comite served in the White House as **Assistant to the Special Counsel to President Clinton**. In that capacity, she handled matters related to the White House's response to investigations, including four independent counsel investigations, a Justice Department task force investigation, two major oversight investigations by the House of Representatives and the Senate, and several other congressional oversight investigations.

Ms. Comite's volunteer activities have included **assisting immigrant women, as survivors of domestic violence, with temporary residency applications** as well as **counseling sexual assault survivors**. Currently, Ms. Comite **supports Connecticut Children's Medical Center and March of Dimes/March for Babies**.

## SEAN RUSSELL

### PRACTICE EMPHASIS

Mr. Russell is an attorney in Scott+Scott's San Diego office where he focuses on complex antitrust litigation and class actions.

### EDUCATION

University of San Diego School of Law (Masters of Taxation, 2016); Thomas Jefferson School of Law (J.D., cum laude, 2015); University of California, Davis (B.A., Economics, 2008)

### HIGHLIGHTS

During law school, Mr. Russell was Chief Articles Editor of the Thomas Jefferson Law Review and a Moot Court Competitor. He also served as an extern to the Honorable William V. Gallo of the U.S. District Court for the Southern District of California.

### REPRESENTATIVE CASES

- Represented class plaintiffs in *Veridian Credit Union v. Eddie Bauer LLC*, No. 2:17-cv-00356 (W.D. Wash.) which resulted in a **$9.8 million settlement**.

- Represents class plaintiffs in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-07789 (S.D.N.Y.), an action challenging collusion regarding foreign exchange rates, and *Alaska Electrical Pension Fund v. Bank of America Corporation*, No. 1:14-cv-07126 (S.D.N.Y.), an action challenging collusion regarding the setting of the ISDAfix benchmark interest rate.

- Actively involved in *In re UnitedHealth Group PBM Litigation*, No. 0:16-cv-3352 (D. Minn.) asserting ERISA and deceptive trade practice claims on behalf of nationwide class plan participants involving overcharge of co-payments for prescription drugs;

- Actively involved in *Josten v. Rite Aid Corp.*, No. 3:18-cv-00152 (S.D. Cal.), an action challenging Rite Aid's reporting of artificially higher prices for certain generic drugs to private and government insurance programs.

- Actively involved in numerous No-Poach cases where the franchisor and franchisee entered into agreements that prohibited the franchisees from soliciting or hiring the employees of other franchisees or the franchisor, including *Deslandes v. McDonald's USA*, LLC, No. 1:17-cv-04857 (N.D. Ill.); *Conrad v. Jimmy John's Franchise, LLC*, No 3:18-cv-00133 (S.D. Ill.), *In re: Papa John's Employee and Franchisee Employee Antitrust Litigation*, No. 3:18-cv-00825, and *Blanton v. Domino's Pizza Franchising LLC*, No. 2:18-cv-13207 (E.D. Mich.).

Outside of the office, Sean is an avid sailor, fisherman, and video gamer. He has sailed boats ranging from 22' to 50'+ and competed in over a dozen races. Sean prefers deep sea fishing out of San Diego or Shelter Cove, CA, however he won't pass up the chance to catch bass in a nearby river. Sean has had access to a computer since he was seven years old and prides himself in being a "techie" and video gamer. He can often be found walking his dog, Lucy, along the shores of San Diego.

## ALEX OUTWATER

### PRACTICE EMPHASIS

Alex Outwater's practice focuses on complex antitrust and consumer class actions.

### EDUCATION

University of San Diego School of Law (J.D., 2008);
University of California - Santa Barbara (B.A., Italian Cultural Studies, 1999)

### HIGHLIGHTS

- *Indiana State District Council of Laborers & HOD Carriers Pension and Welfare Fund v. Omnicare, Inc.*, No. 2:06-cv-00026-WOB-CJS (E.D. Ky.): (**$20 million settlement**)

- *In Re Tesla Motors, Inc. Stockholder Litigation*, No. 12711-VCS (Del. Ch.): an action alleging Elon Musk, as Tesla's controlling stockholder, and Tesla's Board of Directors, breached fiduciary duties to Tesla shareholders in connection with Tesla's $2.6 billion acquisition of SolarCity (a company in which Musk held a substantial interest)

FILED DATE: 8/9/2021 12:00 AM 2021CH03460

# ATTORNEY COURT ADMISSIONS

**International Admissions:** The Netherlands; England and Wales (including Higher Rights of Audience); Republic of Ireland; Scotland; New South Wales, Australia; Queensland, Australia; and Germany; **U.S. Admissions:** United States Supreme Court; United States Courts of Appeal for the First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits; United States District Courts for the Districts of California (Northern, Southern, Eastern, and Central), Colorado, Connecticut, Florida (Northern), Illinois (Northern), Massachusetts, Michigan (Eastern), Missouri (Eastern), New Jersey, New York (Southern, Eastern, and Western), Ohio (Northern and Southern), Pennsylvania (Eastern and Western), Texas (Northern, Western, and Southern), Wisconsin (Eastern and Western), and the District of Columbia; and the courts of the States of Arizona, California, Connecticut, Delaware, Florida, Maryland, Pennsylvania, Massachusetts, Nebraska, New Jersey, New York, Ohio, West Virginia, Wisconsin, Texas, and the District of Columbia.

FILED DATE: 8/9/2021 12:00 AM 2021CH03460

# ACCOLADES

**U.S. News & World Report "Best Law Firms"**

The Firm is currently ranked by U.S. News & World Report as a "Best Law Firm" in commercial litigation in the New York region.

**American Antitrust Institute**

The 2018 Antitrust Annual Report recognized *In re Foreign Currency Benchmark Rates Antitrust Litigation* as the #1 settlement of 2018, as well as ranking the FIrm #1 nationally for aggregate settlements: 2013-2018.

**Global Competition Review**

At the 6th Annual Global Competition Review ("GCR") Awards, Scott+Scott won for Litigation of the Year – Cartel Prosecution, which recognized the Firm's efforts in the foreign exchange settlements in the United States, a landmark case in which major banks conspired to manipulate prices paid in the $5.3 trillion-per-day foreign exchange market and have thus far settled for more than $2 billion.

**Law 360 Glass Ceiling Report**

Scott+Scott is recognized as one of the top law firms in the nation for female attorneys by the legal publication Law360. The Glass Ceiling Report honors firms that "are demonstrating that the industry's gender diversity goals can turn into a measurable result, and boost the number of women at all levels of a law firm.[1,2]" This selection highlights the importance Scott+Scott places on diversity and inclusion within the Firm.

**Center for Constitutional RIghts**

Scott+Scott was the recipient of the 2010 Center for Constitutional Rights' Pro Bono Social Change Award for its representation of the Vulcan Society, an association of African-American firefighters, in challenging the racially discriminatory hiring practices of the New York City Fire Department.

[1] https://www.law360.com/articles/1310926
https://www.law360.com/articles/1162859/the-best-law-firms-for-female-attorneys.



FILED DATE: 8/9/2021 12:00 AM   2021CH03460



SCOTT + SCOTT

+ New York
+ London
+ Amsterdam
+ California
+ Connecticut
+ Virginia
+ Ohio
+ Arizona

Scott+Scott + The Helmsley Building + 230 Park Ave, 17th Floor + New York, NY 10169 + United States + www.scott-scott.com

© 2020 Scott+Scott Attorneys at Law LLP

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# Exhibit H

FILED DATE: 8/9/2021 12:00 AM   2021CH03460



**2201 WAUKEGAN ROAD**
**SUITE 130**
**BANNOCKBURN, IL  60015**
**TELEPHONE (224) 632-4500**


**923 FAYETTE STREET**
**CONSHOHOCKEN, PA 19428**
**TELEPHONE (610) 234-6770**

**www.fklmlaw.com**

FILED DATE: 8/9/2021 12:00 AM   2021CH03460



Freed Kanner London & Millen LLC ("FKLM") is one of the nation's premier plaintiffs' class action practices. The firm's attorneys are among the pioneers and leaders in the class action field, having played leadership roles in major antitrust, consumer fraud, securities, unlawful business practices and insurance fraud cases for decades.

FKLM was founded on January 1, 2007. The founding partners of FKLM, formerly principals and partners of Much Shelist Freed Denenberg Ament & Rubenstein, P.C., have successfully prosecuted class actions for over 40 years, including as lead or co-lead counsel in dozens of cases, resulting in recoveries for class members of more than $2 billion.

## *APPOINTMENTS AS LEAD OR CO-LEAD COUNSEL*

➤ *Murphy, et al. v. Toyota Motor Corp. et al., Consolidated Case No. 4:21-cv-00178-ALM* **(E.D. Tex.)**

FKLM partner Kimberly Justice serves as lead counsel in this class action arising from allegations that Toyota manufactured, sold, and leased 2013-2018 Toyota RAV4 vehicles with defective batteries.

➤ *Northbrook Park District v. Mr. David's Flooring Int'l, LLC et al., No. 20-cv-07538* **(N.D. Ill.)**

FKLM partner Steven Kanner serves as co-lead counsel in this antitrust action arising from an 8-year conspiracy to rig bids to municipal and commercial flooring purchasers in Illinois.

➤ *In re Peanut Farmers Antitrust Litigation,* **2:19-cv-00463 (E.D. Va.)**

FKLM partner Kimberly Justice serves as co-lead counsel in this antitrust class action arising from peanut shellers' wrongful and anticompetitive actions that had the intended purpose and effect of artificially fixing, depressing, maintaining, and stabilizing the price of runner peanuts paid to peanut farmers in the United States over the past 6 years. This matter recently settled for $102.75 million for the class.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460



➢ ***In re Chicago Board Options Exchange Volatility Index Manipulation Antitrust Litigation*, MDL 2842 (N.D. Ill.)**

FKLM partner Kimberly Justice serves as interim co-lead counsel in this multidistrict litigation arising from over a decade of alleged manipulation of financial instruments linked to the Chicago Board Options Exchange's ("CBOE") Volatility Index, the "VIX," and the opaque settlement process the CBOE designed for certain of those instruments.

➢ ***In re Payment Card Interchange Fee and Merchant Discount Litigation*, MDL 1720 (E.D.N.Y.)**

FKLM is serving as interim co-lead counsel for a proposed class of more than twelve million merchants seeking equitable and injunctive relief. Plaintiffs allege, inter alia, that certain of Visa and MasterCard rules, including anti-steering restraints and default interchange fees, working in tandem have caused artificially inflated interchange fees paid by merchants on credit and debit card transactions from January 1, 2004 through the present.

➢ ***In re Opana ER Antitrust Litigation*, MDL 2580 (N.D. Ill.)**

FKLM is serving as co-lead counsel on behalf of indirect purchasers (end-payors) of brand or generic Opana ER, an opioid painkiller, in this antitrust "pay-for-delay" case brought under the laws of 30 states.

➢ ***The Honest Company Inc., Sodium Lauryl Sulfate (SLS) Marketing & Sales Practices Litigation*, 2:16-ml-02719 (C.D. Cal.)**

FKLM served as co-lead counsel in this class action brought on behalf of consumers allegedly deceived in their purchase of products labeled as "Free of SLS." The settlement in the case ultimately provided class claimants with, in most instances, close to full reimbursement of the money they spent on the products at issue and the defendant agreed to cease marketing the products as SLS free.

➢ ***In re Automotive Parts Antitrust Litigation*, MDL 2311 (E.D. Mich.)**

FKLM is serving as interim co-lead counsel on behalf of direct purchasers of automotive parts in multiple concurrently active nationwide, antitrust price-fixing cases relating to the following products: wire harnesses; instrument panel clusters; heater control panels; occupant safety parts; fuel senders; bearings; air conditioning systems; windshield wiper systems; starters; windshield washer systems; spark plugs; oxygen and air fuel ratio sensors; fuel injection systems; brake hoses; alternators; ignition coils; power window motors; shock absorbers; and electric power steering assemblies. Settlements with dozens of defendants reached to date total over $550 million.



FILED DATE: 8/9/2021 12:00 AM   2021CH03460

➢ ***Kleen Products, Inc. et al. v. International Paper, et al.***, **10-CV-5711 (N.D. Ill.) ("Containerboard Antitrust Litigation")**

As co-lead counsel for a class of direct purchasers of containerboard and related products in this antitrust price-fixing case, FKLM recovered $376 million dollars through settlement after more than 7 years of heavily contested litigation, including two appeals to the Seventh Circuit Court of Appeals.

➢ ***In re Pharmacy Benefit Managers Antitrust Litigation***, **MDL No. 1782 (E.D. Pa.)**

FKLM is serving as co-lead counsel in these consolidated class actions brought on behalf of retail pharmacies against prescription benefit managers for fixing at artificially low levels the prices paid to pharmacies for pharmaceuticals sold, and reimbursement for services rendered, to the members of plans created by the prescription benefit managers. The complaints allege that the prescription benefit managers illegally aggregate the purchases of their members in order to effectuate the underpayment.

➢ ***In re Hydrogen Peroxide Antirust Litigation***, **MDL 1682 (E.D. Pa.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing action against hydrogen peroxide producers. The case resulted in settlements of over $97 million for the class. In approving the Plaintiffs' motion for an award of attorneys' fees and expenses, Judge Stewart Dalzell lauded co-lead counsel:

> [t]he "skill and efficiency of the attorneys involved" is of a very high order indeed, and as we noted at the fairness hearing yesterday, we have been impressed that these attorneys have prosecuted this matter vigorously against seasoned opponents without needlessly distracting the Court with discovery disputes.

➢ ***In re Brand Name Prescription Drugs Antitrust Litigation***, **MDL 997 (N.D. Ill.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing class action. Settlements totaling approximately $715 million were recovered on behalf of the plaintiff class.

➢ ***In re Clozapine Antitrust Litigation***, **MDL No. 874 (N.D. Ill.)**

FKLM attorneys served as co-lead counsel in this antitrust class action against Caremark and Sandoz Pharmaceuticals alleging that the defendants entered into an illegal agreement to distribute a drug known as Clozaril by tying it to the purchase of a blood testing system, by fixing the price of the packaged sale, and by conspiring to monopolize the relevant market. More than $20 million was recovered for the class.

- 3 -



FILED DATE: 8/9/2021 12:00 AM   2021CH03460

➢ ***In re High Fructose Corn Syrup Antitrust Litigation*, MDL 1087 (C.D. Ill.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing class action against major manufacturers of high fructose corn syrup. The case was settled for $531 million for the class. At the close of the hearing where counsel fees were approved, Judge Michael M. Mihm stated:

> I've said many times during this litigation that you and the attorneys who represent the defendants here are as good as it gets. Very professional. At least in my presence or in my contacts with you, you've always been civil. You've always been cutting to the chase and not wasting my time or each other's time or adding to the cost of the litigation.

