**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE LEMONADE BIOMETRIC LITIGATION**<br><br>This Document Relates To: | Master File No. 1:21-cv-04513<br><br><br>Consolidated with: No. 1:21-cv-04525<br>No. 1:21-cv-04517<br>No. 1:21-cv-04522 |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Alexander Clarke, Milton Citchens, Andrew Garcia, Ebony Jones, Kyle Swerdlow, Marla Walker, and Ryann Webb ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint against Defendants Lemonade, Inc., Lemonade Ltd., Lemonade Insurance Company, Lemonade Insurance Agency, LLC, and Lemonade Life Insurance Agency, LLC.[1] Plaintiffs make the following allegations upon information and belief (except as to allegations as to Plaintiffs, which are based on personal knowledge), based upon an investigation that is reasonable under the circumstances, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## NATURE OF THE ACTION

1.     Plaintiffs bring this action for damages and other legal and equitable remedies resulting from the illegal actions of Lemonade, Inc. and Lemonade Ltd. in collecting, storing, and

---

[1] Lemonade Insurance Company, Lemonade Insurance Agency, LLC, and Lemonade Life Insurance Agency, LLC are collectively referred to as "Lemonade Insurance." All Defendants are sometimes referred to collectively as "Lemonade" or "Defendants."

using Plaintiffs' and other similarly situated individuals' biometric identifiers[2] and biometric information[3] (referred to collectively as "biometrics") without obtaining informed written consent or providing the data retention and destruction policies to consumers. Plaintiffs also bring this action for damages and other legal and equitable remedies against all Defendants resulting from their unfair and deceptive collection, storage, and use of biometric information without Plaintiffs' and the Class's knowledge and consent in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the California Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et seq.*, other state consumer protection statutes, and other common-law provisions.

2. Biometrics are particularly sensitive personal information. As the Illinois Legislature has found, "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." *Id.*

3. In recognition of these concerns over the security of individuals' biometrics, the Illinois Legislature enacted BIPA, which provides, *inter alia*, that a private entity may not obtain and/or possess an individual's biometrics unless it: (1) informs that person (or their representative) in writing that a biometric identifier or biometric information is being collected or stored, *id.* 14/15(b)(1); (2) informs that person in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used, *id.* 14/15(b)(2);

---

[2] "'Biometric identifier' means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10.
[3] "'Biometric information' means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.*

(3) receives a written release from the person (or their representative) for the collection of his or her biometric identifier or information, *id*. 14/15(b)(3); and (4) publishes publicly available written retention schedules and guidelines for permanently destroying biometric identifiers and biometric information, *id.* 740 ILCS 14/15(a). Further, the entity must store, transmit, and protect from disclosure all biometric identifiers and biometric information using the same standard of care in the industry and in a manner at least as protective as the means used to protect other confidential and sensitive information. *Id.* 14/15(e). Finally, no private entity may sell, lease, trade, or otherwise profit from a person's or customer's biometrics. *Id.* 14/15(c).

4.      In direct violation of each of the foregoing provisions of § 15(a) and § 15(b) of BIPA, Defendants Lemonade, Inc. and Lemonade Ltd. are actively collecting, storing, and using—without providing notice, obtaining informed written consent, or publishing data retention policies—the biometrics of thousands of Illinois residents who have submitted insurance claims to Lemonade Insurance.

5.      Additionally, Defendants Lemonade, Inc. and Lemonade, Ltd.'s collection, storage and use of biometric information without Plaintiffs' and the Class's knowledge and consent constitutes unfair and deceptive acts and practices in violation of the Illinois Consumer Fraud and Deceptive Businesses Practices Act, 805 ILCS 505/1, *et seq*., the California Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et seq.*, and other state consumer protection statutes.

6.      Lemonade, Inc. is a Delaware holding company with operating subsidiaries based in New York. The company uses artificial intelligence and behavioral economics to process insurance claims from its subsidiaries, Lemonade Insurance, which offer homeowners, renters, and pet insurance in the United States. According to Lemonade's securities filing, customers seeking renters or homeowners' insurance can have a two-minute chat with its bot, AI Maya,

while claims can be filed by chatting with another bot, AI Jim, which pays claims in as little as

***three seconds.*** [4]

7.      Lemonade states that its mission is to harness technology and social impact to be the world's most loved insurance company. It further represents that its data architecture melds artificial intelligence with the humankind and learns from the prodigious data it generates to become ever better at delighting customers and quantifying risk.[5]

8.      Lemonade Insurance touts its fast processing of claims through the use of artificial intelligence.

9.      Lemonade Insurance requires consumers submitting insurance claims to send them a video via their digital application explaining the basis for their claim.[6]



[4] Chen, I-Chun, *Lemonade, insurer that uses bots to replace brokers, plans $286M IPO*, Am. Cty. Bus. Js. (June 25, 2020), https://www.bizjournals.com/newyork/news/2020/06/25/lemonade-insurer-that-uses-bots-plans-ipo.html.
[5] *Id.*
[6] Lemonade Inc., *The Secret Behind Lemonade's Claims*, https://www.lemonade.com/claims; *see also* Lemonade Inc., *Form S-1* (June 25, 2020), https://www.sec.gov/Archives/edgar/data/1691421/000104746920003846/a2241899zs-1a.htm ("We also ask the customer to record a video explaining their claims to enhance the claims review process. After the customer completes a claim report on our mobile app, the customer is asked to enter bank account wire information. If the

10.     Insureds are required to keep their face in a designated frame while submitting their

claims so that their facial geometry is in frame:





---

claim is approved, a payment is issued and deposited directly into the customer's account. Claims are commonly paid and declined through our claims-bot, AI Jim, within seconds.").

11.     Lemonade captures and collects users' biometric information through this video collection process. Recently, Lemonade admitted that it collects and analyzes users' information, including video information that Lemonade claims to utilize in connection with its claims handling process. In now-deleted tweets and blog posts, Lemonade represented, among other things, that its AI analyzes the videos that users submit when they file insurance claims for signs of fraud, picking up "non-verbal cues that traditional insurers can't, since they don't use a digital claims process."



12. Lemonade then inputs the "predictive data" gathered from consumers to feed its "machine learn[ing]" process.



13. In response to the tweets and blog posts, Lemonade issued the following statement on its website:

> ***We have never, and will never, let AI auto-reject claims.*** Here's why: We do not believe that it is possible, nor is it ethical (or legal), to deduce anything about a person's character, quality, or fraudulent intentions based on facial features, accents, emotions, skin-tone, or any other personal attribute.[7]

14. Notably, Lemonade did not deny its collection and use of biometric information for its artificial intelligence; in fact, it is a source of pride for the company. Lemonade merely states that artificial intelligence is not involved in the auto-rejection of claims.

---

[7] Lemonade Inc., *Lemonade's Claim Automation*, https://www.lemonade.com/blog/lemonades-claim-automation/ (last visited July 15, 2021).

15.     In processing claims, Lemonade, Inc. and Lemonade, Ltd. capture, upload, store, and disseminate app users' facial geometry and related biometrics without complying with BIPA's requirements.

16.     If Lemonade's database of app users' biometrics were to fall into the wrong hands, by data breach or otherwise, these consumers could have their identities or financial and other highly personal information stolen and used for nefarious purposes.

17.     BIPA confers on Plaintiffs and all other similarly situated Illinois residents a right to know of such risks inherent to the collection and storage of biometrics, and a right to know how long such risks will persist after their use of the mobile application.

18.     Moreover, the collection of this biometric data violates certain statutory and common law rights of consumers.

19.     For example, California Constitution Article I, Section 1 provides a right to privacy, which includes the nondisclosure and use of their person and biometric information. The Illinois Constitution states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California law protects certain invasions of privacy, including the public disclosure of private facts. This duty has been recognized by California courts, through incorporation of the *Restatement of the Law of Torts (Second)* § 652A which specifically recognized four common law invasion of privacy claims, which include: (1) publicity placing a person in a false light; (2) publicity given to private facts; (3) misappropriation of the name or likeness of another; and (4) intrusion upon the seclusion of another. *See Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 214, 955 P.2d 469, 477 (1998).