➢ ***In re Linerboard Antitrust Litigation*, MDL 1261 (E.D. Pa.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing case, which resulted in settlements of over $200 million for the class.

➢ ***SchagrinGas Co. v. BP Products North America, et al.*, No. 1:06-cv-3621 (N.D. Ill.)**

FKLM served as co-lead counsel on behalf of direct purchaser plaintiffs in this nationwide class action involving monopolization claims under Section 2 of the Sherman Act. The case resulted in a settlement of over $50 million for the class.

➢ ***In re Aftermarket Filters Antitrust Litigation*, MDL 1957 (N.D. Ill.)**

FKLM served as interim co-lead counsel on behalf of direct purchasers of replacement automobile air and oil filters in this nationwide, antitrust price-fixing case. The case resulted in settlements of nearly $18 million for the class.

➢ ***In re Flat Glass Antitrust Litigation* (No. II), MDL 1942 (W.D. Pa.)**

FKLM served as co-lead counsel on behalf of direct purchaser plaintiffs of construction flat glass in this nationwide, antitrust price-fixing case. The case resulted in settlements for the class exceeding $22 million.

➢ ***In re Urethane Chemicals Antitrust Litigation*, MDL 1616 (D. Kan.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing action. The case resulted in settlements of $33 million for the class.



FILED DATE: 8/9/2021 12:00 AM   2021CH03460

➢ ***In re Methyl Methacrylate (MMA) Antitrust Litigation*, MDL 1768 (E.D. Pa.)**

FKLM served as co-lead counsel in this antitrust price-fixing action against producers of methyl methacrylate and polymethyl methacrylate. The case resulted in a settlement of over $15 million for the class.

➢ ***In re Infant Formula Antitrust Litigation*, MDL 878 (N.D. Fla.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing class action against the major manufacturers of infant formula. The case settled for over $125 million for the class.

➢ ***In re Chubb Drought Insurance Litigation*, MDL 782 (S.D. Ohio)**

FKLM attorneys served as co-lead counsel in this class action filed on behalf of farmers who purchased drought insurance that Chubb refused to honor. The settlement exceeded $110 million and was achieved in less than 9 months. This sum, together with $8 million recovered at trial against Chubb's general agent, resulted in complete recovery for the affected farmers.

➢ ***In re Ocean Shipping Antitrust Litigation*, MDL 395 (S.D.N.Y.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing class action, which resulted in a $79 million recovery for thousands of U.S. and European shippers. Distributions were made to claimants in the United States and throughout a number of European countries.

➢ ***In re Isostatic Graphite Antitrust Litigation*, Master File 00-CV-1857 (E.D. Pa.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing class action. The case resulted in combined settlements of over $11 million for the class.

➢ ***In re Carbon Dioxide Antitrust Litigation*, MDL 940 (M.D. Fla.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing class action in which the plaintiff class recovered $53 million and achieved significant therapeutic relief for the class.

➢ ***In re Morrison Knudson Securities Litigation*, CA No. 94-CV-3345 (D. Idaho)**

FKLM attorneys served as co-lead counsel in this securities class action where the plaintiff class received $43 million and approximately 3 million shares of Morrison Knudson common stock in settlement of their claims.



FILED DATE: 8/9/2021 12:00 AM   2021CH03460

➢ ***In re M-L Lee Acquisition Fund Securities Litigation*** **(D. Del.)**

FKLM attorneys served as co-lead counsel in this securities class action case against a syndicate of partnerships and its general partners, involving Merrill Lynch and its affiliates, and a leveraged buy-out specialty firm overseen by Thomas H. Lee. The case resulted in a $33 million settlement on behalf of the limited partners.

➢ ***In re Public Service Company of New Mexico*** **(S.D. Cal.)**

FKLM attorneys served as lead counsel in this derivative action and obtained $33 million dollars in a joint settlement with class plaintiffs in a related securities fraud class action. Judge Harry R. McCue, District Court Judge for the Southern District of California stated:

> The petitioners in this case are members of respected law firms which specialize in class action litigation. These attorneys brought considerable legal talents together, and were able to achieve the successful completion of this litigation. They are entitled to fair and reasonable compensation.

➢ ***Piggly Wiggly Antitrust Litigation*** **(E.D. Tex.)**

FKLM attorneys served as co-lead counsel in this statewide (Texas) antitrust price-fixing action, which resulted in total settlements of approximately $32 million for class members.

➢ ***Koch Gathering Systems, Inc. Oil Spill Litigation*** **(Dist. Ct. of Nueces County, Tex.)**

FKLM attorneys served as co-lead counsel in this case concerning a marine oil spill in which a class consisting of commercial fisherman and shrimpers recovered over $10 million.

### <u>*OTHER LEADERSHIP ROLES*</u>

In addition to serving as lead or co-lead counsel, FKLM attorneys regularly play key roles as members of executive or steering committees, negotiating ESI issues, taking and defending depositions, working with expert witnesses, and managing all aspects of pre-trial discovery.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460



> - ***In re Toyota Hybrid Brake Litig.*, No. 4:20-cv-00127-ALM (E.D. Tex.)**

FKLM partner Kimberly Justice serves on the Plaintiffs' Executive Committee in this class action arising from allegations that Toyota manufactured, sold, and leased certain Toyota vehicles with defective braking systems.

> - ***In Re: TikTok, Inc., Consumer Privacy Litigation*, MDL No. 2948 (N.D. Ill.)**

FKLM partner Jonathan Jagher serves on the Plaintiffs' Steering committee in this class action related to allegations of data privacy violations involving the popular app and the creation of short videos on mobile devices.

> - ***In Re: Morgan Stanley Data Security Litigation*, 1:20-CV-05914 (S.D.N.Y.)**

FKLM partner Jonathan Jagher serves on the Plaintiffs' Executive Committee in this data privacy class action related to allegations that Morgan Stanley failed to safeguard its customers' highly sensitive personally identifiable information.

> - ***In re DPP Beef Antitrust Litigation*, 0:20-CV-01319 (D. Minn.)**

FKLM serves on the Plaintiffs' Steering Committee in this antitrust class action alleging that the country's biggest beef companies have illegally conspired to both raise the price of beef and lower the amount paid to cattle ranchers.

> - ***Cameron et al. v. Apple, Inc.*, 4:19-cv-03074 (N.D. Cal.)**

FKLM serves as class counsel and as an Executive Committee Member in this antitrust class action arising from Apple's abusive monopoly in the distribution of iOS apps and related products, seeking to get rid of its pricing mandates, and to reimburse developers for overcharges made through abuse of its monopoly power.

> - ***In re Farm-Raised Salmon and Salmon Products Litigation*, 19-CV-21551 (S.D. Fla.)**

FKLM serves as a member of the Direct Purchaser Plaintiffs' Executive Committee in this case alleging various North Atlantic farms engaged in restrictive business practices including illegal price-fixing and violated rules prohibiting cartels.

> - ***In re Local TV Advertising Antitrust Litigation*, MDL No. 2867 (N.D. Ill.)**

FKLM serves court appointed roles both on the Plaintiffs' Steering Committee, and as Liaison Counsel in this multidistrict, antitrust class action accusing the primary industry players of fixing television advertising prices.

FILED DATE: 8/9/2021 12:00 AM    2021CH03460



> ➤ ***In re German Automotive Manufacturers Antitrust Litigation*, 17-md-02796 (N.D. Cal.)**

FKLM partner Kimberly Justice served on the Plaintiffs' Steering Committee in this multidistrict class action accusing Audi, BMW, Volkswagen and other German automakers of a decades-long antitrust conspiracy covering car technology, costs, suppliers and emissions equipment.

> ➤ ***Washington County Health Care Auth., Inc., et al. v. Baxter Int'l Inc., et al.*, 16-CV-10324 (N.D. Ill.)**

FKLM is serving as interim liaison counsel this class action alleging that the major U.S. manufacturers of a critical medical product, intravenous saline solution ("IV Saline Solution"), conspired to restrict output and artificially fix, raise, maintain and/or stabilize the prices of IV Saline Solution sold throughout the United States, under the pretext of a supply shortage.

> ➤ ***Mulhern, et al. v. Pepperidge Farm*, 16-CV-32199 (N.D. Ill.)**

FKLM is serving as interim liaison counsel and managing discovery efforts in this class action alleging that drivers/distributors are improperly classified by Pepperidge Farm as "independent contractors" in order to wrongfully deny them certain compensation and other benefits.

> ➤ ***In re Lithium Ion Batteries Antitrust Litigation*, MDL No. 2420 (N.D. Cal.)**

FKLM served as a member of the Direct Purchaser Plaintiff Direct Purchaser Plaintiffs' Steering Committee in this case on behalf of direct purchasers of Lithium-Ion Battery products in this nationwide price fixing case. More than $138 million was recovered for the class.

> ➤ ***In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL 1869 (DC)**

FKLM is serving as co-chair of the Executive Committee in this case on behalf of direct purchasers of rail freight services that paid fuel surcharges in this nationwide, antitrust price-fixing case.

> ➤ ***Standard Iron Works v. ArcelorMittal et al.*, 08-CV-5214 (N.D. Ill.)**

FKLM was appointed as liaison counsel on behalf of direct purchasers of steel in this nationwide supply manipulation and price-fixing case.



FILED DATE: 8/9/2021 12:00 AM 2021CH03460

➢ ***In re Blood Reagents Antitrust Litigation*, MDL 2081 (E.D. Pa.)**

FKLM served as a member of the Executive Committee in this nationwide antitrust class action brought on behalf of direct purchasers of blood reagents.

➢ ***In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, 4:09-CV-1967 (N.D. Cal.)**

FKLM attorneys managed a variety of critical discovery matters in this antitrust case brought on behalf of former collegiate athletes.

➢ ***In re Fresh and Process Potatoes Antitrust Litigation*, MDL 2186 (D. Idaho)**

In addition to handling all aspects of discovery concerning two defendants, FKLM attorneys worked closely with lead counsel in drafting the consolidated complaint and successfully opposing a motion to dismiss in this nationwide antitrust class action brought on behalf of direct purchasers of fresh and process potatoes.

➢ ***In re Processed Egg Products Antitrust Litigation*, MDL 2002 (E.D. Pa.)**

FKLM attorneys worked closely with lead counsel in drafting the original complaint and successfully opposing a motion to dismiss in this nationwide antitrust class action brought on behalf of direct purchasers of eggs and egg products.

➢ ***In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL 1917 (N.D. Cal.)**

FKLM served as Chair of Discovery and worked closely with lead counsel to manage a variety of top-level matters, including negotiating ESI issues and taking key depositions in this nationwide price-fixing class action with over $100 million in partial settlements.

➢ ***In re Optical Disk Drive (ODD) Antitrust Litigation*, MDL 2143 (N.D. Cal.)**

FKLM was one of several firms that assisted lead counsel with discovery and briefing in this nationwide price-fixing class action brought on behalf of direct purchasers of optical disk drives.

➢ ***In re Municipal Derivatives Antitrust Litigation*, MDL 1940 (S.D.N.Y.)**

FKLM oversaw discovery of a key defendant and worked closely with lead counsel on a variety of other pre-trial matters in this nationwide class action brought on behalf of purchasers of municipal derivatives.

FILED DATE: 8/9/2021 12:00 AM  2021CH03460



➢ *In re American Express Anti-Steering Rules Antitrust Litigation (No. II)*, **MDL 2221 (E.D.N.Y.)**

FKLM managed discovery of independent merchant (opt-out) plaintiffs in this nationwide antitrust case.

➢ *In re Air Cargo Shipping Services Antitrust Litigation*, **MDL 1775 (E.D.N.Y.)**

FKLM attorneys served as co-chairs of discovery in this antitrust class action involving claims under Section 1 of the Sherman Act. Settlements in the case totaled nearly $600 million.

➢ *In re Intel Corp. Microprocessor Antitrust Litigation*, **MDL 1717 (D. Del.)**

FKLM attorneys managed discovery from dozens of named plaintiffs in this nationwide antitrust action. Among other things, the firm played a key role in overseeing document production and coordinating, managing and defending over 50 depositions.

➢ *In re Vitamins Antitrust Litigation*, **MDL 1285 (D.D.C.)**

FKLM attorneys served as co-chairs of discovery in this antitrust price-fixing action, which resulted in over $1.3 billion in settlements.

➢ *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, **MDL 1486 (N.D. Cal.)**

FKLM attorneys served as co-chairs of discovery in this nationwide, antitrust price-fixing action, which resulted in settlements of over $300 million for class members.

➢ *In re Rubber Chemicals Antitrust Litigation*, **MDL 1648 (N.D. Cal.)**

FKLM attorneys served on the executive committee in this nationwide, antitrust price-fixing action, which resulted in settlements of over $300 million for class members.

➢ *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation*, **MDL 1542 (D. Conn.)**

FKLM attorneys served as co-chairs of discovery in this nationwide antitrust price-fixing action, which has resulted in settlements of over $87 million for class members.

FILED DATE: 8/9/2021 12:00 AM    2021CH03460



- ➤ *In re Static Random Access Memory (SRAM) Antitrust Litigation*, **MDL 1819 (N.D. Cal.)**

  FKLM was a member of the executive committee representing direct purchaser plaintiffs in this antitrust price-fixing case which resulted in settlements exceeding $76 million.

- ➤ *In re Waste Management, Inc. Securities Litigation*, **Master File 97-CV-7709 (N.D. Ill.)**

  FKLM attorneys were actively involved in litigating the case and served as liaison counsel. A settlement for the plaintiff class of $220 million was obtained.

- ➤ *Blinder Robinson Securities Litigation* **(E.D. Pa.)**

  FKLM attorneys served as members of the Steering Committee in this securities fraud action in which an injunction was obtained preventing a transfer of assets; judgment of $71 million was later entered.

- ➤ *In re Drill Bits Antitrust Litigation*, **CA No. H-91-627 (S.D. Tex.)**

  FKLM attorneys served as members of the Steering Committee in this antitrust price-fixing class action and were instrumental in achieving a settlement for the class in excess of $52 million.

- ➤ *In re Industrial Gas Antitrust Litigation*, **CA No. 80 C. 3479 (N.D. Ill.)**

  FKLM attorneys served as members of the executive committee in this antitrust price-fixing class action, which ultimately recovered more than $50 million dollars for the class. The settlement included assignable purchase certificates, which the court found increased the competitive value of the settlement.