20.     Defendants failed to comply with their duties under Illinois and California law, as well as other state consumer protection statutes. Lemonade, Inc. and Lemonade, Ltd. never

adequately informed any of its app users of its biometrics collection practices, never obtained written consent from any of its app users regarding its biometric practices, and never provided any data retention or destruction policies to any of its app users. Moreover, Defendants invaded Plaintiffs' and the Class's privacy and engaged in unfair and deceptive acts and practices through the unauthorized collection, retention, and use of Plaintiffs' biometric information.

21.    Plaintiffs bring this action to prevent Defendants from further violating the privacy rights of United States residents.

22.    Plaintiffs also bring this action to recover statutory damages for Defendants' unauthorized collection, storage, and use of these individuals' biometrics.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the proposed class consists of over 100 members; (2) the parties are minimally diverse, as members of the class of plaintiffs are citizens of a state different from a defendant; and (3) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

24.    This Court has personal jurisdiction over Defendants because Lemonade used and disseminated data derived directly from Illinois-based users, including Plaintiffs, and exposed residents of Illinois to ongoing privacy risks within Illinois based on the collection, capture, obtainment, disclosure, redisclosure, and dissemination of their biometric identifiers and information. Furthermore, many of the images Defendants used for their unlawful collection, capture, and obtainment of biometric identifiers and information were created in Illinois, uploaded from Illinois, and/or managed via Illinois-based user accounts, computers, and mobile devices. Because of the scope and magnitude of Defendants' conduct, Defendants knew that their collection, capture, obtainment, disclosure, redisclosure, and dissemination of impacted

individuals' biometric identifiers and information would injure Illinois residents and citizens. Defendants knew or had reason to know that collecting, storing, using, disclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite consent would deprive Illinois citizens and residents of their statutorily protected privacy rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via the devices they managed from Illinois, and expose Illinois residents to potential surveillance and other privacy harms as they went about their lives within the State.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims occurred here.

## PARTIES

26.     Plaintiff Alexander Clarke is a citizen and resident of Illinois. Plaintiff Clarke obtained pet and renters insurance through Lemonade, and submitted a video that included his biometric information to Lemonade in support of his claim for losses under his renters' insurance policy.

27.     Plaintiff Milton Citchens is a citizen and resident of Illinois. Plaintiff Citchens has renters' insurance through Lemonade, and submitted a video that included his biometric information to Lemonade in support of his claim for losses under his renters' insurance policy.

28.     Plaintiff Andrew Garcia is a citizen and resident of California. Plaintiff Garcia obtained renters' insurance through Lemonade, and submitted a video that included his biometric information to Lemonade in support of his claim for losses under his renters' insurance policy.

29.     Plaintiff Ebony Jones is a citizen and resident of Illinois. Plaintiff Jones has renters' insurance through Lemonade, and submitted a video that included her biometric information to Lemonade in support of her claim for losses under her renters' insurance policy.

30.     Plaintiff Kyle Swerdlow is a citizen and resident of Illinois. Plaintiff Swerdlow obtained renters' insurance through Lemonade, and submitted a video that included his biometric information to Lemonade in support of his claim for losses under his renters' insurance policy.

31.     Plaintiff Marla Walker is a citizen and resident of Illinois. Plaintiff Walker has renters' insurance through Lemonade, and submitted a video that included her biometric information to Lemonade in support of her claim for losses under her renters' insurance policy.

32.     Plaintiff Ryan Webb is a citizen and resident of California. Plaintiff Webb obtained renters' insurance through Lemonade, and submitted a video that included his biometric information to Lemonade in support of his claim for losses under his renters' insurance policy.

33.     Defendant Lemonade, Inc. is a Delaware public-benefit corporation. Lemonade, Inc. is a holding company incorporated in the State of Delaware and has its principal place of business in New York, New York. Lemonade, Inc. is a public company traded under the ticker symbol LMND. Lemonade, Inc. is not licensed to sell insurance and does not insure anyone.

34.     Lemonade Ltd. is Lemonade, Inc.'s wholly owned subsidiary and a company organized under the laws of Israel. According to Lemonade's Annual Report filed on SEC Form 10-K, Lemonade Ltd. provides "technology, research and development, management, marketing, and other services to the companies in the group." Upon information and belief, Lemonade Ltd. provides the technology, services, and systems used to collect, store, analyze, and transfer users' biometric information.

35.     Lemonade Insurance Company is Lemonade, Inc.'s wholly owned subsidiary and an insurance corporation organized under the laws of New York. According to Lemonade's

11

Annual Report filed on SEC Form 10-K,[8] Lemonade Insurance Company "issues insurance policies and pays claims."

36.     Lemonade Insurance Agency, LLC is Lemonade Inc.'s wholly owned subsidiary and a limited liability company licensed as an insurance agent under the laws of New York. According to Lemonade's Annual Report filed on SEC Form 10-K, Lemonade Insurance Agency LLC "acts as the distribution and marketing agent for Lemonade Insurance Company and provides certain underwriting and claims services, and receives a fixed percentage of premiums for doing so."[9]

37.     Lemonade Life Insurance Agency, LLC is Lemonade, Inc.'s wholly owned subsidiary and a limited liability company organized under Delaware law. According to Lemonade's Annual Report filed on SEC Form 10-K, Lemonade Life Insurance Agency, LLC "acts as the distribution and marketing agent for the sale and servicing of life insurance products."[10]

**FACTUAL ALLEGATIONS**

**I.     LEMONADE COLLECTS, STORES, AND USES INSUREDS' PROTECTED BIOMETRIC INFORMATION AND IDENTIFIERS**

38.     Defendant Lemonade, Inc. is a fast-growing, publicly traded company that prides itself on its subsidiaries' pioneering use of artificial intelligence ("AI") and other technologies to intake and to process insurance claims.[11]

39.     Based in and originally launched in New York, Lemonade Inc.'s subsidiaries,

---

[8] Lemonade Inc., *Annual Report (Form 10-K)* (Mar. 8, 2021), https://investor.lemonade.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=14783024.
[9] *Id.*
[10] *Id.*
[11] *See* Sara Morrison, *A disturbing, viral Twitter thread reveals how AI-powered insurance can go wrong*, Vox (May 27, 2021, 1:30 PM), https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter (last visited July 15, 2021).

Lemonade Insurance, use an AI-powered app that offers homeowners, renters, pet, and life insurance policies.

40.    Lemonade Inc.'s subsidiaries, Lemonade Insurance, began writing policies in the State of Illinois in or about April of 2017.

41.    By the end of 2020, Lemonade Inc.'s subsidiaries, Lemonade Insurance, had in excess of 1,000,000 customers in the United States, and its Chief Operating Officer boasted:

> With every new customer, our system grows smarter, our underwriting process gets better, and our prices become more accurate and fair. **At Lemonade, one million customers translates into billions of data points, which feed our AI at an ever growing speed. Quantity generates quality.**[12]

42.    One of the ways that Lemonade is able to collect so much of its customers' biometric and other information is by using its App to collect and to maintain vast troves of customer information, including biometric information.

43.    Lemonade, in its online Privacy Policy, specifically disclaims collecting user's biometric information.[13] This claim is belied by Lemonade's actual practices, as well as other public statements.