- ➤ *In re Records and Tapes Antitrust Litigation* **(N.D. Ill.)**

  FKLM attorneys served as members of the executive committee in this antitrust price-fixing class action. The class recovered $26 million dollars in settlement in cash and assignable purchase certificates.

- ➤ *Kaufman v. Motorola, Inc.* **(N.D. Ill.)**

  FKLM attorneys were actively involved in litigating the case and served as liaison counsel. A settlement of $25 million was obtained for the plaintiff class.



FILED DATE: 8/9/2021 12:00 AM   2021CH03460

> ***In re Unisys Securities Litigation*, CA No. 99-5333 (E.D. Pa.)**

FKLM attorneys served on the executive committee in this derivative action in which Plaintiffs recovered $20 million for corporation.

\* \* \*

Other large class action cases in which FKLM attorneys were involved in a leadership position include *In re Folding Cartons Antitrust Litigation*, *In re Plywood Antitrust Litigation*, *In re Standard Screws Antitrust Litigation*, *In re Cotton Yarn Antitrust Litigation*, *In re Glass Containers Antitrust Litigation*, *In re Aluminum Siding Antitrust Litigation*, *Rusty Jones Warranty Litigation*, *NPA Securities Litigation*, *In re Chlor-alkali and Caustic Soda Antitrust Litigation*, and *In re Potash Antitrust Litigation*.

FKLM frequently serves as local counsel for a variety of cases, working closely with law firms located outside of Illinois. Some examples include *North Miami General Employees Retirement Fund et al. v. Parkinson et al.,* Case No. 1:10-cv-06514 (N.D. Ill.) (pending), *Marvin H. Maurras Revocable Trust v. Bronfman Jr. et al.*, Case No. 1:12-cv-03395 (N.D. Ill.) (pending), and *St. Lucie County Fire District Firefighters' Pension Trust Fund v. Motorola, Inc. et al.*, Case No. 1:10-cv-00427 (N.D. Ill.) actions where FKLM was appointed as liaison counsel.

### *ATTORNEY PROFILES*

## Michael J. Freed

After leaving the Department of Justice Antitrust Division, Mr. Freed has engaged in private antitrust class action litigation for 50 years. He has served as co-lead counsel in many prominent antitrust and securities fraud class action cases. Presently, Mr. Freed is serving as co-lead counsel in the *Kleen Products v. International Paper/Containerboard Antitrust* case and *In re Opana ER Antitrust Litigation*. Prior antitrust class actions in which Mr. Freed served as co-lead counsel include *In re Aftermarket Filters Antitrust Litigation, In re Brand Name Prescription Drugs Antitrust Litigation*, *In re High Fructose Corn Syrup Antitrust Litigation*, *In re Linerboard Antitrust Litigation*, *In re Carbon Dioxide Antitrust Litigation*, *In re Infant*

- 12 -



FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*Formula Antitrust Litigation*, and *In re Ocean Shipping Antitrust Litigation.* More than $2 billion has been recovered for the plaintiff classes in cases in which Mr. Freed has served as co-lead counsel.

Mr. Freed has been named an Illinois Super Lawyer by Chicago Magazine, an Illinois Leading Lawyer by the Leading Lawyer's Network, and one of the top plaintiffs' antitrust lawyers in Illinois by Chambers and Partners. In March 2007, Mr. Freed was honored by the Chicago Appleseed Fund for Justice for his exceptional pro bono efforts.

Mr. Freed was formerly a trial and appellate attorney with the United States Department of Justice, Antitrust Division (Honors Program). He is a graduate of the University of Pennsylvania (B.S., 1959) and University of Chicago Law School (J.D., 1962).

## Steven A. Kanner

Mr. Kanner has over 30 years' experience in complex antitrust litigation and previously led the class action practice at Much Shelist Freed. His experience includes investigation, discovery, trial and appeal of antitrust, securities and other complex cases. Mr. Kanner has been designated an Illinois Super Lawyer by *Chicago Magazine* for the past 5 years and is a frequent lecturer both domestically and internationally on antitrust and trade regulation.

With respect to class action matters, Mr. Kanner has been involved in a leadership capacity in many of the cases described above. Mr. Kanner is currently serving as co-lead counsel or interim co-lead counsel include *In re Automotive Parts Antitrust Litigation*, MDL 2311 (E.D. Mich.), (an international price fixing conspiracy of historic proportions which currently includes individual cases for Wire Harnesses, Instrument Panel Clusters, Fuel Senders, Heater Control Panels, Occupant Safety Systems, Ball Bearings, Air Conditioning Systems, Windshield Wiper Systems, Starters, Alternators, Windshield Washer Systems).

Historically, Mr. Kanner has been appointed by federal and state courts as co-lead counsel in a broad array of important cases, which have resulted in recoveries of hundreds of millions of dollars. Some of these cases include: *In re Aftermarket Filters Antitrust Litig.*, MDL 1957 (N.D. Ill.) (settlements of over $17 million); *In re Carbon Dioxide Antitrust Litig.*, MDL 940 (M.D. Fla.) (settlements of over $53 million); *In re Flat Glass Antitrust Litig.* (No. II), MDL 1942 (W.D. Pa.) (settlements of over $22 million); *In re Hydrogen Peroxide Antirust Litig.*, MDL 1682 (E.D. Pa.) (settlements of over $97 million); *In re Isostatic Graphite Antitrust Litig.*, No. 00-cv-1857 (E.D. Pa.) (settlements of over $11 million); *In re Koch Gathering Systems, Inc. Oil Spill Litig.*, (Dist. Ct. of Nueces County, Tex.) (settlements of over $10 million); and *In re Texas Bread Antitrust Litig.*, No. 95-cv-0048 (E.D. Tex.) (settlements of over $32 million).

A 1979 graduate of DePaul University Law School, Mr. Kanner is admitted to the Bars of Illinois, the Northern District of Illinois (member of the trial bar), the United States Court of Appeals (Second, Third, Fourth, Fifth, Seventh and Tenth Circuits) and the United States Supreme Court. He is also a member of the Chicago Bar Association (Committees on Litigation



FILED DATE: 8/9/2021 12:00 AM   2021CH03460

and Antitrust Law), the Illinois State Association (Sections on Antitrust Law and Litigation), the American Bar Association (Sections on Antitrust Law and Litigation), the Illinois Trial Lawyers Association, and the Decalogue Society where he previously served on the Editorial Board of the Society's Law Journal. Prior to entering private practice, Mr. Kanner was employed by the Federal Trade Commission as a consumer affairs specialist.

## Douglas A. Millen

Mr. Millen devotes his practice to prosecuting direct purchaser, price-fixing class actions and has played a key role in many of the most successful price-fixing cases in the United States. For example, Mr. Millen was recently appointed to serve on the Plaintiffs' Steering Committee for the *In re DPP Beef Antitrust Litigation* (D. Minn.) Mr. Millen was appointed to serve on the Direct Purchaser Plaintiffs' Steering Committee in *In re Lithium Ion Batteries Antitrust Litigation*, MDL No. 2420 (N.D. Cal) which ultimately obtained almost $140 million for the class. Mr. Millen has also played a prominent role in many of the largest antitrust cases in recent history – including: *In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL 1971 (N.D. Cal.), where he served as Chair of Discovery and aided in the recovery of more than $210 million of the class; *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, MDL 1486 (N.D. Cal.); *In re Vitamins Antitrust Litigation*, MDL 1285 (D.D.C.); and *In re Rubber Chemicals Antitrust Litigation*, MDL 1648 (N.D. Cal.) – and his efforts have assisted in the recovery of billions of dollars for class members. Accordingly, he has been recognized as one of the nation's top competition lawyers by various publications, including *Global Competition Review,* and as a top Plaintiffs' lawyer by *Lawdragon 500 Leading Lawyers in America*. Mr. Millen currently represents several Fortune 500 companies in the *Rail Freight Fuel Surcharge Antitrust Litigation* and provides antitrust compliance consultation services for large, multi-national companies.

Mr. Millen is a graduate of the University of Michigan (B.G.S., 1991) and University of Illinois College of Law (J.D. *magna cum laude*, 1994). In 1994, he was admitted to the New York and Connecticut State Bars; and in 1995 he was admitted to the Illinois State Bar. He is also admitted to practice in the Northern and Southern Districts of Illinois. Mr. Millen is a member of the American Bar Association, Antitrust Section and the Chicago Bar Association. Prior to founding FKLM, Mr. Millen was a partner at Much Shelist Freed, where he practiced with the class action group from November 1995 through December 31, 2006.

## William H. London

Mr. London has been litigating class action cases for over 25 years. He served as trial counsel for the plaintiff class in *In re High Pressure Laminates Antitrust Litigation*, a case that was tried before a jury in the Southern District of New York. He was actively involved in several cases in which FKLM was serving in a leadership capacity, including *In re Flat Glass Antitrust Litigation (No. II)*, MDL No. 1942 (W.D. Pa.); *In re Static Random Access Memory (SRAM) Antitrust Litigation*, MDL No. 1819 (N.D. Cal); and *In re Hydrogen Peroxide Antitrust Litigation*, MDL 1682 (E.D. Pa.). Mr. London presently has significant involvement in *In re Automotive Parts Antitrust Litigation*, MDL 2311 (E.D. Mich.) and *In re Optical Disk Drive*



FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*Products Antitrust Litigation*, No. 3:10-md-2143 (N.D. Cal.).

Mr. London graduated *Magna Cum Laude* from Syracuse University in 1984 and received his law degree in 1987 from IIT Chicago-Kent College of Law. In 1987, he was admitted to the Illinois Bar and the Federal Bar; and in 1988, he was admitted to practice before the United States Court of Appeals for the Seventh Circuit. Mr. London is a member of the American Bar Association and is a past-Chairman of the Chicago Bar Association Class Litigation Committee. He was formerly an Assistant Attorney General for the State of Illinois, during which time he argued cases in the United States Court of Appeals for the Seventh Circuit and the Illinois Supreme Court. Since 1990, Mr. London has concentrated on complex and commercial litigation, with an emphasis on class action litigation involving antitrust claims. Mr. London practiced with Much Shelist Freed from March 1993 through December 31, 2006.

## Michael E. Moskovitz

Michael E. Moskovitz is a partner at Freed Kanner London & Millen LLC and has been involved in trial and appellate litigation for more than 15 years. Since 2000, he has concentrated on complex commercial litigation, with a primary emphasis on class action litigation involving antitrust, securities fraud, and consumer fraud claims. Mr. Moskovitz previously played a key role in the class action practice of Much Shelist Freed. He is significantly involved in several pending antitrust class actions, *In re Automotive Parts Antitrust Litigation*, MDL 2311 (E.D. Mich.), and *In re Vehicle Carrier Services Antitrust Litigation*, MDL No. 2471. Mr. Moskovitz is also a member of The Sedona Conference's Working Group 1 (Electronic Document Retention and Production) and has spoken at The Sedona Conference's Midyear meeting and has co-written papers published by The Sedona Conference.

Mr. Moskovitz is a graduate of Indiana University (B.A., 1993) and New York University School of Law (J.D., 1996).

## Robert J. Wozniak

Robert J. Wozniak is a partner at Freed Kanner London & Millen LLC. Since 2001, Mr. Wozniak has been involved in complex commercial litigation, with a primary emphasis on antitrust and consumer class action cases. Prior to engaging in private law practice, Mr. Wozniak worked as a trial attorney for the United States Department of Justice, Antitrust Division (Honors Program). Mr. Wozniak was then employed by Cohen Milstein Hausfeld & Toll, a Washington, D.C. class action firm, before joining Much Shelist Freed in 2004.

The complex antitrust class actions in which Mr. Wozniak has had significant involvement include: *In re Opana ER Antitrust Litigation* (N.D. Ill.); *Mulhern, et al. v. Pepperidge Farm* (N.D. Ill.); *Kleen Products, et al. v. International Paper, et al.* (N.D. Ill.) ("*Containerboard Antitrust Litigation*"); *In re NCAA Student-Athlete Names & Likeness Licensing Litigation* (N.D. Cal.); *In re Fresh and Process Potatoes Antitrust Litigation* (D. Idaho); *In re Municipal Derivatives Antitrust Litigation* (S.D.N.Y.); *In re Flat Glass Antitrust*



FILED DATE: 8/9/2021 12:00 AM 2021CH03460

*Litigation (II)* (W.D. Pa.); *In re TFT-LCD (Flat Panel) Antitrust Litigation* (N.D. Cal.); *In re Static Random Access Memory (SRAM) Antitrust Litigation* (N.D. Cal.); *In re Hydrogen Peroxide Antitrust Litigation* (E.D. Pa.); *In re Intel Corp. Microprocessor Antitrust Litigation* (D. Del.); *In re Dynamic Random Access Memory (DRAM) Litigation* (N.D. Cal.); *In re Buspirone Antitrust Litigation* (S.D.N.Y.); and *In re Terazosin Hydrochloride Antitrust Litigation* (S.D. Fla.).

Mr. Wozniak is a graduate of the University of Michigan (B.A., 1988), University of Minnesota (M.A., 1994), and Wayne State University Law School (J.D., 2000, *cum laude*, Order of the Coif). He has been admitted to practice law in Illinois, Michigan and the District of Columbia.

## Kimberly A. Justice

Kimberly A. Justice, a partner of the Firm, is a respected litigator and experienced trial lawyer who has dedicated her career to obtaining justice for those harmed by corporate fraud. She focuses her practice on class action litigation, including antitrust, consumer and securities fraud matters. Ms. Justice has extensive experience in all aspects of complex litigation from investigating and developing an initial case theory, to formulating and managing litigation strategy, to conducting discovery, to trial.

She has secured sizeable recoveries on behalf of investors in several high-profile securities fraud cases. Kimberly also led the trial team that obtained a jury verdict in favor of investors in the *In re Longtop Fin. Tech. Ltd. Sec. Litig.*, No. 11-cv-3658 (S.D.N.Y) securities class action litigation, among just a handful of securities cases to be tried to jury verdict.