44.    Lemonade Insurance is unique in the insurance industry in that its customers (its policy holders) are required, in connection with their claims submission, to upload a video message describing what happened and the facts upon which their claim is based.[14]

45.    Notably, the video is <u>not</u> essential or even necessary to the claim submission, which is completed via a "chat-bot" in the App. Rather, Lemonade Insurance requires its customers to

---

[12] *See* Lisa Horton, *Lemonade Ends 2020 With Over One Million Active Customers*, Business Wire (Dec. 31, 2020, 8:46 AM), https://finance.yahoo.com/news/lemonade-ends-2020-over-one-13460 0018.html (last visited July 15, 2021) (emphasis added).
[13] *See* Lemonade Inc., *Lemonade's Data Privacy Pledge* (Jan. 27, 2021), lemonade.com/privacy-policy (last accessed Aug. 24, 2021).
[14] *See* Frank McKenna, *Lemonade Under Fire For Using AI To Stop Fraud* (May 27, 2021), https://frankonfraud.com/fraud-trends/lemonade-under-fire-for-using-ai-to-stop-insurance-fraud/. (last visited July 15, 2021).

provide a video of themselves through the App in order to acquire thousands and thousands of "bits" of data so that it can then decide whether to honor a given claim and how to price its insurance products.

46.     Lest there be any doubt about its intentions, Lemonade itself made them quite clear when it issued a series of tweets containing a proud declaration that its AI analyzes videos of customers when determining if their claims are fraudulent.[15]

47.     Lemonade announced that its customer service chatbots collect as many as 1,600 data points from a single video of a customer answering questions regarding their claim:



48.     Lemonade's twitter thread "implied that [it] was able to detect whether a person was lying in their video and could thus decline insurance claims if its AI believed a person was lying."[16]

49.     Lemonade has boasted that it collects "100X more data than traditional insurance carriers."[17]

---

[15] *See A disturbing, viral Twitter thread*, Vox, *supra* note 11.
[16] *Lemonade Under Fire For Using AI To Stop Fraud*, *supra* note 14.
[17] *See A disturbing, viral Twitter thread*, Vox, *supra* note 11.

50.     Later that week, Lemonade clarified its controversial tweet, explaining that "[t]he term, non-verbal cues was a bad choice of words to describe **the facial recognition technology we're using** to flag claims submitted by the same person under different identities. These flagged claims then get reviewed by our human investigators."[18]

51.     Thus, Lemonade confirmed that it uses *facial recognition technology to collect reams of data, including biometric data like face geometry, from its customers, including those in the State of Illinois*.

52.     In a post authored by its Chief Executive Officer and shared on its blog, Lemonade stated:

> It's different for companies built on a digital substrate. Lemonade's chatbots do away with forms altogether, making the process fast and fun, but the data implications are still more profound:
>
> *Lemonade collects about 100x more data-points per customer.*
>
> That's the power of an entirely digital experience.[19]

53.     Indeed, as a recent article detailing Lemonade's questionable uses of AI explains, "[t]he in-depth collection of video data and analyzing it against AI tools **make it clear that Lemonade must be storing at least some biometric data** in order to train models to detect patterns of fraud."[20]

54.     Or, put another way, Lemonade is an insurance company that claims it is replacing human brokers and actuaries with bots and AI in order to streamline the insurance claim process. In the process, however, Lemonade collects tremendous amounts of data, including biometric

---

[18] *Lemonade's Claim Automation*, *supra* note 7 (emphasis added).
[19] Daniel Schreiber, *Precision Underwriting*, Lemonade Inc., https://www.lemonade.com/blog/precision-underwriting/ (last visited July 15, 2021) (emphasis in original).
[20] *Lemonade Under Fire For Using AI To Stop Fraud*, *supra* note 14.

information, about its customers without telling them in direct violation of BIPA.[21]

55.    For instance, an article published in *Forbes* detailed a situation where Lemonade used facial recognition technology to compare various claims submitted by customers in order to root out fraud:

> In the summer of 2017, a Los Angeles man in his mid-20s put on a necklace, blond wig and makeup and made a cellphone video describing how his camera and other electronics had been stolen. He submitted the video to his renters insurance provider, Lemonade, which paid the $677 claim in two days. Three months later, dressed in jeans and a T-shirt and using a different name, email address and phone number, the same man submitted a video claim for a stolen $5,000 camera. But this time, the algorithms that are a crucial part of Lemonade's highly automated systems flagged the claim as suspicious. Last year, the persistent fraudster, this time wearing a pink dress, tried again, only to be foiled once more by Lemonade's computers.[22]

56.    Lemonade used its AI, including facial recognition technology, to determine that the claimants in the above scenario were the same person by collecting, storing and using the immutable biometric information and identifiers of its customers.[23]

57.    Lemonade also confirms that it shares customer data outside of its affiliated group. In its most recent Form 10-K filed with the SEC, Lemonade acknowledges:

> ***We collect, process, store, share, disclose and use customer information and other data, and our actual or perceived failure to protect such information and data, respect customers' privacy or comply with data privacy and security laws and regulations could damage our reputation and brand and harm our business and operating results.***[24]

58.    In its S-1 form filed with the SEC prior to the company going public—and in forms

---

[21] *A disturbing, viral Twitter thread*, Vox, *supra* note 11.

[22] Jeff Kauflin & Kristin Stoller, First, *Fire All The Brokers: How Lemonade, A Millennial-Loved Fintech Unicorn, Is Disrupting The Insurance Business*, Forbes (May 2, 2019, 6:00 AM), https://www.forbes.com/sites/jeffkauflin/2019/05/02/lemonade-fintech-insurance-unicorn/?sh=2 3c5a7ee6cde (last visited July 15, 2021).

[23] *Lemonade Under Fire For Using AI To Stop Fraud*, *supra* note 14 (stating that "[t]he in-depth collection of video data and analyzing it against AI tools make it clear that Lemonade must be storing at least some biometric data in order to train models to detect patterns of fraud").

[24] Lemonade Inc., *Annual Report (Form 10-K)*, *supra* note 8 at 43.

since—Lemonade states that its proprietary AI algorithms are at the core of its business and that it could not function without them, but admits that they could also lead to profit loss should regulators ever crack down:

> ***Our proprietary artificial intelligence algorithms may not operate properly or as we expect them to***, which could cause us to write policies we should not write, price those policies inappropriately or overpay claims that are made by our customers, the company wrote in the filing. Moreover, our proprietary artificial intelligence algorithms may lead to unintentional bias and discrimination.[25]

59.    In short, Lemonade did not disclose to its customers the extent to which it was collecting and using their sensitive biometric (and other information). Indeed, the "instant, seamless, and delightful" insurance experience that Lemonade aggressively markets was built by the collection of its customers' own data, including their biometric information, which those customers never realized they were providing.

60.    As noted in a recent article entitled, *A disturbing, viral Twitter thread reveals how AI-powered insurance can go wrong*, *Lemonade tweeted about what it means to be an AI-first insurance company. It left a sour taste in many customers' mouths*:

> It's rare for a company to be so blatant about how that data can be used in its own best interests and at the customer's expense. But rest assured that Lemonade is not the only company doing it.[26]

61.    According to the analytics site, Crunchbase, there were 47,345 downloads of the App in the last thirty days (as of July 13, 2021), representing a nearly 5% increase from the prior thirty-day period.[27]

---

[25] Todd Feathers & Janus Rose, *An Insurance Startup Bragged It Uses AI to Detect Fraud. It Didn't Go Well*, VICE (May 26, 2021, 1:01 PM), https://www.vice.com/en/article/z3x47y/an-insurance-startup-bragged-it-uses-ai-to-detect-fraud-it-didnt-go-well (emphasis added).
[26] *A disturbing, viral Twitter thread*, Vox, *supra* note 11.
[27] https://www.crunchbase.com/organization/lemonade/technology (last visited July 13, 2021).

## II.     ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT

62.     In 2008, the Illinois Legislature enacted BIPA due to the "very serious need [for]

protections for the citizens of Illinois when it comes to biometric information." Illinois House

Transcript, 2008 Reg. Sess. No. 276. BIPA makes it unlawful for a company to, among other

things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a

customer's biometric identifiers biometric information, unless it first:

> (l) informs the subject . . . in writing that a biometric
> identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific
> purpose and length of term for which a biometric identifier or
> biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the
> biometric identifier or biometric information or the subject's legally
> authorized representative."