Ms. Justice also serves or has served as lead or co-lead counsel in several nationwide antitrust, consumer and securities fraud class actions. Most recently, Ms. Justice was appointed as Lead Counsel in *Murphy, et al. v. Toyota Motor Corporation, et al.*, Consolidated Case No. 4:21-cv-00178-ALM (E.D. Tex.). Ms. Justice also was appointed as Co-Lead Counsel in *In re Peanut Farmers Antitrust Litigation*, 2:19-cv-00463 (E.D. Va.), which settled for $102.75 million for the class, and *In re: Chicago Board of Options Exchange Volatility Index Manipulation Antitrust Litigation* (N.D. Ill.). Ms. Justice also serves on the Plaintiff Steering/Executive Committees in, *In re Local TV Advertising Antitrust Litigation*, No. 18-cv-06785 (N.D. Ill.); *In re Farm-Raised Salmon and Salmon Products Litigation,* No. 19-cv-21551; and *In re Toyota Hybrid Brake Litig.*, No. 4:20-cv-00127-ALM (E.D. Tex.). Ms. Justice served on the Plaintiff Steering Committee in *In re: Liquid Aluminum Sulfate Antitrust Litigation*, No. 16-md-02687 (D.N.J.) (over $90 million in settlements for direct purchaser plaintiff class) and *In re German Automotive Manufacturers Antitrust Litigation*, No. 17-md-02796 (N.D. Cal.).

Prior to entering private practice, Ms. Justice served as a federal antitrust prosecutor for nearly a decade where she led teams of trial attorneys and law enforcement agents who investigated and prosecuted domestic and international cartel activity, including in the following industries: graphite electrodes, carbon products, ocean shipping and benchmark interest rates



FILED DATE: 8/9/2021 12:00 AM   2021CH03460

(LIBOR).

Ms. Justice graduated *magna cum laude* from Temple University Beasley School of Law, where she served as an Articles Editor of the Temple Law Review. Kimberly earned her B.A. *cum laude* from Kalamazoo College. Upon graduating from law school, Ms. Justice served as a judicial clerk to the Honorable William H. Yohn, Jr. of the United States District Court for the Eastern District of Pennsylvania.

Ms. Justice frequently lectures and serves on discussion panels concerning antitrust and securities litigation matters and currently serves as a member of the Advisory Board of the American Antitrust Institute and as an Advisory Council Member for The Duke Conferences: Bench-Bar-Academy Distinguished Lawyers' Series.

### Jonathan M. Jagher

Prior to entering private practice, Mr. Jagher served as a supervising Assistant District Attorney for the Middlesex District Attorney in Cambridge, Massachusetts. As a prosecutor, he conducted numerous investigations and tried approximately forty cases before a jury.

Mr. Jagher is a partner at Freed Kanner where he has a national practice representing plaintiffs in antitrust and consumer class actions. Recent cases include: *In re Automotive Parts Antitrust Litigation*, MDL No. 2311 (E.D. Mich.); *In re Korean Ramen Antitrust Litigation*,13-cv-04115 (N.D. Cal.); *In re Lithium Ion Batteries Antitrust Litigation*, 13-MD-2420 (N.D. Cal.); *In re OSB Antitrust Litigation*, Master File No. 06-CV-00826 (E.D. Pa.); *In re Online DVD Rental Antitrust Litigation*, MDL No. 2029 (N.D. Cal.); *In re Processed Eggs Antitrust Litigation*, MDL No. 2002 (E.D. Pa.); *In re Air Cargo Shipping Services Antitrust Litigation*, MDL No. 1775 (E.D.N.Y.); and *In re Broiler Chicken Antitrust Litigation*, 1:16-cv-08637 (N.D. Ill.).

Mr. Jagher was recently appointed to serve on the Plaintiffs' Steering Committee in *In Re: TikTok, Inc., Consumer Privacy Litigation*, MDL No. 2948 (N.D. Ill.), a class action related to allegations of data privacy violations involving the popular app and the creation of short form videos on mobile devices. Mr. Jagher was also recently appointed to serve on the Plaintiffs' Executive Committee in *In Re: Morgan Stanley Data Security Litigation*, 1:20-CV-05914 (S.D. N.Y.), a data privacy class action related to allegations that Morgan Stanley failed to safeguard its customers' highly sensitive personally identifiable information.

Mr. Jagher received a B.A. degree *magna cum laude* from Boston University in 1998 and a J.D. degree from Washington University School of Law in 2001. He is currently admitted to practice law in Pennsylvania, Massachusetts, the United States District Court for the District of Massachusetts, the United States District Court for the Eastern District of Pennsylvania and the United States Court of Appeals for the Third Circuit. Mr. Jagher currently serves on the Advisory Board of Loyola University School of Law's Institute for Consumer Antitrust Studies and is a member of the Philadelphia Bar Association and the American Bar Association. Mr.



Jagher was named as a Pennsylvania Super Lawyer in 2018 and 2019 after having been named as a Super Lawyer Rising Star in 2012, 2013, 2014, 2015 and 2016.

**Brian M. Hogan**

Brian M. Hogan is a partner at Freed Kanner London & Millen LLC. He specializes in class action litigation and has a wide range of experience successfully handling product liability, mass tort, toxic and environmental exposure, consumer protection and antitrust cases. He has litigated cases in numerous state and federal courts nationwide, including multidistrict litigation. Mr. Hogan has tried over a dozen cases to verdict.

Currently, Mr. Hogan has significant involvement litigating *In re Automotive Parts Antitrust Litigation*, MDL No. 2311 (E.D. Mich.), *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-md-1720 (E.D.N.Y.), and *In re Opana ER Antitrust Litigation*, 1:14-cv-10150 (N.D. Ill.) where Freed Kanner London & Millen is court-appointed co-lead counsel representing direct purchasers of automotive parts who were overcharged as a result of price-fixing and bid-rigging conspiracies by various sets of defendants throughout the automotive parts industry. The litigation follows the largest United States Department of Justice criminal antitrust investigation in history.

Mr. Hogan received a B.A. from Indiana University and his J.D. from Chicago-Kent College of Law.

**D. Patrick Huyett**

D. Patrick Huyett is an associate at FKLM. He is an accomplished and strategic litigator who focuses on helping small businesses and consumers obtain redress for anticompetitive conduct and other unlawful business practices.

Mr. Huyett joined FKLM from the Federal Trade Commission, where he served as an enforcement attorney in the Health Care Division of the Bureau of Competition. While at the FTC, Pat worked extensively on the agency's case against Martin Shkreli and his companies, *FTC v. Vyera Pharmaceuticals, LLC* (S.D.N.Y.), which alleged that the defendants drastically raised the price of a life-saving drug and protected that price increase with a multifaceted anticompetitive scheme. In addition, Pat was part of the litigation teams in *FTC v. Surescripts, LLC* (D.D.C.) and *FTC v. Actavis, Inc.* (N.D. Ga.), and he also engaged in several nonpublic investigations into anticompetitive conduct in the healthcare industry.

In litigating cases on behalf of harmed business and consumers, Pat also draws on the diverse experience he gained before the FTC. At the start of his career, Pat served as a law clerk for the Honorable William H. Yohn, Jr. of the U.S. District Court for the Eastern District of Pennsylvania and the Honorable Marjorie O. Rendell of the U.S. Court of Appeals for the Third Circuit. After clerking, Pat worked at the global law firm Morgan, Lewis & Bockius LLP, where he focused on antitrust, qui tam, and securities litigation and investigations.

- 18 -

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

FILED DATE: 8/9/2021 12:00 AM   2021CH03460



Mr. Huyett graduated *magna cum laude* from Temple University Beasley School of Law, where he was a member of the Order of the Coif and served as the Executive Editor of the Temple Law Review. Pat earned his B.A. from Dickinson College.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

# Exhibit I

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

# BURSOR & FISHER
### P.A.

www.bursor.com

| 701 BRICKELL AVENUE | 888 SEVENTH AVENUE | 1990 NORTH CALIFORNIA BLVD. |
| MIAMI, FL 33131 | NEW YORK, NY 10019 | WALNUT CREEK, CA 94596 |

## <u>FIRM RESUME</u>

With offices in Florida, New York, and California, BURSOR & FISHER lawyers have represented both plaintiffs and defendants in state and federal courts throughout the country.

The lawyers at our firm have an active civil trial practice, having won multi-million dollar verdicts or recoveries in six of six class action jury trials since 2008. Our most recent class action trial victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector found to have violated the Telephone Consumer Protection Act.

In August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which Mr. Bursor served as lead trial counsel, we won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc. (II)*, we obtained a $50 million jury verdict in favor of a certified class of 150,000 purchasers of the Avacor Hair Regrowth System. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009, and the largest in any class action.

The lawyers at our firm have an active class action practice and have won numerous appointments as class counsel to represent millions of class members, including customers of Honda, Verizon Wireless, AT&T Wireless, Sprint, Haier America, and Michaels Stores as well as purchasers of Avacor™, Hydroxycut, and Sensa™ products. Bursor & Fisher lawyers have been court-appointed Class Counsel or Interim Class Counsel in:

1. *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a certified nationwide class of purchasers of LG French-door refrigerators,

2. *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a certified nationwide class of consumers who made in-store purchases at Michaels Stores using a debit or credit card and had their private financial information stolen as a result,

3. *In re Haier Freezer Consumer Litig.* (N.D. Cal. Aug. 17, 2011) to represent a certified class of purchasers of mislabeled freezers from Haier America Trading, LLC,

4. *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a certified nationwide class of military personnel against CitiMortgage for illegal foreclosures,

5. *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012) to represent a certified nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

6.  *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012) to represent a proposed nationwide class of purchasers of mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

7.  *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012) to represent a certified nationwide class of purchasers of Sensa weight loss products,

8.  *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a certified nationwide class of purchasers,

9.  *Ebin v. Kangadis Food Inc.* (S.D.N.Y. Feb. 25, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

10. *Forcellati v. Hyland's, Inc.* (C.D. Cal. Apr. 9, 2014) to represent a certified nationwide class of purchasers of children's homeopathic cold and flu remedies,

11. *Ebin v. Kangadis Family Management LLC, et al.* (S.D.N.Y. Sept. 18, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

12. *In re Scotts EZ Seed Litig.* (S.D.N.Y. Jan. 26, 2015) to represent a certified class of purchasers of Scotts Turf Builder EZ Seed,

13. *Dei Rossi v. Whirlpool Corp., et al.* (E.D. Cal. Apr. 28, 2015) to represent a certified class of purchasers of mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

14. *Hendricks v. StarKist Co.* (N.D. Cal. July 23, 2015) to represent a certified nationwide class of purchasers of StarKist tuna products,

15. *In re NVIDIA GTX 970 Graphics Card Litig.* (N.D. Cal. May 8, 2015) to represent a proposed nationwide class of purchasers of NVIDIA GTX 970 graphics cards,

16. *Melgar v. Zicam LLC, et al.* (E.D. Cal. March 30, 2016) to represent a certified ten-jurisdiction class of purchasers of Zicam Pre-Cold products,

17. *In re Trader Joe's Tuna Litigation* (C.D. Cal. December 21, 2016) to represent a purchaser of allegedly underfilled Trader Joe's canned tuna.

18. *In re Welspun Litigation* (S.D.N.Y. January 26, 2017) to represent a proposed nationwide class of purchasers of Welspun Egyptian cotton bedding products,

19. *Retta v. Millennium Products, Inc.* (C.D. Cal. January 31, 2017) to represent a certified nationwide class of Millennium kombucha beverages,

20. *Moeller v. American Media, Inc.,* (E.D. Mich. June 8, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

21. *Hart v. BHH, LLC* (S.D.N.Y. July 7, 2017) to represent a nationwide class of purchasers of Bell & Howell ultrasonic pest repellers,

22. *McMillion v. Rash Curtis & Associates* (N.D. Cal. September 6, 2017) to represent a certified nationwide class of individuals who received calls from Rash Curtis & Associates,

23. *Lucero v. Solarcity Corp.* (N.D. Cal. September 15, 2017) to represent a certified nationwide class of individuals who received telemarketing calls from Solarcity Corp.,

BURSOR&FISHER
P.A.

24. *Taylor v. Trusted Media Brands, Inc.* (S.D.N.Y. Oct. 17, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

25. *Gasser v. Kiss My Face, LLC* (N.D. Cal. Oct. 23, 2017) to represent a proposed nationwide class of purchasers of cosmetic products,

26. *Gastelum v. Frontier California Inc.* (S.F. Superior Court February 21, 2018) to represent a certified California class of Frontier landline telephone customers who were charged late fees,

27. *Williams v. Facebook, Inc.* (N.D. Cal. June 26, 2018) to represent a proposed nationwide class of Facebook users for alleged privacy violations,

28. *Ruppel v. Consumers Union of United States, Inc.* (S.D.N.Y. July 27, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

29. *Bayol v. Health-Ade* (N.D. Cal. August 23, 2018) to represent a proposed nationwide class of Health-Ade kombucha beverage purchasers,

30. *West v. California Service Bureau* (N.D. Cal. September 12, 2018) to represent a certified nationwide class of individuals who received calls from California Service Bureau,

31. *Gregorio v. Premier Nutrition Corporation* (S.D.N.Y. Sept. 14, 2018) to represent a nationwide class of purchasers of protein shake products,

32. *Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast* (S.D.N.Y. Oct. 24, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

33. *Bakov v. Consolidated World Travel Inc. d/b/a Holiday Cruise Line* (N.D. Ill. Mar. 21, 2019) to represent a certified class of individuals who received calls from Holiday Cruise Line,

34. *Martinelli v. Johnson & Johnson* (E.D. Cal. March 29, 2019) to represent a certified class of purchasers of Benecol spreads labeled with the representation "No Trans Fat,"

35. *Edwards v. Hearst Communications, Inc.* (S.D.N.Y. April 24, 2019) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

36. *Galvan v. Smashburger* (C.D. Cal. June 25, 2019) to represent a proposed class of purchasers of Smashburger's "Triple Double" burger,

37. *Kokoszki v. Playboy Enterprises, Inc.* (E.D. Mich. Feb. 7, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

38. *Russett v. The Northwestern Mutual Life Insurance Co.* (S.D.N.Y. May 28, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

39. *In re: Metformin Marketing and Sales Practices Litigation* (D.N.J. June 3, 2020) to represent a proposed nationwide class of purchasers of generic diabetes medications that were contaminated with a cancer-causing carcinogen,

40. *Hill v. Spirit Airlines, Inc.* (S.D. Fla. July 21, 2020) to represent a proposed nationwide class of passengers whose flights were cancelled by Spirit Airlines

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

due to the novel coronavirus, COVID-19, and whose tickets were not refunded,

41. *Kramer v. Alterra Mountain Co.* (D. Colo. July 31, 2020) to represent a proposed nationwide class of purchasers to recoup the unused value of their Ikon ski passes after Alterra suspended operations at its ski resorts due to the novel coronavirus, COVID-19,

42. *Qureshi v. American University* (D.D.C. July 31, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by American University due to the novel coronavirus, COVID-19,

43. *Hufford v. Maxim Inc.* (S.D.N.Y. Aug. 13, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

44. *Desai v. Carnegie Mellon University* (W.D. Pa. Aug. 26, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Carnegie Mellon University due to the novel coronavirus, COVID-19,

45. *Heigl v. Waste Management of New York, LLC* (E.D.N.Y. Aug. 27, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

46. *Stellato v. Hofstra University* (E.D.N.Y. Sept. 18, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Hofstra University due to the novel coronavirus, COVID-19.