740 ILCS 14/15 (b).

63.     Section 15(a) of BIPA also provides:

> A private entity in possession of biometric identifiers or biometric
> information must develop a written policy, made available to the
> public, establishing a retention schedule and guidelines for
> permanently destroying biometric identifiers and biometric
> information when the initial purpose for collecting or obtaining such
> identifiers or information has been satisfied or within 3 years of the
> individual's last interaction with the private entity, whichever
> occurs first.

740 ILCS 14/15(a).

64.     As alleged below, Lemonade, Inc. and Lemonade Ltd.'s practices of collecting,

storing, and using individuals' biometric identifiers and associated biometric information without

obtaining informed written consent violate all three prongs of § 15(b) of BIPA. Additionally, their

failure to provide a publicly available written policy regarding a schedule and guidelines for the

retention and permanent destruction of individuals' biometrics identifiers and biometric information also violates § 15(a) of BIPA.

## III. DEFENDANTS LEMONADE, INC. AND LEMONADE LTD. VIOLATE ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT

65.     Unbeknownst to the average consumer, and in direct violation of § 15(b)(1) of BIPA, Lemonade Inc. and Lemonade Ltd. scan and collect, and then indefinitely store in an electronic database, biometric information, and identifiers of its app users when they submit a video recording for their claim through the Lemonade mobile application—without ever informing anyone of this practice in writing.

66.     In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade Inc. and Lemonade Ltd. never informed Illinois residents who submitted a video recording for their claim through the Lemonade mobile application of the specific purpose and length of term for which their biometrics would be collected, stored, and used, nor did they obtain a written release from any of these individuals.

67.     In direct violation of § 15(a) of BIPA, Lemonade Inc. and Lemonade Ltd.do not have written, publicly available policies identifying their retention schedules, or guidelines for permanently destroying any of these biometric identifiers or biometric information.

### A.     Plaintiff Alexander Clarke's Experience

68.     Plaintiff Clarke, an Illinois resident, has been a Lemonade Insurance customer since at least 2018. In connection with submitting an insurance claim following water damage to his apartment, Plaintiff, as required by Lemonade Insurance, accessed and used Lemonade's App.

69.     Plaintiff Clarke answered numerous questions posed to him by a Lemonade Insurance "chat-bot." Lemonade Insurance had all the requisite information it needed to process Plaintiff Clarke's claim, as well as his contact information in order to follow-up with him if it required additional information.

19

70.     Nonetheless, Lemonade Insurance required Plaintiff Clarke to upload a "short video describing the incident."

71.     Plaintiff Clarke uploaded a video of himself describing the damage on July 10, 2018. Plaintiff Clarke did not know that Lemonade would collect, obtain, store, and/or use his biometric identifiers or biometric information. Plaintiff Clarke did not give informed written consent to collect, obtain, store, and/or use his biometric identifiers or biometric information, nor was Plaintiff Clarke presented with or made aware of any publicly available retention schedule regarding his biometric identifiers or biometric information.

72.     Likewise, Plaintiff Clarke was never provided with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage, or use of his unique biometric identifiers and/or biometric information.

73.     By collecting, obtaining, storing, and using Plaintiff Clarke's unique biometric identifiers and/or biometric information without his consent, written or otherwise, Lemonade invaded Plaintiff's statutorily protected right to privacy in his biometrics.

74.     In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade Inc. and Lemonade, Ltd. never informed Plaintiff Clarke or other Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored, and used, nor did Lemonade Inc. and Lemonade, Ltd. obtain a written release from these individuals.

75.     In direct violation of § 15(a) of BIPA, Lemonade Inc. and Lemonade, Ltd. did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

### B. Plaintiff Milton Citchens' Experience

76.    Plaintiff Citchens, an Illinois resident, has been a Lemonade Insurance customer since at least 2018. In connection with submitting an insurance claim following a weather incident which caused damage to his apartment, Plaintiff, as required by Lemonade Insurance, accessed and used Lemonade's App.

77.    Plaintiff Citchens answered numerous questions posed to him by a Lemonade Insurance "chat-bot." Lemonade Insurance had all the requisite information it needed to process Plaintiff's claim, as well as his contact information in order to follow-up with him if it required additional information.

78.    Nonetheless, Lemonade Insurance required Plaintiff Citchens to upload a "short video describing the incident."

79.    Plaintiff Citchens uploaded a video of himself describing the incident on August 11, 2020. Plaintiff did not know that Lemonade would collect, obtain, store, and/or use his biometric identifiers or biometric information. Plaintiff Citchens did not give informed written consent to collect, obtain, store, and/or use his biometric identifiers or biometric information, nor was Plaintiff Citchens presented with or made aware of any publicly available retention schedule regarding his biometric identifiers or biometric information.

80.    Likewise, Plaintiff Citchens was never provided with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage, or use of his unique biometric identifiers and/or biometric information.

81.    By collecting, obtaining, storing, and using Plaintiff Citchens' unique biometric identifiers and/or biometric information without his consent, written or otherwise, Lemonade invaded Plaintiff Citchens' statutorily protected right to privacy in his biometrics.

21

82.     In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade Inc. and Lemonade, Ltd. never informed Plaintiff Citchens or other Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored, and used, nor did Lemonade Inc. and Lemonade, Ltd. obtain a written release from these individuals.

83.     In direct violation of § 15(a) of BIPA, Lemonade Inc. and Lemonade, Ltd. did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

### C.     Plaintiff Ebony Jones' Experience

84.     Plaintiff Jones, an Illinois resident, has been a Lemonade Insurance customer since at least 2020. In connection with submitting an insurance claim following a weather incident which caused damage to her apartment, Plaintiff, as required by Lemonade Insurance, accessed and used Lemonade's App.

85.     Plaintiff Jones answered numerous questions posed to her by a Lemonade Insurance "chat-bot." Lemonade Insurance had all the requisite information it needed to process Plaintiff Jones' claim, as well as her contact information in order to follow-up with her if it required additional information.

86.     Nonetheless, Lemonade Insurance required Plaintiff Jones to upload a "short video describing the incident."

87.     Plaintiff Jones uploaded a video of herself describing the incident on July 10, 2020.

88.     Plaintiff Jones did not know that Lemonade would collect, obtain, store, and/or use her biometric identifiers or biometric information.

89.     Plaintiff Jones did not give informed written consent to collect, obtain, store, and/or

22

use her biometric identifiers or biometric information, nor was Plaintiff Jones presented with or made aware of any publicly available retention schedule regarding her biometric identifiers or biometric information.

90.     Likewise, Plaintiff Jones was never provided with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage, or use of her unique biometric identifiers and/or biometric information.

91.     By collecting, obtaining, storing, and using Plaintiff Jones's unique biometric identifiers and/or biometric information without her consent, written or otherwise, Lemonade invaded Plaintiff Jones's statutorily protected right to privacy in her biometrics.

92.     In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade Inc. and Lemonade, Ltd. never informed Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored, and used, nor did Lemonade Inc. and Lemonade, Ltd. obtain a written release from these individuals.

93.     In direct violation of § 15(a) of BIPA, Lemonade Inc. and Lemonade, Ltd. did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

**D.     Plaintiff Kyle Swerdlow's Experience**

94.     In or around June 2020, Plaintiff Kyle Swerdlow recorded a video as part of the insurance claims process via Lemonade's mobile application.

95.     When Plaintiff Swerdlow recorded and submitted this video on Lemonade's mobile application, Lemonade captured, collected, stored, and transferred biometric scans of Plaintiff Swerdlow's face and other biometric information and identifiers.