47. *Kaupelis v. Harbor Freight Tools USA, Inc.* (C.D. Cal. Sept. 23, 2020), to represent consumers who purchased defective chainsaws.

48. *Soo v. Lorex Corporation* (N.D. Cal. Sept. 23, 2020), to represent consumers whose security cameras were intentionally rendered non-functional by manufacturer.

49. *Miranda v. Golden Entertainment (NV), Inc.* (D. Nev. Dec. 17, 2020), to represent consumers and employees whose personal information was exposed in a data breach.

50. *Benbow v. SmileDirectClub, Inc.* (Cir. Ct. Cook Cnty. Feb. 4, 2021), to represent a certified nationwide class of individuals who received text messages from SmileDirectClub, in alleged violation of the Telephone Consumer Protection Act.

51. *Suren v. DSV Solutions, LLC* (Cir. Ct. DuPage Cnty. Apr. 8, 2021), to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act.

52. *De Lacour v. Colgate-Palmolive Co.* (S.D.N.Y. Apr. 23, 2021), to represent a certified class of consumers who purchased allegedly "natural" Tom's of Maine products.

53. *Wright v. Southern New Hampshire University* (D.N.H. Apr. 26, 2021), to represent a certified nationwide class of students for tuition and fee refunds after their classes were moved online by Southern New Hampshire University due to the novel coronavirus, COVID-19.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

### SCOTT A. BURSOR

Mr. Bursor has an active civil trial practice, having won multi-million verdicts or recoveries in six of six civil jury trials since 2008.  Mr. Bursor's most recent victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector for violations of the Telephone Consumer Protection Act (TCPA).

In *Ayyad v. Sprint Spectrum L.P.* (2013), where Mr. Bursor served as lead trial counsel, the jury returned a verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc.* (2009), the jury returned a $50 million verdict in favor of the plaintiff and class represented by Mr. Bursor.  The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009.

Class actions are rarely tried to verdict.  Other than Mr. Bursor and his partner Mr. Fisher, we know of no lawyer that has tried more than one class action to a jury.  Mr. Bursor's perfect record of six wins in six class action jury trials, with recoveries ranging from $21 million to $299 million, is unmatched by any other lawyer.  Each of these victories was hard-fought against top trial lawyers from the biggest law firms in the United States.

Mr. Bursor graduated from the University of Texas Law School in 1996.  He served as Articles Editor of the Texas Law Review, and was a member of the Board of Advocates and Order of the Coif.  Prior to starting his own practice, Mr. Bursor was a litigation associate at a large New York based law firm where he represented telecommunications, pharmaceutical, and technology companies in commercial litigation.

Mr. Bursor is a member of the state bars of New York, Florida, and California, as well as the bars of the United States Court of Appeals for the Second, Third, Fourth, Sixth, Ninth and Eleventh Circuits,  and the bars of the United States District Courts for the Southern and Eastern Districts of New York, the Northern, Central, Southern and Eastern Districts of California, the Southern and Middle Districts of Florida, and the  Eastern District of Michigan.

### *Representative Cases*

Mr. Bursor was appointed lead or co-lead class counsel to the largest, 2nd largest, and 3rd largest classes ever certified.  Mr. Bursor has represented classes including more than 160 million class members, roughly 1 of every 2 Americans.  Listed below are recent cases that are representative of Mr. Bursor's practice:

Mr. Bursor negotiated and obtained court-approval for two landmark settlements in *Nguyen v. Verizon Wireless* and *Zill v. Sprint Spectrum* (the largest and 2nd largest classes ever certified).  These settlements required Verizon and Sprint to open their wireless networks to third-party devices and applications.  These settlements are believed to be the most significant legal development affecting the telecommunications industry since 1968, when the FCC's Carterfone decision similarly opened up AT&T's wireline telephone network.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

Mr. Bursor was the lead trial lawyer in *Ayyad v. Sprint Spectrum, L.P.* representing a class of approximately 2 million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. After a five-week combined bench-and-jury trial, the jury returned a verdict in June 2008 and the Court issued a Statement of Decision in December 2008 awarding the plaintiffs $299 million in cash and debt cancellation. Mr. Bursor served as lead trial counsel for this class again in 2013 during a month-long jury trial in which Sprint asserted a $1.06 billion counterclaim against the class. Mr. Bursor secured a verdict awarding Sprint only $18.4 million, the exact amount calculated by the class's damages expert. This award was less than 2% of the damages Sprint sought, less than 6% of the amount of the illegal termination fees Sprint charged to class members. In December 2016, after more than 13 years of litigation, the case was settled for $304 million, including $79 million in cash payments plus $225 million in debt cancellation.

Mr. Bursor was the lead trial lawyer in *White v. Cellco Partnership d/b/a Verizon Wireless* representing a class of approximately 1.4 million California consumers who were charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. In July 2008, after Mr. Bursor presented plaintiffs' case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements.

Mr. Bursor was the lead trial lawyer in *Thomas v. Global Visions Products Inc.* Mr. Bursor represented a class of approximately 150,000 California consumers who had purchased the Avacor® hair regrowth system. In January 2008, after a four-week combined bench-and-jury trial. Mr. Bursor obtained a $37 million verdict for the class, which the Court later increased to $40 million.

Mr. Bursor was appointed class counsel and was elected chair of the Official Creditors' Committee in *In re Nutraquest Inc.*, a Chapter 11 bankruptcy case before Chief Judge Garrett E. Brown, Jr. (D.N.J.) involving 390 ephedra-related personal injury and/or wrongful death claims, two consumer class actions, four enforcement actions by governmental agencies, and multiple adversary proceedings related to the Chapter 11 case. Working closely with counsel for all parties and with two mediators, Judge Nicholas Politan (Ret.) and Judge Marina Corodemus (Ret.), the committee chaired by Mr. Bursor was able to settle or otherwise resolve every claim and reach a fully consensual Chapter 11 plan of reorganization, which Chief Judge Brown approved in late 2006. This settlement included a $12.8 million recovery to a nationwide class of consumers who alleged they were defrauded in connection with the purchase of Xenadrine® dietary supplement products.

Mr. Bursor was the lead trial lawyer in *In re: Pacific Bell Late Fee Litigation.* After filing the first class action challenging Pac Bell's late fees in April 2010, winning a contested motion to certify a statewide California class in January 2012, and defeating Pac Bell's motion for summary judgment in February 2013, Mr. Bursor obtained final approval of the $38 million class settlement. The settlement, which Mr. Bursor negotiated the night before opening statements were scheduled to commence, included a $20 million cash payment to provide

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

refunds to California customers who paid late fees on their Pac Bell wireline telephone accounts, and an injunction that reduced other late fee charges by $18.6 million.

## L. TIMOTHY FISHER

L. Timothy Fisher has an active practice in consumer class actions and complex business litigation and has also successfully handled a large number of civil appeals.

Mr. Fisher has been actively involved in numerous cases that resulted in multi-million dollar recoveries for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and consumer fraud. With his partner Scott A. Bursor, Mr. Fisher has tried five class action jury trials, all of which produced successful results. In *Thomas v. Global Vision Products*, Mr. Fisher obtained a jury award of $50,024,611 — the largest class action award in California in 2009 and the second-largest jury award of any kind.

Mr. Fisher was admitted to the State Bar of California in 1997. He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern and Eastern Districts of California. Mr. Fisher taught appellate advocacy at John F. Kennedy University School of Law in 2003 and 2004.  In 2010, he contributed jury instructions, a verdict form and comments to the consumer protection chapter of Justice Elizabeth A. Baron's California Civil Jury Instruction Companion Handbook (West 2010). In January 2014, Chief Judge Claudia Wilken of the United States District Court for the Northern District of California appointed Mr. Fisher to a four-year term as a member of the Court's Standing Committee on Professional Conduct.

Mr. Fisher received his Juris Doctor from Boalt Hall at the University of California at Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first-year moot court competition.

In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science.  Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council."  He is also a member of Phi Beta Kappa.

## *Representative Cases*

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court).  Mr. Fisher litigated claims against Global Vision Products, Inc. and other individuals in connection with the sale and marketing of a purported hair loss remedy known as Avacor.  The case lasted more than seven years and involved two trials.  The first trial resulted in a verdict for plaintiff and the class in the amount of $40,000,000.  The second trial resulted in a jury verdict of $50,024,611, which led to a $30 million settlement for the class.

*In re Cellphone Termination Fee Cases* - Handset Locking Actions (Alameda County Superior Court).  Mr. Fisher actively worked on five coordinated cases challenging the secret locking of

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

cell phone handsets by major wireless carriers to prevent consumers from activating them on competitive carriers' systems. Settlements have been approved in all five cases on terms that require the cell phone carriers to disclose their handset locks to consumers and to provide unlocking codes nationwide on reasonable terms and conditions. The settlements fundamentally changed the landscape for cell phone consumers regarding the locking and unlocking of cell phone handsets.

*In re Cellphone Termination Fee Cases* - Early Termination Fee Cases (Alameda County Superior Court and Federal Communications Commission). In separate cases that are a part of the same coordinated litigation as the Handset Locking Actions, Mr. Fisher actively worked on claims challenging the validity under California law of early termination fees imposed by national cell phone carriers. In one of those cases, against Verizon Wireless, a nationwide settlement was reached after three weeks of trial in the amount of $21 million. In a second case, which was tried to verdict, the Court held after trial that the $73 million of flat early termination fees that Sprint had collected from California consumers over an eight-year period were void and unenforceable.

### *Selected Published Decisions*

*Melgar v. Zicam LLC*, 2016 WL 1267870 (E.D. Cal. Mar. 30, 2016) (certifying 10-jurisdiction class of purchasers of cold remedies, denying motion for summary judgment, and denying motions to exclude plaintiff's expert witnesses).

*Salazar v. Honest Tea, Inc*., 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015) (denying motion for summary judgment).

*Dei Rossi v. Whirlpool Corp.*, 2015 WL 1932484 (E.D. Cal. Apr. 27, 2015) (certifying California class of purchasers of refrigerators that were mislabeled as Energy Star qualified).

*Bayol v. Zipcar, Inc.*, 78 F.Supp.3d 1252 (N.D. Cal. 2015) (denying motion to dismiss claims alleging unlawful late fees under California Civil Code § 1671).

*Forcellati v. Hyland's, Inc.*, 2015 WL 9685557 (C.D. Cal. Jan. 12, 2015) (denying motion for summary judgment in case alleging false advertising of homeopathic cold and flu remedies for children).

*Bayol v. Zipcar, Inc*., 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014) (denying motion to transfer venue pursuant to a forum selection clause).

*Forcellati v. Hyland's Inc.*, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) (certifying nationwide class of purchasers of homeopathic cold and flu remedies for children).

*Hendricks v. StarKist Co.*, 30 F.Supp.3d 917 (N.D. Cal. 2014) (denying motion to dismiss in case alleging underfilling of 5-ounce cans of tuna).

*Dei Rossi v. Whirlpool Corp.*, 2013 WL 5781673 (E.D. Cal. October 25, 2013) (denying motion to dismiss in case alleging that certain KitchenAid refrigerators were misrepresented as Energy Star qualified).

*Forcellati v. Hyland's Inc.*, 876 F.Supp.2d 1155 (C.D. Cal. 2012) (denying motion to dismiss complaint alleging false advertising regarding homeopathic cold and flu remedies for children).

*Clerkin v. MyLife.com*, 2011 WL 3809912 (N.D. Cal. August 29, 2011) (denying defendants'

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

motion to dismiss in case alleging false and misleading advertising by a social networking company).

*In re Cellphone Termination Fee Cases*, 186 Cal.App.4th 1380 (2010) (affirming order approving $21 million class action settlement).

*Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007) (affirming order denying motion to compel arbitration).

### ***Selected Class Settlements***

*Melgar v. Zicam* (Eastern District of California) - $16 million class settlement of claims alleging cold medicine was ineffective.

*Gastelum v. Frontier California Inc.* (San Francisco Superior Court) - $10.9 million class action settlement of claims alleging that a residential landline service provider charged unlawful late fees.

*West v. California Service Bureau*, *Inc.* (Northern District of California) - $4.1 million class settlement of claims under the Telephone Consumer Protection Act.

*Gregorio v. Premier Nutrition Corp.* (Southern District of New York) - $9 million class settlement of false advertising claims against protein shake manufacturer.

*Morris v. SolarCity Corp.* (Northern District of California) - $15 million class settlement of claims under the Telephone Consumer Protection Act.

*Retta v. Millennium Products, Inc.* (Central District of California) - $8.25 million settlement to resolve claims of bottled tea purchasers for alleged false advertising.

*Forcellati v. Hyland's* (Central District of California) – nationwide class action settlement providing full refunds to purchasers of homeopathic cold and flu remedies for children.

*Dei Rossi v. Whirlpool* (Eastern District of California) – class action settlement providing $55 cash payments to purchasers of certain KitchenAid refrigerators that allegedly mislabeled as Energy Star qualified.

*In Re NVIDIA GTX 970 Graphics Chip Litigation* (Northern District of California) - $4.5 million class action settlement of claims alleging that a computer graphics card was sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.* (Northern District of California) – $12 million class action settlement of claims alleging that 5-ounce cans of tuna were underfilled.

*In re Zakskorn v. American Honda Motor Co.* Honda (Eastern District of California) – nationwide settlement providing for brake pad replacement and reimbursement of out-of-pocket expenses in case alleging defective brake pads on Honda Civic vehicles manufactured between 2006 and 2011.

*Correa v. Sensa Products, LLC* (Los Angeles Superior Court) - $9 million settlement on behalf of purchasers of the Sensa weight loss product.

BURSOR&FISHER
P.A.

*In re Pacific Bell Late Fee Litigation* (Contra Costa County Superior Court) - $38.6 million settlement on behalf of Pac Bell customers who paid an allegedly unlawful late payment charge.

*In re Haier Freezer Consumer Litigation* (Northern District of California) - $4 million settlement, which provided for cash payments of between $50 and $325.80 to class members who purchased the Haier HNCM070E chest freezer.