96.     Plaintiff Swerdlow never consented, in writing or in any other form, to the collection or storage of his unique biometric identifiers or biometric information.

97.     Further, Plaintiff Swerdlow was never provided with a written release to collect or store his unique biometric identifiers or biometric information. Plaintiff Swerdlow never signed such a release, nor did he have the opportunity to consider doing so.

98.     Likewise, Plaintiff Swerdlow was never provided with the requisite statutory disclosures or any opportunity to prohibit or prevent the collection, storage, or use of his unique biometric identifiers or biometric information.

99.     In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade Inc. and Lemonade, Ltd. never informed Plaintiff Swerdlow or other Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored, and used, nor did Lemonade Inc. and Lemonade, Ltd. obtain a written release from these individuals.

100.     In direct violation of § 15(a) of BIPA, Lemonade Inc. and Lemonade, Ltd. did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

**E.     Plaintiff Marla Walker's Experience**

101.     Plaintiff Walker, an Illinois resident, has been a Lemonade customer since at least 2018.

102.     In connection with submitting an insurance claim in or around September 2018, Plaintiff Walker, as required, accessed and used Lemonade's App.

103.     In so doing, Plaintiff Walker answered numerous questions posed to her by a Lemonade Insurance "chat-bot." Lemonade Insurance had all the requisite information it needed to process Plaintiff Walker's claim, as well as her contact information in order to

follow-up with her if it required additional information.

104.    Nonetheless, Lemonade Insurance required Plaintiff Walker to upload a "short video describing the incident."

105.    Plaintiff Walker uploaded a video of herself describing the incident on or about September 15, 2018.

106.    Plaintiff Walker did not know that Lemonade would collect, obtain, store and/or use her biometric identifiers or biometric information.

107.    Plaintiff Walker did not give informed written consent to collect, obtain, store and/or use her biometric identifiers or biometric information, nor was Plaintiff Walker presented with or made aware of any publicly available retention schedule regarding her biometric identifies or biometric information.

108.    Likewise, Plaintiff Walker was never provided with the requisite statutory disclosures nor an opportunity to prohibit or prevent the collection, storage, or use of her unique biometric identifiers and/or biometric information.

109.    By collecting, obtaining, storing, and using Plaintiff Walker's unique biometric identifiers and/or biometric information without her consent, written or otherwise, Lemonade invaded Plaintiff Walker's statutorily protected right to privacy in her biometrics.

110.    In direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, Lemonade, Inc. and Lemonade, Ltd. never informed Illinois residents who had their biometrics collected of the specific purpose and length of time for which their biometric identifiers or information would be collected, stored, and used, nor did it obtain a written release from these individuals.

111.    In direct violation of § 15(a) of BIPA, Lemonade, Inc. and Lemonade, Ltd. did not have written, publicly available policies identifying their retention schedules or guidelines for permanently destroying any of these biometric identifiers and/or biometric information.

IV. **DEFENDANTS' CONDUCT VIOLATES THE CALIFORNIA CONSTITUTION AND RIGHT TO PRIVACY**

112.    The California Constitution Article I, Section 1 states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

113.    California law protects certain invasions of privacy, including the public disclosure of private facts. This duty has been recognized by California courts, through incorporation of the *Restatement of the Law of Torts (Second)* § 652A which specifically recognized four common law invasion of privacy claims, which include: (1) publicity placing a person in a false light; (2) publicity given to private facts; (3) misappropriation of the name or likeness of another; and (4) intrusion upon the seclusion of another. *See Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 214, 955 P.2d 469, 477 (1998).

114.    Lemonade stored Plaintiffs' and the Class members' biometrics in the form of a digitally encrypted code, derived from Plaintiffs' and the Class members' facial geometry, that uniquely identifies the individual to whom the facial geometry, which violates the California Constitution and Section § 652A of the *Restatement of the Law of Torts (Second)*.

115.    Lemonade systematically collected, used, and stored Plaintiffs' and the Class members' biometric identifiers and/or biometric information without obtaining their consent, and thereby uniformly invaded Plaintiffs' and each Class member's right to privacy in their biometrics. Lemonade's collection, use, and storage of Plaintiffs' and the Class's biometric information constitutes an invasion of privacy and the tort of intrusion upon seclusion in violation of the California Constitution Article I, Section 1 which states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty,

26

acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

### A. Plaintiff Andrew Garcia's Experience

116.    Plaintiff Garcia, a California resident, was a Lemonade Insurance customer from October 2018 until mid-2019. In connection with submitting multiple insurance claims following the theft of household items, Plaintiff, as required by Lemonade Insurance, accessed and used Lemonade's App.

117.    Plaintiff Garcia answered numerous questions posed to him by a Lemonade Insurance "chat-bot." Lemonade Insurance had all the requisite information it needed to process Plaintiff Garcia's claims, as well as his contact information in order to follow-up with him if it required additional information.

118.    Nonetheless, Lemonade Insurance required Plaintiff Garcia to upload a "short video describing the incident."

119.    Plaintiff Garcia uploaded videos of himself describing the thefts on or around November 2, 2018 and June 17, 2019. Plaintiff Garcia did not know that Lemonade would collect, obtain, store, and/or use his biometric identifiers or biometric information. Plaintiff Garcia did not give informed written consent to collect, obtain, store, and/or use his biometric identifiers or biometric information, nor was Plaintiff Garcia presented with or made aware of any publicly available retention schedule regarding his biometric identifiers or biometric information.

120.    Likewise, Plaintiff Garcia was never provided with the sufficient disclosures nor an opportunity to prohibit or prevent the collection, storage, or use of his unique biometric identifiers and/or biometric information.

121.    By collecting, obtaining, storing, and using Plaintiff Garcia's unique biometric identifiers and/or biometric information without his consent, written or otherwise, Lemonade invaded Plaintiff's protected right to privacy in his biometrics under the California Constitution.

122.    By collecting, obtaining, storing, and using Plaintiff Garcia's unique biometric identifiers and/or biometric information without his consent, written or otherwise, Lemonade engaged in unlawful and unfair practices in violation of the UCL.

**B.      Plaintiff Ryan Webb's Experience**

123.    Plaintiff Webb, a California resident, was a Lemonade Insurance customer from January 2020 until May 2021. In connection with submitting an insurance claim following the theft of a household item, Plaintiff, as required by Lemonade Insurance, accessed and used Lemonade's App.

124.    Plaintiff Webb answered numerous questions posed to him by a Lemonade Insurance "chat-bot." Lemonade Insurance had all the requisite information it needed to process Plaintiff Webb's claims, as well as his contact information in order to follow-up with him if it required additional information.

125.    Nonetheless, Lemonade Insurance required Plaintiff Webb to upload a "short video describing the incident."

126.    Plaintiff Webb uploaded a video of himself describing the theft on or around October 16, 2020. Plaintiff Webb did not know that Lemonade would collect, obtain, store, and/or use his biometric identifiers or biometric information. Plaintiff Webb did not give informed written consent to collect, obtain, store, and/or use his biometric identifiers or biometric information, nor was Plaintiff Webb presented with or made aware of any publicly available retention schedule regarding his biometric identifiers or biometric information.

127.     Likewise, Plaintiff Webb was never provided with the sufficient disclosures nor an opportunity to prohibit or prevent the collection, storage, or use of his unique biometric identifiers and/or biometric information.

128.     By collecting, obtaining, storing, and using Plaintiff Webb's unique biometric identifiers and/or biometric information without his consent, written or otherwise, Lemonade invaded Plaintiff's protected right to privacy in his biometrics under the California Constitution.

129.     By collecting, obtaining, storing, and using Plaintiff Webb's unique biometric identifiers and/or biometric information without his consent, written or otherwise, Lemonade engaged in unlawful and unfair practices in violation of the UCL.