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court) - $30 million settlement on behalf of a class of purchasers of a hair loss remedy.

*Guyette v. Viacom, Inc.* (Alameda County Superior Court) - $13 million settlement for a class of cable television subscribers who alleged that the defendant had improperly failed to share certain tax refunds with its subscribers.

## JOSEPH I. MARCHESE

Joseph I. Marchese is a Partner with Bursor & Fisher, P.A. Joe focuses his practice on consumer class actions, employment law disputes, and commercial litigation. He has represented corporate and individual clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Joe has diverse experience in litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, privacy violations, data breach claims, and violations of the Servicemembers Civil Relief Act.

Joe also has significant experience in multidistrict litigation proceedings. Recently, he served on the Plaintiffs' Executive Committee in *In Re: Blue Buffalo Company, Ltd. Marketing And Sales Practices Litigation*, MDL No. 2562, which resulted in a $32 million consumer class settlement. Currently, he serves on the Plaintiffs' Steering Committee for Economic Reimbursement in *In Re: Valsartan Products Liability Litigation*, MDL. No. 2875.

Joe is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, and the Eastern District of Michigan, as well as the United States Court of Appeals for the Second Circuit.

Joe graduated from Boston University School of Law in 2002 where he was a member of The Public Interest Law Journal. In 1998, Joe graduated with honors from Bucknell University.

### *Selected Published Decisions:*

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. Sept. 7, 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

*Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. June 17, 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*In re Michaels Stores Pin Pad Litigation*, 830 F. Supp. 2d 518 (N.D. Ill. 2011), denying retailer's motion to dismiss its customers' state law consumer protection and privacy claims in data breach putative class action.

### ***Selected Class Settlements:***

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

In *re Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB (S.D.N.Y. 2018) – final approval granted for $47 million class settlement to resolve false advertising claims of purchasers of combination grass seed product.

*In Re: Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) – final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

*Rodriguez v. Citimortgage, Inc.*, Case No. 11-cv-4718-PGG (S.D.N.Y. 2015) – final approval granted for $38 million class settlement to resolve claims of military servicemembers for alleged foreclosure violations of the Servicemembers Civil Relief Act, where each class member was entitled to $116,785 plus lost equity in the foreclosed property and interest thereon.

*O'Brien v. LG Electronics USA, Inc., et al.*, Case No. 10-cv-3733-DMC (D.N.J. 2011) – final approval granted for $23 million class settlement to resolve claims of Energy Star refrigerator purchasers for alleged false advertising of the appliances' Energy Star qualification.

### **JOSHUA D. ARISOHN**

Joshua D. Arisohn is a Partner with Bursor & Fisher, P.A. Josh has litigated precedent-setting cases in the areas of consumer class actions and terrorism. He participated in the first ever trial to take place under the Anti-Terrorism Act, a statute that affords U.S. citizens the right to assert federal claims for injuries arising out of acts of international terrorism. Josh's practice continues to focus on terrorism-related matters as well as class actions.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

Josh is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York.

Josh previously practiced at Dewey & LeBoeuf LLP and DLA Piper LLP. He graduated from Columbia University School of Law in 2006, where he was a Harlan Fiske Stone Scholar, and received his B.A. from Cornell University in 2002. Josh has been honored as a 2015 and 2016 Super Lawyer Rising Star.

### *Selected Published Decisions:*

*Morris v. SolarCity Corp.*, 2016 WL 1359378 (N.D. Cal. Apr. 4, 2016), denying defendant's motion to dismiss claims that solar company illegally called consumers using an artificial or prerecorded voice and an automatic telephone dialing system.

*Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. 2016), denying defendant's motion to dismiss and finding that the Michigan Video Rental Privacy Act does not violate the First Amendment.

*Edwards v. Oportun, Inc.*, 193 F. Supp. 3d 1096 (N.D. Cal. 2016), denying defendant's motion dismiss and rejecting its argument that providing a class representative with a cashier's check for his individual damages mooted his individual and class claims.

### *Selected Class Settlements:*

*Morris v. SolarCity Corp.*, Case No. 3:15-cv-05107-RS (N.D. Cal.) - final approval granted for $15 million class settlement to resolve claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

### JOEL D. SMITH

Joel D. Smith is a Partner with Bursor & Fisher, P.A. Joel's practice focuses on consumer class actions and complex litigation. He has substantial experience in trial and appellate courts across the nation.

Prior to joining Bursor & Fisher, Joel was a litigator at Crowell & Moring, where he represented Fortune 500 companies, privately-held businesses, and public entities in commercial litigation and nationwide class actions. While at Crowell & Moring, Joel litigated some of the firm's most high-profile matters, including several class actions alleging deceptive sales practices with respect to Apple iPhones and iPads, and a class action seeking to hold U.S. energy companies accountable for global warming. In California state court, Joel represented four major U.S. retailers in a case arising from a devastating arson fire and ensuing state of emergency in Roseville, California. That case included crossclaims by the defendant alleging a vast cover-up by the City of Roseville's fire and police departments; the involvement of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives; and settlement on the eve of a trial that was expected to last several months and involve numerous witnesses. Joel also was part

of the trial team in a widely publicized trial over the death of a contestant who died after participating in a Sacramento radio station's water drinking contest.

More recently, Joel has represented University of California students in a class action seeking the return of late fees unlawfully collected from students. He also served as interim class counsel in *In re Welspun Litigation* (S.D.N.Y. January 26, 2017), a class action against three of the largest retailers in the United States and one of the largest textile manufacturers in the world, arising from events that one reporter described as the "biggest counterfeit story in retail history."

Joel received both his undergraduate and law degrees from the University of California at Berkeley. While at Berkeley School of Law, he was a member of the California Law Review, received several academic honors, externed for the California Attorney General's office and published an article on climate change policy and litigation.

Joel is admitted to the State Bar of California, as well as the United States Courts of Appeals for the Second, Third and Ninth Circuits; the Northern, Central, Southern and Eastern Districts of California; and is a member of the General Bar of the Northern District of Illinois.

### *Selected Published Decisions:*

*Revitch v. DIRECTV, LLC*, --- F.3d --- (9th Cir. 2020), affirming denial of motion to compel arbitration in putative class action alleging unlawful calls under the Telephone Consumer Protection Act.

*Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116 (C.D. Cal. Sept. 23, 2020), granting class certification of consumer protection claims brought by purchasers of defective chainsaws.

### *Selected Class Settlements:*

*Morris v. SolarCity Corp.*, Case No. 3:15-cv-05107-RS (N.D. Cal.) - final approval granted for $15 million class settlement to resolve claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

### NEAL J. DECKANT

Neal J. Deckant is a Partner with Bursor & Fisher, P.A. Neal focuses his practice on complex business litigation, consumer class actions, and employment law disputes. Prior to joining Bursor & Fisher, Neal counseled low-income homeowners facing foreclosure in East Boston.

In 2015, Neal was defense trial counsel for a law firm and several of its partners in a sexual harassment case brought by a former associate of that firm. The plaintiff's complaint sought $22 million in compensatory and punitive damages. After a 3-week trial in federal court in New York, the jury returned a verdict of not liable for the federal and state law claims. During the trial, the judge also granted defendants' motion for judgment as a matter of law on the

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

plaintiff's claims for retaliation and defamation.  The jury found liability solely under New York City's human rights law, awarding only $140,000 in damages.

Neal is admitted to the State Bars of California and New York, and is a member of the bars of the United States District Court for the Northern District of California, the United States District Court for the Eastern District of California, the United States District Court for the Central District of California, the United States District Court for the Southern District of California, the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York, and the bars of the United States Courts of Appeals for the Second and Ninth Circuits.

Neal received his Juris Doctor from Boston University School of Law in 2011, graduating cum laude with two Dean's Awards.  During law school, Neal served as a Senior Articles Editor for the Review of Banking and Financial Law, where he authored two published articles about securitization reforms, both of which were cited by the New York Court of Appeals, the highest court in the state.  Neal was also awarded Best Oral Argument in his moot court section, and he served as a Research Assistant for his Securities Regulation professor.  Neal has also been honored as a 2014, 2015, 2016, and 2017 Super Lawyers Rising Star.  In 2007, Neal graduated with Honors from Brown University with a dual major in East Asian Studies and Philosophy.

### ***Selected Published Decisions:***

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (N.D. Cal. Mar. 29, 2019), granting class certification of false advertising and other claims brought by purchasers of Benecol spreads labeled with the representation "No Trans Fats."

*Dzielak v. Whirlpool Corp.*, 2017 WL 6513347 (D.N.J. Dec. 20, 2017), granting class certification of consumer protection claims brought by purchasers of Maytag Centennial washing machines marked with the "Energy Star" logo.

*Duran v. Obesity Research Institute*, LLC, 204 Cal. Rptr. 3d 896 (Cal. Ct. App. 2016), reversing and remanding final approval of a class action settlement on appeal, regarding allegedly mislabeled dietary supplements, in connection with a meritorious objection.

*Marchuk v. Faruqi & Faruqi, LLP*, et al., 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

***Selected Class Settlements:***

*In Re NVIDIA GTX 970 Graphics Chip Litigation*, Case No. 15-cv-00760-PJH (N.D. Cal. Dec. 7, 2016) – final approval granted for $4.5 million class action settlement to resolve claims that a computer graphics card was allegedly sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.*, 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016) – final approval granted for $12 million class action settlement to resolve claims that 5-ounce cans of tuna were allegedly underfilled.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – class action claims resolved for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy, following claims that its olive oil was allegedly sold with false and misleading representations.

***Selected Publications:***

Neal Deckant, *X. Reforms of Collateralized Debt Obligations: Enforcement, Accounting and Regulatory Proposals*, 29 Rev. Banking & Fin. L. 79 (2009) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014)).

Neal Deckant, *Criticisms of Collateralized Debt Obligations in the Wake of the Goldman Sachs Scandal*, 30 Rev. Banking & Fin. L. 407 (2010) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014); *Lyon Village Venetia, LLC v. CSE Mortgage LLC*, 2016 WL 476694, at \*1 n.1 (Md. Ct. Spec. App. Feb. 4, 2016); Ivan Ascher, Portfolio Society: On the Capitalist Mode of Prediction, at 141, 153, 175 (Zone Books / The MIT Press 2016); Devon J. Steinmeyer, *Does State National Bank of Big Spring v. Geithner Stand a Fighting Chance?*, 89 Chi.-Kent. L. Rev. 471, 473 n.13 (2014)).

## YITZCHAK KOPEL

Yitzchak Kopel is a Partner with Bursor & Fisher, P.A. Yitz focuses his practice on consumer class actions and complex business litigation. He has represented corporate and individual clients before federal and state courts, as well as in arbitration proceedings.

Yitz has substantial experience in successfully litigating and resolving consumer class actions involving claims of consumer fraud, data breaches, and violations of the telephone consumer protection act. Since 2014, Yitz has obtained class certification on behalf of his clients five times, three of which were certified as nationwide class actions. Bursor & Fisher was appointed as class counsel to represent the certified classes in each of the cases.

Yitz is admitted to the State Bars of New York and New Jersey, the bar of the United States Court of Appeals for the Second, Eleventh, and Ninth Circuits, and the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, Eastern District of Missouri, Eastern District of Wisconsin, Northern Distriict of Illinois, and District of New Jersey.

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

Yitz received his Juris Doctorate from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards. During law school, Yitz served as an Articles Editor for the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling. In 2009, Yitz graduated *cum laude* from Queens College with a B.A. in Accounting.

### ***Selected Published Decisions:***

*Bassaw v. United Industries Corp.,* --- F. Supp. 3d ---, 2020 WL 5117916 (S.D.N.Y. Aug. 31, 2020), denying motion to dismiss claims in putative class action concerning insect foggers.

*Poppiti v. United Industries Corp.*, 2020 WL 1433642 (E.D. Mo. Mar. 24, 2020), denying motion to dismiss claims in putative class action concerning citronella candles.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 6699188 (N.D. Ill. Dec. 9, 2019), granting summary judgment on behalf of certified class in robocall class action.

*Krumm v. Kittrich Corp.*, 2019 WL 6876059 (E.D. Mo. Dec. 17, 2019), denying motion to dismiss claims in putative class action concerning mosquito repellent.

*Crespo v. S.C. Johnson & Son, Inc.*, 394 F. Supp. 3d 260 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding Raid insect fogger.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 1294659 (N.D. Ill. Mar. 21, 2019), certifying a class of persons who received robocalls in the state of Illinois.

*Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding mosquito repellent.

*Hart v. BHH, LLC*, 323 F. Supp. 3d 560 (S.D.N.Y. 2018), denying defendants' motion for summary judgment in certified class action involving the sale of ultrasonic pest repellers.

*Hart v. BHH, LLC*, 2018 WL 3471813 (S.D.N.Y. July 19, 2018), denying defendants' motion to exclude plaintiffs' expert in certified class action involving the sale of ultrasonic pest repellers.

*Penrose v. Buffalo Trace Distillery, Inc.*, 2018 WL 2334983 (E.D. Mo. Feb. 5, 2018), denying bourbon producers' motion to dismiss fraud and consumer protection claims in putative class action.

*West v. California Service Bureau*, *Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017), certifying a nationwide class of "wrong-number" robocall recipients.

*Hart v. BHH, LLC*, 2017 WL 2912519 (S.D.N.Y. July 7, 2017), certifying nationwide class of purchasers of ultrasonic pest repellers.

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*Browning v. Unilever United States, Inc.*, 2017 WL 7660643 (C.D. Cal. Apr. 26, 2017), denying motion to dismiss fraud and warranty claims in putative class action concerning facial scrub product.

*Brenner v. Procter & Gamble Co.*, 2016 WL 8192946 (C.D. Cal. Oct. 20, 2016), denying motion to dismiss warranty and consumer protection claims in putative class action concerning baby wipes.

*Hewlett v. Consolidated World Travel, Inc.*, 2016 WL 4466536 (E.D. Cal. Aug. 23, 2016), denying telemarketer's motion to dismiss TCPA claims in putative class action.

*Bailey v. KIND, LLC*, 2016 WL 3456981 (C.D. Cal. June 16, 2016), denying motion to dismiss fraud and warranty claims in putative class action concerning snack bars.

*Hart v. BHH, LLC*, 2016 WL 2642228 (S.D.N.Y. May 5, 2016) denying motion to dismiss warranty and consumer protection claims in putative class action concerning ultrasonic pest repellers.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting clients' motion for judgment as a matter of law on claims for retaliation and defamation in employment action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217 (E.D.N.Y. 2015), denying diet pill manufacturers' motion to dismiss its purchasers' allegations for breach of express warranty in putative class action.

*Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014), denying online job board's motion to dismiss its subscribers' allegations of consumer protection law violations in putative class action.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### ***Selected Class Settlements:***

*Hart v. BHH, LLC*, Case No. 1:15-cv-04804 (S.D.N.Y. Sept. 22, 2020), resolving class action claims regarding ultrasonic pest repellers.

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014), resolving class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

*West v. California Service Bureau*, Case No. 4:16-cv-03124-YGR (N.D. Cal. Jan. 23, 2019), resolving class action claims against debt-collector for wrong-number robocalls for $4.1 million.


## <u>FREDERICK J. KLORCZYK III</u>

Frederick J. Klorczyk III is a Partner with Bursor & Fisher, P.A. Fred focuses his practice on complex business litigation and consumer class actions.

Fred has substantial experience in successfully litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, and privacy violations. In 2019, Fred certified both a California and a 10-state express warranty class on behalf of purchasers of a butter substitute. In 2014, Fred served on the litigation team in *Ebin v. Kangadis Food Inc*. At class certification, Judge Rakoff adopted Fred's choice of law fraud analysis and research directly into his published decision certifying a nationwide fraud class.

Fred is admitted to the State Bars of California, New York, and New Jersey, and is a member of the bars of the United States District Courts for the Northern, Central, Eastern, and Southern Districts of California, the Southern, Eastern, and Northern Districts of New York, the District of New Jersey, the Northern District of Illinois, the Eastern District of Missouri, the Eastern District of Wisconsin, and the Eastern District of Michigan, as well as the bars of the United States Court of Appeals for the Second and Ninth Circuits.

Fred received his Juris Doctor from Brooklyn Law School in 2013, graduating m*agna cum laude* with two CALI Awards for the highest grade in his classes on conflict of laws and criminal law. During law school, Fred served as an Associate Managing Editor for the Brooklyn Journal of Corporate, Financial and Commercial Law and as an intern to the Honorable Alison J. Nathan of the United States District Court for the Southern District of New York and the Honorable Janet Bond Arterton of the United States District Court for the District of Connecticut. In 2010, Fred graduated from the University of Connecticut with a B.S. in Finance.

### *Selected Published Decisions:*

*Revitch v. New Moosejaw, LLC*, 2019 WL 5485330 (N.D. Cal. Oct. 23, 2019), denying defendants' motions to dismiss consumer's allegations of state privacy law violations in putative class action.

*In re Welspun Litigation*, 2019 WL 2174089 (S.D.N.Y. May 20, 2019), denying retailers' and textile manufacturer's motion to dismiss consumers' allegations of false advertising relating to purported "100% Egyptian Cotton" linen products.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (E.D. Cal. Mar. 29, 2019), granting class certification of California false advertising claims and multi-state express warranty claims brought by purchasers of a butter substitute.

*Porter v. NBTY, Inc.*, 2016 WL 6948379 (N.D. Ill. Nov. 28, 2016), denying supplement manufacturer's motion to dismiss consumers' allegations of false advertising relating to whey protein content.

*Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d. 282 (S.D.N.Y. 2015), denying supplement manufacturer's motion to dismiss consumers' allegations of false advertising relating to a homeopathic cold product.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, Case No. 13-4775 (2d Cir. Apr. 15, 2015), denying olive oil manufacturer's Rule 23(f) appeal following grant of nationwide class certification.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### ***Selected Class Settlements:***

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*In Re: Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) –final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – resolved class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

## YEREMEY O. KRIVOSHEY

Yeremey O. Krivoshey is a Partner with Bursor & Fisher, P.A. Mr. Krivoshey focuses his practice on class actions involving false advertising, fraud, illegal fees in consumer contracts, invasion of privacy, and unlawful debt collection practices. He has represented clients in a wide array of civil litigation, including appeals before the Ninth Circuit.

Mr. Krivoshey served as trial counsel with Mr. Bursor in *Perez. v. Rash Curtis & Associates*, where, in May 2019, the jury returned a verdict for a minimum of $267 million in statutory damages under the Telephone Consumer Protection Act.

Mr. Krivoshey is admitted to the State Bar of California. He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, as well as the District of Colorado.

Mr. Krivoshey graduated from New York University School of Law in 2013, where he was a Samuel A. Herzog Scholar. Prior to Bursor & Fisher, P.A., Mr. Krivoshey worked as a Law Clerk at Vladeck, Waldman, Elias & Engelhard, P.C, focusing on employment discrimination and wage and hour disputes. In law school, he has also interned at the American Civil Liberties Union and the United States Department of Justice. In 2010, Mr. Krivoshey graduated *cum laude* from Vanderbilt University.

### Representative Cases:

*Perez v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR (N.D. Cal. May 13, 2019). Mr. Krivoshey litigated claims against a national health-care debt collection agency on behalf of people that received autodialed calls on their cellular telephones without their prior express consent. Mr. Krivoshey successfully obtained nationwide class certification, defeated the defendant's motion for summary judgment, won summary judgment as to the issue of prior express consent and the use of automatic telephone dialing systems, and navigated the case towards trial. With his partner, Scott Bursor, Mr. Krivoshey obtained a jury verdict finding that the defendant violated the Telephone Consumer Protection Act ("TCPA") 534,712 times. Under the TCPA, class members are entitled to a minimum of $500 per each call made in violation of the TCPA – in this case, a minimum of $267 million for 534,712 unlawful calls.

### Selected Published Decisions:

*Bayol v. Zipcar, Inc.*, 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014), denying enforcement of forum selection clause based on public policy grounds.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*Bayol v. Zipcar, Inc.*, 78 F. Supp. 3d 1252 (N.D. Cal. Jan. 29, 2015), denying car-rental company's motion to dismiss its subscriber's allegations of unlawful late fees.

*Brown v. Comcast Corp.*, 2016 WL 9109112 (C.D. Cal. Aug. 12, 2016), denying internet service provider's motion to compel arbitration of claims alleged under the Telephone Consumer Protection Act.

*Choi v. Kimberly-Clark Worldwide, Inc.*, 2019 WL 4894120 (C.D. Cal. Aug. 28, 2019), denying tampon manufacturer's motion to dismiss its customer's design defect claims.

*Horanzy v. Vemma Nutrition Co.*, Case No. 15-cv-298-PHX-JJT (D. Ariz. Apr. 16, 2016), denying multi-level marketer's and its chief scientific officer's motion to dismiss their customer's fraud claims.

*McMillion, et al. v. Rash Curtis & Associates*, 2017 WL 3895764 (N.D. Cal. Sept. 6, 2017), granting nationwide class certification of Telephone Consumer Protection Act claims by persons receiving autodialed and prerecorded calls without consent.

*McMillion, et al. v. Rash Curtis & Associates*, 2018 WL 692105 (N.D. Cal. Feb. 2, 2018), granting plaintiffs' motion for partial summary judgment on Telephone Consumer Protection Act violations in certified class action.

*Perez v. Indian Harbor Ins. Co.*, 2020 WL 2322996 (N.D. Cal. May 11, 2020), denying insurance company's motion to dismiss or stay assigned claims of bad faith and fair dealing arising out of $267 million trial judgment.

*Perez v. Rash Curtis & Associates*, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020), upholding constitutionality of $267 million class trial judgment award.

*Salazar v. Honest Tea, Inc.*, 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015), denying manufacturer's motion for summary judgment as to customer's false advertising claims.

### ***Selected Class Settlements:***

*Juarez-Segura, et al. v. Western Dental Services, Inc.* (Cal. Sup. Ct.) $35 million settlement to resolve claims of dental customers for alleged unlawful late fees.

*Moore v. Kimberly-Clark Worldwide, Inc.* (Ill. Cir. Ct.) $10.5 million settlement to resolve claims of tampon purchasers for alleged defective products.

*Retta v. Millennium Prods., Inc.*, 2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) granting final approval of $8.25 million settlement to resolve claims of kombucha purchasers for alleged false advertising.

*Cortes v. National Credit Adjusters, L.L.C.* (E.D. Cal.) $6.8 million settlement to resolve claims of persons who received alleged autodialed calls without prior consent in violation of the TCPA.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*Bayol et al. v. Health-Ade LLC, et al.* (N.D. Cal.) – granting final approval of $3,997,500 settlement to resolve claims of kombucha purchasers for alleged false advertising.

## PHILIP L. FRAIETTA

Philip L. Fraietta is a Partner with Bursor & Fisher, P.A. Phil focuses his practice on data privacy, complex business litigation, consumer class actions, and employment law disputes. Phil has been named a "Rising Star" in the New York Metro Area by Super Lawyers® every year since 2019.

Phil has significant experience in litigating consumer class actions, particularly those involving data privacy claims under statutes such as the Michigan Preservation of Personal Privacy Act and the Illinois Biometric Information Privacy Act. Since 2016, Phil has recovered over $100 million for class members in data privacy class action settlements. In addition to data privacy claims, Phil has significant experience in litigating and settling class action claims involving false or misleading advertising.

Phil is admitted to the State Bars of New York and New Jersey, the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, the Western District of New York, the Northern District of New York, the District of New Jersey, the Eastern District of Michigan, the Western District of Michigan, the Central District of Illinois, and the United States Court of Appeals for the Second Circuit. Phil was a Summer Associate with Bursor & Fisher prior to joining the firm.

Phil received his Juris Doctor from Fordham University School of Law in 2014, graduating cum laude. During law school, Phil served as an Articles & Notes Editor for the Fordham Law Review, and published two articles. In 2011, Phil graduated cum laude from Fordham University with a B.A. in Economics.

### *Selected Published Decisions:*

*Kolebuck-Utz v. Whitepages Inc.,* 2021 WL 157219 (W.D. Wash. Apr. 22, 2021), denying defendant's motion to dismiss for alleged violations of Ohio's Right to Publicity Law.

*Bergeron v. Rochester Institute of Technology,* 2020 WL 7486682 (W.D.N.Y. Dec. 18, 2020), denying university's motion to dismiss for failure to refund tuition and fees for the Spring 2020 semester in light of the COVID-19 pandemic.

*Porter v. NBTY, Inc.,* 2019 WL 5694312 (N.D. Ill. Nov. 4, 2019), denying supplement manufacturer's motion for summary judgment on consumers' allegations of false advertising relating to whey protein content.

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

*Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579 (S.D.N.Y. 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

### *Selected Class Settlements:*

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Taylor v. Trusted Media Brands, Inc.*, Case No. 16-cv-01812-KMK (S.D.N.Y. 2018) – final approval granted for $8.225 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. American Media, Inc.*, Case No. 16-cv-11367-JEL (E.D. Mich. 2017) – final approval granted for $7.6 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

## SARAH N. WESTCOT

Sarah N. Westcot is a Partner with Bursor & Fisher, P.A.  Ms. Westcot focuses her practice on complex business litigation, consumer class actions, and employment law disputes. She has represented clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Ms. Westcot served as trial counsel in *Ayyad v. Sprint Spectrum L.P.*, where Bursor & Fisher won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

Ms. Westcot also has significant experience in high-profile, multi-district litigations.  She currently serves on the Plaintiffs' Steering Committee in *In re Zantac (Ranitidine) Products Liability Litigation,* MDL No. 2924 (S.D. Florida).

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

Ms. Westcot is admitted to the State Bars of California and Florida, and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California and the Southern and Middle Districts of Florida.

Ms. Westcot received her Juris Doctor from the University of Notre Dame Law School in 2009. During law school, Ms. Westcot was a law clerk with the Cook County State's Attorney's Office in Chicago and the Santa Clara County District Attorney's Office in San Jose, CA. She graduated with honors from the University of Florida in 2005.

### ALEC M. LESLIE

Alec Leslie is an Associate with Bursor & Fisher, P.A. He focuses his practice on consumer class actions, employment law disputes, and complex business litigation.

Alec is admitted to the State Bar of New York and is a member of the bar of the United States District Courts for the Southern and Eastern Districts of New York. Alec was a Summer Associate with Bursor & Fisher prior to joining the firm.

Alec received his Juris Doctor from Brooklyn Law School in 2016, graduating *cum laude*. During law school, Alec served as an Articles Editor for Brooklyn Law Review. In addition, Alec served as an intern to the Honorable James C. Francis for the Southern District of New York and the Honorable Vincent Del Giudice, Supreme Court, Kings County. Alec graduated from the University of Colorado with a B.A. in Philosophy in 2012.

### ANDREW OBERGFELL

Andrew Obergfell is an Associate with Bursor & Fisher, P.A. Andrew focuses his practice on complex civil litigation and class actions.

Andrew graduated from Drew University with *summa cum laude* distinction. While at Drew University, Andrew was captain of the varsity baseball team. Andrew was inducted into the Phi Beta Kappa honor society and was President of the college's chapter of the Pi Sigma Alpha political science honor society.

Andrew attended Seton Hall University School of Law, where he obtained his law degree with *magna cum laude* distinction, and was inducted into the prestigious Order of the Coif honor society. While in law school, Andrew was an editor and published author for the Seton Hall Law Review, participated in the Impact Litigation Clinic, and was a member of the Interscholastic Moot Court Board. As part of the Interscholastic Moot Court Board, Andrew received the national best-brief award in the 2015 ABA National Appellate Advocacy Competition, as well as the 2015 best student-written brief of the year award as recognized by Scribes, the American Society of Legal Writers.

Prior to joining the firm, Andrew practiced at an AmLaw 100 law firm. He also clerked for The Honorable Douglas M. Fasciale in the New Jersey Superior Court, Appellate Division, in Newark, New Jersey.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

### STEPHEN BECK

Stephen is an Associate with Bursor & Fisher, P.A. Stephen focuses his practice on complex civil litigation and class actions.

Stephen is admitted to the State Bar of Florida and is a member of the bars of the United States District Courts for the Southern and Middle Districts of Florida.

Stephen received his Juris Doctor from the University of Miami School of Law in 2018. During law school, Stephen received an Honors distinction in the Litigation Skills Program and was awarded the Honorable Theodore Klein Memorial Scholarship for excellence in written and oral advocacy. Stephen also received the CALI Award in Legislation for earning the highest grade on the final examination. Stephen graduated from the University of North Florida with a B.A. in Philosophy in 2015.

### BRITTANY SCOTT

Brittany Scott is an Associate with Bursor & Fisher, P.A. Brittany focuses her practice on complex civil litigation and class actions. Brittany was an intern with Bursor & Fisher prior to joining the firm.

She is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, the Eastern District of Wisconsin, and the Northern District of Illinois.