## CLASS ALLEGATIONS

130.     **Class Definition**: Plaintiffs brings this action pursuant to Fed. R. Civ. P. 23 ("Rule 23"). Specifically, Plaintiffs seek class certification of all claims for relief herein on behalf of a class and subclasses defined as follows:

> **Nationwide Class:** All persons who reside in the United States and its territories who made insurance claims using the Lemonade app.

> **Multi-State Consumer Protection Subclass:** All persons who reside in California, Illinois, or any state with materially similar consumer protection laws[28] who made insurance claims using the Lemonade app.

---

[28] While discovery may alter the following, Plaintiffs assert that the other states with similar consumer fraud laws under the facts of this case include but are not limited to: Arkansas (Ark. Code §§ 4-88-101, *et seq.*); California (Cal. Bus. & Prof. Code §§ 17200 and 17500, *et seq.*); Colorado (Colo. Rev. Stat. §§ 6-1-101*, et seq.*); Connecticut (Conn. Gen. Stat. §§ 42-110, *et seq.*); Delaware (Del. Code tit. 6, §§ 2511, *et seq.*); District of Columbia (D.C. Code §§ 28-3901, *et seq.*); Florida (Fla. Stat. §§ 501.201, *et seq.*); Hawaii (Haw. Rev. Stat. §§ 480-1, *et seq.*); Idaho (Idaho Code §§ 48-601, *et seq.*); Illinois (815 ILCS 505/1, *et seq.*); Maine (Me. Rev. Stat. tit. 5 §§ 205-A, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*); Montana (Mo. Code. §§ 30-14-101, *et seq.*); Nebraska (Neb. Rev. Stat. §§ 59 1601, *et seq.*); Nevada (Nev. Rev. Stat. §§ 598.0915, *et seq.*); New Hampshire (N.H. Rev. Stat. §§ 358-A:1, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*); New Mexico (N.M. Stat. §§ 57-12-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349, *et seq.*); North Dakota (N.D. Cent. Code §§ 51-15- 01, *et seq.*); Oklahoma (Okla. Stat. tit. 15, §§ 751, *et seq.*); Oregon (Or. Rev. Stat. §§ 646.605, *et seq.*); Rhode Island (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*); South Dakota (S.D. Codified Laws §§ 37- 24-1, *et seq.*); Texas (Tex. Bus. & Com. Code §§ 17.41, *et seq.*); Virginia (Va. Code Ann. §§ 59.1-196, *et seq.*); Vermont (Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*); Washington (Wash. Rev.

**Illinois Subclass**: All persons who reside in Illinois who made insurance claims using the Lemonade app.

**California Subclass**: All persons who reside in California who made insurance claims using the Lemonade app.

The following are excluded from the Nationwide Class and Subclasses: (1) any Judge presiding over this action and members of his or her family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parent has a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Nationwide Class and Subclasses; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; and (5) the legal representatives, successors, and assigns of any such excluded persons.

131.    **Numerosity**: Members of the Nationwide Class and Subclasses are so numerous that their individual joinder is impracticable. Upon information and belief, members of the Nationwide Class and Subclasses number in the thousands. The precise number of Nationwide Class and Subclass members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Further, the size and relatively modest value of the claims of the individual members of the Nationwide Class and Subclasses renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Nationwide Class and Subclasses are ascertainable and identifiable from Defendants' records.

---

Code §§ 19.86.010, *et seq.*); West Virginia (W. Va. Code §§ 46A-6-101, *et seq.*); and Wisconsin (Wis. Stat. §§ 100.18, *et seq.*). *See Mullins v. Direct Digit., LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

132. **Commonality and Predominance**: Common and well-defined questions of fact and law exist as to all members of the Nationwide Class and Subclasses and predominate over any questions affecting only individual Nationwide Class and Subclass members. These common legal and factual questions include, but are not limited to, the following:

a) whether Defendants collected or otherwise obtained Plaintiffs' and the Class's biometric identifiers or biometric information;

b) whether Defendants properly informed Plaintiffs and the Class that it collected, used, and stored their biometric identifiers or biometric information;

c) whether Lemonade, Inc. and Lemonade, Ltd. obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiffs' and the Class's biometric identifiers or biometric information;

d) whether Lemonade, Inc. and Lemonade, Ltd. developed and made available to the public a written policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of their last interaction, whichever occurs first;

e) whether Defendants used Plaintiffs' and the Class's biometric identifiers or biometric information to identify them;

f) Whether Defendants violated the Illinois Consumer Fraud and Deceptive Businesses Practices Act, 805 ILCS 505/1, *et seq.*;

g) whether Lemonade, Inc. and Lemonade, Ltd.'s violations of BIPA were committed intentionally, recklessly, or negligently;

h) whether Defendants' conduct alleged herein constituted negligence and/or negligence per se;

i) whether Defendant was unjustly enriched by the conduct alleged herein;

j) whether Defendants' conduct alleged herein amounts to an intrusion upon seclusion of Plaintiff's and Class Members' privacy;

k) Whether Defendants' activities and practices referenced above constitute a violation of the Right to Privacy under the California Constitution;

l) Whether Defendants' activities and practices referenced above constitute a violation of the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*;

m) Whether Defendants' activities and practices referenced above constitute a violation of the California False Advertising Law, Bus. & Prof. Code §§ 17500, *et seq.*;

n) Whether Plaintiffs and members of the Class and Subclass sustained damages as a result of Defendants' activities and practices referenced above, and, if so, in what amount; and

o) Whether Defendants profited from their activities and practices referenced above, and, if so, in what amount.

133. **Adequate Representation**: Plaintiffs have retained competent counsel experienced in prosecuting complex consumer class action. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs and their counsel can fairly and adequately represent and protect the interests of such a Nationwide Class and Subclasses are because their interests do not conflict with the interests of the Nationwide Class and Subclass members Plaintiffs seek to represent. Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the Nationwide Class and Subclasses, and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Consolidated Class Action Complaint to include additional Class representatives to represent the Nationwide Class and Subclasses or additional claims as may be appropriate.

134. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Nationwide Class and Subclass members is impracticable. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Moreover, even if every member of the Nationwide Class and Subclasses could afford to pursue individual litigation, the Court system could not. Individual litigation of numerous cases would be unduly burdensome to the courts. Individualized litigation would also present the potential for inconsistent or contradictory judgments, and it would magnify the delay and expense to all parties and to the court

32

system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the Nationwide Class and Subclasses. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Plaintiffs anticipate no difficulty in the management of this action as a class action. Class-wide relief is essential to compel compliance with BIPA.

## COUNT I

### Violation of 740 ILCS 14/1, *et seq.*
### (Against Lemonade, Inc. and Lemonade Ltd.)
### (On Behalf of Plaintiffs and the Illinois Subclass)

135.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

136.     Plaintiffs Alexander Clarke, Milton Citchens, Ebony Jones, Kyle Swerdlow, and Marla Walker, bring this claim individually and on behalf of the Members of the proposed Illinois Subclass against Defendants.

137.     BIPA makes it unlawful for any private entity to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information . . . ." 740 ILCS 14/15(b).

138.    Defendant Lemonade, Inc. is a Delaware corporation, and Lemonade Ltd. is an entity organized under the laws of Israel; both thus qualify as a "private entity" under BIPA. *See* 740 ILCS 14/10.

139.    Plaintiffs and the Illinois Subclass members are individuals who had their biometrics collected and stored by Lemonade, Inc. and Lemonade Ltd. *See* 740 ILCS 14/10.

140.    Lemonade, Inc. and Lemonade Ltd. stored Plaintiffs' and the Illinois Subclass members' biometrics in the form of a digitally encrypted code, derived from Plaintiffs' and the Illinois Subclass members' facial geometry, that uniquely identifies the individual to whom the facial geometry belongs.

141.    Lemonade, Inc. and Lemonade Ltd. systematically collected, used, and stored Plaintiffs' and the Illinois Subclass members' biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3), and thereby uniformly invaded Plaintiffs' and each Illinois Subclass member's statutorily protected right to privacy in their biometrics.