Brittany received her Juris Doctor from the University of California, Hastings College of the Law in 2019, graduating *cum laude.* During law school, Brittany was a member of the Constitutional Law Quarterly, for which she was the Executive Notes Editor. Brittany published a note in the Constitutional Law Quarterly entitled "Waiving Goodbye to First Amendment Protections: First Amendment Waiver by Contract." Brittany also served as a judicial extern to the Honorable Andrew Y.S. Cheng for the San Francisco Superior Court. In 2016, Brittany graduated from the University of California Berkeley with a B.A. in Political Science.

### MAX ROBERTS

Max Roberts is an Associate with Bursor & Fisher, P.A. Max focuses his practice on complex civil litigation and class actions. Max was a Summer Associate with Bursor & Fisher prior to joining the firm.

Max is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Northern, Southern, and Eastern Districts of New York.

Max received his Juris Doctor from Fordham University School of Law in 2019, graduating *cum laude.* During law school, Max was a member of Fordham's Moot Court Board, the Brennan Moore Trial Advocates, and the Fordham Urban Law Journal, for which he published a note entitled *Weaning Drug Manufacturers Off Their Painkiller: Creating an Exception to the Learned Intermediary Doctrine in Light of the Opioid Crisis*. In addition, Max

BURSOR&FISHER
P.A.

FILED DATE: 8/9/2021 12:00 AM    2021CH03460

served as an intern to the Honorable Vincent L. Briccetti of the Southern District of New York and the Fordham Criminal Defense Clinic. Max graduated from Johns Hopkins University in 2015 with a B.A. in Political Science.

Outside of the law, Max is an avid triathlete.

### CHRISTOPHER R. REILLY

Chris Reilly is an Associate with Bursor & Fisher, P.A. Chris focuses his practice on consumer class actions and complex business litigation.

Chris is admitted to the State Bar of Florida and is a member of the bar of the United States District Courts for the Southern and Middle Districts of Florida.

Chris received his Juris Doctor from Georgetown University Law Center in 2020. During law school, Chris clerked for the Senate Judiciary Committee, where he worked on antitrust and food and drug law matters under Senator Richard Blumenthal. He has also clerked for the Mecklenburg County District Attorney's Office, the ACLU Prison Project, and the Pennsylvania General Counsel's Office. Chris served as Senior Editor of Georgetown's Journal of Law and Public Policy. In 2017, Chris graduated from the University of Florida with a B.A. in Political Science.

### RACHEL MILLER

Rachel Miller is an Associate with Bursor & Fisher, P.A. Rachel focuses her practice on complex civil litigation and class actions.

Rachel is admitted to the State Bar of Florida and is a member of the bar of the United States District Court for the Southern District of Florida.

Rachel received her Juris Doctor from the University of Chicago Law School in 2015. During law school, Rachel participated in the Criminal & Juvenile Justice Clinic and received the 2014 Public Interest Law Society Award for Public Service. Rachel graduated *cum laude* from the University of Florida in 2012 with a B.A. in Political Science.

### JULIA VENDITTI

Julia Venditti is an Associate with Bursor & Fisher, P.A. Julia focuses her practice on complex civil litigation and class actions. Julia was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julia is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern and Southern Districts of California.

Julia received her Juris Doctor in 2020 from the University of California, Hastings College of the Law, where she graduated *cum laude* with two CALI Awards for the highest grade in her Evidence and California Community Property classes. During law school, Julia was

a member of the UC Hastings Moot Court team and competed at the Evans Constitutional Law Moot Court Competition, where she finished as a national quarterfinalist and received a best brief award. Julia was also inducted into the UC Hastings Honors Society and was awarded Best Brief and an Honorable Mention for Best Oral Argument in her First-Year Moot Court section. In addition, Julia served as a Research Assistant for her Constitutional Law professor, as a Teaching Assistant for Legal Writing & Research, and as a Law Clerk at the San Francisco Public Defender's Office. In 2017, Julia graduated *magna cum laude* from Baruch College/CUNY, Weissman School of Arts and Sciences, with a B.A. in Political Science.

## SEAN L. LITTERAL

Sean L. Litteral is an Associate with Bursor & Fisher, P.A. Sean focuses his practice on complex business litigation, consumer class actions, and employment law disputes. He holds degrees from Berea College, the London School of Economics and Political Science, and Berkeley Law.

Sean has represented clients in a variety of matters, including survivors against the Boy Scouts of America for covering up decades of sexual abuse; warehouse workers against Walmart for failing to comply with COVID-19 health and safety guidelines; and drivers against Corinthian International Parking Services for systematically violating California's wage and hour laws.

Sean clerked for the Alaska Supreme Court and served as a fellow for the U.S. House Committee on Education and Labor and the Atlanta City Council. He previously externed for the Special Litigation Section, Civil Rights Division of the U.S. Department of Justice; the Berkeley Environmental Law Clinic; and the Corporate Sustainability Program at the Pontificia Universidad Católica de Chile.

He has published in the UC Davis Environmental Law & Policy Journal, the Harvard Latinx Law Review, and the Stanford Law and Policy Review on a broad scope of matters, including corporate sustainability, international trade, and national security.

## JULIAN DIAMOND

Julian Diamond is a Law Clerk with Bursor & Fisher, P.A. Julian focuses his practice on privacy law and class actions. Julian was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julian received his Juris Doctor from Columbia Law School in 2020, where he was a Harlan Fiske Stone Scholar. During law school, Julian was Articles Editor for the Columbia Journal of Environmental Law. Prior to law school, Julian worked in education. Julian graduated from California State University, Fullerton with a B.A. in History and a single subject social science teaching credential.

FILED DATE: 8/9/2021 12:00 AM   2021CH03460

## MATT GIRARDI

Matt Girardi is an Associate with Bursor & Fisher, P.A. Matt focuses his practice on complex civil litigation and class actions. Matt was a Summer Associate with Bursor & Fisher prior to joining the firm.

Matt received his Juris Doctor from Columbia Law School in 2020, where he was a Harlan Fiske Stone Scholar. During law school, Matt was the Commentary Editor for the Columbia Journal of Tax Law, and worked for fledgling businesses with Columbia's Entrepreneurship and Community Development Clinic. In addition, Matt worked as an Honors Intern in the Division of Enforcement at the U.S. Securities and Exchange Commission. Prior to law school, Matt graduated from Brown University in 2016 with a B.A. in Economics, and worked as a Paralegal Specialist at the U.S. Department of Justice in the Antitrust Division.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILED
8/13/2021 2:05 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03460

14431591

Ebony Jones, et al.

Plaintiff(s)

Case No.: 2021CH03460

*vs.*

Lemonade Inc.

Defendant

## **AFFIDAVIT OF SERVICE**

I, Dominic DellaPorte, a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Alias Summons, Civil Action Cover Sheet - Case Initiation, Plaintiffs' Motion for Class Certification, and Class Action Complaint in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 07/28/2021 at 3:13 PM, I served Lemonade Inc. c/o Daniel Schreiber, Chief Executive Officer at 5 Crosby Street, 3rd Floor, New York, New York 10013 with the Alias Summons, Civil Action Cover Sheet - Case Initiation, Plaintiffs' Motion for Class Certification, and Class Action Complaint by serving Dali Solis, Office Administrator, authorized to accept service.

Dali Solis is described herein as:

Gender: Female    Race/Skin: Black    Age: 26    Weight: 140    Height: 5'5"    Hair: Brown    Glasses: No

I declare under penalty of perjury that this information is true and correct.

Sworn to before me on 8/5/21

Notary Public
My Commission Expires:

Dominic DellaPorte

Client Ref Number: 2006-36
Job #: 1592132

EVAN COHAN
NOTARY PUBLIC & ATTORNEY AT LAW OF NY
NO. 02CO4998577
QUALIFIED IN ROCKLAND COUNTY
CERTIFICATE FILED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 29, 2022

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

FILED DATE: 8/13/2021 2:05 PM    2021CH03460

FILED DATE: 8/13/2021 2:05 PM 2021CH03460
FILED DATE: 7/27/2021 12:15 PM 2021CH03460

FILED
7/27/2021 12:15 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03460

14197322

2120 - Served                      2121 - Served                    2620 - Sec. of State
2220 - Not Served                  2221 - Not Served                2621 - Alias Sec of State
2320 - Served By Mail              2321 - Served By Mail
2420 - Served By Publication       2421 - Served By Publication
Summons - Alias Summons                                             (03/15/21) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

EBONY JONES and MARLA WALKER,
individually and on behalf of all others similarly
situated,

Plaintiff(s)

v.                                                   Case No. _____2021CH03460_____

LEMONADE INC.,

Defendant(s)

5 Crosby Street, 3rd Floor
New York, NY 10013

Address of Defendant(s)

Please serve as follows (check one):  ◯ Certified Mail   ◯ Sheriff Service   ⦿ Alias

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court,
within 30 days after service of this summons, not counting the day of service. If you fail to do so, a
judgment by default may be entered against you for the relief asked in the complaint.

### THERE IS A FEE TO FILE YOUR APPEARANCE.

**FILING AN APPEARANCE:** **Your appearance date is NOT a court date.** It is the deadline
for filing your appearance/answer. To file your appearance/answer **YOU DO NOT NEED
TO COME TO THE COURTHOUSE, unless you are unable to eFile your appearance/
answer.** You can download an Appearance form at http://www.illinoiscourts.gov/Forms/
approved/procedures/appearance.asp. After completing and saving your Appearance form, you can
electronically file (e-File) it with the circuit clerk's office.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

Summons - Alias Summons                                           **(03/15/21) CCG 0001 B**

FILED DATE: 8/13/2021 2:05 PM 2021CH03460
FILED DATE: 7/27/2021 12:15 PM 2021CH03460

**E-FILING:** E-filing is now mandatory with limited exemptions. To e-File, you must first create an account with an e-Filing service provider. Visit http://efile.illinoiscourts.gov/ service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-Filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

**FEE WAIVER:** If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www.illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

**COURT DATE:** Your court date will be sent to your e-File email account or the email address you provided to the clerk's office. You can also call or email the clerk's office to request your next court date. You will need to provide your case number OR, if unknown, the name of the Plaintiff or Defendant. For criminal case types, you will also need to provide the Defendant's birthdate.

**REMOTE APPEARANCE:** You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance". Call the Circuit Clerk at (312) 603-5030 or visit their website at www. cookcountyclerkofcourt.org to find out how to do this.

Contact information for each of the Clerk's Office locations is included with this summons. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

Cook County Code: 64550

○ Atty. No.: 6303726

○ Pro Se 99500

Name: Gary M. Klinger

Atty. for (if applicable):

Plaintiffs Ebony Jones and Marla Walker, *et al.*

Address: 227 W. Monroe Street, Suite 2100

City: Chicago

State: IL    Zip: 60606

Telephone: (202) 429-2290

Primary Email: gklinger@masonllp.com

7/27/2021 12:15 PM IRIS Y. MARTINEZ

Witness date _____

_____

Iris Y. Martinez, Clerk of Court

☐ Service by Certified Mail

☐ Date of Service: _____

(To be inserted by officer on copy left with employer or other person)

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**



IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

EBONY JONES and MARLA WALKER,  )
individually and on behalf of         )
himself and all others similarly situated,  )     Case No. 2021 CH 03460
                            )
        Plaintiff,       )     Judge Anna M. Loftus
                            )
      v.             )     Calendar 15
                            )
LEMONADE, INC.,          )
                            )
        Defendant.     )

## <u>ORDER</u>

This matter comes before the Court on Plaintiffs' Motion for leave to file First Amended

Complaint and for the appointment of interim class counsel. The Court, having considered the

motion, HEREBY ORDERS:

1) Plaintiffs' Motion is **GRANTED**, and Plaintiffs are given leave to file their First Amended

    Complaint on or before August 27, 2021;

2) On or before August 27, 2021, Plaintiffs in the related actions, *Citchens v. Lemonade Inc.*,

    No. 2021CH03578; *Swerdlow v. Lemonade Insurance Agency, LLC*, 2021CH03583; and

    *Clarke v. Lemonade Inc.*, 2021CH03593 will voluntarily dismiss their individual cases and

    proceed as Plaintiffs in this action;

3) Plaintiffs' Motion to Appoint Interim Class Counsel is **GRANTED,** and Gary Klinger of

    Mason Lietz & Klinger LLP, Katrina Carroll of Carlson Lynch, LLP and Joseph

    Guglielmo of Scott + Scott Attorneys at Law LLP are appointed Interim Co-Lead

    Counsel; and Frederick Klorczyk of Bursor & Fisher PA and Jonathan Jagher of Freed

    Kanner London & Millen LLC are appointed to the Plaintiffs' Executive Committee.

    Interim Co-Lead Counsel, in consultation with the Plaintiffs' Executive Committee, shall

have the sole responsibility for and authority over the following matters on behalf of all Plaintiffs in this action:

    a.   to determine and present (in briefs, oral argument, or such other fashion as may be appropriate, personally or by a designee) to the Court and opposing parties the position of Plaintiffs and putative class members on all matters arising during pretrial proceedings;

    b.   to coordinate the initiation and conduct of discovery on behalf of Plaintiffs and putative class members, including the preparation of joint interrogatories and requests for the production of documents and the examination of witnesses in depositions;

    c.   to conduct settlement negotiations on behalf of Plaintiffs and putative class members and, where appropriate, to present any proposed settlements to the Court on behalf of putative class members;

    d.   to delegate specific tasks to other counsel or committees of counsel, as authorized by the Court, in a manner designed to ensure that pretrial preparation for Plaintiffs and the putative class is conducted efficiently and effectively;

    e.   to enter into stipulations with opposing counsel as necessary for the efficient conduct of the litigation;

    f.   to maintain adequate time and disbursement records covering services as Interim Class Counsel;

g. to monitor the activities of any other law firms that might seek to represent putative class members to ensure that schedules are met and unnecessary expenditures of time and funds are avoided; and

h. to perform such other duties as may be incidental to the proper prosecution and coordination of pretrial activities on behalf of Plaintiffs and the putative class or authorized by further order of this Court.

4) The previously set case management conference set for **November 15, 2021 at 10:00 a.m.** stands, to occur via Zoom teleconference.

ENTERED
Judge Anna M. Loftus
AUG 16 2021
Circuit Court - 2102

/s/ *Anna M. Loftus*
Judge Anna M. Loftus, No. 2102

Dated: August 16, 2021

SUBMITTED BY:

Gary M. Klinger
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (202) 429-2290
Fax: (202) 429-2294
E-Mail: gklinger@masonllp.com
Firm ID: 64550

3