142.    Lemonade, Inc. and Lemonade Ltd. failed to properly inform Plaintiffs or the Illinois Subclass in writing that their biometric identifiers and/or biometric information were being collected, stored, or otherwise obtained, and of the specific purpose and length of term for which those biometrics were being collected, stored, and used, as required by 740 ILCS 14/15(b)(1)–(2).

143.    In addition, Lemonade, Inc. and Lemonade Ltd. does not provide a written, publicly available retention schedule and guidelines for permanently destroying the biometric identifiers and/or biometric information of Plaintiffs or the Illinois Subclass members, as required by BIPA. *See* 740 ILCS 14/15(a). The failure by Lemonade, Inc. and Lemonade Ltd.to provide such a schedule and guidelines constitutes an independent violation of the statute.

144. Each instance in which Lemonade, Inc. and Lemonade Ltd. collected, stored, used, or otherwise obtained Plaintiffs' and/or the Illinois Subclass's biometric identifiers and/or biometric information as described herein constitutes a separate violation of the statutory right of Plaintiffs and each Class member to keep private these biometric identifiers and biometric information, as set forth in BIPA, 740 ILCS 14/1, *et seq.*

145. On behalf of themselves and the proposed Illinois Subclass members, Plaintiffs seek: (1) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Illinois Class by requiring Defendants Lemonade, Inc. and Lemonade Ltd. to comply with BIPA's requirements, including BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein, and for the provision of the requisite written disclosure to consumers; (2) statutory damages of $5,000.00 for each and every intentional and reckless violation of BIPA pursuant to 740 ILCS 14/20(2), or, alternatively, statutory damages of $1,000.00 for each and every violation pursuant to 740 ILCS 14/20(1) if the violations are found to have been committed negligently; and (3) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

### COUNT II

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 805 ILCS § 505/1, *et seq.*
(Against All Defendants)
(On Behalf of Plaintiffs and the Illinois Subclass)**

146. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

147. Plaintiffs Alexander Clarke, Milton Citchens, Ebony Jones, Kyle Swerdlow, and Marla Walker, bring this claim individually and on behalf of the Members of the proposed Illinois Subclass against Defendants.

148.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq.,* provides protection to consumers by mandating fair competition in commercial markets for goods and services.

149.     The ICFA provides that "deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

150.     The ICFA applies to Defendants' acts as alleged in this Complaint because it applies to transactions involving the provision of services to consumers.

151.     Defendants are "person[s]" as defined by section 505/1(c) of the ICFA.

152.     Plaintiffs and the Illinois Subclass members are "consumers" are defined by 505/1(e) of the ICFA.

153.     Defendants' collection, storage, and use of biometric information without Plaintiffs' and the Class's knowledge and consent constitutes unfair and deceptive acts and practices in violation of the ICFA.

154.     Defendants' unfair and deceptive acts and practices occurred in the course of conduct involving trade or commerce and were directed to the market in general. The complained-of conduct in this case implicates consumer protection concerns.

155.     Defendants' unfair and deceptive acts and practices proximately caused injury and ascertainable loss to the Plaintiffs and the Illinois Subclass.

156. Plaintiffs and the Illinois Subclass are entitled to actual damages, punitive damages, and reasonable attorneys' fees and costs, as well as any other relief the Court deems proper.

## COUNT III

**Violation of the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.***
**(Against All Defendants)**
**(On Behalf of Plaintiff and the California Subclass)**

157. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

158. Plaintiffs Andrew Garcia and Ryan Webb, bring this claim individually and on behalf of the Members of the proposed California Subclass against Defendants.

159. The Unfair Competition Law, California Bus. & Prof. Code §§ 17200, *et seq*. (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which can include false or misleading advertising.

160. Defendants violated, and continue to violate, the "unlawful" prong of the UCL through violation of statutes, constitutional provisions, and common law, as alleged herein.

161. Defendants violated, and continue to violate, the "unfair" prong of the UCL because they collected private biometric identifiers and information, from the Plaintiffs' and the California Subclass' under circumstances in which the Plaintiffs and the Class would have no reason to know that such data and content was being collected. Such collection of biometric identifiers and information infringes on Plaintiffs and the California Subclass's constitutional right to privacy under the California Constitution, which states that: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

162.    Plaintiffs Garcia and Webb and the California Subclass had no reason to know because there was no disclosure of Defendants' collection and transfer of the Plaintiffs' and the California Subclass' biometric identifiers and information.

163.    Plaintiffs Garcia and Webb and the California Subclass have been harmed and have suffered economic injury as a result of Defendants' UCL violations. First, Plaintiffs and the California Subclass have suffered harm in the form of diminution of the value of their private biometric identifiers and information. Second, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private biometric identifiers and information.

164.    Defendants, as a result of their conduct, have been able to reap unjust profits and revenues in violation of the UCL. This includes Defendants' profits and revenues from improvements to their artificial intelligence technologies, their patent applications, and the increased consumer demand for and use of Defendants' other products. Plaintiffs Garcia and Webb and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

165.    Unless restrained and enjoined, Defendants will continue to misrepresent their biometric identifier and information collection and use practices, and will not recall and destroy Plaintiffs' and the California Subclass's wrongfully collected private biometric identifiers and information. Accordingly, injunctive relief is appropriate.

## COUNT IV

**NEGLIGENCE**
**(Against all Defendants)**
**(On Behalf of Plaintiffs and the California Subclass)**

166.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

167.    Plaintiffs Andrew Garcia and Ryan Webb, bring this claim individually and on behalf of the Members of the proposed California Subclass against Defendants.

168.    Lemonade owed a duty under common law to Plaintiffs Garcia and Webb and the California Subclass to exercise reasonable care in collecting, storing, and using Plaintiffs' and the California Subclass's biometric information.

169.    Lemonade's duty to use reasonable care arose from several sources, including but not limited to those described below as well as in its privacy policy.

170.    Lemonade had a common law duty to prevent foreseeable harm to others. This duty existed because of the nature and sensitivity of the biometric information that was collected, stored, and used. By collecting, storing, and using Plaintiffs' and the California Subclass's valuable biometric information Lemonade breached the duties owed to Plaintiffs and the California Subclass and thus was negligent.

171.    Lemonade breached these duties by collecting, storing, and using biometric information without Plaintiffs' and the California Subclass's knowledge and consent.

172.    But for Lemonade's wrongful and negligent breach of its duties owed to Plaintiffs and the California Subclass, their biometric information would not have been collected, used, and stored.

173.    Defendants' negligence caused foreseeable harm, e.g., the invasion of privacy by third parties; the risk to individuals' personal and private identities, including exposure to fraud, identity theft, and surveillance; and the diminution in value to their persona and private data.

174.    The injuries to the Plaintiffs and the California Subclass were reasonably foreseeable and were proximately caused by Defendants' negligence, including their gross negligence and extreme departure from ordinary standards of care.

175.    As a direct and proximate result of Lemonade's negligence, Plaintiffs Garcia and Webb and the California Subclass are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT V

## NEGLIGENCE PER SE
**(Against All Defendants)**
**(On Behalf of Plaintiff and the California Subclass)**

176.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

177.    Plaintiffs Andrew Garcia and Ryan Webb, bring this claim individually and on behalf of the Members of the proposed California Subclass against Defendants.

178.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Lemonade for failing to use reasonable measures to protect personally identifiable information, including biometric information. Various FTC publications and orders also form the basis of Lemonade's duty.

179.    Moreover, the California Constitution Article I, Section 1 states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

180.    California law protects certain invasions of privacy, including the public disclosure of private facts. This duty has been recognized by California courts, through incorporation of the *Restatement of the Law of Torts (Second)* § 652A which specifically recognized four common law invasion of privacy claims, which include: (1) publicity placing a person in a false light; (2) publicity given to private facts; (3) misappropriation of the name or likeness of another; and (4) intrusion upon the seclusion of another. *See Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 214, 955 P.2d 469, 477 (1998).

181.    Lemonade stored Plaintiffs and the California Subclass members' biometrics in the form of a digitally encrypted code, derived from Plaintiffs' and the California Subclass members'

facial geometry, that uniquely identifies the individual to whom the facial geometry belongs in a fashion that plainly violates the California Constitution and the *Restatement of the Law of Torts (Second)*.

182.    Moreover, Lemonade systematically collected, used, and stored Plaintiffs' and the California Subclass members' biometric identifiers and/or biometric information, and thereby uniformly invaded Plaintiffs' and each California Subclass member's statutorily protected right to privacy in their biometrics. Lemonade's collection, use, and storage of Plaintiffs' and the California Subclass's biometric information also violated the California Constitution Article I, Section 1 which states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

183.    Lemonade's violations identified above constitute negligence *per se*.

184.    Plaintiffs Garcia and Webb and the California Subclass are consumers within the class of persons these laws were intended to protect. Moreover, the harm that has occurred is the type of harm that these laws were intended to guard against.

185.    As a direct and proximate result of Lemonade's negligence, Plaintiffs Garcia and Webb and the California Subclass Members have been injured as described herein and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT VI

### INTRUSION UPON SECLUSION
**(Against All Defendants)**
**(On Behalf of Plaintiffs Garcia and Webb and the California Subclass)**

186.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

187.    Plaintiffs Andrew Garcia and Ryan Webb, bring this claim individually and on behalf of the Members of the proposed California Subclass against Defendants.

188.    Plaintiffs Garcia and Webb and the California Subclass have a reasonable expectation of privacy in the information they provide to Lemonade, including their non-public photos and videos, and their personal and private data.

189.    Defendants intentionally intruded on Plaintiffs' and the California Subclass's solitude, seclusion, or private affairs by intentionally and surreptitiously collecting, storing, and/or using Plaintiffs' and California Subclass members' personal and private data, including their biometric data, and then disclosing that data without their consent.

190.    "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Restatement of the Law of Torts (Second)* § 652B.

191.    Defendants' intrusion was highly offensive, in that it was surreptitious, undisclosed, and included access to highly personal and private data. Defendants accessed collected, stored, and used data that a reasonable user would not expect Defendants to access, use, or store.

192.    Plaintiffs and the California Subclass were harmed by, and continue to suffer harm, as a result of Defendants' intrusion into their solitude, seclusion, and private affairs.

193.    Defendants' conduct was a substantial factor in causing the harm suffered by the Plaintiffs and the California Subclass

194.    Plaintiffs and the California Subclass seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the Plaintiffs and the California Subclass,

and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

195.    Plaintiffs and the California Subclass seek injunctive relief to rectify Defendants' actions, including but not limited to, requiring Defendants (1) to cease all access to and/or collection of biometric data, and any other data that is not necessary for the provision of Defendants' services, that is not fully disclosed by Defendants, nor fully consented to by users; (2) to cease the disclosure of any biometric data to third parties; (3) to destroy all biometric data improperly collected, stored, or used in connection with that destruction, notify all users of any and all data improperly accessed, collected, or disclosed the third parties who received that data from Defendants and confirm the destruction of that data.

196.    Plaintiffs Garcia and Webb and the California Subclass also seek disgorgement of all revenues Defendants obtained through their interference with Plaintiffs' and the Class's privacy rights.

**COUNT VII**

**UNJUST ENRICHMENT**
**(Against All Defendants)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

197.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

198.    Plaintiffs bring this claim individually and on behalf of the Members of the proposed Nationwide Class against Defendants.

199.    Defendants have profited from Plaintiffs' and Nationwide Class members' biometric data.

200.    Defendants have accessed, collected, stored, used, and/or disseminated Plaintiffs' and the Nationwide Class's private and personal information and data. That data has value, and

Defendants have profited through, *inter alia*, its marketing, advertising and use of Plaintiffs' and the Nationwide Class's biometric data to perform its business.

201.    Plaintiffs and the Nationwide Class were not informed about, nor did they consent to, Defendants taking of their private data for profit, and Defendants should be disgorged of the profits they derived from the improper collection and use of Plaintiffs' and the Nationwide Class's information and data.

## COUNT VIII

**Violation of the State Consumer Protection Statutes**
**(Against All Defendants)**
**(On Behalf of Plaintiffs and the Multi-State Consumer Protection Subclass)**

202.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

203.    Plaintiffs bring this action individually and on behalf of the Multi-State Consumer Protection Subclass.

204.    Plaintiffs and Subclass members have been injured as a result of Defendants' violations of the state consumer protection statutes listed above in footnote 28, which also provide a basis for redress to Plaintiffs and Subclass members based on Defendants' deceptive, unfair and unconscionable acts, practices and conduct

205.    Defendants' conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Subclass.

206.    Defendants committed unfair and deceptive acts by collecting, storing, and/or disclosing Plaintiffs' and the Subclass's private biometric identifiers and information.

207.    Defendants violated the Multi-State Consumer Protection Subclass states' unfair and deceptive acts and practices laws by engaging in these unfair or deceptive acts or practices.

208.     Plaintiffs and the Subclass were injured and have suffered damages as a direct and proximate result of Defendants' unfair acts and practices.

209.     Plaintiffs and the other Multi-State Consumer Protection Subclass Members' injuries were proximately caused by Defendant's unfair and deceptive business practices.

210.     As a result of Defendants' violations, Defendants have been unjustly enriched.

211.     Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiffs and Subclass members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Nationwide Class and Subclasses, respectfully request that this Court enter an Order:

A.     Certifying this case as a class action on behalf of the Nationwide Class and Subclasses defined above, appointing Plaintiffs as representatives of the Nationwide Class and Subclasses; and appointing their counsel as Class Counsel;

B.     Declaring that the actions of Lemonade, Inc, and Lemonade Ltd., as set out above, violate BIPA, 740 ILCS l4/1, *et seq.*;

C.     Declaring that the actions of Defendants, as set out above, constitute: i) violations of the California Constitution of Right to Privacy; and ii) violations of State Consumer Protection Statutes;

D.     Awarding injunctive and other equitable relief as is necessary to protect the interests of the Nationwide Class and Subclasses, including, *inter alia*, an order requiring

45

Lemonade ensures that its collection, storage, and usage of biometric identifiers or biometric information complies with BIPA;

E.      Awarding Plaintiffs, the Nationwide Class, and the Subclasses treble damages, damages, and punitive damages to the extent permitted by law;

F.      Awarding Plaintiffs, the Nationwide Class, and the Subclasses reasonable litigation expenses and attorneys' fees;

G.      Awarding Plaintiffs, the Nationwide Class, and the Subclasses pre- and post-judgment interest, to the extent allowable; and

H.      Entry of judgment in favor of each class and subclass member for damages suffered as a result of the conduct alleged herein, including compensatory, statutory, and punitive damages, restitution, and disgorgement, to include interest and prejudgment interest; and

I.      Awarding such other and further relief as equity and justice may require.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 7, 2021                          Respectfully submitted,

_/s/ Gary M. Klinger_
Gary M. Klinger
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
gklinger@masonllp.com

Katrina Carroll
**CARLSON LYNCH, LLP**
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Telephone: (312) 750-1265
kcarroll@carlsonlynch.com

Joseph P. Guglielmo*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, New York 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com

*Interim Co-Lead Counsel*

Frederick J. Klorczyk III*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, New York 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
fklorczyk@bursor.com

Jonathan M. Jagher*
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
Telephone: (610) 234-6487
Facsimile: (224) 632-4521
jjagher@fklmlaw.com

*Executive Committee Counsel*

*\*Generally Admitted*